Roger Sullivan
Jinnifer Jeresek Mariman
Ethan Welder
McGARVEY LAW
345 First Avenue East
Kalispell, MT  59901
(406) 752-5566
rsullivan@mcgarveylaw.com
jmariman@mcgarveylaw.com
ewelder@mcgarveylaw.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation; ROBINSON INSULATION COMPANY, a Montana Corporation for profit; GROGAN ROBINSON LUMBER COMPANY, a Montana Corporation for profit; and DOES A-Z,<br><br>Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

**PARTIES, JURISDICTION, AND VENUE**

1.Plaintiff Jackson Wells, as Personal Representative for the Estate of Thomas E. Wells, deceased, is a resident of Sedro-Woolley, Washington. At the time of his death, Thomas E. Wells was a resident of LaConner, Washington.  Plaintiff Judith Hemphill, as Personal Representative for the Estate of Joyce H. Walder, deceased, is a

resident of Libby, Montana. At the time of her death, Joyce H. Walder was a resident of Westminster, California.

2. Defendant BNSF Railway Company (BNSF) is a corporation organized and existing under the laws of the State of Delaware and is engaged in interstate commerce with its headquarters in Fort Worth, Texas. During the times and activities relevant to this action, BNSF was engaged in business activities in Montana. BNSF engaged in conduct that resulted in the accrual of this tort action in this District and Division.

3. Defendant Robinson Insulation Company (Robinson Insulation) is or was a Montana business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana where Robinson Insulation operated a vermiculite expansion plant. Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in this District and Division.

4. Defendant Grogan Robinson Lumber Company (Grogan Robinson) is or was a Montana business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana. Grogan Robinson, individually and through its predecessors in interest and/or their subsidiaries and associates, sold, marketed, and distributed construction products, including asbestos-contaminated vermiculite insulation manufactured by the related entity Robinson Insulation, directly to end users, to other lumber companies, and to various other retail entities, including the retail facility operated by the Wood Products Defendants in Libby, Montana. Grogan Robinson engaged in conduct that resulted in the accrual of this tort action in this District and Division.

5. Defendants Robinson Insulation and Grogan Robinson were related entities that operated on adjacent properties, shared common stockholders, owners, and managers, and were so insured. Together they handled the manufacture, sale, shipment, and delivery of the expanded vermiculite products.

6. Does A - Z are corporations or persons, whose identities are unknown at this time, and whose negligence and wrongful acts caused asbestos related mesothelioma in the listed Plaintiffs. Plaintiffs will seek to amend their complaint when the true names

and capacities of Does A - Z are ascertained.

7. BNSF, Robinson Insulation, and Grogan Robinson engaged in conduct that resulted in the accrual of this tort action in this District and Division.

8. This Court has personal jurisdiction over Defendants whose business activities in this District are the subject of this case. Defendants have purposely availed themselves of jurisdiction and consented to jurisdiction by conducting business in this District and Division.

9. This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship). The amount in controversy for each Plaintiff exceeds $75,000.

10. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants Robinson Insulation are subject to personal jurisdiction in this District and Division.

## GENERAL ALLEGATIONS

11. The Plaintiffs' decedents were community members of Libby, Montana, where vermiculite ore, intermixed with a highly toxic form of asbestos, was mined, processed, released, spilled, and deposited from 1923-1990. Plaintiffs' decedents had repeated and continuous exposures to asbestos, which was in large part released and emanated from accumulations of asbestos containing material harbored on properties owned and maintained by BNSF.

12. Plaintiffs' decedents were ignorant of the nature and extent of the life-threatening risks and injury involved.

13. The Plaintiffs' decedents incurred exposures to asbestos, for which Defendants are responsible, that were very similar in nature and extent, having occurred during an overlapping and coinciding time frame, in nearly identical locations in proximity to BNSF's railyard, and which resulted in parallel medical outcomes with both developing and dying from asbestos induced mesothelioma within several months of one another.

## ALLEGATIONS AS TO BNSF

14. The following entities are all predecessors of the Defendant BNSF:

Chicago, Burlington & Quincy Railroad Company ("CB&Q"), Atchison, Topeka & Santa Fe Railway Company, Great Northern Railway Company, Northern Pacific Railway Company, and Burlington Northern Railroad Company.

15. Through a series of mergers, the CB&Q, the Atchison, Topeka & Santa Fe Railway Company, the Great Northern Railway Company, the Northern Pacific Railway Company, and the Burlington Northern Railroad Company have all merged into BNSF.

16. BNSF has assumed the liabilities of the Great Northern Railway Company and the Burlington Northern Railroad Company.

17. BNSF's active vermiculite operations began in the 1920s and continued until the last shipment of vermiculite left Libby in 1994. The Libby vermiculite was at all times inextricably intermixed with a highly toxic form of asbestos. The 70 years of vermiculite operations resulted in substantial asbestos contamination of BNSF properties and surrounding areas.

18. The ore was mined at Vermiculite Mountain, seven miles northwest of Libby and the asbestos-contaminated vermiculite concentrate was moved via a conveyor belt across the Kootenai River to the River Loading Facility, located 4.5 miles east of BNSF's railyard in Libby (the "Railyard"). BNSF constructed and oversaw the River Loading Facility for the exclusive benefit of Zonolite (later W.R. Grace) in furtherance of their common goal of profiting from the sale and distribution of the vermiculite concentrate across the country.

19. The airborne dust created during the processing and production of the vermiculite ore was sampled and found to contain approximately 40% asbestos.

20. The river loading process was extremely dusty. The loaded rail cars and the entire area were constantly coated in a layer of asbestos contaminated vermiculite dust. When hopper cars were loaded at the river site much loose vermiculite accumulated on the top of every car. From the 1950s to 1994, BNSF employees riding in engines pushing the vermiculite cars to town described visible clouds of dust being produced while returning loaded cars from BNSF's River Loading Facility to its downtown Libby Railyard. These accumulations of dust and layers of asbestos contaminated vermiculite

dust were not contained or transported and were instead released into the environment and deposited on BNSF's Libby properties contributing to the reservoir of asbestos containing material documented in the downtown Libby Railyard.

21. The Libby Railyard was the heart of BNSF activities in Lincoln County. It was located directly adjacent to downtown Libby, surrounded by Libby's residential neighborhoods where Plaintiffs' decedents resided, businesses, and parks. The Railyard was extensive, spanning the entire north end of downtown Libby. W.R. Grace's downtown Libby facility initially straddled, and later adjoined the BNSF Railyard property line and consisted of vermiculite storage, loading, and processing facilities. The storage and export facilities were left open to the public. Most children growing up in Libby recall playing in the area of the Railyard and in the piles of vermiculite located throughout the Railyard complex.

22. The Libby mine produced approximately 80% of the world's vermiculite ore, which up to 1970 amounted to over 29 billion pounds of ore and was estimated to exceed 35 billion pounds of ore between 1971 and 1981 alone. Based on analysis of the asbestos content of the vermiculite concentrate (ranging between 0.3% and 7% asbestos), the amount of asbestos which BNSF brought into downtown Libby amounted to between 193 million and 4.5 billion pounds between 1925 and 1981, and between 19.7 and 460 million pounds throughout the 1980s.

23. Grace's average daily production was between 500 and 1,000 tons of finished vermiculite concentrate per day in the late 1960s and 1970s, and between 800 to 1,000 tons per day in the 1980s. Based on vermiculite asbestos percentages as measured in the 1980s and a daily average of 750 tons, BNSF carried up to 105,000 pounds of Libby asbestos into downtown Libby per day in the late 1960s and 1970s and, based on a daily average of 900 tons per day, up to 126,000 pounds per day through the 1980s.

24. Asbestos sampling and remediation efforts on BNSF properties in Lincoln County did not begin until 2001, more than a decade <u>after</u> vermiculite mining operations ceased in Libby. At that time substantial asbestos contamination and visible vermiculite was still identified throughout its properties at the surface and reaching depths exceeding

4-6 feet in some locations. Remediation efforts on BNSF's properties continued for over a decade, yet in 2013 the EPA determined that additional cleanup at the Railyard was still needed.

25. Constant varied industrial activities took place at the Railyard throughout Plaintiffs' decedents' periods of exposure, resulting in disturbance of the asbestos containing dirt, dust, and vermiculite ore documented at the site. These railroad activities occurred in close proximity to, or direct contact with, the ubiquitous visible vermiculite at the site, resulting in the creation of consistent clouds of visible dust. An average of 20 non-stop trains consisting of up to 100 cars travelled through the Libby Railyard at 50 mph on a given day. Asbestos containing dust produced through active disturbance of vermiculite, asbestos contaminated soil and other surfaces would remain suspended for many hours as it drifted throughout the Libby community. Even just the wind blowing would cast dust from the downtown Libby Railyard into the neighboring Libby community. Given the reservoir of asbestos containing waste present in the Railyard throughout all relevant periods, disturbances, unrelated to transport of vermiculate, ranging from the regular industrial level activities to routine maintenance activities and even normal weather events resulted in the casting of asbestos dust into the neighboring Libby community.

26. The EPA has stated that sources of asbestos contamination are, at least in part, from properties, railroad tracks, and rights-of way owned, leased, and maintained by BNSF, as well as from various BNSF operations performed at a number of locations at or near the asbestos mine facility, and that during such operations, vermiculite containing amphibole asbestos was released to the environment through spillage from the rail cars causing it to accumulate over time.

27. More than a decade after vermiculite operations had ceased in Libby, sampling performed during routine maintenance activities in the downtown Libby railyard still demonstrated airborne asbestos fiber levels of up to 14 f/cc. This is an airborne asbestos level more than 150,000 times greater than the EPA's Libby Asbestos Reference Concentration (RfC) and 140 times higher than OSHA's permissible exposure

limit for workplace asbestos exposure.

28.     BNSF played a central role in the vermiculite operations in Libby, far exceeding a common carrier/shipper relationship.  BNSF took upon itself to perform economic analyses of the vermiculite operations; BNSF participated in developing new uses for vermiculite products and assisted in marketing the vermiculite product to various customers; BNSF funded geologic surveys of the vermiculite deposit; BNSF engaged in several of its own geo-chemical samplings/analyses of the vermiculite ore and associated constituents; and BNSF oversaw dust control, safety, construction, and modifications of the Grace shipping facilities. BNSF transported the entirety of the mined payload of Vermiculite Mountain and also sold land to Grace, and leased land and rail facilities to Grace for a negligible amount. Similarly, Grace leased and sold land to BNSF in furtherance of their common design of profiting from the export of asbestos-laden vermiculite. Grace and BNSF granted each other easements and access agreements on/across their respective adjoining properties.

29.     Emblematic of Grace and BNSF acting in concert in these operations was the River Loading Facility. The River Loading Facility was constructed and operated throughout its existence on BNSF property, for which Grace paid minimal rent.  BNSF oversaw all construction of and modifications to the River Loading Facility. This included reviewing and approving plans for all River Loading Facility dust control equipment prior to installation. In requesting BNSF's review and approval of the 1971 additional dust control facilities, Grace informed BNSF that they were being installed to "comply with Air Pollution Control Regulations in the state of Montana."

30.     Starting in the 1920s, BNSF's knowledge of the presence of asbestos in the Libby vermiculite is demonstrated in publications and BNSF company documents. By 1925, BNSF was one of the first entities to perform a geo-chemical analysis of the Libby Ore.  Over the ensuing years, BNSF showed a continued interest in the economic potential of the Libby Ore and development of the resource.  BNSF issued reports on the vermiculite operations prepared by its Division of Economic Research, sampled/tested the ore several times, and visited the mine site on multiple occasions.  Correspondence

beginning in 1929 between G.R. Martin, Vice President of the BNSF predecessor, demonstrates BNSF's detailed knowledge, including that "the vermiculite deposit near Libby, which is more extensive than other known similar deposits in this country, is accompanied by asbestos." In 1959 the railroad funded a geologic study of the mineral deposit which, among other things, provided that:

> Fibrous amphibole asbestos, because its specific gravity is very near that of vermiculite, causes much trouble in milling the lower grade ores in which the asbestos is abundant. If a process could be perfected to make a clean separation of vermiculite and asbestos, both products would be marketable...

This and other documents unequivocally provided BNSF with notice that the Libby vermiculite was inextricably contaminated with asbestos.

31. BNSF funded further geologic studies of the mineral deposit similarly confirming the presence of asbestos at the site and the inability to separate the asbestos from the vermiculite. In addition to funding geologic studies, BNSF's Mineral Research and Development Department and its Geology Department investigated, tested, and gathered samples of the vermiculite ore. Throughout the years, BNSF discussed possible rates with the mining company for the shipment of Libby asbestos by rail from Libby.

32. By 1977 or earlier, and thereafter, railcars carrying the Libby Ore were marked with asbestos warning placards that read as follows:

> CAUTION
> Contains asbestos fibers.
> Avoid creating dust.
> Breathing asbestos dust may
> cause serious bodily harm.

33. The Occupational Safety and Health Act was passed in 1970 requiring employers to test the level of asbestos in their workplace. Despite BNSF's knowledge that asbestos was present in the Libby Ore and that Libby Ore was being released, spilling, and depositing on BNSF properties, BNSF failed to conduct any testing for the presence of asbestos in its workplaces in Lincoln County, including the downtown Libby railyard.

34. BNSF had early and continuous knowledge of the hazards of asbestos exposure, including bystander exposures, as well as standards of care for detection and prevention of such hazards. Beginning in the late 1920s, asbestos related disease was generally recognized as a deadly health hazard throughout medical and industrial hygiene publications. The connection between asbestos exposure and cancer was established by the 1940s within the medical and industrial hygiene communities.

35. The American railroad industry, and specifically BNSF and its predecessors, have been aware of the asbestos hazard for decades. This knowledge is well documented by the 1930s and thereafter through documents including those known as American Association of Railroad (AAR) Documents, the Alton Railroad Documents, the National Safety Council Documents and BNSF company documents. The record also demonstrates BNSF's contemporaneous understanding of applicable safety regulations and its regular discussion of their impact on its operations. In addition to the applicable safety regulations and general industrial hygiene practices to which BNSF was subject, the Railroad set forth its own self-imposed safety responsibilities which similarly demonstrate its knowledge of these protective principles. BNSF had an extensive exposure to applicable industrial hygiene standards of care throughout the years that it shipped Libby vermiculite. BNSF maintained a Medical Department, an Industrial Hygiene Department, a Safety Department, and a Geology/Mineral Research Department.

36. BNSF train crews operated the local switching train, known as the "Libby Logger," which brought the asbestos-contaminated vermiculite from the so-called "river loading facility" located on BNSF property some 4.5 miles east of town, adjacent to the base of W.R. Grace's mining operation, into downtown Libby. BNSF officials were responsible for the crews' safety, including among other responsibilities identifying risks of injury, warning others of those risks, and preventing harm by eliminating risks.

37. BNSF officials toured W.R. Grace's facilities, including the mine, where he saw government required signs in the mine with the following warning: "Asbestos. Dust Hazard. Avoid Breathing Dust…Breathing Dust May Be Hazardous to Your Health."

38. W.R. Grace leased land to and from BNSF, both adjacent to BNSF's

railyard in Libby, where it operated vermiculite bagging plant and boxcar loading facility, and at the River Loading Facility located on BNSF's property some seven miles out of town, adjacent to the base of W.R. Grace's mining operation. BNSF officials inspected the downtown bagging plant operations because it was located on the railroad property, and observed the Grace employees filling the bags with vermiculite, which bags contained warning labels which stated: "Caution. Contains asbestos fibers. Breathing asbestos dust may cause serious bodily injury."

39.     BNSF officials received requests by Grace for permission to make modifications to their lease-hold improvements on BNSF property, including equipment to control the toxic asbestos containing dust.

40.     BNSF officials were integral to controlling the enormous amount of dust pollution being caused by BNSF's transport of Grace's asbestos laden vermiculite through the Libby community. They were well aware of the dust blowing off and loose vermiculite spilling from the tops of the loaded vermiculite railroad cars, and in fact ordered the crew to place Grace's vermiculite cars behind the local lumber mill's wood chip cars because of complaints received from the processing company that received the wood chips about the vermiculite dust contaminating the wood chips.

41.     BNSF had the authority to remedy the dusty conditions, and the Libby Log crew also complained to BNSF officials about the large amount of dust blowing off the top of the loaded hopper cars coming from Grace's river loading facility. Emblematic of BNSF's control over Libby railroad operations, BNSF officials went to Grace and told them that this had to stop or the railroad would not move the cars. Tragically, BNSF officials did not enforce this edict to W.R. Grace and the asbestos pollution continued unabated.

42.     Nor did BNSF officials take action to enforce this edict or sound a warning to BNSF workers or the Libby community when directly confronted with notice that the vermiculite contained toxic asbestos. After a BNSF crew member first saw a placard on the Grace vermiculite cars warning that the vermiculite loaded cars *contained asbestos*, he removed the placard and brought it to a meeting to address his safety concerns that

was attended by BNSF management officials and the manager of Grace's Libby mine. Yet despite the presence of BNSF officials who were in charge of site safety—including the need to identify risks of injury, to warn others of those risks, and to prevent harm by eliminating risks of harm—BNSF did *nothing* following this meeting, and the railroad's asbestos pollution of Libby continued unabated, claiming ever more victims with the passage of time.

## FIRST CLAIM
## Negligence v. BNSF
## (All Plaintiffs)

43. All paragraphs above are incorporated by this reference.

44. Plaintiffs' decedents resided or remained in proximity to the real property of BNSF and were thereby exposed to asbestos dust from BNSF's property and operations.

45. Throughout their years of exposure, the Plaintiffs' decedents lived in an environment that caused them to be exposed to and to inhale asbestos dust.

46. At all times Plaintiffs' decedents were ignorant of the nature and extent of the life-threatening risks and injury involved, and would not have continued to remain in such an environment if they had known the true facts.

47. Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs' decedents were denied the option of avoiding exposure, demanding dust control or changing residence.

48. At all times BNSF knew or should have known of the asbestos in the vermiculite and knew or should have known of the hazards to human health of asbestos exposure and had a continuing duty to gather information, to prevent toxic dust from collecting upon and escaping from its property, and to warn Plaintiffs' decedents and others who would be harmed by said asbestos containing dust.

49. BNSF was the property owner of the river loading facility and portions of the downtown export facility where asbestos-laden vermiculite was loaded onto train cars. BNSF paid for, oversaw, and operated the river loading facility. BNSF oversaw and inspected the downtown export facility which was part of its larger downtown

Railyard complex. BNSF maintained a contractual relationship with W.R. Grace, where W.R. Grace employees provided the labor to load the toxic vermiculite concentrate into BNSF train cars. Throughout the entirety of the contractual relationship, BNSF had reason to know of the hazards associated with the asbestos contaminated vermiculite concentrate, yet failed to take or require any precautions to eliminate or mitigate the toxic dust produced. BNSF undertook the responsibility for oversight of dust control and safety on their property and at all times retained control to inspect and monitor. At no time during the contractual relationship was there an adequate dust control system, protection for workers, or adequate procedures to ensure asbestos contaminated vermiculite ore did not escape into the Libby community. During the vermiculite loading, movement into Libby, switching, and storage operations, asbestos contaminated vermiculite was spilled, dumped, and otherwise released onto BNSF property in Lincoln County and thereafter disturbed and distributed by BNSF's consistent and constant industrial activities and other soil disturbances resulting in the entrainment of asbestos fibers into the air and onto property in Lincoln County.

50.     BNSF had reason to recognize the loading of asbestos laden vermiculite concentrate created a particular risk of physical harm unless special precautions were taken. As a result of the failure of W.R. Grace to take reasonable care to take such safety precautions, asbestos contaminated the railroad loading facility exposing workers and blew off and spilled from railroad cars thereby contaminating the area adjacent to the railroad line in Lincoln County.

51.     BNSF had a non-delegable duty to ensure that adequate dust control and safety precautions were taken by the contractor W.R. Grace during the course of the river loading and downtown export operations, which posed peculiar risks of physical harm and was inherently dangerous.

52.     BNSF was the property owner of the downtown Libby Railyard. That Railyard was contaminated with asbestos laden vermiculite. BNSF had reason to know of the hazards associated with the asbestos contaminated vermiculite, yet failed to take any precautions to eliminate, contain, or mitigate the toxic dust accumulating therein and

escaping into the Libby community.

53. BNSF was negligent, including as follows:

(a) in failing to inquire, study and evaluate the dust hazard to human health;

(b) in failing to take measures to prevent toxic dust from accumulating upon and escaping from its property;

(c) in maintaining an unreasonably dangerous and/or hidden and lurking danger, in the form of toxic dust, on its property;

(d) in failing to adequately eliminate, control and/or contain the toxic dust present on its property and allowing this dangerous toxin to escape therefrom;

(e) in failing to exclude children, and others, attracted to its property in Lincoln County;

(f) in failing to warn Plaintiffs' decedents of the true nature of the hazardous effects of the dust;

(g) in failing to conform its activities in Lincoln County to applicable statutes (e.g., § 50-78-101 M.C.A. et seq. and 29 U.S.C. Ch. 15) and regulations;

(h) in failing to conform its activities in Lincoln County to common-law standards of care as well as its own plans, rules and standards;

(i) in negligently breaching its non-delegable duty to ensure that adequate dust control and safety precautions were taken by W.R. Grace during the course of their loading and export operations; and

(j) by acting in concert and in furtherance of a common plan, objective, and enterprise with Zonolite/Grace.

54. As a direct and proximate result of the conduct of BNSF as described above, Plaintiffs' decedents contracted asbestos related mesothelioma and died as a result thereof, and incurred the damages alleged herein.

### SECOND CLAIM
### Common Law Strict Liability v. BNSF
### (All Plaintiffs)

55. All paragraphs above are incorporated by this reference.

56. Defendant BNSF failed to control asbestos contaminated vermiculite present during the operation of their business in Lincoln County thereby creating an abnormally dangerous condition and causing Plaintiffs' decedents to be exposed to

asbestos, an extra hazardous and abnormally dangerous substance.

57. Defendant BNSF maintained its property in an abnormally dangerous condition thereby causing the release of asbestos contamination and exposure of Plaintiffs' decedents to deadly asbestos. BNSF's premises were maintained in an abnormally dangerous condition and its business activities in handling, storing, loading, and using asbestos and asbestos contaminated products were abnormally dangerous in that:

 (a) said BNSF property and business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiffs' decedents and others;

 (b) there was and is a strong likelihood that the harm resulting from said BNSF property and business activities and exposure to asbestos is great;

 (c) the risk of harm caused by BNSF's property and BNSF's storing, handling, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to BNSF's property and BNSF's abnormally dangerous business activity;

 (d) said harboring of asbestos on BNSF's property and business activities are not a matter of common usage;

 (e) BNSF's property was located in and abnormally dangerous business activities were carried on within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

 (f) the dangerous attributes of BNSF's property and business activities completely outweigh the value of those activities to the community.

58. The dangers of BNSF's property and business activities for the locality where Plaintiffs' decedents resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, BNSF should be required as a matter of law to pay for any harm caused.

59. BNSF harbored an abnormally dangerous condition at its downtown Libby railyard by maintaining a reservoir of asbestos contaminated material thereon and by failing to take measures to prevent toxic dust from collecting upon and escaping from its

property.

60. BNSF is strictly liable to the Plaintiffs for damages caused by Plaintiffs' decedents exposure to deadly asbestos caused by the abnormally dangerous condition of BNSF's property and BNSF's abnormally dangerous business activities.

61. As a direct and proximate result of the abnormally dangerous condition of BNSF's property and BNSF's abnormally dangerous business activities, Plaintiffs' decedents were exposed to unreasonably dangerous and hazardous asbestos, contracted and suffered from asbestos related mesothelioma and died as a result thereof, and incurred the damages as alleged herein.

### THIRD CLAIM
### Punitive Damages v. BNSF
### (All Plaintiffs)

62. All paragraphs above are incorporated by this reference.

63. BNSF's acts and omissions were willful, reckless, and constituted actual malice. Although BNSF knew or had ample reason to know that its acts or omissions created a high degree of risk of harm to the Plaintiffs' decedents, BNSF nevertheless deliberately acted in conscious disregard of and indifference to the risk imposed upon the Plaintiffs' decedents by their ongoing exposure to asbestos such that it is appropriate to impose punitive damages in an amount sufficient to punish BNSF, deter similar conduct, and to serve as an example and warning to other legal entities similarly situated that conduct of the kind engaged in by BNSF is unacceptable in our society.

### FOURTH CLAIM
### Negligence v. Robinson Insulation and Grogan Robinson
### (All Plaintiffs)

64. All paragraphs above are incorporated by this reference.

65. For many years, Defendant Robinson Insulation obtained asbestos contaminated vermiculite from Libby, Lincoln County, Montana. Said asbestos contaminated vermiculite was transported by BNSF from Lincoln County to Great Falls, Cascade County, Montana, where Defendant Robinson Insulation expanded the asbestos contaminated vermiculite and processed it into various manufactured products.

66. Robinson Insulation expanded the deadly asbestos contaminated vermiculite and processed it into manufactured products, Grogan Robinson, marketed, sold, and distributed said vermiculite and vermiculite products to the J. Neils/St. Regis/Champion lumber mill in Libby and to others for use and for resale in Libby, Montana and elsewhere. Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby and delivered to the lumber mill retail store and to other sites in Libby, from where the products were purchased and utilized throughout the Libby community.

67. Plaintiffs' decedents were exposed to Defendant Robinson Insulation's and Defendant Grogan Robinson's unreasonably dangerous asbestos contaminated products, which Robinson Insulation and Grogan Robinson wrongfully placed in the stream of commerce for use and consumption by the general public.

68. During Plaintiffs' decedents' periods of exposure to asbestos and contaminated vermiculite, which was generated and released by Robinson Insulation's and Grogan Robinson's business activities, Robinson Insulation and Grogan Robinson knew that extended exposure to asbestos was unreasonably dangerous and hazardous to an individual's health. Nevertheless, Robinson Insulation and Grogan Robinson concealed and failed to disclose such knowledge to their employees, the public, and the Plaintiffs' decedents. Robinson Insulation and Grogan Robinson gave no indication that it was unsafe, and in fact a serious health hazard, for Plaintiffs' decedents to be exposed to asbestos generated and released by Robinson Insulation's and Grogan Robinson's business activities. Plaintiffs' decedents were at all times ignorant of the nature and extent of the life-threatening risk involved in exposure to the asbestos generated and released by Robinson Insulation's and Grogan Robinson's business activities.

69. Robinson Insulation and Grogan Robinson owed the Plaintiffs' decedents a duty to act with reasonable care concerning their business operations, so as not to jeopardize Plaintiffs' decedents' health and welfare from exposure to its asbestos contamination and asbestos products.

70. Robinson Insulation and Grogan Robinson breached their duty of care by negligently, carelessly, and recklessly generating, handling, storing, releasing, disposing of, and failing to control and contain unreasonably dangerous and hazardous asbestos created by and/or resulting from their for-profit business operations.

71. As a direct and proximate result of Plaintiffs' decedents' exposure to asbestos-laced vermiculite generated and released by Robinson Insulation's and Grogan Robinson's business activities, Plaintiffs' decedents incurred a level of asbestos exposure that was more than insubstantial in its contribution to their development of asbestos related mesothelioma and resultant death, and incurred the damages as alleged herein.

## FIFTH CLAIM
## Strict Products Liability v. Robinson Insulation and Grogan Robinson
## (All Plaintiffs)

72. All paragraphs above are incorporated by this reference.

73. At times relevant to this action, Defendants Robinson Insulation and Grogan Robinson were engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising multiple products containing vermiculite. Said vermiculite was laced with deadly asbestos.

74. After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation, and Grogan Robinson, sold said vermiculite and vermiculite products for resale at the lumber mill in Libby, Montana and other retail locations. Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby where the products were sold at the lumber mill retail store to various parties for use on construction and other projects in Lincoln County.

75. Defendants Robinson Insulation and Grogan Robinson knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

76. Defendants Robinson Insulation and Grogan Robinson distributed and/or sold said asbestos-laced vermiculite products to the public resulting in toxic exposure to the Plaintiffs' decedents.

77. Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of Defendant Robinson Insulation and Grogan Robinson. Said products did, in fact, cause injury and damage to Plaintiffs' decedents, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

78. Plaintiffs' decedents did not know of the substantial danger of use or exposure to said asbestos-laced vermiculite products, nor was said danger readily recognizable by them. Defendants Robinson Insulation and Grogan Robinson further failed to adequately warn of the risk of contamination to which Plaintiffs' decedents were exposed.

79. As a direct and proximate result of the unlawful actions of Defendants Robinson Insulation and Grogan Robinson and as a direct and proximate result of exposure to Robinson Insulation's and Grogan Robinson's unreasonably dangerous asbestos contaminated vermiculite products, Plaintiffs' decedents incurred a level of asbestos exposure that was more than insubstantial in its contribution to their development of asbestos related mesothelioma and resultant death, and incurred the damages as alleged herein.

## SIXTH CLAIM
**(Does A-Z)**

80. All paragraphs above are incorporated by this reference.

81. Does A-Z are corporations or persons unknown at this time whose negligence and wrongful acts caused asbestos related mesothelioma and resultant death in the Plaintiffs' decedents. Plaintiffs will seek to amend their complaint when the true names and capacities of Does A-Z are ascertained.

## SEVENTH CLAIM
## WRONGFUL DEATH
## (All Plaintiffs)

82. All paragraphs above are incorporated by this reference.

83. As a direct and proximate result of the actions of the Defendants as alleged above, Plaintiffs' decedents suffered from asbestos related mesothelioma, and died as a result thereof, incurring the damages alleged herein. The heirs of Plaintiffs have suffered the loss of their care, comfort, society, and support and have incurred damages as alleged herein.

## DAMAGES

84. All paragraphs above are incorporated by this reference.

85. As a direct and proximate result of the acts of the Defendants, the Plaintiffs' decedents have suffered:

    a. Loss of enjoyment of established course of life;

    b. Loss of services which could no longer be performed;

    c. Loss of earnings and/or earning capacity;

    d. Physical, mental and emotional pain and suffering;

    e. Medical expenses;

    f. Great grief and sorrow;

    g. The Plaintiffs' decedents having died as a result of asbestos related mesothelioma, the heirs have lost the care, comfort, society, and support of said Plaintiffs' decedents and have suffered other damages; and

    h. Punitive damages in an amount sufficient to punish BNSF, deter similar conduct, and to serve as an example and warning to other legal entities similarly situated that conduct of the kind engaged in by BNSF is unacceptable in our society.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs prays for damages against the Defendants as follows:

1. Reasonable damages for lost enjoyment of established course of life, past and future;

2.  Reasonable damages for loss of services which can no longer be performed;

3.  Reasonable damages for physical, mental and emotional pain and suffering;

4.  Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred;

5.  On behalf of those so injured, the Personal Representatives pray for distinct and separate assessment and recovery of reasonable damages for the heirs' loss of care, comfort, society and support of the deceased by reason of the wrongful death of their loved ones;

6.  Advance payment of past and outstanding medical expenses and special damages not reasonably in dispute;

7.  Reasonable damages for loss of earnings and/or earning capacity;

8.  Reasonable damages for grief and sorrow;

9.  For costs of suit;

10. For punitive damages; and

11. For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED this 23rd day of September, 2021.

                        McGARVEY LAW

                        Electronically signed by:
                         /s/ Jinnifer Jeresek Mariman
                            Jinnifer Jeresek Mariman
                            *Attorneys for Plaintiffs*