**EXHIBIT 3**

Expert Witness Report – Wells and Walder vs. BNSF et al.

Submitted by Julie F. Hart, PhD, CIH

August 16, 2022

## I.      Table of Contents

Expert Witness Report – Wells and Walder vs. BNSF et al. ..........................................1

II.      Qualifications .......................................................................................................8

  1.      General ......................................................................................................8

  2.      Libby .........................................................................................................9

III.     Industrial Hygiene and Asbestos ........................................................................9

  3.      IH Purpose ................................................................................................9

  4.      Sources of IH Literature .........................................................................10

  5.      1920s First Reported Cases of Asbestosis ..............................................10

  6.      1930s Hazard ...........................................................................................10

  7.      1940s Lung Cancer Link .........................................................................11

  8.      Tremolite Highly Toxic 1951- LA Composition ....................................11

  9.      1947 Asbestosis Deaths ..........................................................................12

  10.     1960 Meso Link, 1964 Selikoff ..............................................................12

  11.     By 1960s – Hazard ..................................................................................12

  12.     1970s Regulation .....................................................................................12

  13.     Libby Ore - % asbestos and amount shipped ..........................................13

  14.     Fiber years ...............................................................................................14

  16.     Asbestos Fiber Fate and Transport .........................................................15

  17.     Bystander & Community Exposure .........................................................15

  18.     Libby .......................................................................................................22

  19.     Asbestos Concentrations in Libby Ambient…………………………....…27

  20.     Air Asbestos Concentrations in Libby Ambient Air - Transportation Corridors)......22

  21.     Minneapolis Libby Amphibole Dispersion Modeling: ...........................23

  22.     Family Member/ Take-Home Exposure ..................................................23

  23.     1960's Wagner, Selikoff, Newhouse .......................................................24

  24.     OSHA take home ....................................................................................24

  25.     Asbestos use by Railroad ........................................................................24

IV.      Epidemiology Literature and Toxicity of Libby Amphibole ...........................25

  26.     Epidemiology Literature – Occupational LA exposure and asbestos related disease.25

27.      Epidemiology Literature – Community Libby amphibole exposure and asbestos related disease..................................................................................................26

28.      Pleural Disease and Pulmonary Function...................................................28

29.      Current Toxicological Knowledge – Libby Amphibole Asbestos……………...…28

30.      A Summary of Inhalation Factors and Proposed Mechanisms of Toxicity: .............29

V.      BNSF Operations in Libby..................................................................33

31.      BNSF carried tons of asbestos through Libby every day ...........................33

32.      Vermiculite rail car loading....................................................................34

33.      BNSFs presence in downtown Libby...........................................................34

34.      Grace's Downtown Operations. .............................................................35

35.      River Loading Point .............................................................................36

36.      Libby Log Job. ...................................................................................36

37.      Downtown Libby Railyard .....................................................................38

38.      BNSF and W.R. Grace co-mingled operations: .......................................39

39.      Leakage. .........................................................................................39

40.      Derailments ......................................................................................40

41.      Rail Cars ..........................................................................................41

VI.     BNSF asbestos cleanup ........................................................................41

42.      Asbestos Remediation 1999-2013 ..........................................................41

43.      BNSF – a recognized source of asbestos contamination ...........................47

VII.    BNSF Knowledge of Asbestos Hazards ....................................................51

44.      Asbestos Hazards recognized in 1930s-1950s. .........................................51

45.      BNSF aware of asbestos hazard by 1930s.................................................52

47.      AAR 1932.........................................................................................52

48.      AAR 1935.........................................................................................53

49.      AAR 1937.........................................................................................53

50.      AAR 1939.........................................................................................53

51.      AAR 1940.........................................................................................54

52.      AAR 1951-1953 ................................................................................54

53.      AAR 1957.........................................................................................54

54.      AAR 1958.........................................................................................54

55.   Alton Railroad Documents ................................................................................... 54

56.   Alton info shared with AAR in 1937 ................................................................... 57

57.   National Safety Council Documents ..................................................................... 57

58.   Misc. docs. evidencing RR knowledge of asbestos hazard .................................. 57

59.   Other sources of RR knowledge of asbestos hazard and IH standards .................. 58

60.   RR understanding of safety regulations. .............................................................. 58

61.   RR self-imposed safety standards). ..................................................................... 59

VIII.   BNSF Knowledge of Libby Asbestos. ................................................................ 59

62.   RR knowledge of Libby asbestos by 1920s ......................................................... 59

63.   Geological Publications ....................................................................................... 59

64.   BNSF scientific analyses of Libby Ore ............................................................... 61

65.   News Publications ............................................................................................... 62

66.   Sanborn Fire Insurance maps .............................................................................. 65

67.   Company Records ............................................................................................... 65

68.   RR interest in economic development of vermiculite operations .......................... 67

69.   Asbestos Shorts .................................................................................................. 69

70.   Libby Vermiculite Asbestos Warnings ................................................................ 70

71.   Agency Reports/Publications. ............................................................................. 71

72.   National Newspaper Publications ........................................................................ 72

IX.   BNSF's Deceptive Course of Conduct Regarding Asbestos.................................. 72

73.   Introduction ........................................................................................................ 72

74.   BNSF documents re: course of conduct ............................................................... 73

75.   Liukonen testimony ............................................................................................ 73

76.   BNSF conduct re: safety regulations ................................................................... 74

77.   BNSF re: OSHA ................................................................................................. 74

X.   BNSF Working Together with Grace .................................................................... 75

78.   BNSF and Grace working together general .......................................................... 75

79.   Early interactions ............................................................................................... 76

80.   Grace Shipping/Export/Import Facilities ............................................................. 76

81.   River Loading Point ............................................................................................ 77

82. Downtown Export Plant ........................................................................................78
83. Vermiculite and Asbestos Co. Loading Point/Grace Loading Dock..........................78
84. Special relationship between BNSF and Grace...........................................................79
85. BNSF promotion of vermiculite products...................................................................80
XI. Principles of Industrial Hygiene and Applicable Standards of Care.............................80
86. Basic Principles of Industrial Hygiene, ....................................................................82
87. Asbestos in the Literature Prior to 1950....................................................................84
88. Government Action & Impact. ...................................................................................85
89. Standard Practices for Dust Control and Exposure Mitigation.. ................................85
90. Industrial Hygiene Standards of Care. ......................................................................90
91. BNSFS should hve sampled workplace air...............................................................91
92. BNSF should have protected workers........................................................................91
93. BNSF should have provided adequate warnings........................................................92
94. BNSF should have provided education regarding toxic hazards.................................92
95. BNSF's inadequate respiratory protection practices. .................................................93
96. BNSF should have adhered to its own safety regulations:.........................................93
97. BNSF should have used appropriate dust control practices.........................................93
98.  BNSF should have employed proper housekeeping techniques...................................94
99. BNSF should have provided a reasonably safe place to work.....................................94
100. BNSF should have adhered to its own safety regulations...........................................94
101. BNSF largely ignored the basic principles of industrial hygine...................................95
102. BNSF should have ensured effective dust control practices were observed at River Loading and at the Downtown Export Facility........................................................95
103. Description of a proper medical monitoring program.................................................96
104. Industrial Hygiene standards of care conclusion........................................................97
XII. Plaintiff Exposure Pathways...........................................................................................97
105. Exposure Pathway.....................................................................................................97
106. Mr. Thomas Wells Exposure History........................................................................98

107. Joyce Hemphill Walder Exposure History……………….………………...…..100

108. Summary Plaintiff Exposure History. ...................................................................103

XIII. Necessity to Act.............................................................................................................114

109. Necessity to Act. ...........................................................................................114

110. Conclusion ....................................................................................................115

XIV. Appendix A: Hart CV ...................................................................................................116

XV. Appendix B: Contemporary Libby Asbestos IH Studies ............................................121

A. ...................................................... General Asbestos/Government Regulation Standards   121

1. ..............................................................................Small Fibers Are Not Counted.   121

2. .............................................................................................. 69% of LA fibers<5um.   122

3. .......................................................................................Small Fibers Are Dangerous.   123

4. ......................................................................................... Meeker and Sampling Issues.   123

5. ........................................................................... EPA IRIS Toxicological Report.   124

6. .......................................................................................................OSHA PELs   125

7. ..........................................................................................NIOSH IH guidelines   125

B. ........................................................ Exposure Mechanisms: Air, Soil, & Vermiculite   126

8. .........................................................................................Fiber Travel, General.   126

9. ............................................................................................ Fiber Settling Rate.   127

10. ......................................................................................... Fiber Re-entrainment.   127

11. ...............................................................EPA (2001) Disturbed Vermiculite Study   128

12. ............................................................ EPA (2003a) Disturbed Vermiculite Study.   128

13. .......................................................... Soil Disturbance, Greatest Exposure Source.   128

14. .....................................................Soil Disturbance/ND Can Release Fibers.   129

15. ...........................................................Soil<1%Asb. Poses a Hazard When Disturbed, CO..   129

16. ........................................................... EPA (2004b) Spokane LA Soil Disturbance Study   129

17. .................. Addison (1988, 1995), Soil > .001% Asbestos can generate excess of 0.1f/ml   130

18. ..............................................Addison (1988), 200X OSHA PEL from Soil at 1% Asbestos   130

19. ................................................ Addison (1988), Reduction in % Asbestos Not Proportionate   131

20. ....................................................................Ward (2006) Bark Study   131

21. ........................................................ EPA (2008c) & Ward Bark Study   131

22. ..........................................................................EPA (2008c) Bark Study Results.   132

23. ...............................................................EPA(2008c) Bark Study, Forest Soil and Duff.   132

24. ...........................................................EPA (2011b) Human Receptors in OU3   132

25. ................................................................. Bark Activity Based Studies Intro.   133

26. ..........................................................Hart (2007) Firewood Harvesting Study.   133

27. .........................................................Hart (2009) USFS Employee Exposure Study.   134

28. ...................................................... Ward (2012) USFS Controlled Burn Study   135

29. ..................................................Disturbance of Contaminated Trees.   136

30. ...................................EPA (2011a) Warning Re: Gathering of Wood in the Libby Valley   136

XVI.   Appendix 4: Works Cited .............................................................................137

August 23, 2022

Mr. Ethan Welder
McGarvey Law, P.C.
345 First Avenue East
Kalispell, MT 59901

Dear Ethan,

I have reviewed the materials provided to me pertaining to the Libby Claimants' actions against the BNSF Railway Company, with specific reference to Thomas Wells and Joyce Walder. My analysis and opinions regarding their exposure to asbestos resulting from BNSF activities in the Libby area follows. This report is authored at your request and direction to provide those opinions and a summary of the grounds therefor. Over the course of several years, I have collaborated with Dr. Terry Spear in analyzing and developing reports he has authored regarding railroad activities in the Libby area. Due to that close collaboration with Dr. Spear, along with the fact application of the pertinent facts here to generally accepted industrial hygiene and toxicology standards requires opinions like those authored by Dr. Spear, I am independently adopting many aspects of Dr. Spear's prior reports. While my opinions may be similar to those previously offered by Dr. Spear, this report represents a summary of my opinions and all of which are offered to a reasonable degree of scientific certainty, more probable than not. The opinions expressed in this report are based on my education, training, and years of experience in the field of toxicology and industrial hygiene as well as my review of literature, publications, research and other information on the subject. I expect to reference and rely upon opinions and materials referenced or discussed in the expert reports and disclosures of Dr. Marshall, Dr. Compton, Dr. Holstein, Dr. Staggs, Dr. Brody, Dr. Lockey, Dr. Frank, Dr. Colella, and Dr. Castleman. I reserve the option to alter or expand upon my opinions based on additional information obtained through discovery or otherwise. Please note, the referenced Exhibits are included as hyperlinked attachments to this document, available in the associated Attachments file.

## II.   Qualifications

1. **General**: My name is Julie F. Hart. I hold a Ph.D in Toxicology and a M.S. in Industrial Hygiene. I am certified by the Board of Global EHS Credentialing (formerly the American Board of Industrial Hygiene) in Industrial Hygiene, Comprehensive Practice (certification

number 7751 CP). I have served as a faculty member in the Safety, Health and Industrial Hygiene Department at Montana Tech since 2000 and was appointed department chair in 2014. In addition, I currently serve as a member of the Butte/Silver Bow County Health Board. My curriculum vitae is attached as Appendix A of this report.

2.  **Libby Specific:** I have experience in the field of industrial hygiene and exposure science. In 2005, after our research team discovered amphibole contamination on the surface of tree bark in the forested area near the former vermiculite mine, we performed substantial research on the potential for human exposures related to this source. I have been successful in securing funding from external sources for this research from the United States Department of Agriculture Forest Service, National Institute for Occupational Safety and Health and The Rocky Mountain Center for Occupational and Environmental Health, University of Utah School of Medicine. I am lead author on two and co- author on five peer-reviewed publications pertaining to Libby amphibole asbestos (LA). I have presented this LA exposure work at regional and national conferences.

    I have reviewed the expert reports of Dr. Marshall, Dr. Compton, Dr. Holstein, Dr. Staggs, Dr. Brody, Dr. Lockey, Dr. Frank, Dr. Colella, and Dr. Castleman and I rely, in part, on these reports in the formation of my opinions. I am familiar with the studies, reports and other materials referenced in these reports and rely upon, and may refer to them, in support of my opinions during my testimony in deposition or at trial. I have interviewed several dozen railroad workers and Libby residents regarding their knowledge of the presence of vermiculite and the production of dust in and around railroad properties in Lincoln County, Montana, among other topics.  I have visited Libby on numerous occasions over a 17 year period.  I have reviewed thousands of records from BNSF[1], W.R. Grace, Zonolite, governmental agencies including United States Environmental Protection Agency ("EPA") records, State of Montana agency records, records of third parties, relevant and industrial hygiene and toxicology literature, and applicable statutes, and regulations.  I have reviewed numerous transcripts of testimony of BNSF employees, industrial hygienists, and expert witnesses (along with associated expert reports). I have reviewed over many years relevant industrial hygiene literature pertaining to asbestos and have conducted research into pathways of exposure to asbestos.  All of these materials are the type regularly relied upon by professional industrial hygienists in the performance of their profession.

    ### III.    <u>Industrial Hygiene and Asbestos</u>

3.  **IH Purpose**: Industrial hygiene (IH) is the science and art devoted to the anticipation, recognition, evaluation, and control of those workplace environmental factors that may cause sickness, impaired health and well-being, or significant discomfort and inefficiency

---

[1] Unless more specifically referenced, the term "BNSF" refers to the Burlington Northern Santa Fe Railway along with its predecessor railroads including but not limited to the Chicago, Burlington & Quincy Railroad Company (Burlington Railroad), the Atchison, Topeka and Santa Fe Railroad Company (Santa Fe Railroad) and the Great Northern Railroad.

among workers or among citizens of the community. The scope of IH activities encompasses the "cradle-to-grave" concept (research of industrial processes from initiation all the way through the final waste disposal stage). Industrial hygiene is both an aspect of preventative medicine and in particular occupational medicine, in that its goal is to prevent industrial disease, using the science of risk management, and exposure assessment.

Reasonable and prudent industrial hygiene practice since the early 1900s requires that workplaces be evaluated for potential employee exposure to toxic materials and that controls be implemented on any worksite where there are employees with potential exposure to toxic dust, such as asbestos. Ultimately, the central purpose of industrial hygiene is to: (1) study; (2) warn; and (3) protect.

4. **Sources of IH Literature:** Industrial hygienists commonly rely on literature published in the fields of Industrial Hygiene, Occupational Medicine, and Toxicology, as well as general medical literature. Occupational hygienists rely on literature from industry, academia, governmental agencies and independent entities. It is important to assess available data from all sources, both qualitative and quantitative, to measure potential exposures and to utilize professional judgment in the application of industrial hygiene principles.

5. **1920s First Reported Cases of Asbestosis:** While there was documentation of pulmonary disorders associated with asbestos exposure in the early 20th century, Dr. W.E. Cooke, an English pathologist, was the first to describe fibrosis of the lungs due to asbestos exposure in medical literature (Cooke, 1924 and Cooke, 1927). The subject of Cooke's papers was a 33 year old female that worked in the spinning room of a Rochdale asbestos company. An investigation into the problem among textile factory workers was undertaken in Great Britain in 1928 and 1929. In the United States, the first official claim for compensation associated with asbestos was in 1927 in the form of a Massachusetts worker's compensation claim (Lanza, 1936).

6. **1930s Hazard:** Asbestos exposure was recognized as a deadly hazard in industrial hygiene literature by the 1930s. In 1930, Dr. E.R.A. Merewether and Dr. C.W. Price published a study proving asbestos exposure causes deadly lung disease (Merewether and Price, 1930). The same year, the Journal of the American Medical Association reported a fatal case of asbestosis in an asbestos miner (Lynch and Smith, 1930). Throughout the 1930s, dozens of articles appeared in the scientific literature confirming that asbestos exposure causes fatal disease. In the 1930s, industrial hygiene journals published studies demonstrating that x-ray reports of workers exposed to asbestos dust over long periods of time were showing pulmonary abnormalities. "That the long-continued inhalation of asbestos dust is responsible for the development of pulmonary fibrosis is now unquestioned. From many parts of the world come radiographic reports of fine fibrosis in the lungs of persons exposed by occupation to the inhalation of this substance" (Gardner,1931). It was recognized that the longer an individual was exposed to asbestos fibers, the greater degree of disease. "The lungs of workers become affected in direct proportion to the length of time they have been exposed to it, until after twenty years of

10

work 80 percent are affected." Dhers (1931).  "…in every instance where a patient had been working for more than ten years, asbestosis could be demonstrated radiologically" (Gerbils and Ucko, 1932).  The American Journal of Public Health demonstrated the importance of ensuring proper working conditions for asbestos workers:

> Although the total number of workers in asbestos mills is probably far smaller than in many other lines of trade, their health is of paramount importance. The conditions surrounding the greater proportion of the employees constitute a distinct and serious industrial hazard, and often sufficient devices for protection have not been provided. It is doubtful if any single employee in certain departments of these mills can possibly escape some damage to his respiratory system because of the unavoidable inhalation of asbestos dust. Naturally, the longer the service of an employee, the more certain is more or less extensive pulmonary damage.
>
> Although the number of asbestos workers is much less than that in many other industries, their occupation is extremely hazardous, and they are amply justified in expecting whatever protection it is possible to  give them. Furthermore, the fact that efficient protective devices in this industry, in spite of the added expense, will effect a substantial financial savings, is becoming more apparent. The workers themselves are becoming informed of the danger to health, and many civil suits for damages against factory owners are the result. (Donnelly, 1933).

Cases of asbestosis in insulation workers were reported in this country as early as 1933 (Ellman, 1933). The U.S. Public Health Service fully documented the significant risk involved in asbestos textile factories in 1938 (Dressen, 1938).  The authors urged precautionary measures and the elimination of hazardous exposures.

7. **1940s Lung Cancer Link:**  By the 1940s the connection between asbestos exposure and lung cancer was established within the medical and industrial hygiene communities.  The link between asbestos and cancer was referenced in an article by Kenneth M.  Lynch and W. Atmar Smith in a widely disseminated journal in 1935 (Lynch and Smith, 1935).  In 1944, asbestos was identified as a physical or chemical agent known to or suspected of causing occupational cancer in the Journal of the American Medical Association (JAMA, 1944).  Occupational cancers were defined as those "elicited by exposure to the agents in the course of regular occupations."   While Lynch and Smith (1939) suggested that asbestosis was a predisposing factor in carcinoma of the lung, Homburger (1943) concluded that "statistical calculations and morphologic studies did not reliably answer the question of whether asbestosis has to be considered as an etiologic factor in pulmonary carcinoma."  In 1955, a study published by Sir Richard Doll, conclusively demonstrated asbestos causes cancer (Doll 1955).

8. **Tremolite Highly Toxic 1951- LA Composition:**  In 1951, Vorwald et al. published a summary of case studies conducted at the Saranac lab describing experiments conducted on animals exposed to various kinds of asbestos dust.  Inhalation and intratracheal

injection techniques were used on guinea pigs, rabbits, cats, dogs, rats and mice to investigate tissue reactions. Vorwald et al. concluded that the rabbit, guinea pig and rat animals, but not the mouse and dog, developed peribronchial lung fibrosis similar to human asbestosis after being exposed to chrysotile asbestos. In addition, he concluded that long fibers (20 to 50 microns) were essential in the production of this fibrosis and that as the asbestos concentration increased, the pulmonary reaction time decreased. While chrysotile asbestos was the primary mineral discussed in Vorwald's comment and summary, it is important to note that similar peribronchial lung fibrosis observations were made with amphibole mineral species, including tremolite (Vorwald, et al., 1951 (Tables 15 and 16)). At the time of Vorwald's publication, tremolite was reported to be the primary amphibole contaminant within the Rainy Creek Complex (Pardee and Larsen, 1929; Bassett, 1959; Boettcher, 1966b).

In early publications, LA has been referred to as "tremolite." More recently, sophisticated analysis has shown that LA is 84% winchite, 11% richterite and 6% tremolite (Meeker, 2003). Winchite and richterite are close geo-chemical relatives to tremolite.

9. **1947 Asbestosis Deaths:** Drinker and Hatch, Industrial Dust is a standard authoritative industrial hygiene text. At page 39, the text notes the 1947 total of 160 deaths from asbestosis in Great Britain. At page 46, the text demonstrates a 10 times greater than normal incidence of lung cancer among those exposed to asbestos or among those with asbestos related disease (Drinker and Hatch, 1954).

10. **1960 Meso Link, 1964 Selikoff:** In 1960, Dr. J.C. Wagner published a study concluding exposure to asbestos causes mesothelioma (Wagner et al., 1960). In 1964, Dr. Irving Selikoff published a landmark study further demonstrating that exposure to asbestos causes the fatal diseases of asbestosis, lung cancer and mesothelioma (Selikoff, 1964). With this and subsequent publications (Selikoff et al., 1964; Selikoff and Hammand 1965-66) asbestos exposure and disease research extended from asbestos mining and asbestos factory workers to those that used asbestos containing materials in their occupations (Bartrip, 2003).

11. **By 1960s – Hazard:** By the 1960's, hundreds of articles and studies published in the industrial hygiene and medical literature established that asbestos exposure is harmful and can be fatal. These materials were readily available to anyone interested in and capable of learning about the dangers of asbestos. As a standard practice, industrial hygienists review industrial hygiene literature, as well as occupational medicine literature.

12. **1970s Regulation**: The Occupational Safety and Health Act was promulgated in 1970, 29 U.S.C. § 651 et seq., 84 Stat. 1590. Because of the recognition of the grave occupational health problem posed by asbestos as a toxic and physically harmful substance, asbestos was the first toxic substance regulated under this Act. The Act gives the Secretary of Labor the authority to establish standards for permissible concentrations of airborne asbestos fibers. In the 1970s, OSHA required employers to monitor the workforce for asbestos related disease and required preventative measures be taken in the airborne asbestos levels met or exceeded the Permissible Exposure Limit (PEL). 29 CFR 1910.93a

(1972). Later, in the preamble to the 1986 revision to the OSHA standard, OSHA identifies pulmonary fibrosis as among the diseases associated with exposure to asbestos. OSHA further stated, in 1986, "OSHA is aware of no instance in which exposure to a toxic substance has more clearly demonstrated detrimental health effects on humans than has asbestos." 51 F.R. 22612, et seq., June 20, 1986, at p. 22615.

As explained in more detail below, BNSF had knowledge of and familiarity with the OSHA regulations dating back to their inception in 1971 including the following:

The **1971** regulation contains the PEL of 5 f/cc and sets forth respirator requirements that must be used when PELs cannot be met, implicitly imposing a requirement for air sampling of a workplace with asbestos containing materials to determine if PELs are being exceeded. The regulation also includes provisions that require that "Asbestos waste and scrap shall be collected and disposed of in sealed bags or other containers" and that "All cleanup of asbestos dust and blowing shall be performed by vacuum cleaners. No dry sweeping shall be performed." 29 CFR 1910.93a (later renumbered as Section 1910.1001); 37 FR 11318, June 7, 1972. Based on the descriptions of BNSF operations in Lincoln County, none of these standards were observed during active vermiculite operations in Lincoln County or thereafter until cleanup operations began in the early 2000s. BNSF performed dry sweeping of the yard and its tracks in Lincoln County on a regular basis throughout applicable periods of operation.

As another example, the <u>1974 OSHA</u> asbestos regulation required that wet methods be used whenever practicable when working with asbestos. The 1972 regulation also provided:

> (f) *Monitoring* - (1) *Initial Determinations*. <u>Within 6 months of the publication of this section, every employer shall cause every place of employment where asbestos fibers are released to be monitored to determine whether every employee's exposure is below the PEL.</u>

The sampling required included both personal and environmental samples. BNSF apparently did not perform any air monitoring in Lincoln County until the EPA mandated cleanup began in the early 2000s. The 1972 regulation also contains Caution Label requirements requiring that labels be "affixed to all … products containing asbestos fibers." It also includes the following section:

> "(h) *Housekeeping* – (1) *Cleaning*. All external surfaces in any place of employment shall be maintained free of accumulations of asbestos fibers if, with their dispersion, there would be an excessive concentration."

Despite its documented knowledge of OSHA provisions, BNSF did not adhere to these regulations in its asbestos contaminated operations in Libby.

13. **Libby Ore - % asbestos and amount shipped**: The vermiculite that BNSF brought into and shipped out of Libby was heavily contaminated with highly toxic LA. A 1982

Environmental Protection Agency (EPA) study reported that approximately 21 to 26% of the unprocessed ore and 0.3 to 7% (by weight) of the concentrated vermiculite was asbestos (Atkinson et al., 1982).

| Sample | Fibrous phases Estimated mass, % | Mineral types | Nonfibrous amphiboles Estimated mass, % | Mineral types |
|---|---|---|---|---|
| Libby Grace | | | | |
| Grade 1, 270-I | 4-6 | Trem-actin | 1-3 | Trem-actin |
| Grade 2, 276-I | 4-7 | Trem-actin | 3-5 | Trem-actin |
| Grade 3, 259-I | 2-4 | Trem-actin | < 1 | Trem-actin |
| Grade 4, 282-I | 0.3-1 | Trem-actin | 1-3 | Trem-actin |
| Grade 5, 264-I | 2-4 | Trem-actin | 2-5 | Trem-actin |
| Grade 5 (1-day), 267-I | 2-5 | Trem-actin | 4-8 < 1 | Trem-actin Anthophyllite |
| Screen Plant Composite (288-I) | 2-5 | Trem-actin | 1-4 | Trem-actin |

The lowest asbestos content of any of the composite sample results was identified with Grade 4 vermiculite at 0.3%-1%, which result was an outlier among the rest of the composite data which ranged from 2-4% asbestos to 4-7% asbestos. The mean asbestos content in the vermiculite concentrate based on this composite sample data is approximately 3.5%. Asbestos content likely significantly exceeded this level in the preceding decades when the processing methods were less refined. See also United States Department of Health and Human Services Agency for Toxic Substances and Disease Registry, Chemical-Specific Health Consultation: Tremolite Asbestos and Other Related Types of Asbestos, 2001, page 11. See also, Millette et al., (2015).

14. **Fiber years**:  For chrysotile asbestos, the most commonly encountered form of asbestos, it is thought that 25 fiber per cubic centimeter years (f/cc years) of exposure is sufficient to cause asbestosis, whereas, for amphiboles in general and LA in particular, the threshold exposure has been reported at 2 f/cc years or less (Rohs et. al. 2007). *See also* Sluis-Cremer et al. (1990), page 440, "Table 5 showing that even when exposed to an average fiber concentration of 2 f ml-1 or less, very significant proportions of the men have developed asbestosis."  As discussed in detail in Section 29, the EPA has more recently examined the toxicity of the LA in its 2014 Toxicological Review of Libby Amphibole Asbestos and arrived at a reference concentration (RfC) of 0.00009 f/cc for non-malignant asbestos related findings and an Inhalation Unit Risk (IUR) representing the lung cancer and mesothelioma risk associated with LA exposure.

15. **Libby Amphibole Asbestos makeup**:  LA is a particularly toxic form of amphibole asbestos actually consisting of a mixture of three amphibole asbestiform minerals; 84% winchite, 11% richterite, and 6% tremolite (Meeker 2003).

16. **Asbestos Fiber Fate and Transport**:  Every time the ore or the vermiculite concentrate was moved or disturbed, Libby Asbestos dust was entrained into the air.  Employees of BNSF who worked in Libby while BNSF was engaged in the handling of Libby vermiculite report that BNSF's activities created huge amounts of airborne vermiculite dust.

The suspension of LA in air is measured in "half times," representing the time it takes 50% of LA particles to settle out of the air column. A particle with a thickness of 0.5 µm (0.5 micrometers) has a half time of approximately two hours, assuming the source of disturbance has been removed (CDM, 2009). Larger particles will settle faster; a particle of 1 µm has a half time of about 30 minutes. Smaller LA particles may stay suspended for significantly longer. The typical half time for a 0.15 µm particle is close to 40 hours (CDM 2009, EPA 2013).  Asbestos fibers in the air are known to travel long distances from their source or point of origin.  The EPA states:

> During the time that the [asbestos] fiber remains airborne, it is able to move laterally with air currents and contaminate spaces distant from the point of release.  Significant levels of contamination have been documented hundreds of meters from a point source of asbestos fibers, and fibers also move across contamination barrier systems with the passage of workers during removal of material.

> The theoretical times needed for [various sizes of respirable] fibers to settle from a 3 meter (9 ft) ceiling are 4, 20 and 80 hours in still air. Turbulence will prolong the settling and also cause re-entrainment of fallen fibers. (EPA 1978b).

The EPA recently reported:

> Activity-specific testing found that the half-time of LA asbestos suspended by dropping vermiculite on the ground was about 30 minutes.  LA asbestos suspended from disturbing vermiculite insulation settled within approximately 24 hours (CDM Smith 2009). Once suspended, LA Asbestos moves by dispersion through air.  LA asbestos concentration will be highest near the source and will decrease with increasing distance. In outdoor air, wind speed will determine direction and velocity of LA asbestos particle transport. Wind can cause the rapid dispersal of LA asbestos from the source of release (EPA 4/30/2014).

17. **Bystander & Community Exposure:**  It has been known since 1930 or earlier that bystanders are at risk of significant asbestos exposure. That is, people who do not themselves work directly with asbestos materials or dust are at risk of significant exposure

caused by others who are working with or around with asbestos.   For this reason, it was recommended in the 1930s that dusty processes involving asbestos be isolated from other work areas to avoid exposing people whose presence is not necessary in the dustier operations, or performing the dustier operations with asbestos at times when there is a minimum number of other workers present.   See, e.g., Hoffman, 1918; Oliver, 1927; Merewether, 1930; Ellman, 1933; and Alton Documents.

More generally, the dangers of exposure to workers' families and the community from workers bringing home toxic dusts on work clothing has been recognized since the early 1900's.

The 1913 textbook by Tolman, Safety, Methods for Preventing Occupational and other Accidents and Disease, states:

> The importance of wearing suitable clothing on the premises should be strongly impressed upon workers in dangerous trades. The ordinary street clothes should be taken off and replaced by special suits to be worn during working hours. It is not sufficient for a working-suit, jacket or apron to be put on over the ordinary clothing. The working suit should be taken off before the midday meal and before leaving the factory and exchanged for the street-clothes. Working garments should be cut perfectly plain, without folds or pockets, and should be made of strong, smooth, washable materials. By removing the working-clothes before meals and before leaving the factory, the poison is not carried into lunchrooms or into the homes of the workers.  (Tolman, 1913).

In 1914, W.G. Thompson emphasized the hazard which could occur from permitting a worker to wear his dirty work clothes home:

> The provision of adequate washing facilities, water closets and opportunities for removing overalls so that they do not have to be worn home when impregnated, for example, with lead dust or dyes, are other factors of much importance in influencing general health.

> The workman who goes home to a scanty meal, wearing clothing steeping in perspiration and fumes, dust or solutions of toxic materials in which he has been working, and who sleeps in a close, dirty apartment in which he hangs his reeking clothes, carries much of his occupational hazard with him, if it be of toxic nature.   These are not all conditions which can be controlled by legislation, but are largely to be remedied through education of the workman in personal and home hygiene, and by such moral and social influences as may be brought to bear upon the situation.

(Thompson 1914).  By the mid-1930's, L.D. Bristol wrote that employers had a definite responsibility to ensure that workers were safe on and off the job:

16

> While industrial managements cannot be expected to take over the responsibilities of individuals, private doctors, or community health and safety authorities, there most certainly is an opportunity, if not a definite responsibility for industries to be interested in not only the so-called occupational diseases and accidents, but also in the non-industrial diseases and accidents off the job. The practice of good health and safety habits on the part of employees, and the practice of good plant sanitation and safety on the part of management, should be objectives of prime importance in any and every program of industrial hygiene.

(Bristol 1935). In 1934, The International Labor Office (ILO) published its Standard Code of Industrial Hygiene. In addition to advising to avoid the escape of dust into workrooms or adjacent premises, the 1934 ILO Code also provides that, "In dusty trades, cloakrooms, washing accommodations, and eventually douche-baths, separate from the workrooms, should be provided for the workers" (ILO, 1934). The ILO Code further provided:

> Working Clothing
>
> All personnel exposed to infectious, irritating or toxic substances shall be provided with suitable overalls or working clothing and also head coverings where needed, which-
>
> > (a)    shall be removed before partaking of food or leaving the premises, and deposited in the places set apart for such purpose;
> >
> > (b)    shall not be taken out of the factory by the users for any purpose; and
> >
> > (c)    shall be maintained in good repair and shall be sterilized when necessary and washed, cleaned or changed for clean clothing at least once a week or more often if necessary. ***
>
> All personnel exposed to substances which are poisonous through ingestion shall be required to wash their faces and hands thoroughly before partaking of any food, drink or tobacco, or leaving the premises. ***
>
> Dressing Rooms
>
> > (1)  All industrial establishments shall have suitable and sufficient installations for accommodating the workers' clothes and drying them.
> >
> > (2)  These installations shall be placed in rooms separate from the workrooms.

17

> A separate dressing room shall be made available for all employees whose working clothes are exposed to contamination with poisonous, infectious, irritating or radioactive substances and shall be provided with well separated facilities for street and working clothes.
>
> When workers are engaged in processes of such a nature that their working clothes are liable to become wet or have to be washed between shifts, suitable arrangements shall be made to ensure that dry clothes are always available to each employee on his return to work.
>
> Dressing rooms shall be provided with individual lockers of adequate size and with adequate ventilation, preferably of metal and fitted with locks, for clothing taken off during working hours (ILO,1949).

According to Kotin (1977), there are data that suggest that the risk to asbestos-related disease is not exclusively limited to the workplace:

> There are neighborhood cases of asbestos-related disease demonstrated by research and studies in the States, and research and studies in the United Kingdom. Again, these neighborhood cases reflect exposures to effluents in the days of virtual non-regulation and in the days of excessive exposure. Another group that has been identified as being at risk to asbestos-related disease at a site other than the workplace are the instances of the asbestos-related disease in family members of asbestos workers, conjugal cases. Two important things need to be said about neighborhood cases and conjugal cases. There are no data, despite the oft repeated statement… "that these represent minimal exposures." Actually, the exposures, and let us say the conjugal cases, represent maximal exposures. They are exposures that are 24 hours a day, certainly day-long exposures. They are resuspended exposures to asbestos brought home by the worker. You have a spectrum of susceptibilities."

Transcript of Remarks by Paul Kotin, M.D. Senior Vice President, Health Safety & Environment, Johns-Manville Corporation before Consumer Product Safety Commission June 9, 1977.

Incidental environmental asbestos exposures in populations living near plants where asbestos has been mined and/or processed have been well documented throughout the world since the 1960s and continue to be reported in recent literature (Wagner et al., 1960; Newhouse et al., 1965; Barbieri et al., 2012).

Exposure to asbestos by individuals outside of employment is central to this case.[2] In

---

[2] Portions of this section have been adopted from the report of Steve Amter from the previous Libby asbestos case of *Knadler, et al. v. The State of Montana.*

18

contrast to workers who are exposed directly by handling asbestos-containing materials, individuals also can be exposed to asbestos by a variety of other, more indirect, ways. As discussed below, in the community around the Libby mine and plant, this occurred by several pathways: 1) Inhalation of airborne dust emitted from vermiculite operations taking place in proximity to locations where individuals lived, worked, and recreated; 2) contact between family members and employees who worked in or around vermiculite operations and brought asbestos-contaminated dust into the home; and 2) inhalation or contact by community members with vermiculite or associated materials in and outside of Libby. These pathways by which non-workers or workers who do not directly handle toxic materials can be exposed to them are variously referred to as community, environmental, "bystander," indirect, or secondary exposures.

Descriptions of how the understanding of environmental and bystander exposures evolved over time, both for chemicals in general and for asbestos in particular, are provided in the reports and affidavits of Plaintiffs' Experts Dr. Arthur Frank and Dr. Barry Castleman as well as in a chapter in Castleman's comprehensive book on asbestos. As set forth in greater detail in the Expert Disclosure of Barry Castleman, the Affidavit of Barry Castleman, and the text Asbestos: Medical and Legal Aspects authored by Barry Castleman, a threat to life from breathing asbestos has long been recognized (from the 1930s and earlier) by the medical community, railroads, and other industries as extending not only to workers and their families, but to community members as well, including individuals only environmentally exposed to the dust.

As a general concept, the understanding of these exposure pathways for various chemicals and mineral elements goes back many decades. For example, with respect to environmental exposures in surrounding communities, the dust, fumes, and smoke from gold, silver, and copper ore processing in Butte, Montana in the late nineteenth century caused severe air pollution and health effects among the populace, leading to the political and courtroom battles known as "smoke wars." [3] Such conflicts were rife across the nation between 1880 and 1960, where communities rose up against smelters, chemical plants, and many types of industrial and manufacturing operations that polluted the air with dust, fume, and smoke containing arsenic, lead, cadmium, fluoride, sulfuric acid and sulfur dioxide, organic chemicals, and many other toxic compounds. [4]

Toxic chemicals used in various manufacturing operations were also known to pose risks to non-employees through the pathways described above. For example, in the 1930s chlorinated organic chemicals such as PCBs, which often were in powdered form, were known to cause chloracne and liver degeneration among family members exposed to dust brought home on employee work clothes. Reports of these exposures invariably contained recommendations for the standard industrial hygiene measures designed to prevent such occurrences: minimizing contact with the offending compounds, mandatory use of work

---

[3] D. MacMillan, *Smoke Wars: Anaconda Copper, Montana Air Pollution, and the Courts, 1890 - 1924*, Montana Historical Society, 2000.

[4] Ross and Amter, *The Polluters*, Chapters 2 and 3.

clothes that stayed at the plant, and two sets of clothes lockers separated by adequate washing, showering, and laundry facilities.[5]

This general danger of industrial toxins affecting neighbors – and the pathways of indirect or secondary exposure – was explained by Wilhelm Hueper in his widely read 1942 treatise on Occupational Cancer. In the mid-twentieth century Dr. Hueper was perhaps the most known authority on occupational cancer.[6] His text cites references from as early as 1919 which attributed bladder cancer among community members living near dye factories to environmental exposures through dust, air, and other pathways.[7] These exposure pathways into the community were schematically illustrated in a widely read 1950 publication authored by Dr. Hueper and issued by the National Cancer Institute, a Division of the National Institutes of Health, which lists asbestos as a lung carcinogen.[8]

The dangers of breathing asbestos were recognized by the U.S. government no later than 1918[9] and by the 1930s it was understood that not only workers exposed directly by handling asbestos-laden material were at risk, but workers in nearby operations and members of the surrounding community were also at risk of exposure and developing asbestos-related conditions.

The evolution of knowledge about diseases caused by asbestos, including cancer and mesothelioma, is described by Dr. Spear and Dr. Castleman.  Based on an extensive review of technical and medical reports, Castleman concludes that "...it was evident by the mid-1930s that "bystanders" such as clerical workers in asbestos plants could develop asbestosis from years of relatively light exposure."[10]  The medical community recognized that inhalation of asbestos by factory neighbors could potentially affect their lungs. Researchers publishing in the early 1930s found asbestos bodies "in the lungs, *post mortem*, in a man who lived close to a factory for many years but who had never been

---

[5] W.B. Fulton and J.L. Mathews, *A Preliminary Report of the Dermatological and Systemic Effects of Exposure to Hexachloro-Naphthalene and Chloro-Diphenyl*, Pennsylvania Bureau of Industrial Standards Industrial Hygiene Section, March 16, 1936 reported on an infant who contracted chloracne from contact with his father's soiled work clothes; a newspaper account of this exposure reports that both the childs mother and sister also showed symptoms: J. Laventhol, Plant Closed as Mysterious Malady Hits 100, Philadelphia Record, January 22, 1936; L. Schwartz, Dermatitis from Synthetic Resins and Waxes, Amer. J. of Public Health, vol. 26, pp. 586-92, 1936 and C.K. Good and N. Pensky, Halowax Acne ("Cable Rash"), Archives of Dermatology and Syphilology, vol. 48, no. 3, 1943 both report that families of workers contracted chloracne from contact by personal and laundering clothes.

[6] Ross and Amter, *The Polluters*, Chapter 6.

[7] W.C. Hueper, *Occupational Tumors and Allied Diseases*, Charles Thomas Publisher, pp. 525-6, 1942. The chapter of this seminal treatise devoted to occupational lung cancer has a section devoted to asbestos (p. 399-405) as well as a summary of industrial hygiene measures to eliminate or reduce asbestos dust hazards to workers, including wetting to reduce dust levels, improved ventilation, and separation and closing off dust-producing operations, piping, and conveyances.

[8] W. Hueper, Environmental Cancer, National Institutes of Health, 1950.

[9] F.L. Hoffman, *Mortality* from *Respiratory Diseases in Dusty Trades*, Bureau of Labor Statistic Bull. 231, pp. 176-180, 1918.

[10] B.I. Castleman, p. 425.

inside it..."[11] Castleman cites additional evidence from the 1930s and 1940s that demonstrates that lung disease arising from indirect exposure among individuals in "non-production asbestos factory workers (machine adjuster, plant manager, departmental manager)" was recognized within the industrial and medical communities.

In 1960, medical researchers in South Africa reported an unusually large number of cases of the relatively rare cancer mesothelioma in a region known for its asbestos deposits.[12] The authors concluded that the disease resulted from both direct and indirect exposure pathways.  Also in 1960, Raimo Kiviluoto reported that 499 cases of pleural calcification had been found among citizens without occupational exposure who lived in the region surrounding two asbestos mines and processing plants in Finland. Even individuals a considerable distance from the facilities showed effects.[13] Additional investigation by V. Raunio added 1300 more cases. Two air pollution surveys of the region surrounding the mines reported the unsurprising fact that the amount of asbestos dust in the air and falling on the land varied with wind direction and distance from the mines and associated areas.[14]

In 1964, Dermot Hourihane and others, following the work of several researchers studying asbestos-related disease in urban London, described the link between mesothelioma and asbestos and commented that "many of the cases gave no history of industrial exposure, and it is possible that a temporary or relatively trivial exposure may have occurred."[15] That same year, Irving Selikoff and others cited the findings in South African, London, Finland, and elsewhere and concluded:[16]

> ...pleural and peritoneal neoplasms among individuals who had chance environmental exposure to asbestos many years before raises the very important question of possible widespread carcinogenic air pollution. The possibility of environmental exposure has long been known... What is new, however, is an appreciation of the potential extent of the problem.

In a paper titled "Prevention of Industrial Cancers," Wilhelm Hueper provides a good summary of the standard industrial hygiene preventative measures that had been

---

[11] M.J. Stewart, N. Tattersall, and A.C. Haddow, On the Occurrence of Clumps of Asbestosis Bodies in the Sputum of Asbestos Workers, *J of Pathology*, pp. 737-41, 1932."

[12] J.C. Wagner, C.A. Sleggs, and P. Marchand, Diffuse Pleural Mesothelioma and Asbestos Exposure in North Western Cape Province, *British Journal of Industrial Medicine*, vol. 17, pp. 260-71, 1960.

[13] R. Kiviluoto, Pleural Calcification as Roentgenologic sign of Non-Occupational Endemic Anthophyllite-Asbestosis, *Acta Radiologica*, Supplement 194, pp. 1-67, June 1960.

[14] A. Laamanen, L. Noro, and V. Raunio, Observations on Atmospheric Air Pollution Caused by Asbestos, *Annals of the New York Academy of Science*, 1965. These authors were with the Institute of Occupational Health in Helsinki, Finland.

[15] D.O. Hourihane, The Pathology of Mesotheliomata and an Analysis of Their Association with Asbestos Exposure, *Thorax*, vol. 19, pp. 268-78, 1964.

[16] I.J. Selikoff, J. Churg, and E.C. Hammond, Asbestos Exposure and Neoplasia, *Journal of the American Medical Association*, vol. 188, pp. 22-6, 1964.

developed over previous decades.[17] A section of this paper states:

> Workers exposed to carcinogenic agents should be provided with suitable protective clothing... Separate lockers and rooms should be available for work clothes and street clothes. Contaminated work clothes should not be taken home for laundering, since such a procedure might spread the cancer hazard to members of the family of exposed workers or to workers employed in public laundries or persons subsequently using the same laundering equipment in public or commercial establishments. Contaminated clothes should be cleaned in the plant under adequate conditions of safety... Workers should have adequate bathing facilities and should be required to take a bath after work and before leaving for home... All workers should be instructed as to the reasons for the precautionary regulations made and any warning symptoms of cancerous reactions.

And also:

> All available means of education and information should be used by public health agencies for spreading all available knowledge of recognized, probable and potential occupational carcinogens and cancers among all concerned with such matters, including worker organizations, for ensuring an early recognition of actual and possible occupational cancer hazards, and for making possible the institution of preventive measures before such hazards may produce any epidemic-like appearance of cancers.

18. **Libby Community Dispersion Modeling:** As explicated in the expert report of Dr. Julian Marshall, aerial asbestos emissions resulting from the asbestos contaminated condition of BNSF's Libby properties led to the widespread contamination of ambient air in the area, which in turn resulted in inhalation exposures to Lincoln County residents and visitors.

19. **Asbestos Concentrations in Libby Ambient Air**:  Outdoor asbestos air concentrations were measured at locations near the downtown BNSF Railyard in 1975 at up to 1.5 f/cc, more than 16,000 times higher than the LA RfC.  (Results of W.R. Grace 1975 Dust Surveys – Source Emissions).

20. **Asbestos Concentrations in Libby Ambient Air - Transportation Corridors:**  Several air monitoring studies have been performed to assess ambient air quality at the Libby superfund site decades after the vermiculite mine ceased operations.  In 2006, EPA initiated an ambient air monitoring campaign within the community of Libby and the former mine site (OU3).  In 2010, the focus of this program was transferred to ambient air monitoring along transportation corridors (major roadways, railroad, and railyard) in Libby (EPA, 2015, Section 5.1).  Monitoring within the community of Libby showed that

---

[17] W.C. Hueper, Prevention of Occupational Cancer Hazards, CA Cancer J Clin, pp. 88-97, 1966.

58 of the 620 ambient air samples collected (9 percent) revealed detectable phase contrast microscopy equivalent (PCME) Libby amphibole asbestos, whereas 34 of 238 (14 percent) of the samples collected along transportation corridors and 13 of 96 (13 percent) of the samples collected at the former mine site revealed detectable PCME Libby amphibole asbestos. The mean exposure point concentration (EPC) calculated for ambient outdoor air considering the receptor population of residents within the Libby community was $4.8 \times 10^{-6}$ Libby amphibole s/cc, while the mean EPC for ambient outdoor air considering the receptor population of residents along transportation corridors was $9.8 \times 10^{-6}$ Libby amphibole s/cc and $2.0 \times 10^{-4}$ Libby amphibole s/cc at the former mine site (EPA, 2015, Table 5.4). When applied to risk estimates for Libby amphibole in ambient air, the hazard quotients associated with ambient air exposures for residents along transportation corridors are double those calculated for hazard quotients associated with ambient air exposures for residents within the Libby community (EPA, 2015, Table 5.4).

21. **Minneapolis Libby Amphibole Dispersion Modeling:** In addition to the Libby, MT community, dispersion modeling has been performed in other residential areas where Libby vermiculite concentrate was transported by BNSF. Community exposure modeling performed in a densely populated urban residential neighborhood near a former vermiculite processing facility in Minneapolis revealed that fiber emissions from the plant, with geometric mean cumulative community exposures estimated as 0.02 fibers/cc x month, were the largest source of exposure for the majority of the cohort (Adgate et al., 2011).

22. **Family Member/ Take-Home Exposure:** As early as 1949, reports of asbestos disease among housewives exposed to dust brought home on their husband's work clothes appeared in the medical literature (Wyers, 1949). The studies by Newhouse and Thompson, Wagner et al., and Dr. Selikoff in the 1960's further documented asbestos disease among family members exposed to asbestos dust carried home on clothing (Newhouse, 1965; Wagner et al., 1960; Selikoff, 1964).

Studies investigating secondary exposures from work clothing contaminated with asbestos concluded (1) the shaking of typical work clothes that are contaminated from the use of asbestos will cause amosite fibers to be released into the breathing zone of the individual who is performing this work resulting in a significant exposure to airborne amosite fibers, and (2) also caused the surfaces in the area to become contaminated with amosite fibers (as measured by the passive dust samplers) providing another potential source of exposure through re- entrainment from such activities as sweeping, vacuuming or other cleaning projects (Hatfield and Longo, 1999).

In another study, a laundry operation was examined because of its relevance to household exposures in cases of malignancies in families of asbestos workers. Airborne asbestos concentrations during general laundry activities showed a mean of 0.4 f/cc and a maximum of 1.2 f/cc (Sawyer, 1977).

Exposure to indoor dust that is contaminated with asbestos is a potentially important exposure pathway for residents. This is because most people spend a large fraction of time

indoors, and a wide variety of routine and indoor activities may cause the asbestos in dust to become suspended in air where it can be inhaled into the lung. One potential source of asbestos contamination in indoor dust is asbestos in outdoor soil (EPA 2007a).

23. **1960's Wagner, Selikoff, Newhouse**:  A notable 1960 study showed asbestos disease in family members and neighbors to asbestos plants (Wagner, 1960).  Wagner and other studies showing spread of asbestos disease to family members and community members were discussed in Selikoff, 1964.  By the mid-1960's, Newhouse, et al, (1965) reported individuals with household and environmental exposures to asbestos were at an increased risk of mesothelioma.  This article clearly established that individuals who laundered asbestos-contaminated clothing were at risk.  The acceptance of Newhouse's findings were widespread including by the New York Academy of Sciences:

> Dr. Newhouse's work and observations, and those of Dr. Wagner bring out a striking resemblance between accumulating data on asbestos and those on beryllium.  This is brought to mind by recent observations concerning mesotheliomas, made, in a sanitorium in South Africa, as reported by Wagner and his co-workers.  Dr. Hardy observed berylliosis in household members of the families of beryllium workers, and subsequent studies demonstrated the release of beryllium in the laundering and handling of work clothes of beryllium workers.  Similarly, Dr. Newhouse has observed mesotheliomas among the relatives in the household of asbestos workers, who had laundered their work clothes.  The resemblance continues with biological effects of air pollution.  Berylliosis was observed among resident nonemployees within a certain radius of beryllium manufacturing plants in Ohio and Pennsylvania, and Drs. Newhouse and Wagner have reported mesotheliomas, and Kiviluoto pleural plaques, of residents living within a certain radius of asbestos factory and mining operations.

24. **OSHA take home:**  Upon enactment of OSHA's asbestos standards, the federal government reaffirmed through regulation the risks to family members of an asbestos-exposed worker.  OSHA required that workers exposed in excess of its permissible exposure limit must be provided facilities to change out of their contaminated work clothing without contaminating their street clothes.  Furthermore, OSHA required that warnings be provided to any individual who laundered contaminated work clothes.

25. **Asbestos use by Railroad**:  Asbestos has been used in the railroad industry in a variety of ways, including insulation for railroad shops, wrapping around the boilers of locomotives, insulation in the driving cabins and carriages of locomotives, in asbestos cement ties, and for other heat-transfer protection. Asbestos was also found in brake pads, brake linings, clutches and ceiling and floor tiles of passenger cars. Railroad workers at risk of exposure to asbestos include workers engaged in repair, demolition, technical control, maintenance (including machinists), handling waste materials, and railroad construction and maintenance, locomotive engineers, electricians, joiners, painters, laborers, brakemen, station maintenance workers, pipefitters, riggers, insulators, fitters, finishers, polishers, mechanics, and other ancillary workers who work in close proximity to others directly

exposed to asbestos (Dodson and Hammer, Asbestos: Risk Assessment, Epidemiology, and Health Effects, 2011). There have been numerous report of asbestos-related diseases in railroad workers (Maltoni et al., *Ann N Y Acad Sci* 1991;643:347; Mancuso, *Am J Ind, Med* 1983;4:501; Mancuso, *Am J Ind, Med* 1983;4:501; Schenker et al., *Am Rev Resp Dis* 1986;134:461; Malker et al., *Acta Oncol* 1990;11:203).

### IV.   Epidemiology Literature and Toxicity of Libby Amphibole

**26. Epidemiology Literature – Occupational LA exposure and asbestos related disease.** In 1983, the Lockey study demonstrated Libby vermiculite was capable of causing pulmonary changes focused on a worker population from a Marysville, Ohio fertilizer plant that had utilized vermiculite from the Libby mine and South Africa (Lockey et al., 1983).   This cohort became the basis for the proposed RfC discussed in Section 29. Significant correlations were observed with respiratory symptoms (shortness of breath and pleuritic chest pain) and cumulative fiber exposures (Lockey et al., 1984).   Studies focusing on Libby workers followed.

McDonald et al. (1986) included a cohort of 406 men employed at the mine for at least one year prior to 1963 and followed them until 1983. Compared with white men in the U.S., the cohort experienced excess mortality, with standard mortality ratios (SMRs) of 2.45, and 2.55 for respiratory cancer and non-malignant respiratory disease (NMRD) respectively. Standard mortality ratios are defined as the observed number of cases over expected. The proportional mortality for the four identified mesothelioma deaths was 2.4%.

Data collection for a parallel study sponsored by the National Institute for Occupational Safety and Health (NIOSH) was initiated at approximately the same time (Amandus et al. 1987; Amandus and Wheeler, 1987) and included 575 men employed at the mine for a minimum of one year prior to 1970.  Similar to the McDonald et al. (1986) study, SMRs were 2.23 and 2.43 for respiratory cancer and non-malignant respiratory disease respectively (Amandus and Wheeler, 1987). These early occupational-based studies demonstrated strong exposure years/response relationships (McDonald et al., 1986; Amandus and Wheeler, 1987; Antao et al., 2012).

McDonald published additional work in 2004 in which he updated epidemiology data for his original 406 man cohort, following them until 1999 (McDonald et al., 2004). The SMRs reported in this update for lung cancer and non-malignant respiratory disease were 2.40 and 3.09, respectively.  The proportional mortality for the 12 identified mesothelioma deaths was 4.21% and "is similar to that for crocidolite mines in South Africa (4.7%) and in Australia (3.9%) and over 10 times higher than that in Quebec chrysotile miners (0.4%)" (McDonald et al., 2004).  An all-cause linear model implied a 14% increase in mortality for mine workers exposed occupationally to 100 f/mL/yr and approximately 3.2% increase for the general population exposed to 0.1 f/mL for 50 years (McDonald et al., 2004).

An additional NIOSH sponsored study included a cohort of 1,672 Libby miners, millers, and processors in 1982 and followed subjects through 2001 (Sullivan, 2007).  Compared with U.S. white men, SMRs for asbestosis, lung cancer, and cancer of the pleura were 165.8, 11.7, and 23.3, respectively.

An update regarding vermiculite worker mortality (Larson et al., 2010), with a cohort of 1862 Libby miners, demonstrated a clear exposure response relationship between cumulative Libby amphibole fiber exposure and asbestosis, lung cancer, mesothelioma, and NMRD mortality. A limitation noted for earlier epidemiology studies evaluating lung cancer SMRs in Libby mine and mill workers was the lack of control for cigarette smoking. Bias analysis revealed that cigarette smoking had minimal impact on the exposure response relationships reported in this study (Larson et al., 2010; reviewed by Antao et al., 2012). An additional conclusion from this study was the association between Libby amphibole fiber exposure and cardiovascular mortality based on a rate ratio of 1.5 with a 95% confidence interval of 1.1 to 2.0 (Larson et al., 2010).

A follow-up to the Lockey et al. (1984) Marysville, Ohio fertilizer plant study revealed pleural changes in 28.7% of the cohort (Rohs, et al., 2007). As noted previously, this cohort was the basis for the proposed Libby amphibole RfC. Pleural changes were originally reported in 2.2% of the overall cohort and 8.4% of the highest cumulative fiber exposure group (Lockey et al., 1984). The study is significant in that the cohort was based on exfoliation plant workers outside of Libby, MT, with relatively low cumulative fiber exposure (CFE) levels compared to those described in the Libby mine and mill worker studies; the CFE level of 2.2 fiber cc-years was observed.

27. **Epidemiology Literature – Community Libby amphibole exposure and asbestos related disease.**  In addition to epidemiology studies that considered Libby mine and mill workers, there have been numerous epidemiology based studies evaluating ARD mortality among Libby community members. A cross-section interview and medical testing of 7,307 persons who had lived, worked or played in Libby for at least six months prior to 1991 was conducted in 2000 and 2001 by the Agency for Toxic Substance and Disease Registry (ATSDR) investigators (Peipins et al., 2003).  Of the 6,668 participants $\geq$ 18 years of age who received chest radiographs, pleural abnormalities and interstitial abnormalities were observed in 17.8% and < 1% of the participants, respectively.

A more recent community study evaluated asbestos-related mortality in Libby from 1979-2011, while controlling for occupational exposure (Naik et al., 2017).  Statistically significant SMRs were observed for both males and females for non-malignant respiratory diseases and asbestosis, both before and after controlling for past W. R. Grace employment.  In addition, non-worker chronic obstructive pulmonary disease SMRs were also evaluated for females, but not males.

In 2008, a clinical and exposure summary report for 11 individuals diagnosed with mesothelioma who were not Libby mine or mill employees was published (Whitehouse et al., 2008). All cases were non-occupationally exposed individuals. The authors concluded that exposure most likely resulted from Libby amphibole contamination in the

26

community, the surrounding forested area, and areas in proximity to the Kootenai river and railroad tracks that were used to transport vermiculite concentrate (Whitehouse et al., 2008). The mean LA occupationally related mesothelioma latency period has been reported as 35 years (Case, 2006). The latency period reported for these non-occupational cases was 13-67 years from the first known exposure (Whitehouse et al., 2008).

In terms of both occupational and non-occupational mesothelioma cases, current mortality figures indicate one new case per year in Lincoln County, Montana (McDonald et al., 2004; Case, 2006; Whitehouse et al., 2008). Lincoln County has the third highest age-adjusted mesothelioma death rate in the nation with a rate of 56.1 per million (NIOSH, 2008).  Increased risks for the development of mesothelioma have also been observed in the worker cohort at the Marysville, Ohio plant with a SMR of 10.5 (95% CI, 1.3, 13.8) reported (Dunning et al., 2012).

A community study was conducted in a densely populated urban residential neighborhood in Minneapolis, Minnesota where an expansion facility processed Libby vermiculite ore from 1938 to 1989 (Alexander et al., 2012). In addition to commercial vermiculite products such as Zonolite® insulation and Monokote® fireproofing, the facility produced a waste material reported by the Minnesota Department of Health to contain 10% amphibole asbestos (Alexander et al., 2012). The waste product was piled on the property and offered to the community for use in gardening, driveway fill materials, etc. The prevalence of pleural abnormalities obtained for the 461 participants was 10.8%. The odds ratio associated with direct contact with vermiculite ore waste or ever playing in waste piles and pleural abnormalities are 2.78 (95% CI: 1.26, 6, 10) and 2.17 (95% CI: 0.99, 4.78) when adjusted for background exposure. The results suggest that community exposure to Libby vermiculite is associated with measurable effects (Alexander et al., 2012).  A follow up study of the Minneapolis cohort was published in 2019, observing greatly elevated mesothelioma SMRs including among those with "no direct occupational or take-home exposure; their only known exposure was from ambient air exposure as residents for over 20 years."  (Konen, et al., (2019)).

In addition to pulmonary based ARD, rates of systemic autoimmune diseases (SAID) have been evaluated in the Libby community. A follow-up case-control study was conducted among the participants in the 2000/2001 ATSDR study (Peipins et al, 2003) with cases including subjects that reported one of three SAIDs in the initial screening; systemic lupus erythematosus, scleroderma, or rheumatoid arthritis, and controls including subjects in the initial screening that responded negatively to questions regarding SAIDs (Noonan et al., 2005).  Odds ratios among former Libby mine and mill workers > 65 years of age of 2.14 (95% CI, 0.9-5.1) for all SAIDs and 3.23 (95% CI, 1.31 7.96) for rheumatoid arthritis, suggest that LA exposure is associated with SAIDs (Noonan et al., 2006). Increasing SAIDs risk estimates were reported for participants with relative increases in reported vermiculite exposure pathways.

A recently published 17-year follow-up [to Peipins et al., 2003] community mortality study evaluating 1,429 deaths in the 8,043 Libby cohort revealed fewer deaths from all causes and cancers than expected [SMR; 0.86 (95% CI 0.82, 0.91) and 0.85 (95% CI

27

0.77, 0.94)], respectively (Larson et al., 2020). However, the asbestosis SMRs were greater than 80 for all exposure groups (occupation and community). In addition, the SMR for mesothelioma was statistically elevated among W.R. Grace workers and Libby residents [25.58; (95% CI 12.34, 56.32) and 4.25;( 95% CI 1.16, 10.89)], respectively. Lung cancer standardized rate ratios (SRR) were statistically elevated among W.R. Grace workers and workers of other asbestos occupations, [2.83; (95% CI 1.1, 7.25) and 1.69; (95% CI 1.04, 2.75)], respectively, but not among community members [0.73; (95% CI 0.54, 0.98)].

Another recently published case-fatality study of workers and residents of Libby who were evaluated at the Center for Asbestos Related Disease in Libby from 2000 to 2010 and who died prior to March 2010 revealed that approximately one half of the deaths following occupational (64%) and community wide non-occupational exposure (47%) to Libby amphibole were from asbestos related disease (Miller et al., 2021). Thirty percent mortality in the non-occupationally exposed Libby resident group was from non-malignant asbestos related disease, which the authors note is considerably higher than insulator (chrysotile) and Wittenoon, Australia (crocidolite) studies, which revealed 8.6% (insulators) and 2.1% (Wittenoom workers) 0.2% (Wittenoom residents) non-malignant asbestos disease mortality

These epidemiologic studies demonstrate clear and significant increases in ARD, including asbestosis, lung cancer, and mesothelioma among industrial workers. In addition, ARD has been observed in area residents with no direct occupational exposures. The most common health outcome among Libby residents and others with low lifetime cumulative fiber exposure levels are pleural changes.

28. **Pleural Disease and Pulmonary Function:** While pleural disease and progressive loss of pulmonary function has been reported within occupational and non-occupational Libby populations (Whitehouse, 2004), there have been several publications evaluating the relationship between Libby amphibole related pleural changes and lung function with inconsistent results (Clark et al., 2014; Lockey et al., 2015a; Lockey et al., 2015b; Zu et al., 2016; Lockey et al., 2017; Clark et al., 2017). The most recent assessment (Miller et al., 2018) of individuals who worked at the Libby vermiculite mine for a minimum of 6 months revealed that 223 (87%) of the 256 miners had pleural thickening, and among them, 47 (21%) had associated parenchymal abnormalities. Among the 223 with pleural thickening, 68% had lamellar pleural thickening, rather than the classical circumscribed pleural thickening. Lamellar pleural thickening was associated with low values of forced vital capacity and diffusion capacity and significantly lower values in all pulmonary function tests when associated with parenchymal abnormalities. In addition to pulmonary function assessments, radiographic parenchymal abnormalities were associated with lung cancer in the latest community mortality study (Larson et al., 2020), further supporting the hypothesis that pleural plaques may be an independent risk factor for lung cancer mortality (Pairon et al., 2014).

29. **Current Toxicological Knowledge – Libby Amphibole Asbestos:** A toxicological review of Libby amphibole asbestos was published in 2014 (EPA/IRIS, 2014). This review includes the non-cancer and cancer health effects for the inhalation route of

exposure and resulted in a published reference concentration (RfC) and inhalation unit risk (IUR) for non-cancer and cancer risk, respectively. The RfC of $9 \times 10^{-5}$ fibers/cc is defined as "an estimate of an exposure that is likely to be without an appreciable risk of adverse health effects over a lifetime and is expressed as a lifetime daily exposure in fibers/cc (due to measurement by phase contrast microscopy (PCM))."

The RfC for Libby amphibole represents the first published non-cancer reference inhalation concentration for a mineral fiber. Asbestosis, pleural thickening, and other nonmalignant respiratory disease in populations exposed to Libby amphibole asbestos were considered in the development of the RfC, with localized pleural thickening selected as "the critical effect" (EPA/IRIS, 2014). Cohorts considered included two occupationally exposed groups; Libby, MT workers and Marysville, OH workers; and one non-occupational exposure group which consisted of residents near an exfoliation plant in Minneapolis, MN. Cumulative inhalation of Libby amphibole asbestos was associated with increased risk of localized pleural thickening at all sites, even at the lowest ranges of exposure for each group (Christensen et al., 2013). The Marysville cohort was selected due to the strength of the industrial hygiene data and exposure response relationships and the lack of confounding residential/community exposures to Libby amphibole asbestos. The Marysville cohort considered workers who were hired after 1972 and who participated in health evaluations in 2002-2005 (EPA/IRIS, 2014).

The IUR represents the upper-bound estimate of cancer risk from chronic inhalation exposure to Libby amphibole at 1 fiber/cc (EPA/IRIS, 2014). The combined upper bound IUR for Libby amphibole asbestos, considering only mesothelioma and lung cancer models, is 0.169 excess cancer deaths per fiber/cc per person as measured by PCM (EPA/IRIS, 2014). Cohorts selected for Libby amphibole asbestos lung cancer and mesothelioma IUR models were workers employed at the Libby vermiculite mine and mill (EPA/IRIS, 2014).

The significance of this toxicological review is that it is specific for Libby amphibole asbestos, a unique mixture of amphibole minerals. The RfC represents the first non-cancer reference concentration for mineral fibers and it is substantially lower than historic exposure limits for asbestos.

### 30. A Summary of Inhalation Factors and Proposed Mechanisms of Toxicity:

Exposure to Libby amphibole asbestos is associated with nonmalignant and malignant asbestos related diseases including asbestosis, lung cancer, mesothelioma, pleural thickening and pleural plaques (McDonald, 1986; Amandus et al., 1987; Amandus and Wheeler, 1987; McDonald et al., 2004; Case, 2006; Sullivan, 2007; Whitehouse et al., 2008; EPA/IRIS, 2014). As described above, localized pleural thickening was selected as the critical effect for the RfC. Work published prior to 2002 referenced earlier International Labour Organization guidelines for defining pathological alterations of lung parenchyma and pleura; therefore, pleural plaques reported in literature prior to 2002 describe what is currently referred to as localized pleural thickening (EPA/IRIS, 2014).

While other exposure routes and related health outcomes have been reported in literature, inhalation of asbestos fibers is the primary route of human exposure, and as a result, was the basis of the toxicological assessment described above. When characterizing the inhalation exposure risk for asbestos fibers, as with other aerosols, there are many variables to consider. These include, but are not limited to, the concentration of asbestos measured in the breathing zone and the dose inhaled, duration of exposure, frequency of exposure, physical and chemical characteristics of the fibers (shape, length, diameter and surface properties that are influenced by mineral composition and charge), nasal or oral breathing patterns (or both), respiration rate, specific anatomical and physiological features of the respiratory tract, fiber deposition and clearance mechanisms, and individual susceptibility (immune status, genetics) (Liu et al., 2013).

While epidemiologic studies have established that exposure to asbestos causes the ARDs summarized above, the pathogenic mechanisms of these diseases are not completely understood. Asbestosis is one type of pulmonary fibrosis.  Pulmonary fibrosis is commonly described as excess collagen in the alveolar interstitium, which may also extend to the alveolar ducts and respiratory bronchioles (KLAseesn, 2013). Proposed mechanisms of collagen deposition involve epithelial cell injury and macrophage activation. Asbestos elicits a macrophage response to phagocytize and clear fibers, but this response may result in reactive oxygen species production, inflammasome activation and the release of cytokines and growth factors. Asbestos can also induce alveolar epithelial cell apoptosis, which in turn can result in additional growth factors and cytokines. These signaling pathways are considered important for myofibroblast differentiation, collagen deposition by myofibroblasts, and ultimately fibrosis (Liu et al., 2013).  Fibrosis of the lungs impairs the ability for efficient oxygen/carbon dioxide exchange and leads to progressive stiffness.

While parenchymal interstitial fibrosis is observed with most asbestos disease cohorts, a large number of cases in the Libby cohort exhibit pleural disease with limited or no interstitial disease present (Peipens et al., 2003; Rohs et al., 2008; Alexander et al., 2012; Loewen, 2016; Frank, 2016).   While it is postulated that many of the biological mechanisms described above in addition to fiber translocation also contribute to the pleural pulmonary fibrotic process, the mode or mechanism of action for pleural thickening has not been defined specifically for Libby amphibole asbestos (EPA/IRIS, 2014).

Complexity in defining the mechanisms of toxicity also exists for malignant ARDs. Proposed mechanisms for the carcinogenicity of asbestos fibers as defined by the International Agency for Research on Cancer (IARC, 2012; EPA/IRIS, 2014) include direct fiber-cell interaction with target cells and indirect interaction generated from cellular signaling pathways. The surfaces of asbestos fibers deposited in the lungs acquire iron that cycles between the reduced and oxidized forms (Shannahan, 2011). This redox cycle may result in DNA lesions which may lead to apoptosis, gene mutations, chromosomal aberrations, and cell transformation (Huang et al., 2011). Asbestos-induced reactive oxygen species (ROS) production may also result in p53 activation, and other

cellular signals including cytokines, chemokines and growth factors (Liu, 2013). As was noted with the proposed mechanisms of fibrosis, mechanistic events for asbestos carcinogenicity also include macrophage interaction, inflammasome activation associated with frustrated phagocytosis, release of cytokines and growth factors, and subsequent inflammation. Asbestos is considered to be both an initiator and a promotor of the carcinogenic process (Mossman et al., 2011).

Pleural malignant mesothelioma is a rare disease. It is reported in literature that 50 to 90% (Carbone et al., 2012; Sebbag and Sugarbaker, 2001; Dodson and Hammer, 2011 pp 576; Strauchen, 2011) of individuals with pleural mesotheliomas have identifiable accounts of asbestos exposure. In an assessment of lung asbestos fiber burden and asbestos exposure history among patients diagnosed with pleural malignant mesothelioma, (Carbone et al., 2012) 11 of 18 (61%) individuals reporting a negative history of asbestos exposure had lung fiber burden concentrations > 0.5 million fibers/dry gram of tissue. Similar results were reported by (Leigh et al 2002) revealing asbestos fibers in the lungs of 80% of Australian patients with no apparent asbestos exposure. These results suggest that exposure histories may not always accurately reflect asbestos exposure. Individuals with known occupational exposures to asbestos cannot be recast into the "idiopathic" or "unknown exposure" category. When confronted with an individual who has a demonstrated mesothelioma and an occupational exposure to asbestos, the mainstream scientific community recognizes that the cause of that mesothelioma is the asbestos exposure of the individual even if that exposure was "brief or low-level" (Welch, 2007). The consensus of the scientific community is that there is no demonstrable threshold of exposure to asbestos below which adverse health effects do not occur (NIOSH, 1980) Accordingly, "an occupational history of brief or low-level exposure should be considered sufficient for mesothelioma to be designated occupationally related" to asbestos exposure (Helsinki criteria, 2014). Asbestos-induced mesothelioma has a variable but typically long latency period, usually 30 or more years, and the latency increases with lower levels of exposure (Browne, 1994; Bianchi et al., 2007). Unlike carcinoma associated with asbestos exposure, mesothelioma is not associated with cigarette smoking (Klassen, 2013).

The scientific community is in consensus that even brief and low-level exposure to asbestos can cause mesothelioma. The mainstream scientific community has long recognized and continues to recognize today that there is no "safe" level of exposure to asbestos (World Trade Organization, 2000; Helsinki criteria, 2014). As noted by NIOSH, excessive cancer risks have been demonstrated at all fiber concentrations studied to date. Evaluation of all available human data provides no evidence for a threshold or for a "safe" level of asbestos exposure (NIOSH, 1980). There is inconsistency in literature regarding linear dose response curves for asbestos exposure and malignant mesothelioma. It has been commonly reported that there is a dose-response relationship that is linear (risk increases with increased exposure) with no threshold (no safe level of exposure exists) (Lin et al., 2007; Dodson & Hammer, 2011 pp 576). Other studies, primarily focusing on environmental asbestos and erionite mineral fiber exposures, have not reported a linear dose-response relationship between asbestos exposure and malignant mesothelioma (Carbone et al., 2002; Carbone et al., 2012), suggesting that some

individuals may be more susceptible to asbestos induced malignant mesothelioma than others due to factors such as genetics, exposure to cofactors (ionizing radiation, Simian virus), and mineral fiber constituencies (Carbone et al., 2012).

There are numerous instances in the literature of mesotheliomas occurring in relatively low exposure groups, and across various settings and countries. Examples include:

Iwatsubo et al (1998) found an excess of pleural mesothelioma in the lowest exposure group with an estimated total exposure between 0.001 and 0.49 f/cc-years. Twenty three percent of cases and 36% controls were exposed to less than 0.5 f/cc-years. The time-related pattern of exposure revealed a significantly elevated odd ratio among workers whose exposure to asbestos was intermittent.

Rodelsperger et al. (2001) concluded there was a distinct dose-response relationship, even at low levels of exposure, with exposures from >0 to <0.5 f/cc-years showing a significantly increased risk of mesothelioma. Study results confirm the previously reported observation of a distinct dose-response relationship even at levels of cumulative exposure below 1 fiber year. Rodelsperger et al. (2001) stated: "In addition to asbestos exposure at the workplace, contact in the household and environmental exposure to asbestos are established causes of diffuse malignant mesothelioma."

Rolland et al. (2006) reported that a significant dose-response relationship was found between cumulative occupational exposure and pleural mesothelioma, even for the lowest category (greater than 0-0.07 f/cc-years, OR 2.8, 95% CI = 1.7-4.7).

Dodson and Hammer (2011) reported increased risk of mesothelioma at concentrations lower than 0.1 f/cc-years. At 0.1 f/cc-years, there was an excess of 7 cases/100,000 people exposed.

In a study of patients with malignant mesothelioma, focusing on exposure, occupation, survival, and prognostic factors, Skammeritz et al. (2011) reported that the total time of exposure ranged from a few days to over 40 years. The authors found no significant difference in latency between patients with high, moderate and low exposure to asbestos. Approximately 50% of the patients had a cumulative exposure of <10 fibers/cm3-year, illustrating that a massive exposure to asbestos is not necessary to develop mesothelioma.

In a Netherlands cohort study, Offermans et al. (2014) reported that for mesothelioma, hazard ratios (HRs) were significantly elevated in this study, even for the lowest tertile of cumulative exposure median ( 0.20 f-y/mL) based on job exposure matrices (HR = 2.69 [95%CI, 1.60 to 4.53]).

Lacourt et al (2014) reported that a clear dose-response relationship was observed between occupational asbestos exposure and pleural mesothelioma (OR=4.0 (99% CI 1.9 to 8.3) for men exposed at less than 0.1 f/mL-year vs 67.0 (99% CI 25.6 to

175.1) for men exposed at more than 10 f/mL-year). The study also suggests that the overall population attributable risk (ARp) in women is largely driven by non-occupational asbestos exposure arguing for the strong impact of such exposure in pleural mesothelioma occurrence.

Jiang et al. (2018) found that the variables of highest probability of exposure, highest intensity of exposure and highest frequency of exposure were associated with increased risk of mesothelioma. The risk was remarkably elevated for cases with definite exposure (OR = 64; 95% CI: 12–328), high intensity of exposure (OR = 49; 95% CI: 11–225), and continuous exposure (OR =53; 95% CI: 11–263). A dose–response relationship was found for the duration of asbestos exposed job with risk of mesothelioma reaching 28 (95% CI: 6–134) for <6 years, 51 (11–247) for 7–17 years and 56 (9–351) for 18 years. A dose–response relationship of cumulative exposure index (CEI) with risk of mesothelioma was 28 (6–137) for CEI at 0–0.5 f/mL-years, 36 (7–184) for CEI at 0.5–29 f/mL-years, and 79 (14–451) for CEI >29 f/mL-years.

A mechanism proposed for mesothelial cell transformation is that asbestos fibers induce necrotic cell death of human mesothelial cells, which results in the release of high-mobility group protein B1 (HMGB-1) in the extracellular space (Yang et al., 2006 and 2010). Secreted HMGB-1 induces a chronic inflammatory response which includes an accumulation of macrophages and the release of inflammatory cytokines from macrophages, including TNF-α and IL-1β. "TNF-α activates the NF-β pathway, which increases the survival of human mesothelial cells after asbestos exposure, allowing cells with asbestos-induced DNA damage to divide rather than die, and if key genetic alterations accumulate, to eventually develop into malignant mesothelioma" (Carbone and Yang, 2012).

## V.  BNSF Operations in Libby

31. **BNSF carried tons of asbestos through Libby every day:**  Strip mining, transportation, and processing of vermiculite ore containing asbestiform minerals was conducted in the Libby area from approximately 1923-90. The vermiculite operation involved a mountain top removal method of mining. Throughout the nearly 70 years of vermiculite mining operations the top several hundred feet of Vermiculite Mountain was in fact removed. See, e.g., Mountain Top Removal diagram (19__) and images from 1948, 1968, and 1971 showing the removal of the top of Vermiculite Mountain in stages (cf. Google Earth Image of the Mine from 1995). Hundreds of billions of pounds of vermiculite ore was excavated, processed and either dumped as waste or shipped into Libby by BNSF. The Libby mine produced approximately 80% of the world's vermiculite ore, which by 1970 amounted to over 29 billion pounds of ore (Bulletin 79, p. 147) and was estimated to exceed 35 billion pounds of ore from 1971 through 1981 alone.[18] According to W.R.

---

[18] See Grace Mine Production Report – April 1979.

Grace, the average daily production from the mine and milling operation was between 500 and 1000 tons of finished vermiculite concentrate per day between the late 1960s and 1970s and between 800 to 1000 tons per day in the 1980s.[19]   Using the vermiculite asbestos percentages as measured in the 1980s and a daily average of 750 tons, BNSF carried up to 105,000 pounds of Libby Amphibole Asbestos into and out of downtown Libby per day in the late 1960s and 1970s and, based on a daily average of 900 tons per day, up to 126,000 pounds per day through the 1980s.  This amounts to up to 383,000,000 pounds of asbestos carried into Libby in the 1970s and up to 460,000,000 pounds through the 1980s.

32. **Vermiculite rail car loading:**   The ore was mined at Vermiculite Mountain, approximately seven miles outside of Libby, and processed first in Libby and then later at the mine site.  After processing, the concentrate was trucked down to river storage and stored in large bins/silos in various grades.  Beginning in 1949 (12/15/1949 Western News Article), the concentrate was released into tunnels below the river storage bins onto a conveyor belt and was moved across the Kootenai River to the River Loading Site, which is located 5 miles east of BNSF's downtown railyard in Libby (the "Railyard").  BNSF constructed a rail siding at this location for the exclusive use of Zonolite (later W.R. Grace), and, subject to BNSF's review and approval, allowed the company to install its vermiculite loading equipment there on BNSF property so the company could pour its vermiculite products into waiting rail cars.  During the loading process a cloud of vermiculite dust would be produced coating the rail cars and loading equipment in a layer of dust.  In addition, a substantial amount of vermiculite would always spill onto the surface of the cars.  BNSF then brought each of the asbestos laden vermiculite shipments into the Railyard located in downtown Libby.**[20]**  From the Railyard, BNSF joined the vermiculite filled railroad cars to eastbound or westbound trains.  BNSF shipped an average of 10-16 car loads of vermiculite concentrate out of their downtown Railyard per day and across the Country to processing facilities nationwide.

33. **BNSFs presence in downtown Libby:**  The Railyard was the heart of BNSF activities in Libby.  It was located directly adjacent to downtown Libby and was immediately surrounded on all sides by Libby's residential neighborhoods, businesses, places of employment, public parks, sporting fields, the public swimming pool, and the community garden.  (See Mineral Ave Color C, downtown Libby circa 1950s with railcars in background; MDOT 4/25/1977, BNSF's Libby Railyard associated W.R. Grace Facilities and surrounding properties.)  The Railyard was extensive, spanning the entire north end of downtown Libby.  W.R. Grace's downtown Libby facility initially straddled, and later adjoined the BNSF Railyard property line and consisted of vermiculite storage, loading and processing facilities.

---

[19] See W.R. Grace's response to the Second Request for Information Regarding the Libby Asbestos site, February 22, 2000, pp. 8-9.
[20] Prior to the construction of the River Loading siding in the late 1940s (9/13/1949 Letter from J.M. Budd to F.J. Gavin; 9/29/1949 Western News Article), the vermiculite ore was trucked to the Zonolite/W.R. Grace export plant located on the BNSF Railyard property in downtown Libby.  During that period, the vermiculite ore was stored and loaded into BNSF boxcars at the Railyard.

Baseball was popular in Libby and nearly everyone in the area attended games. See Baseball Field at Zonolite; Baseball Parade; Baseball Parade 2. The storage and export facilities attendant to the rail transportation of vermiculite were left open to the public and most children growing up in Libby recall playing in the area of the Railyard as well as in the large piles of vermiculite located throughout. See Baseball Field at Zonolite 2, Photo of baseball game being played in close proximity to BNSF's downtown Libby facilities (note children playing on ramp entering Railyard). In addition, local celebrations such as Logger Days and the Carnival were held at the baseball fields adjacent to the Railyard. See MDOT 7/13/1971, showing cleanup and removal of equipment from ball fields following Logger Days celebration and children practicing baseball on two of the three other ball fields; MDOT 6/14/67 showing children practicing on adjacent ballfields.

34. **Grace's Downtown Operations**: The first expanding plant was built in 1924-5 and adjoined the J. Neils Lumber company sawmill to take advantage of the rail siding and the availability of wood waste as a fuel source. 9/18/1924 Western News Article. Later, the limited expansion operations were moved immediately adjacent to the Downtown Libby Railyard where it operated until 1969. 9/25/1969 Western News Article. Its output was about 25 tons per week or half a 50 ton boxcar per week. The raw ore was expanded two to three times per month. The popped (or expanded) vermiculite was put in bags at the expanding plant and then moved to the loading area at the bagging plant.

The bagging plant abutted the Railyard and was served by a BNSF spur track built over an easement granted to BNSF by W.R. Grace. BNSF contractor maps indicating property ownership show the spur track serving the export and bagging facility as owned and overseen by BNSF as part of its right of way. See, June 1, 2010 EMR Libby Railyard Map. Vermiculite concentrate was delivered to the bagging plant in covered trucks and loaded into storage silos. In the bagging plant, two workers bagged the vermiculite concentrate and loaded it into boxcars. At the peak of bagging plant production, it is estimated that they filled up to one boxcar per day, which was 50 tons or about 1,000 100 pound bags. The bagging plant operated five days per week (one shift). In the 1950s, production was less and then it was fairly constant at this level in the 1960s, 1970s and 1980s. BNSF hauled the filled box cars away and kept the bagging plant supplied with empty boxcars to fill. The export and bagging facility was located immediately adjacent to the downtown childrens' ballfields. When workers were loading the boxcars on BNSF property with the thousands of bags of asbestos contaminated vermiculite, air was pumped into the cars to lower the airborne asbestos levels incurred by bagging workers. See, US v. Grace Transcript – Geiger Excerpt. This dust was instead released to the outside air in immediate proximity to the downtown ballfields where children were playing and would similarly reach other locations in the area. In comparison, air from the adjacent bagging facility itself was reportedly pumped through a filter system before being exhausted to the outside air. According to John Swing, BNSF Supervisory Agent in Libby up until 1984, the bagging plant/export facility was located partially on BNSF property and BNSF management would inspect the facility a couple times each month. See 9/13/16 Deposition of John Swing.

35

35. **River Loading Point**:  Production and shipments of vermiculite ore increased over the 1950s, 1960s, 1970s, and 1980s.  At the W.R. Grace River Loading Site, Grace employees loaded the rail cars that BNSF transported to and from the downtown Railyard.  Initially, box cars were used exclusively.  Eventually, larger hopper cars became the primary means of shipping ore, although box cars were still used.  Loading was performed five days per week, and sometimes more frequently, throughout the 40 plus years (1950 through early 1990s) that the River Loading Site was used. (See River Loading Photo 1, with approximately 18 cars being loaded on Zonolite siding; River Loading Photo 2, 9/7/1960, with at least 24 cars being loaded; River Loading Photo 3.)  The river loading point had a loading rate of 100 tons per hour and Grace was able to load one 50 ton car every 40 minutes.  (See 5/12/1962 Zonolite memorandum; 1951 Report on Mining Vermiculite.)

36. **Libby Log Job:**  BNSF's transport operation between the River Loading Site and the Railyard adjacent to downtown Libby was known as the "Libby Log Job."  Occasionally the Libby Log Job crew (consisting of 4-5 BNSF employees, depending upon time period) would make two trips per day to the Grace River Loading Site.  In addition to the Grace loads, the Log Job crew was responsible for daily hauling of cars to and from the Libby lumber mill, as well as other smaller and less regular local jobs in the Libby/Troy area.  When pushing loaded vermiculite cars into Libby from the River Loading Point, the train would typically travel between 15 and 20 m.p.h. and would not exceed a top speed of 25 m.p.h. (worker reports).

The river loading process was extremely dusty.  See Video Clip of River Loading Site in operation; River Loading Site Video narrated by Butch Hurlbert.  The airborne dust created during the processing and production of the vermiculite ore was sampled and found to contain approximately 40% to 80% asbestos, well in excess of the percentage of asbestos found in the vermiculite ore, demonstrating the highly friable and easily entrained nature of the LAA fibers (see MCE 121, 10/17/1968 Public Health Service Report; Vermiculite Dust Sampling, 4/13/1962).  The loaded rail cars and the entire area were constantly coated in a layer of this vermiculite dust.  See River Loading Photo 4 – note the layer of vermiculite dust accumulated on the south facing roof in the forefront.  Box cars were used exclusively at the River Loading Site until the 60s when BNSF also started using top loading hopper cars.  See, e.g., 9/25/1961 Hopper car request letter from Zonolite to the Great Northern Railroad (GNRR).  The process of loading the box cars through the open side doors was extremely dusty.  See River Loading Photo 3, with visible vermiculite dust emanating from loaded box car and accumulated dust pile on loading shack roof; River Loading Photo 5, with a visible dust cloud spreading from the loading shack to the right covering the loaded box cars in vermiculite dust; River Loading Photo 6, 9/24/1959, with dust covered vermiculite loaded box cars to the right of the loading shack and cleaner empty cars to the left.

When hopper cars were loaded at the river site, the conveyor did not stop when passing from one hopper car hatch to another.  Much loose vermiculite accumulated on the top of

every car.[21] Railroad worker interviews consistently report that when hopper cars were picked up at the river load out, the cars would have several inches (6-8 inches) of loose vermiculite and vermiculite dust on the top due to the continuous feeder conveyor system. Thus, all the time from the 1950s to approximately 1993, BNSF employees riding in engines pushing the vermiculite cars to town described visible clouds of dust being produced.  There was dust in the air the entire time while returning loaded cars from Grace to the Railyard.  The dust came into the windows and vents into the engine cab.  The United States Department of the Interior, Bureau of Mines performed testing of tremolite asbestos dust throughout the Grace Mine operation, including at the River Loading Point on several occasions.  See, e.g., US Bureau of Mines Report 1971 (BN Grace Repository Docs. 20152342).  The 1971 Report states:

> The car loader, located in a control booth alongside the railroad tracks, filled cars with concentrate.  Although protected in the booth, and although the loading equipment was provided with a Pangborn dust-collecting system, the exposure appeared high … Settled dust was noted above the railroad car roof slots.

Later, in April of 1973, the Bureau of Mines returned to the River Loading Point and again noted significant airborne dust production:

> A cyclone dust collector was used during car filling operation, but the system tended to plug up easily; at this time, considerable airborne dust was generated…

> The car cleaner used brooms and jets of compressed air for cleaning cars prior to filling with vermiculite concentrate…

> At the ore loader station, the dust collector's cyclone tended to plug. The bucket elevator and screw conveyor (at the cover plate) leaked dust at these times. At the top of the structure at the belt transfer point, the exhaust appeared inadequate to collect the dust -- a poorly-fitting gate may have been involved or perhaps the cyclone was plugged when the belt transfer point was observed.  The entire dust-collecting system should be reexamined and improved accordingly.[22]

> Compressed air jets should not be used for cleanup purposes around the ore loader station or in the railroad box cars…

---

[21] This was confirmed by Former BNSF Director of Industrial Hygiene James Shea in 2007.  See 1/26/2007 Deposition of James Shea, p. 91.

[22] As discussed below, BNSF retained control over the design and construction of the health and safety fixtures on its premises, including air pollution control devices.

It is recommended that the fiber dust levels be determined in the shipping operations and appropriate action be taken.

1973 BOM Report.   The airborne asbestos/dust condition at the River Loading Point remained in 1977 and, although the samples in this location were apparently taken within the "pressurized control room," airborne asbestos levels were among the highest measured across the entire vermiculite operation at up to more than 10 f/cc.  See 1976-77 airborne asbestos sampling.

At the river loading point the spilled vermiculite concentrate and dust would regularly build up above the level of the tracks (worker reports) and had to be removed.  In early years this was performed with a front end loader which was later replaced by a vacuum truck.  Because spilled vermiculite and accumulated vermiculite dust had to be continually cleaned from the loading area, Grace created a spilled vermiculite dumping point along the access road to the River Loading Point.  See MDOT 1967; 3/15/2007 Deposition of David McMillan pp. 23-24, 76.  Asbestos sampling in the area has revealed extensive visible vermiculite and high concentrations of asbestos in the soil.  See, e.g., EPA Libby Database mapping of River Loading Point soil samples, EPA 3/1/2007, pp. 328-333.

The River Loading Site was owned by BNSF and leased to Zonolite and W.R. Grace.  See, e.g., Affidavit of James Roberts 2/8/2007; Zonolite Siding Lease 9/12/1956.  BNSF funded the construction of the Zonolite siding and oversaw all construction and improvements made at the site.  BNSF and W.R. Grace employees worked in tandem at the River Loading Point to deliver, fill and transport the railcars of ore into Libby.  The parties carried a series of landlord and tenant insurance policies which covered the River Loading Site, and named BNSF as the insured.  See, e.g., Zonolite Siding Insurance Agreement 4/14/1977.  As discussed below, BNSF retained control over the design and construction of the health and safety fixtures on its premises, including air pollution control devices.

The bagging plant had no ventilation. The building had an open entrance between the storage silos and the bagging plant where a boxcar entered.  In 1975 or 1976 a new bagging machine greatly decreased the indoor dust produced.  Some fiber monitoring was done by federal officials inside the bagging plant and inside a boxcar that was being loaded in the 1970s, which still demonstrated hazardous levels of airborne asbestos in these indoor locations.

37. **Downtown Libby Railyard**:   Once transported to the downtown Railyard, loaded vermiculite cars usually sat for at least several hours, and usually longer, in the Libby yard before being attached to an east or west bound train. The cars first had to be inspected and often times weighed by BNSF workers at the scales near the depot in the Railyard.  This involved decoupling and coupling the cars, "kicking" and bumping them each time.  Workers report seeing dust fall from cars and being entrained into the air during this process of collisions during coupling, as well as by the buckling and unbuckling of air hoses between cars during their movements.  Workers estimate that each car would be moved several times, each time going through the collision involved in coupling and

38

decoupling, prior to leaving the downtown Libby Railyard.  See, e.g., Rail Car Coupling Video.

While waiting to be attached to outbound freight trains, the loaded vermiculite cars would be placed on Tracks #1, #2, or #3, in close proximity to the main line (cars parked on track 1 would be within several feet of passing trains).  Workers report that the hopper cars would still have loose vermiculite and vermiculite dust (1/8 to three inches) on their tops at this point, carried into town from the river loading process.  Throughout the entire period when BNSF shipped vermiculite, freight trains consisting of up to 100 cars (or more in the 1980s) sped through the Libby yard at 55 mph, generating dust clouds which drifted in all directions.

Railyard workers estimate that on average 20 to 30 trains would pass through the Railyard on a given day during the 60s through the 80s.[23]  The ground and track bed throughout the Railyard was covered in visible vermiculite which would be blown around and disturbed each time a train passed by. The diesel locomotives used by BNSF, and in particular the GP locomotives used locally in Libby, had various blowers used to cool various parts of the locomotive including the traction motors.  Many of these blowers, including the traction motor blowers, would blow downward onto the ballast and surrounding substrate. Workers report that these blowers would entrain significant dust from these areas when the locomotives were in operation.  It was commonplace that the force of air turbulence from passing freight trains would blow visible dust off the vermiculite cars sitting in the Libby Railyard.  From a point west of the vermiculite bagging plant to a point east of the depot, the railroad right-of-way was between 100 and 300 feet wide. From this large area, and indeed all portions of the track on either end of and beyond the Railyard, dust containing dangerously high levels of LA was entrained into the air and cycled into the town of Libby and neighboring properties.

**38. BNSF and W.R. Grace co-mingled operations:**  Over the years, Zonolite/Grace had multiple leases, easements and land use agreements with BNSF related to the operation of both downtown facilities.  These entities engaged in multiple real property transfers in and around the Railyard.  See, e.g., Affidavit of James Roberts 2/8/2007; List of Zonolite contracts with GNRR transferred to Grace in 1963 sale; Compilation of selected leases, easements, and property transfer documents.  While the history is complex, what is clear is that BNSF and W.R. Grace operations were co-mingled and closely associated in downtown Libby.

**39. Leakage**:  As indicated above, workers report that the hopper cars would still have up to several inches of loose vermiculite and vermiculite dust on their tops at this point, carried in to town from the River Loading process.  At the downtown Railyard, BNSF workers all

---

[23] Libby represented one of the busiest stops on the northern line during much of the period that BNSF transported vermiculite.  This was due, in large part, to vermiculite and lumber shipments being made by W.R. Grace and the Libby Lumbermill, and for some time, the shipments of construction materials for use in the erection of the Libby Dam.

report seeing vermiculite leak from the loaded vermiculite cars. Much of this spillage accumulated in the Railyard. Workers report that the loose vermiculite and vermiculite dust on the loaded hopper cars would regularly spill off the cars during the weighing and moving process. They all report that the Railyard, the right of way leading into and out of Libby and the Troy rail yard were all constantly covered in a layer of visible vermiculite.[24] They recall dust piles one to two feet high in the Libby yard from leaking vermiculite cars on a regular basis, and reported scattering the piles into the Libby yard with a shovel or simply kicking down smaller piles to avoid tripping over them when working at night. Many remember freight trains leaving the Libby yard with vermiculite cars, and noticing that the cars were leaking. See, e.g., 12/23/1958 letter from J.R. Huxley of the California Zonolite Co. to R.A. Bleich of Zonolite (reporting a car en route losing over 30 tons), and other selected documents referencing leakage and spillage.

It was BNSFs responsibility to inspect the rail cars to ensure they were clean and suitable for use in shipping of the vermiculite ore prior to delivery to the River Loading Site. See, e.g., BNSF HHP 000626; 5/26/1966 letter from Grace to GNRR – dirty, unispected hopper cars. The cars were again inspected by BNSF for suitability and leakage during the weighing and shipping process. Despite the Railroad's responsibility in this regard, the condition of the cars received by Grace for shipment of vermiculite was often times reportedly poor. See, e.g., Selected shipper's comment forms regarding condition of cars provided; 5/26/1966 letter from Grace to GNRR – dirty, unispected hopper cars.

Track crews recall that regular maintenance and upkeep in the Libby yard was more challenging due to the prevalent vermiculite waste. BNSF workers spent several weeks each year in and around Libby performing the various cleaning, tamping, and surfacing projects and these constant activities disturbed, entrained, and most often redeposited asbestos-contaminated vermiculite on the tracks, in the BNSF right-of-way and on nearby properties.

**40. Derailments**: Several derailments involving vermiculite containing rail cars occurred over the years. These wrecks, and the subsequent cleanup efforts, generated major soil disruption around the rights-of-way. A derailment at the River Loading Point in the winter of 1966 resulted in overturned vermiculite hopper cars, significant dust exposure to BNSF cleanup workers, and additional contribution to asbestos in the Lincoln County airshed. See photo of Derailment at River Loading – Winter 1966 ; 2/3/1966 Western News Article; and 2/28/1966 Derailment loss claim. In February 18, 1979, there was another derailment at the River Loading Site, which resulted in the destruction of the River Loading facility, extensive spilled vermiculite and vermiculite dust, massive dust exposure to BNSF cleanup workers, and others in the area. 2/22/1979 Western News Article – Wreck Demolishes Loading Facility; and 2/18/1979 Derailment Packet. While the W.R. Grace River Loading Site was being reconstructed, ore loading operations took

---

[24] The presence of visible vermiculite throughout the Railyard into the 2000s was confirmed by BNSF Manager of Industrial Hygiene, Gerald McCaskill, who remembers the Railyard sparkling with vermiculite. 1/24/2007 Deposition of Gerald McCaskill, p. 55.

place at the Railyard in downtown Libby.  *Id.* pp. 9-10.   There were also derailments that occurred in the Railyard, which contributed to the amount of vermiculite in the rail bed of the Railyard and, when cleaned up by BNSF workers, contributed to the asbestos in the Libby airshed.  See, e.g., 2/12/2002 Deposition of Frank E. Shockley.

41. **Rail Cars**:  Often if a forklift entered a boxcar it could crack the floor, but the crack was not visible, or did not give out until the car was loaded with vermiculite. Railroad employees recall that the vermiculite was held into the box cars using grain doors, which were pieces of plywood that would be stacked across the door to hold the loose vermiculite in the car during loading and shipping. See, e.g., BNSF_HHP_000033; 1951 Report on Mining Vermiculite.  They recall that vermiculite would make its way through the space between the grain doors and through knot holes in the grain doors themselves and that the boxcar doors would not prevent this escaped material from spilling out onto the Railroad ballast.

Workers report that at the River Loading Site, very often the vermiculite dust would build up 8 to 16 inches above the rails, and there was so much dust from the loading operation generally that it was difficult to see if a rail car was leaking.  This led to rail cars being filled and brought to town, leaking all the way.  Workers report that it was a common occurrence to observe such leaks creating a pile of vermiculite so high it would reach the bottom of the hopper car.

BNSF employees were responsible for inspection of cars at the Railyard during weighing and shipping from the Railyard.  See, e.g., BNSF_HHP_000626;  2/12/2002 Deposition of Frank E. Shockley.   During the inspection and weighing process, Railroad employees were responsible for ensuring that box cars were not leaking excessively and for ratcheting closed the hopper doors of the hopper cars.  Railroad employees recall that even with proper inspection and the additional ratcheting efforts, the hopper door seals would still allow leakage.  If cars (boxcar or hopper) were discovered to be excessively leaking in the Libby yard, then "repairs" were made by stuffing "waste" material (shredded rags) into the holes.  This was a temporary fix at best but was still quite common. See, e.g., selected documents referencing leakage and spillage.  Sometimes the railroad returned the boxcar out to the spur at River Loading, where Grace workers would do a more substantial fix on the boxcar.  Due to the condition of the cars delivered for loading, Grace incurred significant expense in making repairs and since "close supervision of repairing the bad cars [was] necessary to prevent 'loss in transit.'"  See 6/3/1952 letter from Zonolite to GN. Workers at the Libby lumber mill report that when they received otherwise empty boxcars for their own loading activities they regularly first had to sweep the cars clean from all the leftover vermiculite in the cars.

   VI.   **BNSF asbestos cleanup**

42. **Asbestos Remediation 1999-2013 – Operable Unit 6.**  The EPA began remediation efforts in Libby in 1999 and the Libby Asbestos Site was placed on the Superfund program's National Priorities List (NPL) in October 2002. In 2009, for the first time in the history of the agency, EPA declared a Public Health Emergency in Libby.   The site

includes eight operable units (OU) one of which (OU6) consists of 42 miles of rail line, rights-of-way, and rail yards owned and operated by BNSF. The 42 miles of rail lines and yards were included as a separate OU due to the Libby amphibole soil contamination resulting from decades of BNSF's deposition of asbestos contaminated vermiculite on their properties throughout the area (EPA, 2018). The EPA began investigating Libby amphibole contamination on BNSF properties in 2001. However, due to the extensive contamination on railroad properties, remediation efforts extended for more than a decade and involved multiple cleanup attempts. In order for the cleanup efforts to be deemed adequate, vermiculite and Libby amphibole asbestos contamination had been removed or capped in place from nearly every square foot of the downtown Libby railyard and other BNSF properties in Lincoln County. See, e.g., Envirocon cleanup Photos.

BNSF entered into a consent agreement with the EPA under which BNSF agreed to perform the cleanup of its Lincoln County property using its own environmental contactors. In an 11/4/2001 document titled Settlement Negotiations: Order on Consent for Removal[25], the EPA reports:

> Respondent owns a railyard within the Site. Respondent recently implemented its own investigations to determine if yard activities would entrain asbestos fibers into the air; the results confirmed that such activities can entrain high levels of asbestos fibers.

In 2001, Environmental Resources Management, a contractor for BNSF, performed soil sampling in the Libby railyard. A 100 ft. grid system was used. "Visibly obvious" vermiculite or biotite was mapped for placement on the CADD map and flagged with surveyor whiskers. However, soil samples were not collected from these flagged areas. Excluding areas with visible vermiculite, 22 composite samples were collected. Libby amphibole asbestos was detected in 5 of the composite samples (PLM NIOSH 9002 concentration < 1%). When one of the composite samples (BN-09000) was analyzed individually, four of five samples revealed Libby amphibole in concentrations at < 1%. In May of 2002, the EPA reported:

> Burlington-Northern Railroad (BNR) investigations identified amphibole asbestos contamination along the tracks in the rail yard, and in the buildings. BNR has begun to address these issues by removing the contaminated source materials from its property. ***

> The effects of these exposures may be aggravated by the prevailing tendency for meteorological inversions, which trap particulate contaminants in the area, resulting in Libby's historic designation as a non-attainment area for particulates (EPA 5/2/2002).

---

[25] To maintain brevity, subsequent citations to documents received from, or authored by, EPA will be provided as follows - (EPA date of document) and those received from BNSF will be designated using BNSF's bates numbers.

Soil sampling performed in the BNSF's Libby Railyard in 2002 demonstrated the presence of LA in 8 of 15 composite soil samples and 27 of the 32 individual samples making up those composite samples. (EPA 4/30/2014). Although it had been more than a decade since Grace had shut down its mining operations in Libby, mapping of visible "biotite"[26,27] on the rail beds of the Railyard demonstrated extensive visible vermiculite remaining throughout the rail beds. (BNSF_511_0034[28], Map of Visible Vermiculite – Kennedy Jenks). Visible vermiculite was also identified and sampled at the River Loading Facility where asbestos was detected in a majority of the soil samples taken at levels of up to 4% Libby asbestos. See BNSF_511_0005, p 8; EPA 3/1/2007 pp. 328-333, 335-336. By August of 2002, the EPA found:

> Respondent recently implemented its own investigations to determine if yard activities would entrain asbestos fibers into the air. Baseline monitoring along the tracks conducted by Respondent has found the highest concentrations measured during the sweeping ranges from 7 to 14 f/cc in air samples in three locations - Hwy. 37 crossing the railroad tracks, close to the 5th Street, and the loading/unloading station near the Bluffs. A total of twenty-two surface soil samples collected in November, 2001 by Respondent along the railroad tracks and its railyard ranged from trace to less than 1 % fibrous amphibole asbestos by weight. In addition, visible unexpanded vermiculite remained at Track #1, Track #2 and Track #3.

(EPA 8/19/2002). For comparison, the 14 f/cc of asbestos measured in the air during BNSF's 2002 Railyard activities, is more than 150,000 times greater than EPA's recently issued LA RfC and 140 times higher than OSHA's permissible exposure limit for workplace asbestos exposure.

It is critical to note that the initial soil characterizations occurred more than a decade after the vermiculite mine ceased operations. As reported by railroad worker interviews and testimony, ballast removal and replacement (using a regulator to remove the fines from ballast and then redepositing the ballast) typically occurred annually, while cleaning activities like sweeping typically occurred monthly. These activities are designed to

---

[26] Vermiculite and biotite are both found throughout the Rainey Creek complex near Libby, Montana. The "biotite" material was considered waste rock in Libby as, despite assistance from BNSF's Mineral Research and Development Department, no beneficial use of this mineral was developed. It is suggested that the vermiculite is a product of leaching of biotite by ground waters. Boettcher, A.L., Vermiculite, Hydrobiotite, and Biotite in the Rainy Creek Igneous Complex near Libby Montana, *Clay Minerals* (1966) 6, 283.

[27] Throughout cleanup efforts, BNSF insisted on referring to the vermiculite and associated LAA as "hydrated biotite" despite EPA requests that they replace this term throughout. See, e.g., EPA OU6 documents, 2022475 Letter transmits Response to EPA Comments, p. 5. Nowhere else in the Libby Asbestos Superfund Site has the material been referred to in this way. BNSF's deliberate avoidance of the use of the terms vermiculite and asbestos in their cleanup documents is suspect and seems to comport with their long-standing practice of minimizing and ignoring the asbestos problem in Lincoln County.

[28] Note that a large stretch of track was occupied by a parked train at the time of inspection so visible vermiculite was not reported for that stretch.

remove extraneous material from the rail line in order to ensure adequate water drainage, etc.  A substantial portion of the extraneous material removed through these processes would have been vermiculite and associated asbestos.  Asbestos fibers were also entrained into surrounding areas and covered by subsequent depositions of dust and debris over the ensuing decade since active operations had ceased. Therefore, the chronology of soil sampling activities that occurred from 2001 on were most likely not representative of the soil conditions in the railyard during the 70 plus years of vermiculite transport into and out of the town of Libby.  In addition, the 2001 soil sampling activities did not include sample collection in areas with visible vermiculite, thereby under reporting the asbestos concentration in the soil.  Notes and log sheets authored by BNSF employees and contractors  during the Railyard activity sampling events indicate how dusty conditions at the Railyard were; "Huge Dust Plumes" created during ballast regulation exercise (BNSF_503_0017), "Big dust cloud generated during movement, plowing, and especially during brooming" … "Very dusty when sweeping, big dust cloud - dust noticeable to ball fields (couldn't see at times)" (BNSF_503_0018), "small cloud of dust/visible dust generated replacing tie and plate…  Dust cloud generated during brooming" (BNSF_504_0002).  See also BNSF Lincoln County Maintenance Operations 9/13/2016 #1, #2, #3.  I have observed firsthand how dusty BNSF's Libby operations are even today nearly two decades after Libby cleanup efforts began (Video of train passing with dust) and have observed extensive visible vermiculite still present on BNSF's right of way (see photos).  Even in the absence of disturbance activities, the nature of the rail facilities and attendant operations resulted in loose soil conditions that were conducive of dust dispersion. (2018 video of dust at railyard).

In August 2003, soil containing visible vermiculite was removed from the BNSF Railyard using vacuum trucks and an excavator.   See Photos of vacuum remediation. Post-excavation clearance soil sampling was then conducted.   Despite BNSF's extensive cleanup efforts, LA was still detected in all three composite clearance soil samples with reported concentrations ranging from less than 1 percent to 3 percent and all composite samples returning results of 2 percent asbestos revealing a homogenous distribution of asbestos contamination in the Railyard.  (EPA 4/30/2014 - Libby Asbestos OU6 Final Remedial Investigation Report).  These samples, taken after removal of more recently accumulated surface material, are likely more representative of the conditions that were present during active vermiculite operations than the early surface sampling performed by BNSF. An initial pollution report regarding the Railyard issued shortly thereafter provided:

> Sampling shows that asbestos, a hazardous substance, is present in soil, raw ore, ore-concentrate and other soil-like materials at various locations in and around the community of Libby including the BNSF rail yard. Visible vermiculite has been found along the tracks and within the railyard and analytical results have shown asbestos levels in soil from 2-5%. ***

> Asbestos contaminated materials were hauled and shipped through the railyard, and spilled into the soil for decades. The soil around the tracks and under the ballast is contaminated and needs to be removed. BNSF has

44

agreed to perform the cleanup at the Libby railyards and its tracks under an Administrative Order on Consent (AOC) <u>to address the high levels of asbestos</u>. The BNSF's work plan and sampling plan were approved on October 25, 2002. Cleanup began on August 13, 2003. <u>Unfortunately, cleanup was not achieving satisfactory results</u>, so work was stopped on August 21, 2003 and BNSF is reevaluating cleanup options. Work is expected to begin again in spring 2004. EPR-SR is overseeing the cleanup (EPA 9/29/2003).

Cleanup activities continued on BNSF property, but due to the extensive contamination, these efforts proved unsuccessful.  After the 2004 characterization of Libby amphibole in the railyard, BNSF hired Kennedy/Jenks consultants to "evaluate appropriate response actions for the railroad bed materials containing asbestiform fibers" (BNSF_511_0024). Kennedy/Jenks reported:

> The rail bed structure in the yard has been infiltrated with fine particulates of vermiculite from a local mining operation that loaded the vermiculite into railroad cars for transport. Vermiculite from Libby contains actinolite-tremolite in asbestiform fibers (asbestiform fibers), which is a regulated substance being cleaned up under The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)…

> The BNSF facilities in Libby include a transcontinental main line, a yard with four tracks (one including a scale), and several other industrial spurs. The yard is oriented roughly east to west and lies on the northern side of the main line... A former vermiculite mine operated by W.R. Grace & Company provided mined material for loading into railroad cars at a location east of Libby; the loaded cars were brought to the Libby yard for weighing and shipment to other locations. The cars were switched and organized into trains at the eastern end of the yard. As a result, Kennedy/Jenks Consultants understands the track ballast and adjacent soil at the eastern end of the yard contains asbestiform fibers. Four currently active yard tracks and remaining portions of some former industrial spurs with an aggregate length of approximately 9,000 feet are potentially affected.

In late 2004, BNSF's own remediation contractor EMR reported to the EPA:

> It was determined during excavation activities on the west end of the site that there are some pockets of material located randomly throughout the area north of the main line in which the presence of hydrated biotite [(vermiculite)] is visible to a depth of three to four feet below the reference elevation, which is the tops of the railroad ties along the main line track.

> Three [airborne asbestos] samples collected on September 24, 2004 contained detectable Libby Amphibole (LA)... Upon review of the data and

45

discussions with site personnel, it was determined that the exclusion zone boundary was set up too close to decontamination activities.[29]

Two additional personal air samples submitted for analysis had detectable structures.   These air samples, BN-00318 and BN-301, were worn by personnel working on the site …

Clearance soil samples are being collected at the east end of the site; as of October 1, results for samples... had been received. LA was detected at a concentration of less than one percent (<1 %) Tremo1ite/Actinolite in clearance samples…

(EPA 10/4/2004).  Kennedy Jenks then developed a Response Action Work Plan which was implemented in the fall of 2004.  Phase 1 of the response plan consisted of removal of 28,192 linear feet of rails and other track materials, the scale house and concrete support structure, and approximately 8,000 railroad ties.  Phase 2 consisted of soil removal or capping in eight separate zones.  Excavation of soil in zones 1, 2/3, 5, and 8, where active tracks were anticipated in the future, occurred to depths of detectable vermiculite.  At the end of 2004, BNSF contractor Kennedy Jenks issued a Libby Railyard Response Action Completion Report which provided:

In the zones scheduled for excavation, soil potentially containing Libby amphibole or hydrated biotite was excavated, and underlying soil was sampled concurrently to evaluate whether detectable Libby amphibole remained (clearance samples). Excavation proceeded until laboratory results indicated that Libby amphibole fibers were not detected in the soil samples (generally no more than 29 to 35 inches below the top of the adjacent ties comprising the existing BNSF main line) or to a depth of at least 4 feet. At several locations, excavation reached a depth greater than 4 feet, but clearance samples indicated detectable Libby amphibole had been removed. At one small location, excavation reached at least 6 feet, but clearance was not achieved, as described below. In the other portions of the Site, soil containing Libby amphibole or hydrated biotite was capped in place... Before the geotextile liner and clean backfill material (railroad sub-ballast) were set in place, soil within Zone 1/2/3 that was believed to contain Libby amphibole was excavated to a tan clay layer [approximately 18 inches below ground surface (bgs)], or to the depth required to remove all visible hydrated biotite [(vermiculite)]. After soil had been excavated to the prescribed depths, confirmation soil samples were collected to verify removal of Libby amphibole. One location (sample BN-71001) failed to achieve clearance, but the final excavation elevation was 6 feet below the original ground surface, which is greater than EPA's 4-foot standard for

---

[29] Airborne asbestos was detected at the perimeter of railyard during these cleanup activity sampling events despite the use of wetting and other dust suppression techniques.

leaving potentially impacted soil in place.[30]

(BNSF_511_0041). See also, Libby Railyard Response Action 2004 for BNSF.  One of the locations with visible vermiculite reported at greater than four feet in depth is designated by BNSF contractors as the "Former Dump Area."  (EPA 4/30/2014, p. 151).  The visible vermiculite throughout the Railyard is further documented in BNSF contractor field notes from the time.  See, e.g., EMR Field Notes Sept.

Despite the extensive continuing cleanup efforts up to 2005, LA continued to be detected in clearance soil samples and site air monitoring.  BNSF's cleanup efforts between 2003 and 2005 led to more than 18,000 tons of LA asbestos-containing soils and 5.34 miles of rail and other track material being removed from the Railyard alone.  (EPA 4/30/2014, EPA 5/14/12).  By the end of this process, nearly all of the ties and tracks had to be removed and nearly the entire Railyard was excavated and either filled or capped.  See EPA 4/30/2014, Construction Drawings pp. 117-145; Environcon Photos of Railyard excavation, tie removal and geotextile capping.  Yet, in 2005, soil and air samples were still demonstrating significant asbestos contamination at the Railyard.  In 2005, BNSF had reportedly completed cleanup efforts at the Railyard, however, while conducting a "final completion site walk with BNSF site representatives to inspect the restored rail yard areas" they found "a pile of Libby Vermiculite that was on existing railyard property" and were forced to remove an additional "approximately 15 cubic yards of contaminated material."  (EPA 1/27/2005).  BNSF's cleanup efforts continued to be unsuccessful and in 2011 extensive areas of vermiculite contamination were once again identified at the Railyard.  (EPA 5/30/2011). By the time the cleanup of this contamination had been completed, vermiculite and asbestos contamination had been identified and removed or capped on place from practically every square foot of the Libby yard.

**43. BNSF – a recognized source of asbestos contamination:**  Significantly, the EPA recognized that BNSF's 60 plus years of vermiculite related activities in Libby were the source of, and had caused, extensive contamination to other properties, including downtown Libby, which was located adjacent to the Railyard.  In 2012, it reported:

> The Libby Asbestos Site has been the focus of a number of environmental investigations and response actions. Areas investigated have included property owned by BNSF and along BNSF rights-of-way. BNSF has performed a removal action at the Railyard. **EPA has reason to believe that sources of contamination are, at least in part, from properties, railroad tracks, and rights-of way owned, leased, and maintained by BNSF, as well as from various railroad operations performed at a number of locations at or near the asbestos mine facility at the Site** (EPA 2/2/2012).

---

[30] See Ballast excavation cross section demonstrating vermiculite presence down to clay layer.

A 2012 "Good Faith Offer" and Proposed Settlement Agreement from BNSF attorneys to the EPA states:

> Respondent's rail line runs, in part, between Troy and Libby. It is believed that spillage and dispersion may have occurred along the rail line, rights of way, and other properties associated with rail transport in the area thus causing vermiculite concentrate and/or processed material to be deposited on and adjacent to these areas. It is these areas within the Site that comprise OU6. ***

> EPA has performed extensive analyses of both the amphibole asbestos content and friability of such asbestos in vermiculite. It has also reviewed similar data collected by W.R. Grace. The data reveal that vermiculite from the Zonolite Mine in Libby contains amphibole asbestos and that when that vermiculite is disturbed; it releases significantly high levels of amphibole asbestos fibers into the environment. ***

> The vermiculite spillage along Respondent's right-of-way is uncontrolled. Once disturbed, the vermiculite spillage exposes receptors to high levels of amphibole asbestos fibers. ***

> Respondent is the Owner and operator of property in OU6 at the Site and holds a right-of-way along its rail line. **During the operation of such rail line, vermiculite containing amphibole asbestos was released to the environment through spillage from the rail cars**. With the exception of spillage in the rail yard, the spillage has been left exposed to the environment and to disturbance by human activity. ***

(EPA 4/16/2012).  In September of 2013, after more than 10 years of BNSF remediation activities at the site, the EPA determined that an additional removal action would be required on BNSF property.  (EPA 9/23/2013).

Studies sampling tree bark in the Libby area, performed by myself and others including the EPA, have demonstrated that trees can act as receptors of airborne asbestos fibers. Samples of tree bark "collected 7 miles west of the town next to a railroad line had concentrations of 19 million fibers/g."  Ward et al., Trees as reservoirs for amphibole fibers in Libby, Montana, Sci. Total Environ. 2006 Aug 15;367(1).  This was a more than 100 fold exceedance of a bark sample taken from a tree in the City of Libby adjacent to the Libby Middle School Track (0.13 million fibers/g).  Given the remote location of the railroad samples in relation to W.R. Grace facilities, BNSF's activities are the likeliest contributor to airborne asbestos fibers in this area and in other areas surrounding the BNSF corridor generally. This study indicates the release of substantial levels of Libby amphibole asbestos fibers from BNSF's Lincoln County property occurring even miles from the epicenter of BNSF's Lincoln County activities at its downtown Libby railyard.

Because the Railyard was located in downtown Libby, asbestos fibers entrained by activities thereon would be dispersed and eventually onto the adjacent residential, commercial, and recreational properties of Libby.  Once asbestos fibers settle out of the air they can be re-suspended into the air following soil, dust and sediment disturbances.  Due to these characteristics of LA, BNSF's activities while handling and transporting and depositing massive amounts of concentrated vermiculite into downtown Libby and throughout Lincoln County resulted in the substantial (in distance and over time) casting of dust containing Libby asbestos into the air of the community.  This was a health hazard not only for railroad workers and their families, but also for members of the Lincoln County community who lived, worked, shopped and played in relative proximity to the Railyard where asbestos monitoring demonstrated airborne fiber levels of up to 1.5 f/cc, more than 16,000 times higher than the LA RfC.

The extensive contamination of BNSF's downtown Libby railyard and resultant risk to the surrounding community has been confirmed by the Montana Supreme Court (*BNSF Ry. Co. v. Eddy*, 2020 MT 59, 399 Mont. 180, 459 P.3d 857).  The Montana Supreme Court made several findings and rulings relevant to the present case including the following:

> Grace mined the vermiculite through open strip mining of Vermiculite Mountain, approximately seven miles outside of Libby. Libby was one of only three places in the world where vermiculite was mined, and Grace's operations in Libby were the largest, producing approximately 80% of the world's vermiculite ore. From the mine, between 500 and 1,000 tons of vermiculite concentrate was produced per day in the 1970s, rising to between 800 and 1,000 tons in the 1980s.

> The ore body Grace mined contained a significant amount of amphibole asbestos, and processing the ore produced and released dust containing fine asbestos fibers into the air. After mining and processing the vermiculite, its concentrate was loaded onto BNSF's railcars. BNSF's tracks run through town, and its railyard is located in downtown Libby.

> In response to concerns regarding possible asbestos exposure in Libby, the EPA began investigating in 2000 and placed the site on the Superfund National Priorities List in 2002. In 2003, it released an Initial Pollution Report which revealed "[a]sbestos contaminated materials were hauled and shipped through the [BNSF] railyard, and spilled into the soil for decades," and that "asbestos ... is present in soil, raw ore, ore-concentrate and other soil-like materials at various locations in and around the community including the BNSF railyard." Likewise, the report indicated that "analytical results have shown asbestos levels in soil from 2-5%" in the railyard and that "[b]aseline monitoring along the track conducted by BNSF has found the highest concentrations measured during the sweeping ranges from 7 to 14 f/cc in air. A total of 22 surface soil samples collected along the railroad tracks and its railyard ranged from a trace to less than 1% fibrous amphibole asbestos by

weight. In addition, visible unexpanded vermiculite remained at Tracks #1, #2 and #3." These statistics were provided by tests done by BNSF at least a decade after the vermiculite mining operations in Libby had ceased, and after BNSF had attempted to excavate and remediate the property.

*** 

### a. Existence of a high degree of risk of some harm to the person, land, or chattels of others

¶22 The Asbestos Court found this factor "weigh[ed] heavily in favor of finding an abnormally dangerous activity" because "[t]here is no question that through BNSF's activities in Libby there was a high degree of risk of some harm to members of the community exposed to asbestos dust[.]" BNSF contends a genuine issue of material fact exists regarding whether it exposed the community to asbestos, arguing that "virtually no asbestos was present on or around BNSF's tracks, its railyard, or the air surrounding its properties." Plaintiffs assert the record before the Asbestos Court clearly indicated that, more than a decade after the Libby vermiculite activities ceased, BNSF's Libby Railyard still contained vast asbestos contamination. The parties do not dispute that exposure to asbestos creates a high degree of risk of harm to individuals through airborne contamination.

The evidence BNSF presents does not dispute there were large amounts of asbestos present in its railyard and around its tracks. Central to both parties' arguments is the EPA's 2003 Initial Pollution Report. BNSF correctly points out that the document provides, "[a] total of 22 surface soil samples collected along the railroad tracks and its railyard ranged from a trace to less than 1% fibrous amphibole asbestos by weight." However, reviewing the document in its entirety, **\*195** it also establishes additional facts BNSF does not dispute, including that the railyard testing revealed asbestos soil levels of 2-5% and extensive areas of visible vermiculite. Therefore, by not actually disputing *the entirety* of the EPA's report, including the several statements that ample asbestos remained in the Libby Railyard, BNSF did not meet its burden to defeat summary judgment. Similarly, BNSF references one part of a 2001 EPA report on personal air samples, and points out that those results do not exceed the OSHA limit. However, upon examining the entirety of the test results in that report, it is clear that plenty of the samples taken did exceed the OSHA limit. Likewise, the EPA's 2003 Initial Pollution Report indicates airborne asbestos levels at 7-14 f/cc, far above the OSHA limit. Again, BNSF does not dispute these numbers. Finally, BNSF's expert, relying on maps that indicate asbestos was present in the soil around BNSF's property, maintained only that the asbestos in the soil "is not *clustered* around the BNSF rail yard or the BNSF tracks," but that, nonetheless, "detections of [asbestos] are widespread throughout the area ...." (Emphasis added.) Thus, although BNSF cherry picks the record to cite to isolated favorable test results, it is beyond dispute that extensive asbestos existed, at high levels, on BNSF's properties.

***Similarly, BNSF contends that virtually no asbestos was present in its railyard, and cites to its own Statement of Disputed Facts that there was no visible vermiculite throughout the railbeds. However, the attached maps show plain markings for "visible biotite" on all of BNSF's tracks.

Therefore, we conclude the Asbestos Court correctly determined BNSF did not meet its burden of disputing Plaintiff's assertions. Because it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination, and exposure to asbestos creates a great risk of harm to individuals, the Asbestos Court did not err in concluding this factor weighs in favor of finding BNSF strictly liable.

My opinions are consistent with the facts, findings, and rulings of the Montana Supreme Court.

In August of 1982, the Chemical Control Division issued a Disposition Paper for Asbestos Contaminated Vermiculite which reported high-exposure occupational groups including rail workers transporting the vermiculite mined in Libby and estimated exposure levels for these workers at 400 billion asbestos fibers per year. CDC (1982) – Disposition Paper for Asbestos-Contaminated Vermiculite. Notably, the likely source of these high-exposure activities was BNSF's river loading facility and downtown Libby railyard, which was surrounded by residences, childrens' recreation areas, and businesses.

 As BNSF's own contractor noted during its cleanup efforts:

There is empirical evidence to suggest that vermiculite material with asbestos content as low as 0.1% may generate airborne fiber concentrations ranging between 5 and 10 fibers/cubic centimeter (f/cc) when disturbed without any applied engineering controls. …

Tremolite, winchite and richterite are all amphiboles, which make them closer in physical properties to Amosite than Chrysotile (the common serpentine form of asbestos). Therefore, there is a higher risk of potential exposure to these minerals and a need for more stringent engineering controls.

BNSF_501_0014_0008.   No engineering controls were in place on BNSF properties during BNSF's decades of vermiculite related activites and maintenance of its asbestos contaminated railyard.

### VII.   BNSF Knowledge of Asbestos Hazards

**44. Asbestos Hazards recognized in 1930s-1950s:**  As described in some detail above (see paragraphs 5-11), asbestos exposure was recognized as a deadly hazard in industrial hygiene literature at least by the 1930s.  The connection between asbestos exposure and lung cancer was established in the 1940s within the medical and industrial hygiene

communities.  Tremolite asbestos, like other forms of asbestos, was recognized in the industrial hygiene literature as highly toxic by 1951 (Vorwald, 1951).  Traditionally, Libby Amphibole Asbestos ("LA") has been referred to as "tremolite."  More recently, sophisticated analysis has shown that LA is 84% winchite, 11% richterite and 6% tremolite (Meeker, 2003).  Winchite and richterite are close geo-chemical relatives to tremolite.

45. **BNSF aware of asbestos hazard by 1930s**:  BNSF and its predecessor railroads have been aware of the hazard presented by asbestos exposure for many decades.  This knowledge is documented throughout the available literature by the 1930's.

46. **AAR Documents**:  Several of BNSF's predecessor railroads were members of the AAR and had agents that were members of the Association of American Railroads ("AAR") Medical and Surgical Section.  See e.g. Excerpts of AAR Annual Meeting Reports (highlighting the role and attendance of these officials throughout the AAR documents). For example, the Chicago, Burlington & Quincy Railroad Company (Burlington Railroad), the Atchison, Topeka and Santa Fe Railroad Company (Santa Fe Railroad) and the GNRR were members of the AAR.  The Medical and Surgical Section held annual meetings and issued reports on the meetings.  Both the Burlington and Santa Fe Railroads had members in attendance at these meetings.  In 1937, Dr. D.B. Moss, medical director of Burlington Railroad, was Chairman of the AAR Medical and Surgical Section and presented on the topic of occupational disease and the current state of knowledge regarding asbestos exposure.  He advised other members of the AAR that dust could be harmful to workers and that asbestos was one of the principal sources of toxic dust exposure to railroad workers.  At the same time, Dr. Moss advised AAR members that asbestosis was strictly a dust disease, caused only by exposure to asbestos.

The AAR Medical and Surgical Section reports acknowledged the hazard of asbestos exposure including asbestosis, pneumoconiosis, pulmonary fibrosis and cancer as well as the process of disease and latency periods.  These reports also demonstrate an in depth understanding of how asbestos travels through the air, often to distant locations, and asbestos exposure prevention including through the use of protective equipment, wet procedures and separating non-essential workers from such activities.  Documents consistently reference the specific attendance of high-ranking Board officers and medical officials of the GNRR, Santa Fe and Burlington railroads.  A chronological summary of some of these reports follows:

47. **AAR 1932.**  The Committee on Occupational Disease and Rehabilitation presented on the subject of "dust as an industrial Hazard."

> Dust pathology may occur in any occupation where dust is produced and inhaled in sufficient quantity over a long enough period of time. ***

> In conclusion, we wish to emphasize the facts that under certain conditions inhalation of dust cause a fibrosis of the lungs know as pneumoconiosis and that this is an industrial health hazard, that it can be prevented by

52

> proper use of water and ventilation, that after fibrosis develops secondary infection is prone to occur and tuberculosis is often engrafted on the fibrosis and the radiographic examination is the easiest and most reliable means of diagnosis.

Notably, the Chief Medical Officer of the Great Northern Railroad was present at the meeting (p. 13), the Chief Medical and Surgical Officer of the Burlington Railroad, Dr. Moss, was a member of the Committee of Occupational Diseases and Rehabilitation, and the Surgeon General of the Bureau of Public Health Service was an honorary member (p. 7).

48. **AAR 1935.** The Medical and Surgical Section of the AAR's Committee on Occupational Diseases and Rehabilitation reported:

> We as railroad surgeons are undoubtedly more interested in silicosis and asbestosis than in other types [of lung disease].

The Report went on to discuss the cause and symptoms of asbestosis. It then recommended medical monitoring practices for employees working in dust and disease prevention techniques including removal of dust, using wet methods, use of respirators and "frequent analysis of the dust content of the air at different times during the working hours."

49. **AAR 1937.** The report discusses the recently enacted Illinois Workmen's Occupational Diseases Act noting that:

> Silica, asbestos, and lead are the principal substances generating toxic dusts to which railway employees may be exposed… It is obvious that avoidance of great exposure to toxic dusts and other poisonous substances used in or generated by manufacturing processes and of unfavorable working condition, is the first essential in preventing and controlling occupational diseases. (pp. 19-21).

The report then discusses the importance of pre-employment physicals and histories, as well as periodic physical examination of employees "in occupations in which known hazards exist." (p. 21). The report discusses proper dust control measures, including the use of personal protection including respirators. It goes on to state "silicosis and asbestosis are strictly dust diseases . . . contracted only by breathing silica or asbestos dust. . . . Prevention and control, therefore, consists of protecting the employee against exposure by the means best adapted to preventing the generation and dispersion of these harmful dusts." The 1937 report demonstrates early BNSF knowledge of the deadly and disabling nature of asbestos exposure, and its prevention.

50. **AAR 1939.** An extensive discussion of pneumoconiosis was had and Dr. Lanza presented on the topic of "Medical Progress Toward Further Protection of Industrial health; Report of Medical Committee, Including Plans for 1939. This speaker stated that in his opinion

instead of removing man from dust infection work that the dust should be removed from the work. He urged periodic examinations … He also referred to an international labor board which has made some investigations along these lines." (p. 38).

51. **AAR 1940.**   Discussions note that much "time and study" has been devoted to "pneumoconiosis" by the "Air Hygiene Foundation of America, Inc." (name changed to Industrial Hygiene Foundation in 1941).   The committee noted that Air Hygiene Foundation meetings don't directly apply to the railroads, "yet many details are brought out at their annual meetings which can be made of immense value to the railroads." (p. 29).

52. **AAR 1951-1953.**   The AAR Committee on Disability and Rehabilitation "mention silicosis and asbestosis as forms of [lung] disease most interesting to railroad surgeons." (p. 34).   The committee recommended medical examinations at the time of hiring to include history and chest x-ray, "particularly in those occupations where unusual quantities of silica or asbestos dust have been encountered or are contemplated as a routine occupational exposure."  (p. 34).

53. **AAR 1957.**   The Committee on Disability and Rehabilitation alters the language on pneumoconiosis from the 1951-53 reports, adding that periodic x-ray examinations should be done "annually" on employees exposed to dust.  (p. 24).

54. **AAR 1958.**   As with the other meetings, members of virtually all of the major railroads in the United States were present.   Doctors reported that, "there is very good proof that asbestos is a cause of carcinoma.   This is seen in individuals working with asbestos, particularly miners.   It is also seen among plumbers who work with asbestos, seamfitters (sic) particularly." (p. 81).   The doctor referenced a study "in which he showed there was a higher incidence of cancer among the operating staffs of the railroads than among the non-operating staffs." The study reported "that lung cancer cases were more than three times as numerous among "operating" railroad workers (engineers, firemen, brakemen, conductors, switchmen, and roundhouse personnel) than 'non-operating' workers.   Yet the former group made up only about 25 percent of the work force."

In addition to these AAR reports, Railroad claims agents discussed asbestosis at meetings and in their journals beginning in the 1930s.[31]

55. **Alton Railroad Documents**:  Clearly, the railroad industry was well aware of the hazards of toxic dusts, including asbestos, by the 1930's.  A collection of documents commonly referenced as Alton Railroad Documents were created pursuant to the operation of the

---

[31] P. Folger, "Legal and Other Aspects of Dust Hazards," Minutes of the 45th Annual Meeting of the Association of Railway Claim Agents, held in May, 1934, pp. 27-48; O.G. Browne, "Silicosis," The Bulletin 19:281-284, April 1935; E.R. Hayhurst, "Common Occupational Diseases and Their Differential Diagnosis," Minutes of the 48th Annual Meeting of the Association of Railway Claim Agents held in May, 1937, pp. 31-41.

Railroad Engineering and Shop Committee, of which the Burlington and Santa Fe Railways were members.  Notably, the Burlington railroad was jointly owned and controlled at the time of the Alton documents by the Great Northern and Northern Pacific Railways. See Moody's Manual of Investments documenting this fact.  The Alton Documents demonstrate the railroad industries extensive knowledge of the hazards of asbestos as well as methods of prevention and detection of asbestos related disease by the railroad industry from the 1930's forward.

In a November 28, 1936 letter from Armstrong Chinn, Chief Engineer of the Alton Railroad Company and Chairman of the Railroad Engineering and Shop Committee, to railroad executives including J.P. Morris, Division Master Mechanic of the Santa Fe Railway and D.B. Moss, Chief Medical Officer of the Burlington Railroad, Mr. Chin recounted the first meeting of the committee.  Mr. Chin reported, in part:

> [A]s [the committee's] first work, we are to give consideration to and recommend what action seems immediately advisable to protect the railroads from the following possible occupational diseases:
>
> 1. Asbestosis, from handling asbestos materials, such as boiler lagging
> . . .

In a January 5, 1937, letter from an attorney for the Illinois Central Railroad Company to railroad executives including D.B. Moss, Chief Medical Officer of the Burlington Railroad, the railroad demonstrated early knowledge regarding the highly toxic nature of asbestos, problems with the migration of asbestos fibers, and the principle for bystander exposure:

> A discussion was had concerning the best methods of protecting workers from Asbestosis and Silicosis.  The men handling Asbestos or doing sand-blasting are not the only ones exposed to the danger of these diseases, as the dusts they make in doing their work create a danger to others that may be working in the vicinity.

The letter further discussed that various railroads "have already studied the question of danger from these diseases, and have put out specific instructions to reduce the hazard."

The Alton Documents also include "Recommendations for Protection Against Occupational Diseases," which stated in relevant part:

> In submitting the revised recommendations for prevention of occupational diseases such as lead poisoning, silicosis, and asbestosis, the Committee recognized that the recommendations which are made and designed to comply with the requirements under the Health and Safety Act, and are to be considered a minimum.  Some railroads may carry on more expansive operations, which expose employee to the risk of disease or injury by contact with harmful dusts, fumes or gases.  Control of such hazards is

imperative . . . The first consideration, and the most important, is isolation of any excessively dusty processes, to protect employees in the vicinity engaged in other work and not aware of the risk to which they are exposed. This may necessitate a considerable re-arrangement and re-location of equipment. . . .

All dusts and all poisonous fumes may not be eradicated, but they can be controlled and reduced to a degree which is recognized by sanitarians and by experience to be non-hazardous, and the Committee recommends that at points where extensive operations are carried on, after available mechanical appliances for ventilation are installed, periodic examinations of its air should be carried on to determine the quantity and composition of the dust, . . . It is only by such examinations that the presence of harmful substances in the air can be ascertained and the adequacy of the ventilation systems checked.

These recommendations relate to the engineering control. No less important is the medical control. . . . Supplementing a satisfactory pre-employment history, a physical examination should be made paying particular attention to signs indicating disease of the heart or lungs. The environment in which an employee may be required to work makes necessary this inquiry into the occupational history and physical condition to ascertain that there is no history of previous exposure which may cause impairment and no condition present which may be made worse by occupation. No less important is the periodic physical examination of employee engaged in occupations known to be health hazards if a correct diagnosis is   to be made and the proper balance struck between diseases which are unfavorably influenced by occupation and these diseases in which occupation has no bearing.  The Committee recommends that employees engaged in work which is recognized as more than a normal hazard such as exposure to silica, asbestos, or lead dusts, be examined semi-annually, or more frequently whenever there appears to be indications for doing so, with transfer of employees who are becoming impaired, to less hazardous work. (Emphasis added).

The Alton series of documents go on to discuss the hazard asbestos exposure presents to railroad employees and those surrounding them as well as state of the art discussions of exposure prevention techniques.  These documents demonstrate the early and extensive understanding by the railroad industry, including BNSF, that asbestos presents a serious health hazard, disturbance of asbestos containing materials presents a hazard even to people in the area who are not engaged in the disturbance activities, that periodic examinations of air for the presence of asbestos dust is necessary in railroad work areas, how exposures can be prevented and reduced, and that periodic physical examinations are necessary among employees engaged in work involving asbestos.

56

56. **Alton info shared with AAR in 1937**:  The knowledge of the hazard and prevention of asbestos exposure demonstrated in the Alton documents was shared with the other Railroads that were part of the American Association of Railroads, including the GNRR, shortly after the above referenced Alton interactions, in June of 1937.  At the 1937 AAR meeting, Dr. D.B. Moss, Medical Director of BNSF predecessor Burlington Railroad, active member of the Shop and Engineering Committee responsible for authoring the Alton documents, and the then current Chairman of the AAR Medical and Surgical Section, presented on the findings of the Shop and Engineering Committee regarding the topic of occupational disease advising the other members of the AAR that dust could be harmful to workers and that asbestos was one of the principal sources of toxic dust exposure to railroad workers.  At the same time, Dr. Moss advised AAR members that asbestosis was strictly a dust disease, caused only by exposure to asbestos.  For the 1937 AAR meeting, W.P. Kenney, President of the Great Northern Railroad, and S.T. Bledsoe, President of the Atchison, Topeka & Santa Fe Railway, were on the Board of Directors, and Dr. D.C. Webb, Chief Surgeon of the Great Northern Railway was on the Committee of Direction for the Medical and Surgical Section.  Despite the documented knowledge and recommendations going back to the mid-1930s, BNSF never followed its own guidance in Libby even throughout the 1990s.

57. **National Safety Council Documents**:  BNSF predecessors, including the Great Northern Railroad, the Burlington Railroad and the Santa Fe Railroad were members of the Railroad Section of the National Safety Council.  See National Safety Council Railroad Section Chairman List; Discovery Request No. 68 (1987).  The National Safety Council published and disseminated numerous articles documenting the hazards of asbestos exposure in the 1930s and later.

At least one railroad, the Norfolk & Western, had an asbestosis claim decades ago. The man worked in the engine shop of the railroad, frequently handling insulation materials made with asbestos. He claimed he was totally disabled with asbestosis and had suffered pleural effusion as well (Ancel Wheeler V. Norfolk & Western, U.S. Dist. Court S. Dist. Ohio, W. Div., Civ. No.2740; and Dr. Allen Barker's letter to Dr. W. R. Whitman, Chief Surgeon for N & W, Aug.18, 1951 describing the X-ray findings as "compatible with asbestosis").

58. **Misc. docs. evidencing RR knowledge of asbestos hazard**:  In 1960, asbestos was listed as one of seven materials which had been "suspected as lung carcinogens" in an article by Dr. I. Kaplan of the Baltimore and Ohio Railroad ("Relationship of Noxious Gases to Carcinoma of the Lung in Railroad Workers." J.A.M.A. 171:2039-2042, Dec. 12, 1959, reprinted in The Bulletin 44:511-520, 1960); see also 11/18/1980 BNSF correspondence noting "Asbestos is one of the few materials which has been demonstrated to be capable of causing cancer in humans."  It is notable that in this same time period Wagner (1960) identified mesothelioma in railroad workers when he described that two of his patients were lagging locomotives.  BNSF was aware that "concerning asbestos containing products" "the hazard exists whenever dust is produced during the life cycle of the

product." 3/29/1979 BNSF correspondence; see also 4/10/1979 BNSF memorandum "Discussion on Hazardous Materials – Products containing asbestos".

59. **Other sources of RR knowledge of asbestos hazard and IH standards**:  BNSF had an extensive exposure to applicable industrial hygiene standards of care throughout the years that it shipped Libby vermiculite.  BNSF maintained a Medical Department, an Industrial Hygiene Department, a Safety Department, and a Geology/Mineral Research Department. In addition to being a member of the National Safety Council, the Association of American Railroads, and the Shop and Engineering Committee, BNSF's industrial hygienists were members of the American Industrial Hygiene Association as well as the American Society of Safety Engineers and BNSF's medical officers were members of the American Occupational Medical Association.  See Discovery Request No. 68 (1987), Swanson v. BNSF; BNSF's Response to Sixth Discovery Requests - Kleeck.  BNSF maintained a vast industrial hygiene and occupational medicine library and received an extensive number of publications on the topic for the use of their Medical Department and industrial hygienists including various texts on asbestos hazards and prevention.  See, e.g., List of publications received by BNSF Medical Department (1987).  The Railroad had a Safety Division and regularly sent employees working therein to safety training courses. See 1/11/1982 BNSF correspondence.

60. **RR understanding of safety regulations:**  The Railroad was aware of applicable safety regulations and regularly discussed their impact on their operation.  See, e.g., 4/19/1974 BNSF correspondence, discussing Federal safety regulations and training "required by law"; 1/9/1984 BNSF memorandum discussing OSHA regulations for the exposure to asbestos and BNSF's responsibility to conform thereto; 3/24/1981 Letter from BNSF to OSHA requesting an additional copy of booklet entitled "Training Requirements in OSHA Standards" and a page from the publication discussing the Railroad's obligation to analyze work environments for potential exposure to toxic dust; 5/16/1975 BNSF Correspondence discussing OSHA regulations and their effect on Railroad industry; 6-6-1974 BNSF memorandum regarding Federal Respirator Regulations; 3/29/1979 BNSF correspondence discussing "the strict federal regulations controlling work practices with asbestos; 4/26/1979 BNSF correspondence; 4/10/1979 BNSF correspondence discussing stringent OSHA regulations regarding asbestos including the permissible exposure limit; BNSF 0517 regarding OSHA directives to be used during asbestos removal; BNSF 0394-0416 - BN Respiratory Protection Program setting forth "OSHA's Requirements for a Minimal Respirator Program."  Despite its understanding and above referenced recognition of these safety standards, in 1992 BNSF itself noted that "The asbestos program within the Burlington Northern Railroad has been rather hit and miss."  BNSF 0570-0571 - BN Asbestos Operating & Maintenance Program (3-4-1992).

In 1976, BNSF circulated a memorandum with an attached National Safety news article on Safety Program Evaluation and requesting regional management assess deficiencies in this regard.  See 11-1-1976 BNSF Correspondence.  The article sets forth applicable standards of care of the time including inquiry, among other things, into whether "exposure to toxic dust, fumes, vapors, and radiation has been analyzed to determine if health hazards to employees exist," "chemicals handled by employees are monitored to

prevent respiratory irritations, and whether "occupational health surveys are performed by qualified industrial hygienists."

61. **RR self-imposed safety standards:**  In addition to the applicable safety regulations and general industrial hygiene practices to which BNSF was subject, the Railroad set forth its own self-imposed safety responsibilities which similarly demonstrate its knowledge of these protective principles.  See, e.g., BNSF Responsibilities for Safety – Content from Supervisor/Foreman seminars on safety 1975-1976 setting forth what BNSF considers to be "the fundamental requirements" and requiring inspection of "Atmospheric conditions, e.g. dusts"; 5/16/1975 BNSF memorandum discussing the BN Safety Policy which states "Safety is essential for efficient transportation and Safety is the primary concern and continuing responsibility of each supervisor and employee alike"; 9/11/1981 BNSF correspondence attaching a BNSF Respiratory Protection Program representing "the minimum which will meet all requirements" and setting forth the BNSF policy that "Burlington Northern will use substitution, engineering, and administrative controls to reduce employee exposures to toxic substances whenever feasible. When not feasible, or while being implemented, respiratory protection will be used." (Also found at BNSF 0379-0383).  In developing its respiratory program, BNSF industrial hygienist Larry Liukonen set forth the "Requirements for a minimal acceptable program," which among other things included "Appropriate surveillance of work area conditions and degree of employee exposure or stress shall be maintained."  BNSF 0379-0383 - BN Respiratory Protection Program (1981).

In sum, BNSF clearly had early knowledge of the hazard presented by asbestos, the proper means of identifying its presence, and appropriate means of preventing exposure.  Thus, BNSF could and should have recognized and addressed the extreme asbestos hazard that BNSF's vermiculite related activities were producing in the Libby area.  Despite the documented knowledge and recommendations going back to the mid-1930s, BNSF failed to take any action in Libby even throughout the 1990s.  As set forth below, BNSF not only had early knowledge of the hazard presented by asbestos, but had early knowledge of asbestos in the Libby vermiculite.

## VIII.   BNSF Knowledge of Libby Asbestos.

62. **RR knowledge of Libby asbestos by 1920s**:  BNSF knowledge of the presence of asbestos in the vermiculite ore on Vermiculite Mountain near Libby is demonstrated in relevant literature, publications and BNSF company documents by the 1920s.

63. **Geological Publications**:  Geologic studies of the material on Vermiculite Mountain beginning in the 1920's revealed the presence of tremolite asbestos in the vermiculite. See, e.g., *Pardee and Larsen* (1925, 1926, 1928, 1929); *Kreigel* (1940); *Perry* (1948); *Johns* (1959); *Bassett* (1959); *Peck* (1960);  *Weeks* (1981).  As discussed below, many such geological studies were financed and/or received by BNSF.  Relevant excerpts include the following:

**DEPOSITS OF VERMICULITE AND OTHER MINERALS IN THE**

**RAINY CREEK DISTRICT, NEAR LIBBY, MONT.**   Pardee JT, Larsen ES. 1929. Deposits of vermiculite and other minerals in the Rainy Creek District, near Libby, Montana: USGS Bulletin; 805: 17-28.

In the Rainy Creek district in Montana the workings of the Vermiculite & Asbestos Co. expose several bodies of amphibole asbestos which are of dikelike or tabular form and of different widths. As commonly understood, the term asbestos embraces the fibrous varieties of several minerals, including anthophyllite, tremolite, actinolite, and crocidolite, which belong to the amphibole group, and chrysotile, a variety of serpentine. A large body of the vermiculite is being developed commercially by the Zonolite Co. In addition several smaller bodies are being explored by the Vermiculite & Asbestos) Co., and in some of these bodies the mineral makes up from 30 to 84 per cent of the pyroxenite country rock. Samples representing areas of several square feet at different places in the workings of the Vermiculite & Asbestos Co. contained from 30 to 84 per cent of vermiculite. Apparently there is a huge amount of such mixed material. Locally the pyroxene (diopside) of the large pyroxenite mass has been changed by hydrothermal metamorphism to an amphibole of fibrous habit, related to tremolite. The minerals known commercially as amphibole asbestos are more or less useful, their value depending on their quality and the relative location of the deposits.

*** 

**SUMMARY OF** OCCURRENCE**, PROPERTIES, AND USES OF VERMICULITE AT LIBBY, MONTANA.** Kriegel WW. 1940. Summary of occurrence, properties, and uses of vermiculite at Libby, Montana.  Bulletin of The Amer Ceramic Soc. 19 (3): 94-97.

Though many deposits of vermiculite have been found throughout the United States, including North Carolina, South Carolina, Colorado, New Mexico, California, Idaho, Wyoming, the New England States, and other parts of Montana, the history and development of the industry are closely allied with that of the Libby deposits and companies. A second series of dikes intersecting the ore body consists of material high in amphibole asbestos with less altered pyroxenite. Where the concentration of asbestos is sufficiently high, it is mined and marketed.

*** 

**GEOLOGIC INVESTIGATIONS IN THE KOOTENAI-FLATHEAD AREA, NORTHWEST MONTANA.   WESTERN LINCOLN COUNTY.** Willis M. Johns. STATE OF MONTANA BUREAU OF MINES AND GEOLOGY. 1959.

60

The largest vermiculite mine in the United States has been developed by the Zonolite Company in the Rainy Creek district 7 miles northeast of Libby. Although the company has an expanding plant in Libby, the bulk of the concentrate is shipped as crude vermiculite to expanding plants throughout the country. The expanded vermiculite is marketed under the trade-name, Zonolite. The pyroxenite is very coarse grained and composed of vermiculite, aegerine-augite, soft fibrous amphibole asbestos (tremolite), magnetite, and locally a little biotite. Fibrous amphibole asbestos-, because its specific gravity is very near that of vermiculite, causes much trouble in milling the lower grade ores in which the asbestos is abundant. If a process could be perfected to make a clean separation of vermiculite and asbestos, both products would be marketable, and much material now mined and dumped as waste could be milled and made to yield a profit.

***

**THE ORIGIN OF THE VERMICULITE DEPOSIT AT LIBBY, MONTANA. THE AMERICAN MINERALOGIST**, Bassett WA. 1959. The origin of the vermiculite deposit at Libby, Montana. Am. Mineral. 44: 282-299.

Four alteration minerals predominate, asbestos (tremolite-actinolite), biotite, hydrobiotite, and vermiculite.  Many thin (approximately 1 inch), white asbestos veins cut through the pyroxenite. The asbestos has been identified by x-ray diffraction and optically as tremolite-actinolite.

64. **BNSF scientific analyses of Libby Ore**: By 1925, BNSF was one of the first entities to perform a geo-chemical analysis of the Libby Ore.  See 11/1/1925 Zonolite Publication - GNRR chemical geological analysis of Libby Ore, p. 4; 1926 Publication summarizing early GNRR chemical/geological analysis of the Libby Ore, p. 2.  Over the ensuing years, BNSF showed a continued interest in the economic potential of the Libby Ore and development of the resource.  Among other things, BNSF issued reports on the vermiculite operations prepared by its Division of Economic Research, funded geologic studies of the vermiculite and asbestos deposit, sampled/tested the ore several times, and visited the mine site on multiple occasions.

An October 30, 1961 Zonolite memo discusses a visit to the Libby mine by Great Northern's Chief Metallurgist and attaches his resultant report regarding possible applications for the "green sands" byproduct of the vermiculite milling process. See IP 1077514, IP 1077515.

An August 30, 1963 letter from Alva J. Haley of Great Northern's "Mineral Research and Development Department" to J.A. Kelly, president of the Zonolite Company, discusses Great Northern's visit to the Zonolite headquarters and apparent intent to engage in a

cooperative business endeavor involving the agricultural application of Zonolite's vermiculite ore. The letter provides:

> Dear Mr. Kelly,
>
> I very much enjoyed our talk in your office the other day and immediately upon my return to Seattle discussed the entire matter with Mr. Ralph Watson, our Geologist on the west end; we are fully prepared to pursue the matter of biotite investigation in accordance with your wishes. As soon as we have the samples and analyses, Mr. Watson will locate an agronomist for you who can and will undertake to proceed with the testing.
>
> In the event that it might be more convenient for you, Mr. Watson can arrange to be in Libby on September 18 or 19 and would be happy to discuss this matter with Mr. Bleich. The two of them could then take samples; whichever way you prefer.

See 8/30/1963 GNRR correspondence (Emphasis added). A December 1963 Zonolite Sample Shipment Log documents the shipment of multiple "Biotite" samples to the Great Northern Mineral Research and Development Department. See IP 0845421. A report was then issued on August 21, 1964 by the North Dakota State University Chemistry Department to the Great Northern Chemical Engineering Department regarding the chemical properties of the "Biotite" samples. See IP 1200511.

In 1976, the BNSF Geology Department visited the W.R. Grace mine. An August 20, 1976, letter from Ronald Seavoy of BNSF to Ray Kujawa of W.R. Grace provides:

> Dear Ray,
>
> Fred and I had a very delightful and informative time during your guided tour of the Zonolite Mine. Thank you very much for taking the time to show us the geology and allow us to collect specimens.
>
> I was particularly interested in vermiculite, having worked for Johns-Manville exploring for asbestos and knowing more than most geologists about industrial minerals. When I returned to the motel and washed some of the specimens I collected, I could see very clearly what you meant by the low temperature alteration solutions that produced vermiculite.
>
> The thing that clearly indicated the low temperature of formation was the way the very large crystals of pyroxene (enstatite?) were partially altered to tremolite-talc rock … (Emphasis added).

**65. News Publications**: By the mid-1920s two companies had been established to exploit the comingled vermiculite and asbestos resource on outside of Libby, the Zonolite Company and the Vermiculite & Asbestos Company, both of which shipped their products via the

GNRR. In 1924, freight rate negotiations with BNSF (12/4/1924 Western News Article) allowed the companies to secure a low freight rate for shipment of their product by rail (12/11/1924 Western News Article). Shortly thereafter, rail cars were being loaded and shipped from BNSF's downtown Libby Railyard. 1926 GNRR Semaphore Article. By 1924, the Zonolite Co. announced plans to construct an aerial tram to the location on the BNSF railroad later known as the River Loading Point. See 8/7/1924 Western News Article; 3/4/1926 Western News Article; 12/16/1926 Western News Article. By 1929, the Zonolite Co. had yet to construct the tramway but was to accept bids on a contract to build the tramway. 7/4/1929 Western News Article.

A 1926 Western News article reports that the Zonolite Company has recently employed a noted engineer chemist; "The Zonolite Company has recently secured the service of Frank J. Buck, C. E., E. M., to superintend the installation of a new treating plant to be erected at the site of the present experimental furnace." See 1/21/1926 Western News Article. See also 1/20/1926 Western News Article – Vermiculite & Asbestos Co. will manufacture many products from Vermiculite and Asbestos; 2/10/1927 Western New Article – discussing possible applications for the vermiculite and asbestos mined in Libby; and 1/20/1926 Western News Article – Offering Stock in Vermiculite & Asbestos Co. In 1927, the Western News contained an entry offering stock in the Vermiculite & Asbestos Company and reporting that the "company has many thousands of dollars in commercial asbestos already opened up" … "to say nothing regarding the mountain of vermiculite" … "Our program for this property is an extensive development plan and the immediate erection of a mill. But we will not wait for mill to begin shipping the crude asbestos. This will start rolling to market soon as the tramway is completed." 1927 Western News Publication. See also 5/5/1927 Western News Article discussing extensive asbestos deposits in the Vermiculite & Asbestos Co.'s extensive Rainey Creek mine claim and discussing markets and uses for the asbestos product. A subsequent Western News publication discusses the Libby vermiculite and provides "this stuff belongs to the asbestos family, but is a higher insulator for heat or cold. The stuff has been shipped from Libby to our Los Angeles plants for several years and we worked out thirty-two uses for this material." 5/19/1927 Western News Article.[32] A May 1927 article titled "Work Progressing at Asbestos Mine" provides that the Vermiculite and Asbestos Co.'s "orders are beginning to pile up and only yesterday a letter was received from the largest users of asbestos on the west coast that they could use several cars weekly." 5/12/1927 Western News Article. Later that month the Western News reported that the neighboring Zonolite Co. was shipping out many orders. 5-26-1927 Western News Article. By June 30 of 1927, in a Flathead Monitor publication,[33] the Zonolite Company discussed the great publicity "the occurrence of the amphibole asbestos in the Rainy Creek mining district" had been given and announced that commercial export was not economically feasible based in part on the "freight rates on the Amphibole" which "would range from fifteen to twenty dollars per ton in car lots to Chicago and eastern markets with higher proportionate rates to the west." By June of 1927, the Zonolite Company had obtained permission to

---

[32] The Western News reprinted this article in 1967 as part of an anniversary edition.
[33] This article was also reprinted in the Western News in 1967.

build a tram with "bunkers and other terminal equipment for the lower end of the tram, which we expect to locate on the Great Northern right-of-way."  See 6/9/1927 Western News Article.

An October 1927 Western News article entitled "Mining Journal Gives Write-up of Libby and Troy Districts" discusses the operations at Rainey Creek stating:

> A visit was made to the Zonolite Company's jeffersite or vermiculite mine some six miles north of Libby on Rainy Creek.  This operation has attracted a great deal of interest.  The noted geologist, J.T. Pardee, arrived in Libby while the reporter was at the property, and made his second visit to the mine the following day… An aerial tram will be run about 10,000 feet down Rainy Creek and across Kootenai River to a loading platform on the Great Northern railroad from which the material will be transported to the Zonolite company's treating plant in the eastern outskirts of Libby. ***

> On the opposite side of the same mountain the Vermiculite & Asbestos Company has started to develop an extension of the jeffersite deposit.  In this section there appears to be more of the amphibole asbestos, to which the Zonolite people pay no attention. ***

> Two other concerns, the Micalite Company and the Jeffersite Company, have been formed to explore the outlying sections of the deposits but they are inactive.

See also 4/17/1928 Western News Article discussing Libby mines and noting that asbestos is found here also.  Although by 1929, railroad records indicate that only small amounts of vermiculite had been moved by rail, shortly thereafter vermiculite shipping operations appear to have been well underway.   By 1932, the Western News reported that the Vermiculite & Asbestos Co. was beginning construction of their new 125-Ton vermiculite processing mill that was expected to be able to produce 125 tons of vermiculite concentrate per day.  See 10/27/1932 Western News Article.  In 1934, the Vermiculite & Asbestos Co. became the Universal Insulation Co.  In March of 1936, the Western news reported that the Vermiculite Company was expanding to include a processing plant in Minneapolis for its growing business.  See Western News Article 3/26/1936.  In 1939, the several different vermiculite operations were combined into the Universal Zonolite and Insulation Company, the name of which was changed to the Zonolite Company in 1948.  In September of 1939, the Western News contained an article entitled "Concern Ships 63 Carloads in August" which describes in some detail the Zonolite operations taking place at the "loading docks north of the Great Northern tracks here in Libby… 63 freight carloads of vermiculite had been shipped from Libby to points all over the world.  This is more ore than was ever shipped by either of the former companies together."   9/21/1939 Western News Article.

64

In 1962, the Zonolite Co. made public its plan to produce and export asbestos from the vermiculite mine and mill facility through publication in the Western News. See 4-5-1962 Western News Article – Asbestos Pilot Plant Planned.

66. **Sanborn Fire Insurance maps** from June of 1946 show the Zonolite Co.'s Storage and Shipping Plant located on Great Northern's right of way at the Railyard and a former Vermiculite & Asbestos Co. property located immediately adjacent to the Railyard.  See Sanborn Fire Insurance Maps.  During this period, the ore was trucked from the mine site to the processing facility in Libby where it was loaded on the trains, but by 1949 the river conveyor was constructed and material was loaded on the Zonolite railroad siding directly across the river from Rainey Creek Road.

67. **Company Records**:  The corporate records of the Great Northern Railway, held and maintained by the Minnesota Historical Society, contain various documents demonstrating BNSF's early knowledge of the presence of asbestos in the vermiculite mined in Lincoln County as well as a great interest in the economic development of the Libby vermiculite mine.

Correspondence beginning in early 1929 between G.R. Martin, Vice President of the Great Northern Railway and others demonstrates this interest and knowledge.  Mr. Martin sought information regarding the vermiculite product being mined in the area from local railroad employees and the United States Department of the Interior Geological Survey. See 4/6/1929 Letter from A.B. Ashby to Mr. Martin, 4/29/1929 Letter from Mr. Kenney to Mr. Martin and 5/13/1929 Letter and attachments from Mr. J.T. Pardee to Mr. Martin with Great Northern Railway's President's Office Seal regarding Bulletin 805-B.  When asked about railroad knowledge of the vermiculite, local railroad employee W.F. Kenney informed Mr. Martin that they "have heard of this; in fact, have rates in [effect], but only a very small quantity of it has moved."   The noted geologist Mr. Pardee provided Mr. Martin with the study entitled "Deposits of Vermiculite and other Minerals in the Rainy Creek District near Libby, Montana" (Bulletin 805-B (1929)) which provides as follows:

> The deposits described are in an easily accessible area about 7 miles northeast of Libby Mont. . . . About two-thirds of the stock consists of a coarse-grained pyroxenite that ranges from nearly unmixed pyroxene to nearly unmixed biotite or its alteration product vermiculite. ***

> The principal minerals thus produced are white mica, aegirite and aegirite-diopside (both locally vandiferous), vermiculite, and fibrous amphiboles… A large body of the vermiculite is being developed commercially by Zonolite Co.  In addition several smaller bodies are being explored by the Vermiculite & Asbestos Co., and in some of these bodies the mineral makes up from 30 to 84 per cent of the pyroxenite country rock. Vermiculite is comparatively new to commerce…

> On the spur north of Kearney Creek much of the pyroxene of the large pyroxenite body has been altered to amphibole of a fibrous habit that is

65

<u>known commercially as amphibole asbestos</u>. ***

The area under consideration is the lower part of the basin of Rainy Creek, about 7 miles northeast of Libby, Mont.  (See pl. 1.)  It is easily reached from the main automobile highway along the north bank of the Kootenai River by a short branch road up Rainy Creek.  <u>The Great Northern Railway approaches within 2 miles, but it lies on the opposite bank of the river.  A few miles below Rainy Creek, however, a logging railroad crosses to the north bank</u>. ***

<u>Locally the pyroxene (diopside) of the large pyroxenite mass has been changed by hydrothermal metamorphism to an amphibole of fibrous habit, related to tremolite</u>.

In the Rainy Creek district in Montana <u>the workings of the Vermiculite & Asbestos Co. expose several bodies of amphibole asbestos</u> which are of dikelike or tabular form and of different widths.  The largest, as exposed by open cuts, appears to by 100 feet or more long and from a few feet to 14 feet wide.  A body 4 feet or more wide exposed in the face of a tunnel at a depth of 150 feet or more may be the downward continuation of the same deposit.  Several smaller bodies are exposed in other workings…

<u>As commonly understood</u>, the <u>term asbestos embraces</u> the <u>fibrous</u> varieties of several minerals, including anthophyllite, <u>tremolite</u>, <u>actinolite</u>, and crocidolite, which belong to the amphibole group, and chrysotile, a variety of serpentine. ***

For a few inches on both sides of the veins the pyroxene of the wall rock is changed to <u>a fibrous amphibole related to actinolite and glaucophane</u>. (Emphasis added.)

Plate 1 of the report is a geologic map of the Rainey Creek district which clearly shows the Zonolite and the Vermiculite & Asbestos Co. developments located immediately adjacent to each other, on top of vermiculite mountain, and directly over the pyroxenite deposit, referenced above as being associated with, and having been altered to, amphibole asbestos.  The map also shows the Great Northern Railroad running in close proximity to the deposits.

Also attached to Mr. Pardee's letter to Mr. Martin was an April 8, 1929 report from the American Mining Congress Special Daily Information Service, Washington, D.C., which provides that "the vermiculite deposit near Libby, which is more extensive than other know similar deposits in this country, is accompanied by asbestos …"

<u>These reports put BNSF's predecessor on notice, as of 1929, that the ore coming from the Rainey Creek area, which they were already engaged in shipping, was highly intermixed with tremolite and actinolite type amphibole asbestiforms.</u>

68. **RR interest in economic development of vermiculite operations**:   The railroad's interest in the economic development of this resource continued and in 1959 the railroad funded a State of Montana Bureau of Mines and Geology Report known as "Bulletin 12," further entitled "Progress Report on Geologic Investigations in the Kootenai-Flathead Area, Northwest Montana."   The report was prepared under a cooperative agreement with, and funded by, BNSF.[34]  Bulletin 12 provides:

> The largest vermiculite mine in the United States has been developed by the Zonolite Company in the Rainey Creek district 7 miles northeast of Libby… In 1939, the several different operations were combined into one under the Universal Zonolite and Insulation Company… A 1,000-ton mill, erected in 1948, produced 350 to 400 tons of concentrate per day, and it is presently being enlarged.  Although the company has an expanding plant in Libby, the bulk of the concentrate is shipped as crude vermiculite to expanding plants throughout the country.  The expanded vermiculite is marketed under the trade-name, Zonolite.
>
> The [vermiculite] deposit is an elongated stock composed of pyroxenite and syenite.  The stock intrudes strata of both the Wallace and Striped Peak formations in the trough of a northwest-trending syncline.  The pyroxenite is very coars-grained and composed of vermiculite, aegerine-augite, soft fibrous amphibole asbestos (tremolite), magnetite, and locally a little biotite. ***
>
> This unusual stock has many minerals of potential value.  The vermiculite, of course, is being actively marketed at present.  **Fibrous amphibole asbestos, because its specific gravity is very near that of vermiculite, causes much trouble in milling the lower grade ores in which the asbestos is abundant.  If a process could be perfected to make a clean separation of vermiculite and asbestos**, both products would be marketable... (Emphasis added).[35]

The following year the railroad funded a second State of Montana Bureau of Mines and Geology Report entitled "Bulletin 17" providing:

---

[34] That BNSF funded these studies based on its financial interest in the vermiculite operations is confirmed by BNSF's Director of Environmental Operations, Melvin Burda, who testified that it "was commissioned by the Marketing Department to see during a time of downturn economics for the railroad to see if there was any potential growth or any other commodities if it should ever come into commercial use, would it be a potential marketable service for that firm to basically need shipping requirements to move that commercial product… Asbestos was one of those that was identified as a potentially marketable product that may need shipping."  See 1/25/2007 Deposition of Melvin Burda, p. 46-47.

[35] This description of the Libby Vermiculite Deposit appears to have been referenced by the Railroad in 1964, in drafting a Great Northern Goat article on the vermiculite facility; "Ore masses are cut by syenite rock dikes varying in width from a few inches to many feet."

It consists primarily of augite pyroxenite altered on a large scale to biotite, hydrobiotite, and vermiculite. Veins of asbestos intrude the pyroxenite (see. pl. 2). Outcrops of this body are very few, and <u>the only good exposures are at the Zonolite Company's open pit in the vicinity of Vermiculite Mountain</u> (east central part of sec. 22, T. 31 N., R. 30 W.).

<u>Four alteration minerals predominate: asbestos (tremolite-actinolite), biotite, hydrobiotite, and vermiculite.</u> The name hydrobiotite is applied to the interstratified biotite-vermiculite from Libby. This mineral along with vermiculite and biotite, constitutes the commercial vermiculite ore. (Emphasis added.)

In 1970, the railroad funded a further State of Montana Bureau of Mines and Geology Report entitled "<u>Bulletin 79</u>" providing in relevant part:

RAINY CREEK STOCK

The Rainy Creek stock is west of the Kootenai River about 8 miles northeast of Libby. This large complex stock of pyroxenite and syenite underlies part of the valley of Rainy Creek and extends east beneath Vermiculite Mountain. ***

Pyroxenite within the Zonolite pit is light gray to yellowish-green coarse-grained friable rock composed of vermiculite, aegirite, aegiritediopside, <u>soft fibrous tremolite</u>, apatite, magnetite, garnet, biotite, and hydrobiotite…

<u>Tremolite (amphibole asbestos) forms at the expense of pyroxenite</u> in altered zones bordering syenite apophyses and quartz veins that cut the pyroxenite mass (Boettcher, 1963). ***

Bordering the syenite apophysis and related syenite dikes in the pyroxenite are alteration <u>halos of tremolite after pyroxenite, which are of potential economic importance as a source of brittle asbestos</u>. ***

The Rainy Creek pluton has many minerals of potential value, besides the vermiculite, which is being marketed at present.  <u>Amphibole asbestos (tremolite) … may be profitable byproducts if separation can be achieved economically and if markets can be developed for these minerals</u>. (Emphasis added.)

Bulletin 79 also includes a figure depicting the Rainy Creek Stock, which shows the mine operations located directly over the pyroxenite deposit and the Great Northern Railroad passing by in close proximity to the mine location.

69. **Asbestos Shorts**:  In addition to the freight rates from Libby for amphibole asbestos shipments reported in 1927 (referenced above),  in 1962, the Zonolite Company, operator of the vermiculite mine near Libby, communicated with BNSF about the possibility of hauling pure asbestos from Libby to various locations throughout the United States This is memorialized by a Grace memorandum confirming communications between BNSF and Grace and quoting rates to the Zonolite Company for prospective hauling of pure asbestos. See Asbestos Shorts Shipping Rates Memo, 4/30/1962.  Zonolite also inquired with Great Northern's Montana tax agent regarding joint tax treatment for their vermiculite and proposed asbestos businesses given that the mining was to be done from the same property in Libby.  See 2-21-1962 Zonolite Memorandum.  The plan to produce and export asbestos from the vermiculite mine and mill facility was published in the Western News on April 5, 1962. See 4-5-1962 Western News Article – Asbestos Pilot Plant Planned. Former BNSF Director of Industrial Hygiene James Shea confirmed these communications between the GNRR and W.R. Grace and that Bulletin 12 conveyed that then current milling technologies were unable to separate the asbestos from the vermiculite in admitting that the GNRR was aware there was "amphibole material in the vermiculite product." 1/26/2007  Deposition of James Shea, pp. 99-100.

> **Q**  And one of the locations where Great Northern evaluated the content of ore to assess economic opportunities was Zonolite mountain?
> **A**  Yes, that's correct.
> **Q**  And the study revealed, did it not, that the vermiculite ore on Zonolite mountain contained amphibole asbestos?
> **A**  Yes, it did.
> **Q**  And the study even specifically said that current milling technologies were unable to separate the asbestos from the vermiculite, right?
> **A**  I believe it described that.
> **Q** Were you aware that the Great Northern Railroad actually entered into negotiations with W. R. Grace discussing the establishment of rates for hauling asbestos from Libby, Montana?
> **A**  That's my understanding.
> **Q** And that was in the early 1960's, right?
> **A**  Well, I believe Grace took ownership in 1963, so I imagine they would have entered into that discussion immediately.
> **Q**  The discussion actually was with the predecessor to Grace, the Zonolite Company, right?
> **A**  Yes.
> **Q** And that was in the early '60's?
> **A**  That would have been in, yes, the very early '60's, yes.
> **Q**  So there's really no question, is there, that Great Northern was aware that there was asbestos present in material buried on Zonolite mountain, do you agree with that?
> **A**  I think that's pretty clear from judging from that document that the document spoke of amphibole material in the vermiculite product.  So to the extent that described it, yes.

BNSF's Director of Environmental Operations, Melvin Burda, further confirmed that a motivation of BNSF in funding Bulletin 12 was to explore the potential for shipments of the Libby asbestos to be made on its lines and admits, with reference to Bulletin 12, that he was aware of the difficulty with separating the vermiculite concentrate from the asbestos.  See 1/25/2007 Deposition of Melvin Burda, p. 55.

**70. Libby Vermiculite Asbestos Warnings**:

    **A. Railcar Warnings:**  W.R. Grace correspondence of October 24, 1972, discusses new regulations requiring that railroad cars carrying Libby Ore carry asbestos warning labels "in the form of a placard posted on both sides of the vehicle.  By at least 1977 and thereafter, railcars carrying the Libby Ore were marked with asbestos warning placards reading as follows:

CAUTION

Contains asbestos fibers.

Avoid creating dust.

Breathing asbestos dust may

cause serious bodily harm.

    See, e.g., W.R. Grace correspondence of 10/24/1972, 6/21/77, 6/28/77, 6/27/78, and W.R. Grace's response to the Second Request for Information Regarding the Libby Asbestos site, February 22, 2000, p. 20.  The Libby Historical Society also has the attached rail car vermiculite ore warning label in its archives which was also used by Grace on cars carrying Libby vermiculite ore.  River Loading Point workers remember affixing these warning signs on hopper cars going to private customers (See, e.g., 6/9/1999 Deposition of River Loading Point worker Robert Wilkens), and BNSF employees remember seeing these warnings on outgoing vermiculite cars.  BNSF employees also remember a meeting of BNSF employees and management with W.R. Grace manager William McCaig after BNSF employees noticed the warnings on the outgoing railcars.  See, e.g., 6/28/2016 Deposition of Bruce Carrier.  The use of placards on rail cars carrying the Libby vermiculite ore is also well documented throughout the transcript of the U.S. vs. W.R. Grace criminal trial.

    **B. Other Warnings:**  Beginning in 1972, W.R. Grace placed government required signs in the mine and processing facilities with the following warning:

ASBESTOS DUST HAZARD

Avoid Breathing Dust.

Wear Assigned Protective Equipment.

Do Not Remain In Area Unless Your Work Requires It.

Breathing Asbestos Dust May Be Hazardous To Your Health.

    See, e.g., W.R. Grace's response to the Second Request for Information Regarding the Libby Asbestos site, February 22, 2000, pp. 14, 20.  BNSF executives and its geology department visited the W.R Grace mine on several occasions, at which time the

government required asbestos dust warning signs in the mine and the asbestos warning labels on bags of vermiculite concentrate would have further informed BNSF of the asbestos hazard associated with the ore they were hauling.

W.R. Grace shipped bagged vermiculite ore in BNSF boxcars, which beginning in March 1976 each carried a warning label reading:

CAUTION
CONTAINS ASBESTOS FIBERS
BREATHING ASBESTOS DUST MAY CAUSE
SERIOUS BODILY HARM

C. **Vermiculite MSDS:**  Beginning in 1974, Grace supplied Material Safety Data Sheets to customers receiving shipments of vermiculite ore stating that it contains the "Hazardous Ingredient" tremolite asbestos and advises to avoid creating airborne dust and to use dust control techniques when handling the material.  Subsequent MSDSs for vermiculite warned of "normal physical handling given to vermiculite concentrate can create an airborne fiber level in excess of OSHA standards….See 7/19/1977 MSDS; W.R. Grace's response to the Second Request for Information Regarding the Libby Asbestos site, February 22, 2000; and BNSF HPP 001271-001491 - MSDS Materials Produced by BNSF.  BNSF's industrial hygiene and toxicology expert, Francis Weir, concedes that BNSF received these MSDS, giving them further notice of the asbestos content of the vermiculite concentrate they were hauling.  See 7/2/2003 Deposition of Francis Weir, p. 68.  BNSF's receipt of these MSDS from W.R Grace has been further confirmed by BNSF through prior discovery.

71. **Agency Reports/Publications**:   In October 1968, the U.S. Department of Health, Education and Welfare reported on its atmospheric and bulk asbestos sampling at Libby.  See U.S. Public Health Department Tremolite Sampling Report 10/8/1968 and 10/17/1968.   By the mid-1970s the EPA was engaged in investigations of, and publications regarding, the asbestos content of the Libby vermiculite. See, e.g., EPA's Libby Vermiculite/Asbestos Timeline; EPA 1977, Asbestos Fibers in Discharges from Selected Mining and Milling Activities; EPA 1981, Asbestos-Contaminated Vermiculite; EPA 1983, "According to the submitter, the Libby Vermiculite deposit has long been known to be contaminated with tremolite, an asbestiform mineral"; EPA 1985, "W.R. Grace and Company, the largest domestic supplier and user of vermiculite, acknowledged in 1971 the presence of asbestos contamination in the ore mined at their Libby, Montana facility.  Even after the ore was processed to remove impurities, some amphibole asbestos was detected in the vermiculite (EPA 1980a)."[36]  These materials were freely available to BNSF.

---

[36] EPA 1980(a) also notes that employees in loading areas are exposed to up to 5 f/cc and notes that "a substantial portion of the general public also is potentially exposed to asbestos contaminated vermiculite".

71

The 1976 NIOSH Revised Recommended Asbestos Standard produced in BNSF files at "BNSF 1818-1878" provides:

> Mining and milling of asbestos in the United States is not extensive: fewer than a thousand workers are employed (148). However, amphibole minerals and, to a lesser extent, serpentines, are sometimes found as contaminants of other types of ore bodies, such as talc, vermiculite, crushed stone aggregates, and in ores from various metal mining operations.***
>
> ***Research Priorities***: Although asbestosis is well characterized clinically and has been the subject of a good deal of epidemiological research, a number of research priorities remain:
>
> I. Epidemiological studies are needed to further characterize: potential asbestos risk from exposure in the railroad industry; tremolite exposure from contaminated vermiculite and talc in the users of these products; the risk (if any) among those working in the crushed stone industry; and to assess the risk of pleural abnormalities in the absence of parenchymal changes. (Emphasis added.)

72. **National Newspaper Publications**:  The problems with asbestos in the Libby vermiculite ore were announced publicly nationwide in various news publications by the 1970's.  See, e.g., Louisa, VA Article 9/3/76; 10-24-1979 Letter from USM to U.S. Consumer Product Safety Commission, attaching various articles and publications demonstrating the "general acknowledgement that vermiculite ore contains chrysotile and tremolite asbestos."   In 1985, Ralph Nader's Public Citizen publications reported that Libby workers, in particular, were ailing. Then in 1988, a leading Montana newspaper, The Missoulian, ran a front-page Sunday-edition story about Libby's dying workers and widows filing lawsuits against the company.  BNSF continued to make shipments of the vermiculite material until 1993. See 4/28/1993 Newspaper Article – Last Train Out.

In sum, the above materials clearly establish BNSF's early actual and constructive knowledge of the presence of toxic asbestos in the vermiculite ore coming from Libby.

## IX.    BNSF's Deceptive Course of Conduct Regarding Asbestos

73. **Introduction**:  Contrary to applicable industrial hygiene standards of care, despite the documented early and in-depth understanding of the hazard presented by asbestos, how exposure could be prevented, and the presence of asbestos in the Libby product, the available record indicates that BNSF ignored and later concealed its problems regarding asbestos.  As discussed previously, the Railroad's knowledge of the asbestos hazard in general is documented going back to the early 1930's through the Alton Documents, the American Association of Railroad Conference Reports and other documents and the Railroad's knowledge of the asbestos content of the Libby product was apparently established even earlier.  Yet, there is no evidence that BNSF ever engaged in any air or dust sampling or prevention in Libby or ever provided any respiratory protection/equipment to their employees in Libby.  In fact, the record demonstrates that

BNSF avoided regulation or inspection of their activities in regards to air quality of BNSF premises.

74. **BNSF documents re: course of conduct**:  BNSF documents show that they were aware that asbestos creates a hazard whenever dust is produced during the life cycle of the product and that asbestos causes cancer (W.A. Marshall to A.M Skinner, March 26, 1979; Abbott Skinner to W. A. Marshall, March 29, 1979).  A December 12, 1983, letter to Thompson Matthews and Mears from Donald E. Engle advises that "The Regional Vice Presidents were advised regarding the health hazards relative to asbestos following the last regional staff meeting in St. Paul. It appears necessary that we take the next step and implement rules for the handling and working with asbestos which is found to be located in BN facilities."  A 1984 BNSF document states: "In connection with development of policy regarding the removal and/or handling of asbestos at BN, I feel the matter has now reached the point where severe restrictions of communications are counterproductive and can soon result in loss of credibility when trying to present any favorable findings.  OSHA has issued regulations for exposure to asbestos and BN, the same as any manufacturer and real estate holder, has a potential and significant problem."  See 1/9/1984 BNSF Memorandum.  BNSF correspondence preserved in a 12/18/1981 letter from J.J. Button to J.G. Edwards referencing an article from the "'Occupational Hazards' individual responsibility for corporate managers" entitled "Criminal penalties coming for concealing hazards," stated: "Sounds like some of us may end up penniless and behind bars.  If it passes, all of our corporate officers need to be made aware."

75. **Liukonen testimony**:  Larry Liukonen was the industrial hygienist for BNSF from 1979-1987 and during that time he became the Director of Industrial Hygiene for BN.  Mr. Liukonen has testified that prior to 1979, he was not aware that BNSF had ever conducted any studies to determine whether its workers had been exposed to asbestos.  (Liukonen depo. of 1/24/2007 at p. 39).  Mr. Liukonen testified that the written program developed by the Safety and Rules Department for BNSF, prior to his employment, did not address asbestos.  Mr. Liukonen testified that BNSF did have some friable asbestos-containing materials in different places where BNSF employees worked, and that BNSF never instructed its employees to wear respirators while working with or around asbestos-containing materials.   Mr. Liukonen also testified that Labor Relations for BNSF undertook to tell all of the BNSF employees that they should not work with friable asbestos-containing material sometime in the early 1980's, and before 1979, the employees were working with the friable asbestos-containing materials. Finally, Mr. Liukonen testified that BNSF's program to generally educate their employees about chemicals that they might work with did not address asbestos.

Mr. Liukonen further testified that he had no knowledge regarding the operations that BNSF conducted in Libby while he was employed by the company, that he had no knowledge of whether the vermiculite BNSF hauled out of Libby, Montana contained asbestos, that he never made any attempt to evaluate the work that the workers in Libby were doing on a daily basis, and that as far as he knew, no one else did either.  (Id. pp. 40-45.)

76. **BNSF conduct re: safety regulations**:   Contrary to applicable industrial hygiene standards of care, BNSF documents demonstrate a long standing course of conduct of minimizing, ignoring and avoiding safety standards, rules and regulations.   See, e.g., 4/19/1974 BNSF correspondence, reporting that BNSF "can no longer afford to sidestep the responsibility of training our supervisors, and our employees' supervisors in safety methods, as required by law"; 5/16/1975 BNSF Correspondence discussing the "common weakness throughout our industry; that of training people for their positions" and discussing broadening safety training; 9/11/1981 BNSF correspondence discussing BNSF's citations for not having a Respiratory Protection Program; 5/10/1974 BNSF memorandum noting "It is not uncommon to find employees working at hazardous jobs while failing to wear protective equipment," or to "have no safety rule book" or protective equipment available to them and recognizing that it is "necessary to continually audit any operation to check for rules compliance by all employees";  6/30/1976 BNSF memorandum discussing, among other issues, the practice of BNSF supervisors' use of "continual threat of dismissal for failure to comply with instructions even though they are contrary to safe practices"; DuPont Safety and Environmental Probe of BNSF Operations – Negative Items finding, among other things, that "Emphasis in many areas remains on production more than safety" and that "ballast watering needs to be consistent"; DuPont Safety Management Evaluation of BNSF Operations 12-92.

77. **BNSF re: OSHA**:  By the 1970s OSHA promulgated regulations regarding asbestos and other chemical hazards in the workplace which included mandatory safety requirements, required employers to post OSHA signs and warnings, set forth exposure levels, required engineering controls to eliminate the hazards, set forth work practices for dealing with asbestos similar to what the railroad industry had itself recommended decades earlier, required methods of air monitoring for exposures, respiratory protection and fit testing, and medical monitoring of exposed workers.  Asbestos was the first material regulated by OSHA.  Throughout the years, BNSF has maintained a contentious relationship with OSHA in regards to safe practices on their premises by refusing to conform to regulations and refusing to allow the agency to enter onto Railroad property. [37]  November 1978 BNSF correspondence discusses various OSHA citations being issued to railroads and provides:

---

[37] See, e.g., 2/6/1975 BNSF correspondence discussing requirements of posting OSHA Act posters in BNSF facilities and declining to comply by recommending "no change be made in present BN policy," and that "we do not post the notice unless we get a lot of OSHA inspectors on the property.  The thought here is that this poster may encourage more employees to write to OSHA on complaints.  This has my concurrence." In addition 2/7/1975 BNSF correspondence confirms this course of conduct and provides that "Even though Burlington Northern has received a citation for this type of violation, our legal department still does not fell that the OSHA posters should be displayed.  Later in 1975, the International Association of Machinists submitted a formal complaint and request for inspection to OSHA, almost exclusively regarded BNSF facilities, alleging "worker exposure … to excessive dusts, fumes, vapors gases and soot [which] constitute continuous and cumulative health hazards producing systemic effects including the respiratory system."  See 6/30/1975 Formal OSHA complaint.  In this regard, BNSF noted that "the ventilation issue could have a major impact," "our safety audits seldom have items on ventilation" and "if the OSHA inspectors were to inspect the 69 work centers, they may find other health standards which do not comply and these areas may cause a major impact."  7/9/1975 BNSF correspondence.

> We do not have the OSHA notice posted on our property except in the State of Minnesota. We have not been cited by OSHA inspectors at points other than Minnesota, with one or two exceptions, where OSHA has inspected our property due to employee complaint. <u>These are rather minimal fines and believe it in our best interest not to post at this time</u>.

See also <u>1/28/1975 ATSF</u> memo discussing its decision not to post OSHA notices<u>; 2/7/1975 letter from AAR to ATSF</u> discussing legal department decision not to conform to OSHA notice requirements; In 1980, BNSF refused to allow OSHA inspectors on their property in Montana to investigate adequacy of respiratory protection and ventilation despite authority under a Federal Inspection Warrant and the order of a U.S. Magistrate. See <u>12/6/1980 Billings Gazette Article</u>.[38]   Despite BNSF's well documented awareness and understanding of OSHA regulations and accepted respiratory safety practices in general, they typically refused to come into compliance, and in Libby followed this course of conduct by making no effort to classify or quantify the visibly obvious vermiculite dust present at the Libby Railyard, the River Loading Point and its rights of way throughout Lincoln County.

## X.   BNSF Working Together with Grace

**78.  BNSF and Grace working together general**:  The available materials demonstrate that from a very early point in the development of the vermiculite resource, BNSF took a special interest in the Libby operations.  Based on the limited sampling of documents currently available, it is apparent that throughout the ensuing 60 plus years, BNSF played a central role in the vermiculite operations that took place in Libby that far exceeded a relationship that could fairly be described as simply that between a common carrier and a shipper.  In BNSF's own words, its Libby "operations are not just limited to the loading facility, but include other facets of Grace's facilities and operations and would encompass the entire Grace plant, as well as BNSF's rail operations, which were all necessary and incidental to the premises located in Libby, Montana." <u>BNSF's 2019 Counterclaim for Declaratory Relief Against Arrowood, et al.</u> filed in Tarrant County Insurance action. While BNSF transported the entirety of the mined payload of Vermiculite Mountain, amounting to more than 80% of the world's supply of vermiculite ore[39], out of downtown

---

[38] See also <u>4-11-1978 BNSF Correspondence</u> discussing BNSF policy in regards to OSHA inspectors; <u>1-8-1986 BNSF Personal and Confidential Memo</u> setting forth BNSF policy regarding OSHA inspections ("<u>It is Company policy to prohibit federal or state OSHA inspections without a court order, search warrant</u>, or a bona fide employee complaint containing an allegation of a specific hazard.").

[39] By 1970, Libby had processed over 29 billion pounds of ore (Bulletin 79, p. 147) and was estimated to exceed 35 billion pounds of ore from 1971 through 1981 alone.   According to W.R. Grace, the average daily production from the mine and milling operation was between 500 and 1000 tons of finished vermiculite concentrate per day between the late 1960s and 1970s and between 800 to 1000 tons per day in the 1980s.   Using a daily average of 750 tons, BNSF carried up to 105,000 pounds of Libby Amphibole Asbestos into and out of downtown Libby per day in the late 1960s and 1970s and, based on a daily average

Libby on behalf of these companies, BNSF sold and leased land and rail facilities to Grace for a negligible amount. See, e.g., River Loading Lease Agreement 1 – April 1950 leasing the River Loading Point to Zonolite for $10 per year; Quit Claim Deed from Great Northern to Zonolite – November 1938. Similarly, Grace leased and sold land to BNSF in furtherance of their mutually beneficial undertaking to benefit from the export of vermiculite, which was laden with asbestos.

BNSF took upon itself to perform economic analyses of the vermiculite operations; BNSF took part in developing new uses for vermiculite products and assisted in marketing the vermiculite product to various customers; BNSF funded geologic surveys of the vermiculite deposit; BNSF engaged in several of its own geo-chemical samplings/analyses of the vermiculite ore and associated constituents; BNSF and Grace executives had close personal relationships, and BNSF oversaw dust control, safety, construction and modifications of the Grace shipping facilities. Parts of Grace operations were located on BNSF property and vice versa. These entities granted each other easements, leased property to each other and worked together to construct the vermiculite export facilities. Their activities involved direct insurance agreements with one another. See, e.g., Zonolite Siding Insurance Agreement 4/14/1977, Affidavit of James Roberts 2-8-2007.

79. **Early interactions**: By 1924, the Libby Vermiculite operations had secured a "low freight rate" from the Railroad for the shipment of vermiculite. See, e.g., 12/11/1924 Western News Article. The first full train car load of Libby vermiculite was shipped to Ohio for use as an insulator in 1925. See 3/25/1925 Western News Article; and Libby Legacy Project Timeline). Shortly thereafter, regular shipments of vermiculite, and apparently some shipments of Libby asbestos, were being made from the Railroad's downtown Libby Railyard. See, e.g., 1926 Great Norther Publication discussing vermiculite operations, then existing markets for Libby ore, and containing a photo of a box car being loaded at the Libby Railyard for shipment to Dayton, Ohio; Sanborne Fire Insurance Maps showing a Zonolite shipping facility located in the Railyard and a Vermiculite and Asbestos Company facility abutting the Railyard; 5/12/1927 Western News Article referencing orders for cars of asbestos; 5/26/1927 Western News Article entitled Zonolite Shipping Out Many Orders; 1928 Zonolite Co. Annual Stockholders Report.

By 1926, the Railroad and Zonolite were engaged in a plan to locate an additional vermiculite loading facility (the River Loading Facility) on the Railroad right of way across from Rainey Creek Road, a plan that was not realized until 1949. See, e.g., 11/30/1926 Flathead Monitor Article; 6/9/1927 Western News Article.

80. **Grace Shipping/Export/Import Facilities**: Each of W.R. Grace's shipping, export, and import related facilities were closely associated with the Railroad and received special involvement of the Railroad in their operations. These facilities included Grace's River

---

of 900 tons per day, up to 126,000 pounds per day through the 1980s. This amounts to up to 383,000,000 pounds of asbestos carried into Libby in the 1970s and up to 460,000,000 pounds through the 1980s.

Loading Point, Downtown Export Plant, and their downtown import dock and fuel/oil facility.

81. **River Loading Point**:  The Grace-BNSF co-operation was apparent at the River Loading Point. [40]   BNSF operated the River Loading Facility "in Libby to transport vermiculite for Grace's benefit.  As a condition to having access to the BNSF facility, Grace agreed to indemnify and insure BNSF for its operations in Libby."  Excerpt of BNSF's Complaint for Declaratory Judgement 2-7-14.  As succinctly stated in correspondence between BNSF and Grace, "These loading facilities are as much a part of your business as they are of ours." (BNSF_HHP_000035).  The River Loading facility was constructed and operated throughout its existence on BNSF property for which Grace initially paid a $10.00 annual rental fee.  See River Loading Lease Agreement 1 – April 1950.  This amount increased minimally over the subsequent decades.  See, e.g., River Loading Lease Agreement 2 – September 1956; BNSF_HHP_000226, increasing River loading lease to $25.00 per month in 1984.  BNSF and W.R. Grace carried a series of "Owners Landlords and Tenants" insurance policies which covered the River Loading site, and named BN as an insured.  See, e.g., River Loading insurance policy documents.  The River Loading Point was excavated out of the hillside adjacent to the mainline of the railroad and consisted of the Zonolite Siding track, the W.R. Grace conveyor and loading equipment, a storage shed and a parking area.  The construction of the River Loading Point siding, with the exception of clearing and grading, was approved and paid for by BNSF.  See 9/13/ 1949 Letter from J.M. Budd to F.J. Gavin.

BNSF oversaw all construction of and modifications to the River Loading equipment and was responsible for inspecting and maintaining the siding track.  This included reviewing and approving plans for all River Loading Point equipment prior to its installation.  See, e.g., Railroad Dust Control Approval 3/9/1962; 3/30/1962; 1/21/1971; and 11/10/1977.  In requesting BNSF's review and approval of the 1971 additional dust control facilities, Grace informed BNSF that they were being installed to "comply with Air Pollution Control Regulations in the state of Montana."[41]  After a BNSF derailment destroyed the River Loading Point loading equipment in 1979, BNSF again reviewed and approved the new River Loading Point construction plans.  See BNSF_HHP_000480 discussing necessity of approval of plans by BN with district engineers as well as improvements meant to minimize liability for "**possible over exposure to personnel**."

Grace and BNSF were in constant daily contact to ensure that cars were available for River Loading, in picking up the cars when full and bringing them back to the Libby

---

[40] The Universal Insulation Co., formerly the Vermiculite and Asbestos Co. initially acquired the land across from the Rainey Creek screening plant in 1934 with plans to build a tram across the Kootenai River to access the GNRR's main line.  This area would eventually be adjacent to the River Loading Point and provide the access thereto.  Once the River Loading Point was in operation, this property also served as a dumping point for the excess vermiculite spilled during operation of the River Loading Point.

[41] That these dust control measures were made to comply with Montana air-pollution requirements was also announced publicly in a 7/16/1970 Western News Article reporting that Zonolite was "given an extension on pollution control" with particular reference to the River Loading Point dust control.

Railyard, in weighing the cars before and after filling, in inspecting the cars for leaks, in securing hopper hatches, and in attaching the cars to outbound freight trains.

82. **Downtown Export Plant**:  While the chain of title for Grace's downtown export and expanding plant is complex, it appears that the original Railyard loading facility straddled the line between Libby Railyard property and the adjoining properties owned by Ralph W. Smithberger and the First Holding Company.  See Sanborn Fire Maps;  Chain of Title – EDC Business Park;  Chain Sheet – EDC Business Park.  In 1937, the Zonolite Co. purchased the Leonard Tract which adjoined the Great Northern Railway.  8/12/1937 Western News Article.  In November of 1938, after 13 years of active vermiculite shipments, the Zonolite Company acquired ownership of the property owned by the Railroad for one dollar (see Quit Claim Deed from Great Northern to Zonolite – November 1938, referencing Zonolite's adverse possession of the property for more than thirty years past) as well as those owned by Mr. Smithberger and the First Holding Company. [42]   Of the four sidings which Grace used in their downtown export activities, one was owned by Grace while the remaining three were owned by BNSF. See 1/18/1983 Letter from Grace to the Montana Department of Revenue.  BNSF kept the spur tracks stocked with boxcars for vermiculite loading, a process which required daily communications between the Grace and the Railroad.  Once the boxcars were loaded, BNSF was responsible for picking them up, inspecting them (BNSF HHP 626), weighing them and attaching them to outbound freight trains. [43]   BNSF retained ownership and oversight of the spur track servicing the export facility and bagging plant as part of its right of way in Libby. See, e.g.,  June 1, 2010, EMR Libby Railyard Map.  BNSF management inspected the Export Plant a couple times each month.  See 9/13/16 Deposition of John Swing.

83. **Vermiculite and Asbestos Co. Loading Point/Grace Loading Dock**:  Initially, the Vermiculite and Asbestos Company's downtown Libby facility was located on the south side of the Railyard adjacent to the train depot.  See 10/18/1928 Western News Article; Sanborn Fire Maps; Chain of Title - KootRiverHealthPark.  When the Vermiculite and Asbestos Co. merged with its competitor Zonolite Insulation Co. to become the Universal Zonolite Insulation Co. in 1939, primary shipping operations were consolidated to the north export plant, however this other property appears to have been retained.  This property was apparently used in conjunction with an adjacent parcel of Railroad property leased by Grace and containing its fuel/oil storage tanks, pump house and loading dock. Just as with the River Loading Point lease, the Railroad charged negligible rate for the use and occupation of such a parcel of commercial/industrial property (this lease payment was increased to $30.00 per month in 1977).  See 8/24/1977 Letter from BN to Grace.

---

[42] Throughout the ensuing period of Grace operations in Libby the Export facility adjoined the Railyard and had shared spur tracks which ran from the Railyard to the facility.  See Export Plant Site Plan.

[43] Pursuant to these operations, BNSF and Grace granted each other various access agreements and easements onto and across their respective properties.

BNSF and Grace also shared other vermiculite related properties in other states. At these properties BNSF typically owned the spur and the parties had access and service agreements for their co-operation thereof. See, e.g., Western Mineral Site Summary and Spur Track Agreement (BNSF_511_0009).

84. **Special relationship between BNSF and Grace**: By 1926, the Railroad was engaged in in-depth analyses of the potential uses and economic value of the vermiculite deposit and published an article on the subject authored by Libby Great Northern Agent E.M. Boyes, which provides:

> A large and growing market has been established for the mineral; and at present and probably in the future, the only means of transportation for this immense tonnage will be over the Great Northern Railway on the longer part of its journey to various points for fabrication. As new markets develop, greater and greater quantities will be moved, assuring the Great Northern Railway a permanent tonnage of vast proportions.
>
> This new enterprise on the Great Northern is not only of interest to the railway and the community in which the deposit occurs, but is of national importance in its economic value. As illustrating the potentialities in the investigation and development of the non-metallic mineral resources lying along the Great Northern the story of Zonolite can not be too widely advertised.

1926 GNRR Semaphore Article. See also e.g. Publication entitled "Many Uses Found for Zonolite" summarizing a 1926 GNRR chemical geological analysis of the Libby Ore. In 1954, the Railroad published an article in the Burlington Zephyr touting the beneficial uses of the Libby vermiculite, discussing the revenue BNSF had garnered through its export and explaining the "Great Northern Railroad has cooperated with this producer since the plant establishment …" 1954 Zephyr Article.

1953 correspondence between GNRR and Grace accurately describes the relationship between these companies in regards to the Libby operations; "Ever since the introduction of vermiculite as a commercial mineral, the Great Northern Railway Company and the Zonolite Company have been partners in the promotion and development of vermiculite ore as an article of commerce." 7/31/1953 Letter from A.T. Kearney to J.M. Budd. Later that year GNRR interoffice correspondence discusses whether vermiculite shipping rates "should be the lowest possible rates the GNRR could establish as their part in the partnership between the industry and the railroad in developing over the years a movement of the estimated 300,000,000 tons which Zonolite has in sight at Libby" and concluded that "in order to continue our long-established policy of working with Zonolite as closely as possible, the matter was left with the understanding both the industry and the railroad would make various tests along the lines of rate measures …" 10/20/1953 Letter from C.E. Finley to J.M. Budd. This special relationship between the companies is borne out throughout the years through various documents. For example, in 1959 the Railroad, in conjunction with Zonolite Officers, performed an economic analysis of the Zonolite

vermiculite operations.  1959 GNRR economic analysis and report on Zonolite.  Later that year, C.E. Finley of the GNRR makes his point that the "studies being performed by the Department of Economic Research" were inadequate and needed to be revisited and illustrated the special role the Railroad too in vermiculite production by noting:

> We have kept the Zonolite Company in competitive alignment with Perlite from California and we have met the problem of market competition on aggregate grade of vermiculite throughout the eastern part of the United States as it is presented by perlite and also by the deposits of vermiculite operated by the Zonolite Company in South Carolina which is located much closer to the eastern markets.

6/3/1959 Letter from C.E. Finley to R.W. Downing.  In 1964, GNRR met with W.R. Grace to explore accessing overseas markets for their vermiculite products by performing analyses of the markets, directing them to available sea ways and foreign ships, and offering the potential use of GNRR ore docks.  See 4/17/1964 Letter from V.P. Brown to C.E. Finley and attachments.  See also 2/27/1963 Letter from C.E. Finley to J.M. Budd discussing a prior meeting with W.R. Grace, their plans to export vermiculite ore to European markets, and Grace's awareness "of the service we give them and [stressing] how close our relations have been with them." See also Zonolite Presentation stating "It is reported by the officials of the GN railroad that Zonolite is their biggest customer from shipments originating from one point. More than $2,000,000.00 was paid to the Great Northern last year in freight alone." Excerpted at IP 0962484.

85. **BNSF promotion of vermiculite products**:  BNSF's promotion of the vermiculite product and their assistance in developing further uses of the ore material continued throughout the period of active mine operations.  See, e.g., 1963 chain of correspondence documenting efforts by the Railroad's geologist and Mineral Research and Development Department to develop additional uses for unused fractions of the vermiculite ore; 1961 correspondence regarding "byproduct" problem (with summary transcription) discussing the GNRR Mineral Research and Development's ideas for potential markets and uses of the vermiculite mine byproduct; GNRR Great Resources Publication discussing Zonolite's vermiculite and geologic and analytic work being done on the topic.

In addition to the close business relationship between BNSF and Grace, BNSF and Zonolite/Grace management and executives maintained close personal relationships throughout their cooperative engagement in the Libby vermiculite operations.   See, e.g., 12/28/1961 GN Letter to Zonolite, "Thanks a million for the gift, also the wine of joy … Please extend to your entire staff my sincere thanks for the wonderful co operation they have extended to us the past year."; 11/26/1968 letter from Grace to GN – Boyes' retirement; 3/19/1956 letter from GN to Zonolite.

## XI.    Principles of Industrial Hygiene and Applicable Standards of Care

86. **Basic Principles of IH**:  The central principles of industrial hygiene are to (a) study; (b) warn; and (c) protect.  "Industrial hygiene offers a method of attacking general problems of public health administration. Because industrial hygiene establishes contact with a large section of our population, and keeps it under close observation, there is an opportunity to practice preventative medicine at a low cost to the community."  Dallavalle and Jones (1940).

**a. Study:**  By the time the River Loading Point was constructed and in operation in 1950, there had already been extensive literature published regarding the best methodology to fully comprehend the degree and extent of industrial hazards.  The industrial hygiene literature laid out steps that should be taken to ensure the safety of employees, including specifically when dealing with asbestos laden dust.  This includes studying (1) the degree of the hazard in the work environment; and (2) how the hazard impacts the worker.

1) "Once asbestos was recognized as a hazardous agent, a guideline for excess asbestos exposure was explored in an attempt to protect workers. The first value for the asbestos guideline for dust control arose by analogy to silica." Brown (1950).  With the understanding that asbestos exposure was hazardous, the National Conference of Governmental Industrial Hygienists (NCGIH) (later the American Conference of Governmental Industrial Hygienists (ACGIH)) developed guidelines for asbestos exposure in the workplace.  These "Maximum Permissible Concentrations" set a recommendation for limits to asbestos, although they recognized the inadequacies of such an endeavor, writing "The table [of Maximum Permissible Concentrations] is not to be construed as recommended safe concentrations."  NCGIH (1942).   The use of these "Maximum Permissible Concentrations" is meant primarily for engineering guidelines. "… the intent in presenting these maximum allowable concentrations is to provide a handy yardstick to be used as guidance for the routine industrial control of these health hazards – not that compliance with these figures listed would guarantee protection against ill health on the part of the exposed workers, nor should the maintenance of the suggested concentrations be considered a substitute for medical control."  Cook (1945).   A review of the literature makes it clear that early industrial hygienists and doctors interpreted these limits and suggestions as guides, and they were not so naïve as to think that these limits represented absolute safe level of exposure to all workers in all occupations.  The necessity to understand the levels of toxic dust in the workplace was the starting point to effectuating any industrial hygiene program.

Studying a hazardous work environment requires full exploration of the hazard, its causes, and its impacts. This cannot be an isolated study, but instead one that persists. "It should not be forgotten, however, that with every test we get only, as it were, a snapshot, and we do not know what

81

happens before and after. We need therefore to have those tests repeated." Teleky (1948).

2) Once the extent of the dust hazard was evaluated by frequent testing, the workers then need to be evaluated medically. Workers with exposure to asbestos should participate in pre-employment X-ray and physical screenings, and follow up screening should be conducted every year. Lanza et al. (1935). Without medical monitoring of employees, there is no way to grasp the impact of the hazard on the workers.

**b. Warn:** By 1950, there had been extensive literature regarding how to best inform workers and others exposed to an industrial hazard of the risks involved. Education of the worker regarding the potential hazards is essential to the basic premise of effective warning. In order to implement an industrial hygiene program, the workers must know the dangers present, or there will be no reason for the workers to protect themselves. For example, in 1917, in Joplin Missouri, miners and their families who were exposed to silicosis causing coal dust were informed of the hazard through newspapers and through "three-moving picture shows". Up to 2,700 people attended these informational shows. The Department of the Interior noted,

> At the start few miners gave evidence of interest in better sanitary conditions. However, as they began to acquire a knowledge of the ill effects of silicosis dust their attitude changed, and the miners as a whole became interested in the abatement of silicosis dust and the general improvement of conditions underground and on the surface. There were many instances of miners quitting their working places if they were not supplied with means of allaying the dust." Higgins et al. (1917).

Worker training and education must encompass two elements: (1) why something should be done; and (2) how it should be done. Brandt (1943). To accomplish the first step, the worker must be informed of the hazard and why prevention to exposure is important. "A cooperative, interested, and well-trained worker can accomplish much with any control equipment, whereas the indifferent, lackadaisical, untrained worker produces the maximum amount of atmospheric contamination with any control device." Brandt (1947). "The education of the worker for his own protection is as important as to prevent the creation of unnecessary dust…He must be told which contaminants are harmful and sold on the idea of avoiding the higher concentrations." Brandt (1947).

To accomplish the second step, the worker must then be instructed how they he can minimize their exposure to a hazardous substance through education. This can be done through supervisors, the community, and through various educational programs.

> The most erroneous and expensive policy any employer can adopt is to minimize to his workmen the dangers of free silica dust; no true observance of dust protection can be expected from the workman

> unless he is fully acquainted with the dangers of his occupation…Supervisors should be told the whole story, and workmen, severally and individually, in season and out of season, week in and week out, should be educated, warned, and even cajoled into full observance of the rules." Harrington and Davenport (1937).

The literature states that not only should the information be communicated through supervisors, but pressure can be put on the community to assist in the dissemination of information. "[Precautions can reduce or prevent disease by] forcing their adoption on the workers; of doctors in correctly diagnosing the disease, giving publicity to its prevalence, seriousness, preventative remedies, etc., and assigning death certificates dust disease as the cause if such is the case; and of merchants, newspapers, and other influences in the community in trying to prevent the disease rather than hide its existence." Harrington and Davenport (1937). In fact, one of the principles underlying industrial hygiene is the protection of employees and the safety of the public. The unified code of ethics adopted by the ACGIH and other industrial hygiene organizations notes the importance of public health and safety, as well as the necessity to disseminate information to the public if the hazard can lead to detrimental health impacts:

> II.C. Public health and safety.

> 1. Follow appropriate health and safety procedures, in the course of performing professional duties, to protect clients, employers, employees <u>and the public</u> from conditions where injury and damage are reasonably foreseeable.

 (ACGIH, 2007)

**c. Protect**:  By the 1950s, there existed extensive published literature regarding the necessity to protect workers exposed to asbestos dust from the hazards associated with the job.  By 1936, industrial hygiene journals were publishing articles regarding the dangers of asbestos dust exposure and the necessity to mitigate worker exposure.

> …asbestos dust is a serious occupational hazard, and it also is apparent that these workers must be protected against the hazard as effectively as is possible.

> Sufficient evidence has been produced to prove that the inhalation of asbestos dust is productive of serious impairment of health.  In fact, the victim of asbestosis, as a rule, eventually becomes totally disabled from engaging in any form of labor.

> An industrial worker is entitled to every protection that may safeguard his health, so that he may earn a livelihood for himself and family for at least a reasonable period of years in the work in which he is most skilled. Donnelly (1936).

83

In order to protect workers from asbestos exposure, "The minimum requirements recommended segregation of dusty work, special ventilation, use of respirators, and periodic medical examinations." Minimum Req. for Safety, 1943.

87. **Asbestos in the Literature Prior to 1950:** By 1950, there was extensive industrial hygiene literature available regarding known hazards associated with asbestos dust exposure and the medical issues associated with prolonged exposure. As a result, industry groups, federal agencies, and state governments began to publish information regarding methods to prevent excessive exposure to known toxic dust in the workplace. This literature demonstrates that if others besides the workers, such as family members or community members, are exposed to the hazardous dust, they should also be informed of the potential hazard and ways to protect themselves from such hazard.

The term "pulmonary asbestosis" was first used in 1927 by W.E Cooke to describe the fibrotic lung disease caused by inhalation of asbestos fibers. Work involving asbestos in the US was recognized as being "unhealthy" in the early 1900's.

> [The] conditions, necessary to establish a relationship between the inhalation of asbestos dust and the development of fibrosis, could be demonstrated. These conditions are:
>
> 1. Work involving exposure to asbestos dust.
>
> 2. The existence, demonstrable clinically and radiologically, of a definite pulmonary fibrosis.
>
> 3. The absence of previous or present infections known to cause pulmonary fibrosis-e.g., tuberculosis, influenza, or pneumonia.
>
> 4. The absence of previous or present work involving exposure to other dusts, which might cause pulmonary fibrosis.
>
> These conditions being fulfilled, a relationship between the inhalation of asbestos dust and the development of pulmonary fibrosis may be presumed. This disease, insidious in its onset, stealthily advances with but faint warnings of its progress; inexorably it cripples the essential tissues of the lungs, yet for a considerable period causes almost no inconvenience to the worker. As time goes on, however, the lungs find more and more difficulty in re-aerating the blood; and breathing is quickened on slight exertion. Merewether (1930).

In the 1930s, Industrial hygiene journals published studies demonstrating that x-ray reports of workers exposed to asbestos dust over long periods of time were showing pulmonary abnormalities. "That the long-continued inhalation of asbestos dust is responsible for the development of pulmonary fibrosis is now unquestioned. From many

parts of the world come radiographic reports of fine fibrosis in the lungs of persons exposed by occupation to the inhalation of this substance." Gardner (1931).

It was recognized that the longer an individual was exposed to asbestos fibers, the greater degree of disease. "The lungs of workers become affected in direct proportion to the length of time they have been exposed to it, until after twenty years of work 80 per cent. are affected." Dhers (1931). "…in every instance where a patient had been working for more than ten years, asbestosis could be demonstrated radiologically." Gerbils and Ucko (1932). The *American Journal of Public Health* demonstrated the importance of ensuring proper working conditions for asbestos workers:

> Although the total number of workers in asbestos mills is probably far smaller than in many other lines of trade, their health is of paramount importance. The conditions surrounding the greater proportion of the employees constitute a distinct and serious industrial hazard, and often sufficient devices for protection have not been provided. It is doubtful if any single employee in certain departments of these mills can possibly escape some damage to his respiratory system because of the unavoidable inhalation of asbestos dust. Naturally, the longer the service of an employee, the more certain is more or less extensive pulmonary damage.

> Although the number of asbestos workers is much less than that in many other industries, their occupation is extremely hazardous, and they are amply justified in expecting whatever protection it is possible to give them. Furthermore, the fact that efficient protective devices in this industry, in spite of the added expense, will effect a substantial financial saving, is becoming more apparent. The workers themselves are becoming informed of the danger to health, and many civil suits for damages against factory owners are the result." Donnelly (1933).

In sum, by 1950, there were extensive publications regarding the physiological impacts of asbestos exposure, including pulmonary fibrosis and death.

88. **Government Action & Impact**: In the 1930s and 1940s, Federal agencies, in particular the Bureau of Mines, published industrial hygiene information regarding the dangers of asbestos and how to mitigate the risk. Additionally, States around the nation were ensuring that their workers compensation system was helpful in tracking issues that arose regarding occupational disease due to asbestos. In many cases, disease due to asbestos was categorized within the category of silicosis for reporting purposes.

> Evidence has appeared that the dust formed in the treatment of asbestos produces effects which are generally similar to those arising from the silica-laden dust. The fibrous formations are not precisely the same, and they appear to develop more rapidly, though adding less to the patient's susceptibility to phthisis. After careful enquiries, in fact, asbestosis has been added to silicosis as an occupational disease arising from working in dusty surroundings…" Mineral Dust in Factories (1930).

85

**89. Standard Practices for Dust Control and Exposure Mitigation**

**a.  Local Exhaust Systems:**  In any dusty environment is important to isolate workers from excessive dust concentrations regardless of content. This is particularly important in situations where the dust consists of toxic materials. In 1955, the Johns-Mansville Corp. constructed the largest asbestos fiber mill in the world and used some state-of-the-art practices, at the time, during its construction. The mill utilized almost 200 cyclone collectors for their dust control system. These rubber lined collectors maintained minimum pressure drop and high-efficiency in order to collect fibers of commercial value and isolate workers from high-fiber levels. Miles of large diameter sheet steel piping were installed to remove the asbestos fibers and control the dust. In addition, the dusty machines and processes were redesigned to enclose the dust and keep it from working areas. About 500,000 cfm of air was used for dust control purposes in the mill.  There were hundreds of oscillating screens with dust covers to confine the dust and were fitted with exhaust connections.   Conveyors were covered with tight fitting enclosures and exhaust connections were added to different points.  Areas where dust might escape to the mill atmosphere, such as crushers, packers, rotating screens, and elevators were provided with exhaust air.  Goldfield (1955).

**b.  Proper Housekeeping**:  One of the essential mechanisms of controlling dust in an industrial setting is good housekeeping, an objective of which is to prevent dust from being re-entrained into the air.

**c.  Sanitation:**  In order to prevent secondary exposures to hazardous dust by the process of dust traveling home on the clothes of workers, a system of personal hygiene should be implemented to mitigate "take-home" exposures.

> Modern Change Houses.  What could be more conductive to thoughts of safety than the approach to the place of work through the means of practical and attractive change houses.  The old frame building, with row upon row of steam pipes, red with hematite and over-run by cockroaches, is now a thing of the past, and in its place we see a two-story building, of concrete and brick construction with separate rooms for street and "digging" clothes; 287 lockers that are used for clean clothes only, concrete floors, shower room, toilets and laundry, and a suspension structure with hooks operated by pulley that permits the individual's hanging of underground clothes for drying and aeration, with individual padlocks supplied to make ownership secure.  Barrett and Donovan (1940).

BNSF never provided a change facility to its Lincoln County employees to keep hazardous dust from being taken home or into the general community.

**d. Use of Respirators**:  In dusty work environments, the industrial hygiene literature demonstrated early on that the use of safety equipment, such as respirators, is an important tool to mitigate workplace exposure.  "In low dust concentrations, face respirators are used.  In higher dust concentrations, air-line respirators are used effectively and with comfort.  A good ventilation program, like a good safety program, reflects comfort to the workman and increased efficiency to compensate for the expenditure."  Barrett and Donovan (1940).

> Getting workmen to wear safety devices requires the same mental attitude on the part of the management that a good salesman must have when he goes out to capture a difficult new account.  If the management is not convinced that protective devices must be employed at all times, and if they, in turn, cannot convince their shop superintendents and foremen that such devices are necessary, then they cannot but blame themselves if workmen fail to manifest a good spirit toward self-protection.  For psychological as well as for protective reasons shop superintendents, as well as foremen, when approaching dusty operations should invariably wear their respirators, and even visitors to plants should not be permitted to enter dusty departments without wearing respirators.  In this way workmen can finally be convinced that the management truly believes in full-time protection.  For best results everyone concerned should be willing to live up to the rules of the shop, without exception.  In this work any weakening on the part of the management is fatal.  Harrington and Davenport (1937).

During active vermiculite operations in Libby, BNSF did not ever require the use of respirators for its employees in the area.

**e.  Education of the Worker**:  As noted above, it is essential for workers to understand why certain precautions should be taken in order for them to be an active participant in dust control.   Industrial hygiene literature recommended that worker education be conducted by warnings placed throughout the workplace.

> Large bulletin boards are placed throughout the plant and smaller ones underground in lunchrooms and other places where employees gather, and in the surface industrial buildings.  Most of the material used on these boards is obtained from the National Safety Council although some is clipped from various publications.   Suggestions for improvement of industrial health and safety are welcome and suggestion boxes are maintained so that an employee may remain anonymous if he desires.  Prizes are paid monthly for the best suggestions and they are put into effect as promptly as possible.  When safety inspectors see violations, they take the matter up promptly and explain to the employee the hazards involved and the safe way to perform the job.  These little safety talks right on the job at the time of the violation are much more effective than a series of

penalties, so other action is usually unnecessary.  Jones and Eisenach (1946).

Additionally, education on workplace hazards should not be limited to the workers; family members and the community should be active participants in workplace safety.

Elements of a Personnel Program

Once these policies regarding employee and community relations are operating it is advisable to organize a program for evaluating not only the employee's attitude but also his family's attitude toward them.  In addition, channels of communication must be set up whereby any suggestions regarding community conditions or working conditions will receive consideration by the proper company official and his decision as well as the reason for it, made known.  It is difficult to over emphasize the importance of this fourth step.

Another problem of long standing is that of getting company management and supervisors to realize the importance of safety and industrial hygiene programs not only from a humanitarian and financial point of view but also from the standpoint of improved employee relations.  Here again the problem is not as difficult as it was in the past because of the actual experience of many mine operators and such organizations as the National Safety Council, the U.S. Bureau of Mines, and the state industrial commissions.  Some state mining associations have accumulated sufficient data to convince most operators that it is to their advantage to have a well-organized safety and industrial hygiene program.

Here are a few methods of presenting information **to the public** that have been used:

(1) Arrange plant tours for various business and civic organizations as well as wives of employees that will give them a clearer understanding of some of the major problems involved in the operations.

(2) Mail circular letters periodically to community leaders and also to employees who will spread the information.

(3) Prepare suitable press releases regarding such things as employee activities and company plans, prospects and policies.

(4) Arrange for a booth at a state fair or similar local functions where information and exhibits of company activities are available.

(5) Invite reporters in and see that they obtain factual information on newsworthy events.

Jones (1949; emphasis added).

In 1985, Montana passed its Employee and Community Hazardous Chemical Information Act (MCA 50-78-101 et seq.; see, e.g., BNSF_2175-2211). The Act required among other things that an employer normally having a hazardous

88

chemical in the workplace, record a list of the hazardous chemicals used with the county clerk and recorder, post notice of the use of the chemical in the workplace and provide effective training on the potential hazard and safe handling thereof. "For Montana employers, receipt of an MSDS with a chemical shipment indicates that the chemical manufacturer has doe the evaluation required by the federal OSHA standard and determined that the chemical is hazardous." (BNSF_2194). The record indicates that BNSF received MSDS for both Libby vermiculite and diesel fuel and therefore was required to adhere to these statutory requirements. See, e.g., BNSF Hazardous Chemical Reporting for Flathead County; Deposition of BNSF expert witness Dr. Francis Weir, 7/2/2003, p. 68, testifying that the Railroad received MSDS for Libby Vermiculite. There is no indication that BNSF ever posted notice of the presence of asbestos or diesel exhaust in Mr. Watson's workplace or ever provided training on the potential hazard and safe handling of those substances.

Moreover, BNSF did not ever conduct education campaigns for workers or the community regarding the asbestos hazard posed by their activities in Lincoln County.

**f. Standard Practices for Medical Monitoring**:  Literature available from the 1930s forward noted the importance of monitoring employees when working in potentially toxic environments such as those with excess dust.

> The physical well-being of the workman is of primary importance in its relationship to safety. The good health of the employee and his family is given impetus by the furnishing of competent medical doctors and excellent hospital facilities sponsored by the mining industry. The best of medical care and hospitalization is furnished for this as well as humane reasons. Physical examinations are not only informative to the employer, but are beneficial to the employee as well. Barrett and Donovan (1940).

In 1933, an article titled "Protecting the Worker Against Dust Inhalation" published in *National Safety News* noted the response to the silicosis problem required two definite steps: (1) medical examinations of new employees and routine examinations of all persons exposed to dangerous dust concentrations; and (2) reduction of dust concentrations breathed by the worker to what are considered safe limits. Drinker (1933). The purpose of the examination should not solely be for the purpose of evaluating the fitness of a worker in a certain position but to inform the worker on the necessity of safety with the worker could do to curb dust dissemination. *See: Harrington and Davenport (1937).* The U.S. Bureau of Mines Bulletin published in 1937 outlines a plan for medical control of all phases of a dust hazard. This plan includes:

(1)    Establishment of a medical department adequately equipped;
(2)    Routine examination of all applicants for employment;
(3)    Rating and placement of applicants;

      (4)     Periodic physical examinations; and

      (5)     Provisions for the disabled.

Harrington and Davenport (1937).  See also Bloomfield (1952); Striegel (1952).

By 1950, numerous industrial hygiene publications including those published by governmental entities detailed the necessity for an effective medical monitoring program for workers exposed to toxic dusts. These publications recommended that radiographic screenings be conducted pre-employment and on a regular basis to monitor the health of the workers. These publications also specify that no matter how small the industry may be, it is important to have a medical monitoring program for workers and to disseminate the results of the monitoring to the employees.  Many industrial facilities had adequate facilities to monitor their employees.  Bjorge (1952).

The railroad industry has been well aware of the need for a robust medical monitoring system since at least the mid 1900's.  For example, the Chairman's Address at the Thirty-Seventh Annual Meeting of the Medical and Surgical Section of the Association of American Railroads (1957) includes the following:

> Furthermore, it is our job, for most of us, to supervise the physical examinations on thousands of employees. Undoubtedly, in the different sections of our country, the different sections demand different things from our employees, and, therefore, we have to adapt our physical findings to the conditions under which these people work.

> The one point that I'm trying to bring out, from a personal standpoint, is this: we are spending millions in building new mechanical shops, drafting rooms and all kinds of technological advances, to take care of these new machines. How much are we doing for our manpower?

> There are a few of our railroads (and you know exactly where your railroad stands) where we haven't had a physical examination on some of the men since the day they started work. That may be rather far-fetched. We do know that they get the eyes and the hearing tests, but I'm talking about the physical examination of these employees, and what an important part it plays in the running of our railroads.

In summary, despite the above standards and guidance, BNSF failed to provide an effective medical monitoring program for its employees in Lincoln County.  Had it met the applicable standard of care by providing an effective medical monitoring program, it more likely than not would have identified the occurrence of asbestos related findings among its employees and have been able to timely institute preventative measures.

**90. Industrial Hygiene Standards of Care**:  Applicable industrial hygiene standards of care require a large corporation such as BNSF to (a) study and monitor potential workplace hazards including specifically the asbestos contaminated vermiculite dust that its workers

and others were exposed to; (b) warn its workers and others potentially exposed to the hazard of the risks associated therewith; and (c) to protect workers and others from the risk. Had these practices been followed, in addition to ensuring the wellbeing of employees, many of the control strategies would have translated to the protection of the Libby community with attendant public health outcomes.

By 1950, the industrial hygiene literature stated that because toxic dust causes medical issues with potential for death, two things were necessary: (1) dust controls to protect against the exposure to toxic dust; and (2) medical monitoring of employees.

The professional literature (see generally Brandt, 1947) demonstrated the following steps were necessary to protect against exposure to toxic dust and to ensure compliance with measures put into place.

    a. local exhaust systems;
    b. wet processing methods;
    c. proper housekeeping;
    d. sanitation;
    e. the use of respirators;
    f. education of the workers; and
    g. effective warnings and labeling.

A medical program should also be in place to monitor employee's exposure to potentially toxic hazards. *Industrial Dust* by Drinker and Hatch states:

> For the complete evaluation of the industrial dust hazard it is necessary to do more than simply determine the dust concentrations associated with various dust-producing operations. A medical study of the workers, including physical examinations, chest X-rays in certain industries, and medical histories is also necessary (Drinker and Hatch, 1936).

At no time during active vermiculite operations in Libby, including during the Plaintiffs' time in Libby, did BNSF meet the standards of care espoused by these rudimentary industrial hygiene principles.

91. **BNSF should have sampled workplace air**:  Applicable industrial hygiene principles going back to 1950 and earlier required that BNSF test and sample dust and general air quality at its work areas for the presence of toxic substances, including dust containing asbestos and diesel exhaust.  By failing to do so in Libby, BNSF violated standards of industrial hygiene and public health of the time including OSHA standards and regulations and BNSF.  The applicability of this standard of care was particularly pronounced in Libby where BNSF workers, who worked with and around the asbestos containing vermiculite, regularly reported extremely dusty conditions and where temporary dust remediation measures were utilized (and then abandoned) due to problems with dust generation by the regular non-stop train traffic and vermiculite loading techniques utilized. (See, e.g., 6/28/2016 Deposition of Bruce Carrier, pp. 21-22, 26-28, 52-55).  BNSF

recognized the applicability of this standard of care in its own safety guidelines.  See, e.g., BNSF Responsibilities for Safety.  In fact, BNSF tested and sampled dusty working conditions at other locations where far less toxic dusts such as saw dust, coal dust and rock dust from ballast material was present.  See, e.g., BNSF 0241-0245, discussing conditions at the Klamath Falls Railyard, where in 1990 BNSF sampled hazards presented by saw dust which was "blown into the air by car and engine movement and the trainmen in turn inhale and get these items in their eyes" and determined appropriate respiratory protection even though the dust was considered to be a non-toxic nuisance dust.  BNSF should have adhered to this same standard of care in Libby, where similar but more toxic conditions were present, but failed to do so.  See also BNSF 0349-0350, BNSF 0475, 1980 BNSF correspondence regarding the proper respiratory protection for BNSF employees to use when working around coal dust.  Similarly, beginning in 1982 or earlier BNSF conducted worker monitoring for silica exposure during ballast disturbance activities and found that to protect from such exposures "Ballast regulator operators, other machine operators, and their helpers, should wear respirators when elevated dust concentrations in the air are apparent."  In the present case, where BNSF's industrial level activities were being performed in and on asbestos contaminated vermiculite and in close proximity to childrens' recreational facilities, the requirement to perform minimal acceptable air monitoring is obvious, particularly given the notice to BNSF of the asbestos content in the material.

92. **BNSF should have protected workers**:  Pursuant to applicable industrial hygiene standards, BNSF had an obligation to protect its workers, and the community of Lincoln County, from exposure to toxic dust, and fumes, including dust containing asbestos. BNSF's failure to protect its workers resulted in the spread of LA dust throughout the neighboring areas and the exposure of the general community thereto.  Had BNSF took appropriate measures to protect its employees in Lincoln County, the community would not have been exposed to the asbestos created by BNSF activities in the area.  BNSF's actions in this regard violated applicable industrial hygiene and public health standards of care including OSHA standards and regulations and BNSF's own self-imposed safety regulations.

93. **BNSF should have provided adequate warnings:** Although BNSF has long maintained medical, industrial hygiene and safety departments, the managers and directors of these departments have testified that to their knowledge BNSF never conducted any studies to determine whether its workers were being exposed to asbestos in Libby, never instructed its employees to wear respirators while working with or around asbestos-containing materials and never made any attempt to evaluate the work that the workers in Libby were doing on a daily basis.

Under applicable industrial hygiene and public health standards of care, BNSF had an obligation to warn its workers, and the community of Lincoln County, of the hazards associated with exposure to toxic materials, including the asbestos dust generated by its operations.  By failing to warn the workers and the public of this hazard, BNSF violated applicable industrial hygiene and public health standards of care.  BNSF Manager of Industrial Hygiene, Gerald McCaskill, admitted that had BNSF been aware of the

presence of asbestos in the vermiculite, it would have been unacceptable conduct not to warn its workers (1/24/2007 <u>Deposition of Gerald McCaskill</u>, p. 114).[44]

94. **BNSF should have provided education regarding toxic hazards**:  In violation of applicable industrial hygiene standards of care, BNSF failed to educate its workers with respect to the hazards of asbestos exposure and exposure to other toxic materials.  The BSF workers in Lincoln County regularly worked with and around asbestos-containing vermiculite and other contaminated surfaces and substances and were exposed to asbestos-containing dust generated from their work activities. BNSF's worker education program in this regard was non-existent and inadequate and in violation of industrial hygiene standards into the 1990's.  Had BNSF properly educated and protected their workers, they would have thereby also protected family members and the Libby community from the asbestos dust hazard they created.

95. **BNSF's inadequate respiratory protection practices**:   In violation of applicable industrial hygiene standards of care, BNSF did not require its workers to wear respirators when working with and around asbestos containing materials and other toxic compounds. While BNSF had been cited for its failure to have a respiratory program and had developed a proposed respirator program by 1981, it was not put into use in Lincoln County.  <u>9/11/1981 BNSF correspondence</u>.  In developing its respiratory program, BNSF industrial hygienist Larry Liukonen set forth the "Requirements for a <u>minimal acceptable program</u>," which among other things included "Appropriate surveillance of work area conditions and degree of employee exposure or stress shall be maintained."  <u>BNSF 0379</u>. There is no indication that BNSF ever met this minimal standard of care in Libby by assessing the air quality conditions for their Libby employees.  BNSF's respirator program in Libby was inadequate and violative of industrial hygiene standards into the 1990's.

In further violation of applicable industrial hygiene standards of care, BNSF did not require or provide protective clothing or changing rooms to its employees to protect them and their families from exposure to asbestos or other toxic materials.

96. **BNSF should have adapted its operations to existing knowledge**:  BNSF violated applicable industrial hygiene standards of care by failing to alter its work processes, in accordance with existing knowledge, to environmentally control hazards from asbestos and other toxic materials created by its operations.  BNSF failed to adequately enclose or isolate its work processes involving asbestos dust.  BNSF failed to control the hazardous dust generated by its operations as a result of poor housekeeping and the failure to prevent dispersion of the dust at its source by employing recognized asbestos dust suppression techniques.

---

[44] Cf. contemporaneous deposition testimony of former BNSF Director of Industrial Hygiene James Shea confirming communications between the GNRR and W.R. Grace about shipping asbestos from Libby, agreeing that Bulletin 12 conveyed to GNRR that then current milling technologies were unable to separate the asbestos from the vermiculite, and admitting that the GNRR was aware there was "amphibole material in the vermiculite product."  1/26/2007 <u>Deposition of James Shea</u>, pp. 99-100.

97. **BNSF should have used appropriate dust control practices**:  Consistent with applicable industrial hygiene standards of care, BNSF should have prevented dispersion of the asbestos dust at its source by:

  (a)    Segregating or confining the dust to an area near its source;
  (b)    Using vacuuming or washing techniques to control dust;
  (c)    Using local exhaust ventilation;
  (d)    Wetting the dust;
  (e)    Providing protective clothing.

By using open loading systems and failing to fence, post warnings around, enclose its facilities, or relocate its vermiculite related operations, BNSF failed to segregate its hazardous work operations from the adjacent Libby community in contravention of then existing industrial hygiene standards.

BNSF's own respiratory protection program provides:

  ENGINEERING AND ADMINISTRATIVE CONTROLS
  Built-in protection, inherent in the design of a process, is preferable to a method that depends on continual human implementation or intervention. A complete understanding of the circumstances surrounding the problem is required in choosing methods that will provide adequate control. Hazards can change with time so that health hazard control systems require continuous review and updating. ***

  Process Design Modifications

  The best time to introduce engineering controls is when the equipment or process is in the blueprint stage. If this is not done, then the equipment or process has to be changed to offer the best reduction in hazards.

BNSF 0395.  BNSF should have followed this self-acknowledged standard of care, and thereby protected its employees and the Libby community, by obtaining "a complete understanding of the circumstances surrounding the problem" and then by introducing "engineering and administrative controls … in the blueprint stage" or thereafter.  BNSF was given this very opportunity on the multiple occasions that BNSF reviewed and approved the dust control system at the River Loading Point, the primary source of OU6 contamination.

98. **BNSF should have employed proper housekeeping techniques**:   Consistent with applicable industrial hygiene standards of care, BNSF should have employed proper housekeeping in its operations.  High levels of toxic dust existed on many of its Libby area work surfaces which were not properly cleaned, and as a result asbestos dust became re-entrained into the air during normal work activities.  As a result of its poor housekeeping, BNSF allowed further dispersion of asbestos dust throughout its Libby operations and

beyond.   Given BNSF's knowledge of asbestos in the vermiculite ore, its poor housekeeping violated applicable standards of care.

99. **BNSF should have provided a reasonably safe place to work**:  Consistent with applicable industrial hygiene standards of care, BNSF had an obligation to provide its workers with a safe and healthful place to work.  BNSF employee exposure to asbestos occurred as a result of BNSF's failure to control and contain the asbestos-containing materials they worked with and around in performing various activities in Lincoln County. BNSF's failure to provide a safe place to work directly led to the widespread contamination of the areas surrounding their railyards, sidings and rights-of-way in Lincoln County.

100.   **BNSF should have adhered to its own safety regulations:** To meet applicable industrial hygiene standards of care at the time, BNSF had to adhere to its own safety standards.  See, e.g., BNSF Responsibilities for Safety:

> Provide safety and healthful working conditions to the maximum extent practicable for all employees. …
>
> To instruct [all] employees concerning the hazards of his job, and how to work safely to avoid injury. …
>
> Supervisors should always be alert for … lack of or inadequate guards or safety devices, poor housekeeping hazards, and hazardous atmospheric conditions. …
>
> WHAT TO INSPECT:
> 1.  **Atmospheric conditions, e.g. dusts, gasses, fumes**, sprays…
> 10. Personal Protective Equipment , e.g. hard hats, safety glasses, safety shoes, respirators, etc. (Emphasis added.)

See also 9/11/1981 BNSF correspondence attaching Respiratory Protection Program; BNSF 0379 setting forth the "Requirements for a minimal acceptable program," which among other things included "Appropriate surveillance of work area conditions and degree of employee exposure or stress shall be maintained."   In violation of these self-acknowledged IH standards of care, BNSF ignored these minimum acceptable standards of care as to asbestos in Lincoln County.

101. **BNSF largely ignored the basic principles of industrial hygiene**:  Asbestos disease in Libby was preventable with the use of the basic industrial hygiene principles of the time.  My research, including transcripts demonstrates there were a number of failures by BNSF to adhere to applicable industrial hygiene standards of care.  BNSF failed to instigate, mandate, or in some cases even recommend generally accepted  standards of industrial hygiene of the time in the following respects:

> a.  There was not  adequate  housekeeping  at the Railyard, Lincoln County

95

sidings, and Railroad rights of way.  Housekeeping should have kept the accumulation of dust to a minimum.  The general standard was to prevent the accumulation of dust or dirt in the workplace.  However, BNSF operations in Libby remained dusty and there was not a proper respiratory protection program.

b. Protection from the hazards of asbestos had been written about by Merewether and Price as early as 1930.  Feasible dust control measures were utilized elsewhere.  Additionally, respirators were not made available to employees and the use of respirators was not required or recommended by managers or supervisors.  No respirator training or fit check program was instituted.  While not an ideal method of providing warning of a hazard, the use of use of a proper respirator program in BNSF's downtown Libby operations would have provided the neighboring public an indications of the asbestos hazard present.

c. BNSF failed to perform any meaningful medical monitoring of its employees working in Lincoln County.

102. **BNSF should have ensured effective dust control practices were observed at River Loading and at the Downtown Export Facility:**  BNSF contractually obtained/retained the right and responsibility to review and approve all construction, modifications and improvements made on its property at the River Loading Point.  BNSF undertook oversight and pre-approval of the design and specifications of the loading facility and attendant dust control facilities at the river loading point.  BNSF was explicitly aware that dust control devices were supposed to control air borne pollution at the site (1/21/1971 Dust Control letter).  Later in 1979, Grace and BNSF district engineering discussed the River Loading Point rebuild (post derailment), which conversation specifically included discussion of "improvements in the design to minimize liability" for "overexposure to personnel."  BNSF_HHP_000480.  Pursuant to applicable industrial hygiene standards of care, this right and responsibility of oversight and approval came with the responsibility to meet the applicable standard of care by ensuring that river loading dust control facilities were sufficient to prevent the spread of LA dust.  BNSF failed to meet this standard of care by approving the dust producing loading facility and the insufficient and unreliable dust control facilities that were in use throughout the period of shipping activities at the River Loading Site.

The same issues and principles applied to the Downtown Export Facility, where BNSF retained control and ownership of the loading siding where bagged vermiculite was loaded into box cars in close proximity to childrens' recreational facilities, residences, and businesses.  Air from the boxcars was actively pumped out of the BNSF railcars into the surrounding areas in an effort to reduce the hazardous conditions experienced by workers during the loading process. See, US v. Grace Transcript – Geiger Excerpt. BNSF management reportedly inspected the Export Plant a couple times each month as this was BNSF property.  See 9/13/16 Deposition of John Swing.  BNSF should have ensured that

96

dust control practices were in place to protect the children and Libby residents located nearby.

Moreover, Railroads including BNSF may establish reasonable terms for the carriage of a commodity. As has been done with the rail transport of coal and the control of coal dust, BNSF could have required Grace to take reasonable measures to control the asbestos laden vermiculite dust. (See, e.g., DEIS for Tongue River RR at 6-26, -27, April 2015.) In fact, for brief periods, BNSF required Grace to remove the asbestos-laden vermiculite from the exterior surfaces of the rail cars before the BNSF crew would push the load from River Loading into the Libby Railyard. (6/28/2016 Deposition of Bruce Carrier at p. 55.) This was confirmed by BNSF Supervisory Agent John Swing (Deposition of John Swing 9/13/16.) BNSF should have ensured that this practice was continued throughout their years of vermiculite shipping operations.

103. **Description of a proper medical monitoring program**: Consistent with applicable industrial hygiene standards of care, a proper medial surveillance program by the BNSF under the circumstances extant in Lincoln County required many measures insufficiently undertaken or never undertaken by BNSF, including the following:

   a. Physical exams of workers by chest physicians who could integrate chest x-rays, pulmonary function tests and physical examination results and instruct the workers on how to protect their health. This was never done by BNSF. These should have been required on an annual basis.

   b. Proper pulmonary function tests and chest images should have been performed on all Lincoln County BNSF employees annually.

   c. Results of company chest x-rays, pulmonary function tests and physical exams (which were not performed) should have been published to local doctors, and made available to the worker.

   d. BNSF did not properly solicit medical information from Grace, nor did it conduct any medical investigation into the health of workers, family members, or community members.

104. **Industrial hygiene standards of care conclusion**: Ultimately, BNSF was aware that the vermiculite ore they were handling was contaminated with asbestos, were aware that the material was widespread throughout their facilities, were aware that their industrial level activities were taking place on and around the material and in close proximity to recreational, residential, and work-place area. BNSF was aware that, once entrained, asbestos fibers will travel by air. BNSF knew that the problem with asbestos was not isolated to railroad properties. BNSF was therefore aware that the bystander exposure to the asbestos hazard extended to the entire community. Applicable standards of care required BNSF to study, warn and protect not only its workers, but also their families

and the neighboring community. BNSF failed in recognizing and acting on existing medical and industrial hygiene information putting both its workers and the community at risk of exposure to asbestos emanating from their operations in Lincoln County.

## XII.   Plaintiff Exposure Pathways

105. **Exposure Pathway**:  An exposure pathway is the process by which an individual is exposed to contaminants originating from a contamination source. An exposure pathway consists of the following five elements: (1) a source of contamination; (2) a media such as air or soil through which the contaminant is transported; (3) a point of exposure where people can contact the contaminant; (4) a route of exposure by which the contaminant enters or contacts the body; and (5) a receptor population. A pathway is considered complete if all five elements are present and connected.

There was substantial asbestos containing vermiculite in and around BNSF's Lincoln County properties present during active operations. These properties were located in close proximity to most residential, recreational, commercial, medical and municipal locations in Lincoln County. BNSF's operations involved extensive disturbance activities in contact with and in close proximity to the asbestos-contaminated materials, where friable asbestos was present, and where BNSF activities disturbed asbestos-containing and asbestos-contaminated materials and created the transport mechanisms to release fibers into the breathing zone of those living, working or recreating in proximity to BNSF's properties in Lincoln County.

106. **Mr. Thomas Wells Exposure History**:  Mr. Thomas "Tom" Wells was born in Teaneck, New Jersey on May 8, 1954, and died on March 26, 2020, in Washington state from pleural mesothelioma.[45, 46]  Tom grew up in Upper Saddle, New Jersey (14 years) and graduated from high school in California in 1972. His father was an airline pilot, and his mother was a homemaker. Tom attended the University of Montana in Missoula and graduated with a degree in Education in 1978. Tom was married to his wife Lucy in 1978. Tom was a middle school science and math teacher in Washington state for 30 plus years. Tom's spouse was a school librarian. Tom and his wife then had two sons, Jackson, born in 1987, and Sean, born in 1991.

Tom worked in the Libby area for the U.S. Forest Service for four seasons, 1976, 1977, 1978 and 1981. He was initially hired as a soil technician the first summer. However, Tom reported that the need for technician work was not as great as anticipated, so he also performed timber analysis and surveying work. In the Yaak, he almost exclusively performed survey work. His soil technician work required measuring materials that they were laying down with a nuclear densometer gauge to assess soil density. The gravel they used in this work was sourced from the Yaak. The work with the Forest Service was

---

[45] Telephone interview with Mr. Wells March 23, 2020.
[46] Death Certificate – Mr. Wells.

typically conducted from June through November.  He typically worked five days per week, and sometimes worked four, 10-hour shifts.

In the summer of 1976, Tom lived in a bunkhouse in the Yaak.  In summer of 1977, he lived in Libby approximately ¼ mile from the railroad just west of Libby on Highway 2. Tom reported that he frequently had to vacuum and dust. In the summer of 1978, he lived in a trailer home abutting the Libby railyard on the 2nd Street West Extension:



Tom reported that it was hot in Montana during that time of year and that the trailer was hot and dusty with no air conditioning.  He reported that they had to leave the windows open and they frequently shook out the blankets because of the dust that accumulated in the trailer. Tom reported that in the evenings (5 or 6 PM), he often walked down to the local tavern to have a beer and later walked back.  He estimated the frequency of this trip as two to three times per week.  Tom described his walking routes as either, along the railroad tracks, or a straight shot through town. Tom reported that when walking along the railroad tracks, the trains passing by created "a violent air movement" which he described as a "mini tornado stirring up material".  In 1981, he lived in Troy with a friend on Bull Lake and Highway Two.  He was stationed out of the Yaak and frequently fished in the Yaak.

While living in the Libby area, Tom attended Libby Logger Days, at least once, maybe twice, and he participated in the log rolling event there. On his days off, he would sometimes run down to Missoula to visit his girlfriend, or go camping and fishing in the area. His typical fishing spots were some small lakes in the Yaak. Sometimes they would camp overnight. He also played some golf at the Cabinet View golf course. Tom reported that while living in Libby, he performed some gardening, attempting to grow beans, lettuce, and tomatoes, without much success. He used fertilizers and soil supplements, but does not recall using vermiculite for gardening.

Tom served in the Peace Corp in South Korea as a public health worker in a tuberculosis program. He visited villages with a nurse to identify potential patients.

Tom did not recall ever working with asbestos containing materials. There was one school (Burlington Edison School District) with a boiler room where he worked for five years, but Tom reported that he never entered that room.

Tom reported that he first heard about asbestos in Libby in the 1990s. Tom smoked tobacco for two years (1970-72) and chewed tobacco for a few months (1976-78). Tom was diagnosed with malignant pleural mesothelioma on December 9, 2019. He reported that his health was good up to his diagnosis.

107. **Joyce Hemphill Walder Exposure History**: Joyce Hemphill Walder was born in Libby, MT on May 14, 1954[47] and died October 23, 2020, of pleural mesothelioma.[48] Joyce was the third of four children. Joyce's biological father passed away when she was 12 years old. He had a logging business along with another man. Joyce's mother helped her father with the business and then later went into office work. Joyce stated that her father and his partner owned their own truck, cut their own trees, and delivered them to the mill with their truck. Joyce reported that her mother frequently drove the truck to the mill while her father and his work partner continued harvesting trees in the forest. The kids played in the woods during this time and occasionally went into town with their mother. Joyce reported that, at times, the family camped out in the forest and her father then went to work from the camp site. [Joyce was unsure how many times the family camped in the woods and the location where they camped.]

Her father worked at the lumber mill for some winter periods, but Joyce does not remember how many years or what his specific job title was. She reported that one of her brothers also worked in the mill right out of high school for a period of time.

Joyce's brothers played baseball and Joyce spent a lot of time at the baseball fields. Joyce reported that she played on vermiculite piles adjacent to the railyard and heated

---

[47] Telephone interview with Ms. Joyce Walder – June 26, 2020
[48] Death Certificate of Joyce Walder.

vermiculite to watch it puff. Joyce reported that as a child, she played on the Kootenai River and walked along the railroad tracks to get to the ball fields and to Kootenai Falls and bridge. Joyce attended logger days every year.  Joyce took part in track and field throughout middle and high school which took place at the Legion field adjacent to the railyard to the south.  When growing up, Joyce's best friend Melody Vinson lived on 1st Street West adjacent to the railyard.  Joyce would spend a lot of time at their home from the ages of 12 through 17.  She and her friends would frequent the nearby city pool during the summer months.

Joyce and her family burned firewood in their Libby homes, but she is unsure of the source of the firewood.  While her father was alive, firewood was gathered during his logging activities. In addition to burning wood during the winter months, the family frequently had outdoor fires in the summer during family visits back to Libby.

Joyce attended school in Libby from the first through 12th grades. She lived in Libby from 1954-1972, 1976-1978, and made continuous visits from 1979 through 2009.  The family lived in various homes in the Libby area including several within a half mile of BNSF's properties and from 1968-1969 in a trailer park on the 2nd Street Extension abutting the rail line and near the downtown Libby Railyard:



Joyce did not remember her family using Zonolite for gardening, specifically, in any of the homes.  After her father passed and her mother remarried, the mother's new husband used it in a garden, but this was after Joyce had left home.

After finishing high school in 1972, Joyce went to a business college for a period of time then Boise State University, and later finished her degree in California in Radio/Television. Joyce had numerous jobs including working in a hospital office, planting trees for the Forest Service out of the Troy Ranger Station, working as a cocktail waitress, and working in the basement of the Libby Library repairing books. In 1979, Joyce joined the military as an Air Force Reservist. As a reservist she was committed to a minimum of one week per month duty. She spent two years on air cargo in Hawaii. During her time in Hawaii she also worked at a hotel. She then moved to California and continued her service a load master. Joyce reported that as a load master, she was responsible for loading, balancing, and downloading cargo. In addition, she was responsible for the safety of the flight crew. She logged 5000 hours in air travel with cargo. She worked six to ten days per month on duty and was then activated for the Desert Storm and Iraqi Freedom Wars. Joyce had no knowledge of working around any asbestos during her military duties. The last five years of the Air Force work was spent in an office job. Joyce retired from the Air Force in 2011. Prior to being activated for wartime service, Joyce worked at the Academy of Performing Arts. In 2007, Joyce began working at a high school in California as the student body bookkeeper.

Joyce was married with four children. When she first met her husband, he was building ships in San Diego. He then moved to Orange County with Joyce where he had various occupations including real estate and repairing motorhomes. He is currently active-duty retired. Joyce and her husband raised their family in California. However, they spent many summers in Libby.

Joyce estimates that the family spent 15 summers in Libby until she was activated for war duty. Joyce worked two times in Libby in the summers (two weeks each) in forest fire camps. The first year was off of Highway Two near the Bull Lake Road. Joyce was responsible for setting up the camp. The second year she was the camp crew manager in an area near the Yaak. During their summers in Libby, Joyce and her family stayed with her mother at the 1124 Hemphill Road address. Activities that they performed included horseback riding and recreating on lakes and rivers. The family had a raft and floated on the Kootenai River.

Joyce was diagnosed with pleural thickening on December 29, 2014[49, 50] and malignant pleural mesothelioma on May 19, 2020. Joyce reported neither she nor her husband ever smoked tobacco.

---

[49] Center for Asbestos Related Disease Report 12/29/14.
[50] Dr. Mark S. Colella MD Report, July 30, 2022.

**108. Summary Plaintiff Exposure History.**

**Mr. Wells:** IARC notes that all forms of asbestos cause mesothelioma (IARC, 2018). During the period from 1999-2015, 45,221 deaths with malignant mesothelioma identified as the underlying or contributing cause of death were reported for persons aged $\geq$ 25 in the United States, increasing from 2,479 deaths in 1999 to 2,597 in 2015 (Mazurek et al., 2017). Although not at issue in a case such as this with substantial documented asbestos exposure, "malignant mesothelioma is known to occur at lower levels of exposure to asbestos, and no dose has been established below which there is no risk of malignant mesothelioma; that is, no 'safe,' threshold of cancer risk has been demonstrated" (Markowitz, 2015). As noted in the IARC Monographs, "mesothelioma may occur among individuals living in neighborhoods of asbestos factories and crocidolite mines, and in persons living with asbestos workers."

My opinions in this case are confirmed by Dr. Julian Marshall's conservative models of Mr. Wells' BNSF related asbestos exposure and associated health risk from his time living adjacent to the Downtown Libby Railyard alone, exclusive of BNSF's vermiculite shipping related activities. The report of Dr. Julian Marshall, applying the EPA RfC for LA, demonstrates a considerable risk of asbestos related disease. Applying these models to the EPA IUR for LA similarly demonstrates a markedly increased cancer risk in excess of acceptable lifetime cancer risk guidelines.[51, 52, 53, 54] See, Railyard IUR & HQ

---

[51] The use of a Reference Concentration, and calculation of an HI, is typically for non-cancer risks, rather than for cancer risks. However, regarding LA in Libby and elsewhere, the November 2020 Final Consent Decree notes, "the State of Montana's acceptable cancer risk is less than $10^{-5}$. For LA, a cancer risk of $10^{-5}$ is approximately equivalent to a non-cancer HQ of 1." (page DS-63).

[52] See also, https://deq mt.gov/cleanupandrec/Programs/superfundstate, FAQ section, which provides that "DEQ considers an additional or excess 1 in 100,000 chance (or 0.001% or 0.00001 or $1 \times 10^{-5}$) allowable. (The Montana Legislature has directed that $1 \times 10^{-5}$ is an allowable risk for state water, § 75-5-301, MCA, and based on that level, DEQ has determined that $1 \times 10^{-5}$ is an appropriate risk)." … "DEQ allows cleanup levels calculated based on cumulative risk levels less than or equal to a total excess cancer risk of $1 \times 10^{-5}$ for carcinogens or a total hazard index less than or equal to 1 for non-carcinogens." … "Cumulative cancer risk for carcinogenic compounds may not exceed 1E-05. Total hazard index for non-carcinogenic compounds may not exceed 1 for each target organ." See MTDEQ FAQ Excess Lifetime Cancer Risk, and MTDEQ FAQ What do we consider allowable risk.

[53] See also, "Montana Risk Assessment Tables - Draft User's Guide" (April 2017, prepared for Montana DEQ by CDM Smith), the "Guidance for Risk Assessment Tables", which states that the user should ensure "that the cumulative risk does not exceed $1 \times 10^{-5}$ or a cumulative hazard index of 1 for each critical effect or target organ" (page 2-7)[53]. The April 2017 Risk Assessment Tables report (e.g., page 2-18; the text states, "By default, the cleanup levels are based on a target hazard index of 0.1 and a target cancer risk of $1 \times 10^{-6}$ per chemical.").) The "Montana Risk Assessment Tables" include parameters that relate to "inhalation of dust and vapors from soil." Thus, in summary, Montana DEQ also uses terms such as "not allowed", "not appropriate", "may not exceed", and "[do] not exceed", in addition to "unacceptable".

[54] In general EPA considers cumulative excess cancer risks that are less than 1E-6 to be negligible and 1E-4 to be significantly large that remedial action is warranted. United States Environmental Protection Agency (EPA) 2015.  Site-Wide Human Health Risk Assessment, Libby Asbestos Superfund Site, Libby, Montana.  Prepared by CDM Smith of the U.S. Environmental Protection Agency, ES-4, CDM Smith for EPA.

spreadsheet. Based on the limited dispersions modeled by Dr. Marshall, Mr. Well's BNSF railyard related asbestos exposure results in a hazard index of 5 to 640, demonstrating a substantially increased risk of developing asbestos related disease form this source alone. This is a substantial exposure estimate, particularly in the setting of mesothelioma and well in excess of lifetime background airborne asbestos levels. In addition, Dr. Marshall's model excludes emissions from BNSF River Loading Site activities, downtown Export Facility activities, and vermiculite shipping operations, which would have added substantially to Mr. Well's BNSF related asbestos exposures. Dr. Marshall's model does not consider the myriad of other dust producing activities BNSF engaged in at the Libby Railyard. In addition, Dr. Marshall's model considers only one of the two summers that Mr. Wells resided in Libby. Dr. Marshall's model does not consider exposures resulting from re-entrainment of asbestos dust released from BNSF's downtown Libby railyard, or the years of accumulation of asbestos fibers in the home adjacent to the railyard. As a result of the above, the hazard index of up to 640 very likely underestimates the actual increased risk of asbestos related disease Mr. Wells incurred as a result of BNSF activities.  When added to his cumulative estimated exposures to asbestos from both BNSF and other sources including BNSF's River Loading Site emissions, and emissions related to BNSF's shipment of vermiculite, his estimated risk of asbestos related disease would be greatly increased.  Dr. Marshall's report demonstrates the substantial exposures resulting from the asbestos contaminated condition of BNSF's railyard alone, irrespective of BNSF's vermiculite transport. In its downtown Libby railyard, BNSF harbored a massive reservoir of asbestos contaminated soil in close proximity to the Plaintiffs' homes and recreational areas.  This deposited material was not transported. In fact, the asbestos contaminated condition was neither tested nor cleaned up until more than a decade had passed since the last shipment of vermiculite left Libby. There is no indication that BNSF had any obligation to harbor this uncontained and uncontrolled hazardous condition in downtown Libby.

My opinions in this case are also confirmed by the report of Dr. Steven Compton who similarly opines that Tom Wells incurred substantial exposures to asbestos emitted from BNSF's Libby properties, at levels that were orders of magnitude higher than typical ambient asbestos levels, over a substantial period of time while living and recreating in proximity to BNSF's downtown Libby railyard.


**Mrs. Walder:** The risk of mesothelioma among U.S. women is extremely low (estimated at 0.000004% or .41 case per 100,000 individuals, between 2003 and 2008), which risk greatly increases with exposure to asbestos, which is by far the primary causative agent of all mesotheliomas (Henley et al., 2013). The annual number of mesothelioma deaths increased significantly among women in the U.S. from 1999 to 2000 with 489 and 614 deaths reported, respectively (Mazurek et al 2022). As noted previously in this report, it is frequently reported in scientific literature that female pleural malignant mesothelioma rates are lower than male because female occupational exposures to asbestos are typically less frequent than male exposures (Dodson and Hammar, 2011 p. 375). Malignant mesothelioma rates in women that can be attributed to occupational exposure has been reported as comprising between 23-40% of such cases. (Spirtas et al., 1994; Rake et al., 2009).  As a result, mesothelioma rates in females are often considered sensitive

indicators to identify environmental exposures to asbestos and other mineral fibers (Baumann et al., 2015; Lacourt et al, 2014).  Five of the 11 (45%) of the non-occupationally exposed cases of malignant mesothelioma reported in Libby (Whitehouse et al, 2008) were females.

It has long been recognized that asbestos is the causative agent in the vast majority of mesothelioma cases and can be caused by relatively low levels of asbestos exposure. Studies regarding significant levels of spontaneous mesothelioma are not in line with the majority of medical literature and typically fail to take into account unidentified and unreported exposures to asbestos common among non-occupationally exposed individuals.

Furthermore, Mrs. Walder has been diagnosed with asbestos related pleural plaquing/thickening placing her in a heightened risk category for malignant asbestos related disease as a result of her asbestos exposure:

> One of the most important implications of the diagnosis of nonmalignant asbestos-related disease is that there is a close correlation between the presence of nonmalignant disease and the risk of malignancy, which may arise from exposure levels required to produce nonmalignant disease or mechanisms shared with premalignant processes that lead to cancer. The major malignancies associated with asbestos are cancer of the lung (with a complex relationship to cigarette smoking) and mesothelioma (pleural or peritoneal), with excess risk also reported for other sites. There is a strong statistical association between asbestos related disease and malignancy (ATS, 2003). [emphasis added]

> In addition, as noted in paragraph 27 of this report, radiographic parenchymal abnormalities were associated with lung cancer in the latest Libby community mortality study (Larson et al., 2020), further supporting the hypothesis that pleural plaques may be an independent risk factor for lung cancer mortality (Pairon et al., 2014). [emphasis added]

My opinions are confirmed by Dr. Julian Marshall's conservative models of Mrs. Walder's BNSF related asbestos exposure and associated health risk from her time simply recreating adjacent to the Downtown Libby Railyard alone, exclusive of BNSF's vermiculite shipping related activities. The report of Dr. Julian Marshall, applying the EPA RfC for LA, demonstrates a considerable risk of asbestos related disease.  Applying these models to the EPA IUR for LA similarly demonstrates a markedly increased cancer risk in excess of acceptable lifetime cancer risk guidelines. See, Railyard IUR & HQ spreadsheet. Based on the limited dispersions modeled by Dr. Marshall, Mrs. Walder's BNSF railyard related asbestos exposure results in a hazard index of 2.6 to 340, demonstrating a substantially increased risk of developing asbestos related disease form this source alone. Applying sensitivity analyses to her railyard exposure models brings the hazard index range to between 2.9 and 960. This is a substantial exposure estimate, particularly in the setting of mesothelioma and well in excess of lifetime background airborne asbestos levels. In addition, Dr. Marshall's models exclude emissions from BNSF River Loading Site, downtown Export Facility activities, and vermiculite shipping

operations, which would have added substantially to Mrs. Walder's BNSF related asbestos exposures. Dr. Marshall's model does not consider the myriad of other dust producing activities BNSF engaged in at the Libby Railyard. Dr. Marshall's model does not consider exposures resulting from re-entrainment of asbestos dust released from BNSF's downtown Libby railyard. Moreover, Dr. Marshall's models consider only the 2160 hours Mrs. Walder spent near the railyard. They do not incorporate exposures while Mrs. Walder was in Libby at home or at other near-railroad locations during her 19 years living in Libby; those other exposures would add to (would be in addition to) the exposures referenced above. As a result of the above, the hazard index of up to 340 greatly underestimates the actual increased risk of asbestos related disease Mrs. Walder incurred as a result of BNSF activities.  When added to her cumulative estimated exposures to asbestos from other BNSF sources including BNSF's River Loading Site emissions and emissions related to BNSF's shipment of vermiculite Mrs. Walder's estimated cancer risk would be greatly increased. As stated above, Dr. Marshall's report demonstrates the substantial exposures resulting from the asbestos contaminated condition of BNSF's railyard alone, irrespective of BNSF's vermiculite transport. In its downtown Libby railyard, BNSF harbored a massive reservoir of asbestos contaminated soil in close proximity to the Plaintiffs' homes and recreational areas.  This deposited material was not transported. In fact, the asbestos contaminated condition was neither tested nor cleaned up until more than a decade had passed since the last shipment of vermiculite left Libby.  There is no indication that BNSF had any harbor to maintain this uncontained and uncontrolled hazardous condition in downtown Libby.

My opinions in this case are also confirmed by the report of Dr. Steven Compton who similarly opines that Joyce Walder incurred substantial exposures to asbestos emitted from BNSF's Libby properties, at levels that were orders of magnitude higher than typical ambient asbestos levels, over a substantial period of time while living and recreating in proximity to BNSF's downtown Libby railyard.

**Plaintiffs Wells and Walder** have both been diagnosed with asbestos related diseases.  In Libby, where numerous sources of environmental as well as occupational exposure pathways have been identified, it is likely that multiple pathways contributed to the cumulative fiber exposures for each plaintiff.  Neither of the residents have occupational histories that are consistent with asbestos exposures.  In addition to considering the source of exposure, intensity, frequency, and duration are important parameters for assessing risk. Mr. Wells' living history does not indicate that he incurred significant take home exposures to asbestos. Mrs. Walder's living history indicates possible take home exposure from her father's limited time working in the timber industry during her early childhood prior to his death.  While it is apparent that multiple exposure pathways contributed to each plaintiff's cumulative asbestos exposure,  based on the living/working histories of the plaintiffs, available exposure data, community-based epidemiology studies, the conditions of the railyard and railway adjacent to which they lived and recreated, other available materials, and my experience and knowledge in the field of toxicology and industrial hygiene, it is more probable than not, to a reasonable degree of scientific certainty, that their individual environmental community exposures to LA released from BNSF's properties, incurred while living in the Libby area, were a substantial contributing cause of

their respective asbestos related diseases.  Based on this information and knowledge, it is more probable than not, to a reasonable degree of scientific certainty, that the Plaintiffs' inhalation of asbestos fibers generated from the activities of BNSF Railway and its predecessors in the Libby area caused and substantially contributed to their overall Libby amphibole asbestos fiber exposures and mesothelioma.

As vermiculite was being transported into and out of Libby, a gangue amphibole mineral referred to as Libby amphibole asbestos was also continually present in the vermiculite and deposited on BNSF's properties. Libby amphibole asbestos comprised approximately 0.3 to 7% (by weight) of the concentrated vermiculite that was shipped by rail to over 200 expansion facilities throughout the U.S. (Atkinson et al., 1982).  It is estimated that up to 383,000,000 pounds of Libby amphibole asbestos were transported into Libby in the 1970s and up to 460,000,000 pounds through the 1980s.

Despite BNSF's knowledge of the presence of asbestos in the vermiculite sourced from Libby since the 1920s, as well as applicable standards of care, OSHA mandated airborne asbestos sampling beginning in the 1970s, and placarding of railcars warning of asbestos, BNSF apparently failed to perform any sampling for asbestos during the decades of active vermiculite transport operations into and out of Libby.

Exposure to Libby amphibole asbestos is associated with asbestos related diseases including asbestosis, mesothelioma and lung cancer.  The most common health outcomes observed with Libby amphibole asbestos exposure are pleural changes (EPA, 2014). While clear and significant increases in asbestos related disease are present among former mill and mine workers in Libby, these same diseases are also observed in community members who experienced substantially lower levels of asbestos exposure. The rates of asbestosis and mesothelioma among Libby residents with no household contact to former mine and mill workers are 93 and 4.25 times greater, respectively, than expected (Larson, 2020).

There is substantial evidence of the extensive contamination of BNSF's Libby properties and the airborne dust emanating therefrom.

The Libby Asbestos Site was placed on the Superfund program's National Priorities List (NPL) in October 2002.  The site included eight operable units (OU), one of which (OU6) consisted of 42 miles of rail line, rights-of-way, and rail yards owned and operated by BNSF.  The 42 miles of rail lines and yards were included as an OU due to the Libby amphibole soil contamination associated with decades of deposition of vermiculite on BNSF properties (EPA, 2018).

Initial remediation work by BNSF and its hired contractors in the Libby railyard in 2001 identified extensive visible asbestos containing vermiculite throughout the railyard despite that vermiculite operations had ceased more than a decade prior:



These areas containing visible vermiculite were reportedly simply marked with survey whiskers and were not sampled by BNSF until "clearance" samples were taken after cleanup efforts had been performed using vacuum trucks to remove contaminated materials. Despite BNSF's cleanup efforts in this regard, composite clearance samples taken in 2003 from the areas of attempted remediation still demonstrated soil asbestos contamination at 2%:

**2003 Soil Sample Laboratory Analytical Data**
**The Burlington Northern and Santa Fe Railway Company**
**Vermiculite Remediation**
**Libby, Montana**
**EMR Project: 5539.003**

| Sample ID | Type | Sample Collection Date | Depth (inches) | Color | Latitude | Longitude | Asbestos | Mica | Asbestos Type | Purpose |
|---|---|---|---|---|---|---|---|---|---|---|
| T3-00001 | Grab | 08/13/2003 | 3-6 | Brown | 48.39417 | 115.54592 | ND | 20% | NA | Test |
| T4-00001 | Grab | 08/13/2003 | 3-6 | Brown/Red | 48.39417 | 115.54592 | ND | 10% | NA | Test |
| **BN-38000** | **Composite** | **08/15/2003** | **NA** | **Brown/Red** | **NA** | **NA** | **2%** | **10%** | **Tremolite/Actinolite** | **Clearance** |
| BN-38001 | Discreet | 08/15/2003 | 3-6 | Brown | 38.39415 | 115.54572 | 2% | 10% | Tremolite/Actinolite | Clearance |
| BN-38002 | Discreet | 08/15/2003 | 3-6 | Brown/Red | 48.39424 | 115.54587 | ND | 0% | NA | Clearance |
| BN-38003 | Discreet | 08/15/2003 | 3-6 | Red | 48.39438 | 115.54559 | 2% | 10% | Tremolite/Actinolite | Clearance |
| BN-38004 | Discreet | 08/15/2003 | 3-6 | Red | 48.3943 | 115.54572 | <1% | 10% | Tremolite/Actinolite | Clearance |
| BN-38005 | Discreet | 08/15/2003 | 3-6 | Brown | 48.39428 | 115.54597 | 2% | 10% | Tremolite/Actinolite | Clearance |
| **BN-39000** | **Composite** | **08/18/2003** | **NA** | **Brown** | **NA** | **NA** | **2%** | **20%** | **Tremolite/Actinolite** | **Clearance** |
| BN-39001 | Discreet | 08/18/2003 | 3-6 | Brown | 48.39433 | 115.54609 | 2% | 10% | Tremolite/Actinolite | Clearance |
| BN-39002 | Discreet | 08/18/2003 | 4-7 | Red | 48.39436 | 115.54616 | ND | 0% | NA | Clearance |
| BN-39003 | Discreet | 08/18/2003 | 6-9 | Brown | 48.39437 | 115.54628 | 2% | 8% | Tremolite/Actinolite | Clearance |
| BN-39004 | Discreet | 08/18/2003 | 3-6 | Red | 48.3944 | 115.54607 | ND | 10% | ND | Clearance |
| BN-39005 | Discreet | 08/18/2003 | 3-6 | Red | 48.39444 | 115.54622 | <1% | 0% | Tremolite/Actinolite | Clearance |
| **BN-40000** | **Composite** | **08/18/2003** | **NA** | **Brown** | **NA** | **NA** | **2%** | **10%** | **Tremolite/Actinolite** | **Clearance** |
| BN-40001 | Discreet | 08/18/2003 | 4-7 | Brown | 48.39443 | 115.54646 | 2% | 10% | Tremolite/Actinolite | Clearance |
| BN-40002 | Discreet | 08/18/2003 | 4-7 | Brown | 48.39448 | 115.54658 | 2% | 0% | Tremolite/Actinolite | Clearance |
| BN-40003 | Discreet | 08/18/2003 | 3-6 | Red | 48.39453 | 115.5467 | 3% | 15% | Tremolite/Actinolite | Clearance |
| BN-40004 | Discreet | 08/18/2003 | 4-7 | Red | 48.39445 | 115.54647 | <1% | 10% | Tremolite/Actinolite | Clearance |
| BN-40005 | Discreet | 08/18/2003 | 4-7 | Red | 48.39453 | 115.54657 | <1% | 0% | Tremolite/Actinolite | Clearance |
| BN-00123 | Grab | 08/20/2003 | 8-12 | Brown/Red | 48.39437 | 115.54611 | ND | 5% | NA | Investigation |
| BN-00124 | Grab | 08/20/2003 | 17-20 | Black | 48.39437 | 115.54611 | ND | 15% | NA | Investigation |
| BN-00125 | Grab | 08/20/2003 | 8-11 | Black | 48.39467 | 115.54724 | ND | 0% | NA | Investigation |
| BN-00126 | Grab | 08/20/2003 | 12-15 | Brown | 48.39467 | 115.54724 | ND | 0% | NA | Investigation |
| BN-00127 | Grab | 08/20/2003 | 8-12 | Brown | 48.39522 | 115.54896 | ND | 0% | NA | Investigation |
| BN-00128 | Grab | 08/20/2003 | 10-13 | Brown | 48.3957 | 115.55038 | ND | 0% | NA | Investigation |
| BN-00129 | Grab | 08/20/2003 | 6-9 | Brown | 48.39624 | 115.55187 | ND | 0% | NA | Investigation |
| BN-00130 | Grab | 08/20/2003 | 12-15 | Brown | 48.39674 | 115.55379 | ND | 10% | NA | Investigation |
| BN-00131 | Grab | 08/20/2003 | 8-11 | Brown | 48.39716 | 115.55538 | ND | 5% | NA | Investigation |
| BN-00132 | Grab | 08/20/2003 | 17-20 | Brown | 48.39716 | 115.55538 | ND | 10% | NA | Investigation |

F:\EMR Public\Dave's Folder\Libby, MT\laboratory(1)(2003 Soil Data)

KJSub013951

108

Limited airborne asbestos monitoring was performed by BNSF during regular maintenance activities in April of 2001. This sampling demonstrated that very substantial levels of airborne asbestos were still being released from the railyard soil at levels up to 14 f/cc (140 times the then applicable OSHA exposure standard and 150,000 times greater than EPA's 2014 RfC).  The test result of 14 f/cc was measured during brooming from the center to the west end of the Railyard. The railyard was particularly busy during the 1960s and 1970s when both the logging and mining industries were booming in the area. Airborne asbestos entrainment from the railyard would have been higher during this time given the higher level of activity and that new layers of asbestos contaminated vermiculite were being deposited daily. The initial soil characterizations occurred more than a decade after the vermiculite mine ceased operations. Notes and log sheets authored by BNSF employees and contractors during the Railyard activity sampling events consistently revealed dust plumes and dust clouds associated with Railyard activities.

BNSF's cleanup efforts between 2003 and 2005 led to more than 18,000 tons of LA asbestos-containing soils and 5.34 miles of rail and additional track material being removed from the Railyard alone (EPA 4/30/2014, EPA 5/14/12).  By the end of this process, nearly all of the ties and tracks had to be removed and nearly the entire Railyard was excavated and either filled or capped. BNSF's cleanup efforts continued to be unsuccessful and in 2011 extensive areas of vermiculite contamination were once again identified at the Railyard (EPA 5/30/2011). By the time the cleanup of this contamination had been completed, vermiculite and asbestos contamination had been identified and removed or capped on place from practically every square foot of the Libby yard.

Available ambient asbestos sampling conducted in three locations in downtown Libby in proximity to the railyard in 1975 revealed 0.67 f/cc, 1.1 f/cc, and 1.5 f/cc (more than 16,000 times higher than the LA RfC).  As noted in Dr. Marshall's report, these concentrations were recorded during multi-day rain events which most likely suppressed ambient asbestos fiber concentrations.  Dr. Marshall performed a conservative model applying these levels, which provided a hazard index of 49-110 for Tom Wells and 26-58 for Joyce Walder (HI up to 160 when sensitivity analyses were considered) again demonstrating substantially increased risk of asbestos related disease per both the EPA RfC and IUR during just the limited periods of time considered in the model.

Studies conducted by my colleagues and I evaluating the ability of trees to serve as reservoirs for Libby amphibole asbestos in Libby and near the former vermiculite mine provide additional evidence of airborne asbestos impacting or intercepting on the surface of tree bark. Asbestos concentrations on bark within the town of Libby showed a quarter of a million fibers/cm2, and the tree bark sample collected from a ponderosa pine tree located on the railroad line seven miles west of town (note that the vermiculite mine is east of town) showed 5.8 million fibers/cm2 of tree bark surface area.  These data suggest that vermiculite transportation and deposition substantially contributed to airborne concentrations of asbestos in the Libby community.

Decades after the vermiculite mine ceased operations, air quality assessments conducted in 2006, revealed elevated Libby amphibole asbestos exposure point concentrations along

109

transportation corridors.  When applied to risk estimates for Libby amphibole in ambient air, the hazard quotients associated with ambient air exposures for residents along transportation corridors are double those calculated for hazard quotients associated with ambient air exposures for residents within the Libby community (EPA, 2015, Table 5.4).

The extensive contamination of BNSF's downtown Libby railyard and resultant risk to the surrounding community has been confirmed by the Montana Supreme Court and concluded that, "through BNSF's activities in Libby there was a high degree of risk of some harm to members of the community exposure to asbestos dust." *BNSF Railway Co. v. The Asbestos Claims Court of the State of Montana*, 2020 MT 59, ¶¶ 2-4, 22-25.

The CDC exposure estimates reported in 1982 for rail workers transporting Libby vermiculite concentrate were startlingly high with per year estimates of 400 billion asbestos fibers.   See, CDC (August 1982) Disposition Paper for Asbestos-Contaminated Vermiculite.

I have observed firsthand how dusty BNSF's Libby operations are even today nearly two decades after Libby cleanup efforts began (see, e.g., Video of dust at Railyard 8/22/2018, Video of train kicking up dust 8/22/2018, Photo of train kicking up dust over Champion Haul Road) and have observed extensive visible vermiculite still present on BNSF's right of way (see, e.g., Video of Vermiculite by tracks 8/2/2018, Photo of Vermiculite by tracks 8/2/2018).   First hand witness testimony and interviews consistently confirms the dusty conditions at BNSF's downtown Libby railyard during applicable periods.

As noted in more detail in Dr. Marshall's report, increased risk of mesothelioma in communities neighboring industrial asbestos sites has been well documented in literature (Kurumatani and Kumagai, 2008; and Vimercait et al., 2019) with decreasing odd ratios observed with increasing distance from the source (Airoldi et al., 2021). As noted previously in this report, exposure to Libby amphibole asbestos in a Minneapolis, Minnesota community have revealed increased rates of pleural abnormalities when adjusted for background exposure (Alexander et al., 2012) and greatly elevated mesothelioma SMRs including among those with "no direct occupational or take-home exposure; their only known exposure was from ambient air exposure as residents for over 20 years." (Konen, et al., 2019).

Asbestos fibers tend to settle out of the air and deposit on any exposed surfaces.  Asbestos fibers are readily re-suspended into the air following disturbance of contaminated media (i.e., dust, soil, duff and bark). (USEPA, 2015).

Typically, the higher the level of asbestos present in bulk media sources (duff, soil) or other contaminated surfaces, the higher the level of asbestos fibers in the air when disturbed. The EPA has noted that even today outdoor soil disturbance activities appear to be the greatest source of Libby amphibole exposure (USEPA, 2015).

"Asbestos fibers are nonvolatile and insoluble, so their natural tendency is to settle out of air and water, and deposit in soil or sediment" (EPA, 1977); (EPA, 1979c). However, some fibers are sufficiently small that they can remain in suspension for

110

extended periods of time. In addition, "they are resistant to heat, fire, and chemical and biological degradation" (ATSDR, 2001).

Plaintiffs Tom Wells and Joyce Walder each incurred substantial exposures to asbestos dust released from BNSF's Libby property.  Mr. Wells lived immediately adjacent to the railyard for approximately 6 months in 1978. Mrs. Walder lived just west of Mr. Wells on the 2nd Street Extension in proximity to the railyard and abutting the railroad for 12 months during 1968-1969 (Mrs. Walder). In addition, Joyce Walder spent a substantial amount of time recreating and otherwise spending time adjacent to the railyard. Both Plaintiffs' residences near the railyard reportedly had the windows open during the warmer months to help cool the homes.  See, e.g. Historic Photos identifying Wells' residence in 1978 and Walder's residence in 1968-1969:



Their residences were located in proximity to BNSF's response and removal "area containing tremolite/actinolite" asbestos:



Final Remedial Action Report for Operable Unit 6 (OU6) of the Libby Asbestos Superfund Site (modified to show location of Wells' residence in red).

Given the direct proximity of Plaintiffs' residences to this heavily asbestos contaminated industrial site, that would later be designated as an asbestos Superfund site resulted in exposure to asbestos of substantial degree and duration.

In addition, both Plaintiffs lived for varying periods of time at locations near, but not adjacent to, BNSF's Libby properties that would have additionally contributed to each of their substantial exposures to asbestos released from BNSF's Libby properties.

Both Plaintiffs also spent substantial time recreating, socializing, or otherwise in downtown Libby in proximity to the Railyard. Tom Wells recalled walking in or near the Railyard on his way to the local tavern in downtown Libby approximately three times per week during his residence in Libby in 1978. He also recalled attending and participating in Logger days at Legion Field. While growing up in Libby, Joyce Walder spent a substantial amount of time near BNSF's downtown Libby railyard including while running track throughout middle and high school at the Legion field adjacent to the railyard to the south,

112

frequenting the municipal ball fields just north of the railyard to watch her brother's play baseball and to otherwise recreate (1960-1966), spending substantial time at her best friend's house, who lived immediately adjacent to the south of the Libby railyard from years 1966 to 1971, attending annual Logger's Day's festivals at the Legion field, spending many days during the summer months at the city Pool just south of the Railyard, and simply spending time in downtown Libby:



As a child (approximately 1960-1972), Joyce Walder also spent a considerable amount of time on and around BNSF's tracks as she would walk the tracks from her home to get to the ball fields and along the Kootenai River to get to Kootenai Falls and the bridge.

When taken in context of the extensive asbestos contamination described above, each of these individuals railyard related exposure histories demonstrate exposures to railroad entrained asbestos dust that was substantial in both degree and duration.

In prior expert reports, BNSF's expert has admitted general causation is satisfied in the context of LAA exposure in the Libby community but asserted that specific causation cannot be established without a quantitative dose assessment based on site and activity specific sampling (e.g. Barnes Kind Report,[55] p. 35). This is not an accurate statement of industrial hygiene or toxicology principles as exposure can be assessed using best available data, modelling, data from other applicable sampling, or even just by applying industrial hygiene and toxicology principles to what is known about asbestos containing

---

[55] Dr. Kind's report regarding Tracie Barnes is referred to hereafter as "Kind." His reports regarding Rhonda Braaten and Gerrie Flores contain many identical or similar statements to which the following comments also apply. Specific references to the Braaten and Flores reports are noted.

source materials and the entrainment/behavior of asbestos fibers when disturbed. Additionally, the lack of site/activity specific quantitative data from the time of Plaintiffs' exposure stems in large part from BNSFs failure to sample its properties as mandated by OSHA regulations and applicable standards of care.[56]  Moreover, as discussed in detail above in my report, and as confirmed in the reports of Dr. Arthur Frank, Dr. Steve Compton, and Dr. Julian Marshall, there is extensive documentation of the asbestos contamination of BNSF's Libby properties, that this asbestos contamination was readily and actively entrained into the Libby airshed, that Plaintiffs Tom Wells and Joyce Walder were exposed to substantial levels of this airborne asbestos over a substantial duration, and that such exposures were sufficient to result in their development of mesothelioma.

### XIII.   Necessity to Act

109. **Necessity to Act.**  As described above, the health hazards related to asbestos exposure were well known by BNSF by the 1930s. Additionally, BNSF was undeniably aware of the presence of asbestos in the vermiculite concentrate mined in the Libby area which they hauled into and out of Libby. Consequently, pursuant to applicable standards of care, BNSF was obligated to protect its workers and the Lincoln County community from exposure to the asbestos on its properties, under its control, and/or generated by its activities.

The record demonstrates that the loading and transport of the vermiculite concentrate into and out of the Libby community generated copious amounts of dust and extensive deposition of asbestos on BNSF properties.  Given BNSF's knowledge of the asbestos content of the concentrate, under the applicable standard of care BNSF should reasonably have studied asbestos exposure propagating from its properties and facilities, warned of the hazards, and ensured controls were implemented to prevent exposure. Even if one were to assume that BNSF was unaware of the asbestos content of that dust it was producing, given the obvious visible presence of the dust in the BNSF workplace, under applicable standards of care BNSF should reasonably have measured and evaluated the potential dust hazard to people in and around its properties.  Had BNSF met this standard of care, as imposed by general industrial hygiene and toxicology standards and its own safety rules and guidelines[57], it would have certainly learned of the asbestos content and

---

[56] Demonstrative of BNSF's violations of applicable standards of care is that the other corporations engaged in vermiculite related operations, on both ends of BNSF's vermiculite operation, utilized extensive dust control and air monitoring efforts for decades before BNSF's shipments ceased (e.g. W.R. Grace and Scotts).  A missing link in the health safety efforts was BNSF's operation where no sampling or dust control measures were utilized, and which took place in close proximity to residential, work-place, and childrens' recreational areas.

[57]  See e.g. BNSF Responsibilities for Safety – Content from Supervisor/Foreman seminars on safety 1975-1976  setting forth what BNSF considers to be "the fundamental requirements" and requiring inspection of "Atmospheric conditions, e.g. dusts"; 5/16/1975 BNSF memorandum discussing the BN Safety Policy which states "Safety is essential for efficient transportation and Safety is the primary concern and continuing responsibility of each supervisor and employee alike"; 9/11/1981 BNSF correspondence attaching a BNSF

hazardous nature of the dust, and have been able to have studied, warned, and protected its workers and the Libby community from exposure to the toxic LA.

In addition, in the Zonolite Siding Lease Agreement between W.R. Grace and BNSF covering the area of the River Loading Point, the Railroad retains oversight and approval of all construction proposed at the site.   BNSF reviewed and approved the River Loading Facility design both at the time of initial construction and upon its reconstruction after the facility was destroyed in the 1979 derailment at the site.   On multiple other occasions BNSF specifically reviewed and approved the dust control appliances and improvements at the site, which historic footage, dust testing, and eye-witness testimony all demonstrate was grossly inadequate to control the massive clouds of asbestos containing dust produced during the loading process.  See e.g. Railroad Dust Control Approval 3/9/1962; 3/30/1962; 1/21/1971; 11/10/1977; and Video Clip of River Loading Site.  By securing the right to review and approve all improvements and modifications to the site, under the applicable standard of care, as imposed by general industrial hygiene and toxicology standards and its own safety rules and guidelines, BNSF should have required more substantial dust control mechanisms be installed and maintained, but failed to do so.  Further, BNSF had this additional and specific notice of dust exposures in its work place and should have performed the necessary evaluation and instituted subsequent controls.

BNSF had a long standing awareness of the hazards associated with asbestos exposure and of the presence of asbestos in the Libby vermiculite, which is documented going back well before the Plaintiffs' exposure periods.  Applicable standards of care imposed by then current principles of industrial hygiene and toxicology required that BNSF perform the necessary actions to protect the public from these hazards. There is no indication that BNSF attempted to meet this standard in Libby.

110. **Conclusion**:   Based on the information presented in this report, my knowledge of the issues relating to Libby amphibole asbestos, and my training and experience in the field of industrial hygiene and toxicology, it is my opinion, to a reasonable degree of scientific certainty, that BNSF activities in Lincoln County significantly contributed to airborne asbestos levels in the ambient air shed and plaintiffs Tom Wells and Joyce Walder were exposed to resultant substantial levels of asbestos over a substantial period throughout their residencies in Lincoln County.  It is more probable than not, to a reasonable degree of scientific certainty, that these community exposures significantly contributed to their development of mesothelioma.

Sincerely,

_____

Respiratory Protection Program representing "the minimum which will meet all requirements" and setting forth the BNSF policy that "Burlington Northern will use substitution, engineering, and administrative controls to reduce employee exposures to toxic substances whenever feasible. When not feasible, or while being implemented, respiratory protection will be used."

XIV.   **Appendix A: Hart CV**

**CURRICULUM
VITAE**

**Julie F. Hart**

Professor and Department Chair
Department of Safety, Health and Industrial
Hygiene Montana Tech

**Education**:

| University of Montana | Ph.D | Toxicology | 2013 |
| Montana Tech | M.S. | Industrial Hygiene | 1991 |
| Montana Tech | B.S. | Occupational Safety & Health | 1989 |

 **Professional Registration and Licenses**:

Certified Industrial Hygienist (1998) American Board of Industrial Hygiene (No. 7751)

Work Experience:

| Montana Tech | Professor and Department Chair, Safety, Health and Industrial Hygiene (August, 2014-present) |
| Montana Tech | Professor in Safety, Health and Industrial Hygiene (August, 2013-August, 2014) |
| Montana Tech | Associate Professor in Safety, Health and Industrial Hygiene (August, 2010-August, 2013) |
| Montana Tech | Assistant Professor in Safety, Health and Industrial Hygiene (2000-2010) |
| Montana Power Co. | Corporate Health and Safety Auditor (1997-2000) |
| Thunder Basin Coal Co. | Senior Safety Advisor (1994-1997) |
| Thunder Basin Coal Co. | Safety Advisor (1991-1994) |
| Wyoming/MSHA State Grants | Part-Time Instructor (1995-1997) |

**Professional Affiliations**:

116

American Board of Industrial Hygiene (1996 – present)
American Industrial Hygiene Association (1990 – present)
American Industrial Hygiene Association - Pacific Northwest Section: Montana Local Education (2000 to 2017)
American Industrial Hygiene Association – Pacific Northwest Section: Secretary (2017 – 2020)
American Conference of Governmental Industrial Hygienists (2017 – present)

**Honors and Awards**:

- Montana Tech:  Merit Award: Meritorious achievement in Teaching, Scholarship and Professional Service (2021)
- Montana Tech:  Rose and Anna Busch Endowment Faculty Achievement Award for Recognition of Outstanding Teaching, Scholarship and Professional Service (2020)
- American Industrial Hygiene Association: (2019) David L. Swift Memorial Outstanding Aerosol Paper Award – for excellence in aerosol research applied to Industrial Hygiene as demonstrated in the paper entitled, "A Comparison of Respirable Crystalline Silica Concentration Measurements Using a Direct-on-Filter Fourier Transform Infrared (FT-IR) Transmission Method Versus a Traditional Laboratory X-ray Diffraction Method."
- Montana Tech:  Rose and Anna Busch Endowment Faculty Achievement Award for Recognition of Outstanding Teaching, Scholarship and Professional Service (2017)
- Montana Tech:  Merit Award: Meritorious achievement in Teaching, Scholarship and Professional Service (2016)
- Montana Tech: Alumni Recognition Award (2011)
- Pacific Northwest Section of the American Industrial Hygiene Association: Distinguished Industrial Hygienist Award (2009)

**Funded Grants:**

**Active Awards:**

Agency: Department of Health and Human Services/Centers of Disease Control/National Institute for Occupational Safety and Health.
Awarded:  2019 – 2024                              Hart, J.F. (PI/PD)
Occupational Safety and Health Training Project Grant. Combined Undergraduate and Graduate
Training Program.  T03OH008630.
Role:  PI/PD                              Grant Amount:  $647,000

Agency: National Institute of Health / Montana INBRE
Awarded:  2022                              Autenrieth, D. (PI)
Phase III – Evaluating the efficacy of DIY portable air cleaners in reducing the impact of infiltrated wildfire smoke PM in office settings.

Role:  Co-I                                        Grant Amount:  $110,000


**Completed Awards:**

Agency: National Institute of Health / Montana INBRE
Awarded:  2021                          Autenrieth, D. (PI)
Phase II – Evaluating the efficacy of DIY portable air cleaners in reducing the impact of
infiltrated wildfire smoke PM in office settings.
Role:  Co-I                                        Grant Amount:  $40,000


Agency: National Institute of Health / Montana INBRE
Awarded:  2020                          Autenrieth, D. (PI)
Building the foundation for an impactful wildfire smoke exposure control project
Role:  Co-I                                        Grant Amount:  $12,621


Agency: Department of Energy
Awarded:  2007-2010                     Spear, T.M. (PI)
Evaluating the impact of weatherization activities in homes with vermiculite insulation or
other asbestos containing material.
Role:  Key Personnel                    Grant Amount: $100,000


Agency:  The Rocky Mountain Center for Occupational and Environmental Health
(RMCOEH), Department of Family and Preventive Medicine, University of Utah School of
Medicine. Pilot/Small Projects Program supported by the National Institute for Occupational
Safety and Health.
Awarded:  2008-2009                     Hart, J.F. (PI)
An Evaluation of Potential Occupational Exposure to Asbestiform Amphiboles near a Former
Vermiculite Mine.                       Grant Amount:  $28,000


Agency: National Institute of Health / Montana INBRE
Awarded:  2022                          Autenrieth, D. (PI)
Phase II – Evaluating the efficacy of DIY portable air cleaners in reducing the impact of
infiltrated wildfire smoke PM in office settings.
Role:  Co-I                                        Grant Amount:  $60,000

**Principal Publications**:

Spear, T., Hart, J., Allen, B. (2020) Recommended Safeguards for Residential Vermiculite
        (Zonolite) Attic Insulation, Montana State University Extension Mont Guide.
        Housing and Environmental Health.  MT202007HR.  Available online @
        https://store.msuextension.org/publications/HomeHealthandFamily/MT202007HR.
        pdf.

Stauffer, D, Autenrieth, D, Hart, J, and Capoccia, S. (2020) Control of Wildfire-sourced
        PM2.5 in an Office Setting Using a Commercially Available Portable Air Cleaner,

118

Journal of Occupational and Environmental Hygiene DOI 10.1080/15459624.2020.1722314.

Hart, JF, Autenrieth, DA, Cauda, E., Chubb, LG, Spear, TM, Wock, S, Rosenthal, S. (2018 in press). A Comparison of Respirable Crystalline Silica Concentration Measurements Using a Direct-on-Filter Fourier Transform Infrared (FT-IR) Transmission Method Versus a Traditional Laboratory X-ray Diffraction Method. *Journal of Occupational & Environmental Hygiene.* 15:10, 743-754, DOI: 10.1080/15459624.2018.1495334.

Sheehy, A, Autenrieth, D, Hart, J, Risser, S (2017). Making it Sound as Good as it Tastes. Artisan Spirits - Summer Issue. http://artisanspiritmag.com/current-issue/.

Richardson, C., Capoccia, S, Hart, J (2016). Population Dynamics of the Feral Pigeon in the Central Business District of Butte, Montana. Conference Proceedings. 27th Vertebr. Pest Conf. R. M. Timm and R. A. Baldwin, Eds.) Published at Univ. of Calif., Davis. 2016. Pp. 217-220.

Richardson, KS, Kuenzi, A, Douglass, RJ, Hart, J, Carver, S (2013). Human exposure to particulate matter potentially contaminated with Sin Nombre virus. EcoHealth. DOI: 10.1007/s10393-013-0830-x.

Ward, TJ, Spear, TM, Hart, JF, Webber, JS, Elashheb, MI (2012). Amphibole asbestos in tree bark – A review of findings for this inhalation exposure source in Libby, Montana.
*Journal of Occupational and Environmental Hygiene*, 9:6, 387-397.

Spear, TM, Hart, JF, Spear, TE, Loushin, M, Shaw, N, Elashheb, MI (2012). The presence of asbestos-contaminated vermiculite attic insulation and/or other asbestos containing materials in homes and the potential for living space contamination. *Journal of Environmental Health*, 75:3, 24-29.

Elashheb ML, Spear TM, Hart JF, Webber JS, Ward TJ (2011). Libby Amphibole Contamination in Tree Bark Surrounding Historical Vermiculite Processing Facilities. Jour of Env Prot. 2: 1062-1068.

Balasubramanian, V., Spear, T.M., Hart, J.F., Larson, J.D. (2011) Evaluation of surface lead migration in pre-1950 homes: An onsite hand-held X-ray florescence spectroscopy study. *Jour of Env Health* Vol.73, No. 10, 14-19.

Hart, J.F., Ward, T.J., Spear, T.M., Rossi, R.J., Holland, N.N., Loushin, B.G. (2011). Evaluating the effectiveness of a commercial portable air purifier in homes with wood burning stoves: A preliminary study. *Jour of Env and Public Health*. Doi:10.1155/2011/324809.

Hart, J.F., Spear, T.M., Ward, T.J., Baldwin, C.E., Salo, M.N., Elashheb, M.I. (2009). An evaluation of potential occupational exposure to asbestiform amphiboles near a former vermiculite mine. *Jour of Env and Public Health*. Doi:10.1155/2009/189509.

Ward, T.J., Hart, J.F., Spear, T.M., Meyer, B.J., Webber J.S. (2009). Fate of Libby amphibole fibers when burning contaminated firewood. *Environ. Sci. Technol.*, Vol. 43, 2878-2883.

Hart, J.F., Ward, T.J., Spear, T.M., Crispen, K., and Zolnikov, T.R., (2007). Evaluation of Asbestos Exposures During Firewood Harvesting Simulations in Libby, Montana, *Annals of Occupational Hygiene*, 51, 8: 1-7.

Ward, T.J., Spear, T.M., Hart, J.F., Noonan, C., Holian, A., Getman, M., Webber, J.S., (2006).

Trees as reservoirs for amphibole fibers in Libby, Montana, *Science of the Total Environment,* Vol. 367, 460 – 465.

Spear, T.M., Hart, J., Stephenson, D.J., (2006). Yellowstone Winter Use Personal Exposure Monitoring, Rocky Mountains Cooperative Ecosystem Studies Unit (RM-CESU), RM- CESU Cooperative Agreement Number: J1580050167.

Wilson, T.B., Douglass, R.J., Spear, T.M., Hart, J.F., and Norman, J.B., (2002). Evaluation  of protective clothing for handling small mammals potentially infected with aerosol- borne zoonotic agents, *Intermountain Journal of Sciences*, Vol. 8(1).

**Service:**

Butte-Silver Bow County Health Board member (2009-present) (January 2015- present)

Montana Local Education Officer, Pacific Northwest Section of the American Industrial Hygiene Association, (2000-2017)

Peer Reviewer, Journal of Environmental and Public Health (2014)

Grant Peer Reviewer, National Institute for Occupational Safety and Health – Total Worker Health Programs (2016)

Grant Peer Reviewer, National Institute for Occupational Safety and Health – Total Worker Health Programs (2017)

Tenure Application Reviewer, Colorado State University, College of Veterinary Med and Bio Sciences (2017)

Application Reviewer, National Institute for Occupational Safety and Health – Pittsburgh Mining Research Division – Advancing Exposure Monitoring for Airborne Particulates (2017)

Grant Peer Reviewer, National Institute for Occupational Safety and Health – National Occupational Research Agenda (2018)

Industrial Hygiene Program Reviewer, Air Force Institute of Technology – Dayton, Ohio (2018)

Safety and Occupational Health Study Section, National Institute for Occupational Safety and Health – (2019, 2020, 2021).

Reviewer, Underground Mine Evacuation Technologies and Human Factors Research, National Institute for Occupational Safety and Health – (2021)

**Professional Development in Last Five Years:**

Attended 9 professional society conferences, presented at 5.

## XV.   Appendix B: Contemporary Libby Asbestos IH Studies

## A.   General Asbestos/Government Regulation Standards

1. **Small Fibers Are Not Counted.**  Another important issue pertaining to the toxicity of asbestos is fiber morphology. For the purposes of counting asbestos fibers in air samples, regulatory agencies commonly count particles that have lengths $\geq 5$ micrometers (µm) and length to width ratios $\geq 3:1$ as fibers. The current occupational exposure limit for asbestos is 0.1 f/cc (8-hour time weighted average) for fibers $\geq 5$ µm in length, with an aspect ratio (length:width) $\geq 3:1$ (OSHA, 2001); (ACGIH, 2001).

The current standard method for determining airborne asbestos particles in the U.S. workplace is the National Institute for Occupational Safety and Health (NIOSH) Method 7400 which uses phase contrast light microscopy (PCM) (NIOSH, 1994a); (NIOSH, 1994b). Fibers are collected on a filter and counted with 400-450x magnification. The method does not accurately distinguish between asbestos and non-asbestos fibers, and cannot detect fibers thinner than about 0.25 µm.

Transmission electron microscopy (TEM) and scanning electron microscopy (SEM) methods can detect smaller fibers than PCM and can be used to determine mineral habit in bulk materials that may become airborne. NIOSH Method 7402, Asbestos by TEM, is used to determine asbestos fibers in the optically visible range and is intended to complement PCM (NIOSH Method 7400). However, NIOSH Method 7402 still counts fibers $\geq 5$ µm in length.

In addition to the occupational exposure limits specifying mineral species, counting rules for asbestos apply when comparing air concentrations to occupational exposure limits. Fibers equal to or longer than 5 µm with a length-to-width ratio (aspect ratio) (AR) of 3:1 or greater are counted (ACGIH, 2001; CDC, 2010; OSHA, 1994b). This counting rule has been questioned by epidemiologists and others in the environmental health community (Dodson et al., 2003); (Stayner et al., 2008).

Stayner et al. (2008) emphasized that the counting rule was based largely on accuracy and reproducibility limitations associated with phase contrast microscopy (PCM) counting versus a toxicological basis. Libby amphibole studies which revealed similar inflammatory potencies in respirable size fractioned and non-size fractioned LA

121

strengthen this discussion (Duncan et al., 2010).

A common toxicological justification for the counting rule is that short fibers are cleared more readily from the lungs and that longer fibers impair the phagocytic process. (Dodson et al., 2003); (Stanton et al., 1981). Longer fibers have a greater potential than short fibers to generate an inflammatory response and stimulate a release of Il-1B from macrophages. (Kane (1992); (Donaldson et al., 2010); (Palomaki et al., 2011). However, as in any toxicological assessment, the dose and dosing frequency are critical factors to consider in the long versus short fiber toxicity discussion (Kane et al.,1992); (Castranova et al., 2000); and (Dodson et al., 2003).

In the Dodson et al. (2003) review of fiber length and pathogenicity, the conclusions drawn from Castranova et al. (2000), of "constant infusions of short fibers and a resultant eventual dust overload, can greatly compromise clearance" was cited as the main reason to underscore the short fiber clearance reasoning. A similar hypothesis regarding particle overload and the potential for short crocidolite asbestos fibers to generate substantial inflammatory responses was discussed by Kane (1992). Dodson et al. (2003) further emphasized that when appropriate techniques are used to analyze asbestos fiber tissue burden, in most tissues, a substantial majority of asbestos fibers are less than 5 μm in length. These observations may be due to increased deposition of shorter fibers and/or breaking of longer fibers over time.

Additional counting rules other than those specified by OSHA are used for ambient and indoor asbestos monitoring to provide more detailed quantification of asbestos structures. Two that have been used in studies assessing exposure to LA are the Asbestos Hazard Emergency Response Act (AHERA) and International Standards Organization 10312 methods (AHERA, 1987); (ISO, 1995). The AHERA method was derived for clearance sampling in school buildings following asbestos abatement. Under the AHERA method, an asbestos fiber is defined as a structure greater than or equivalent to 0.5 μm in length and a diameter > 0.002 μm with an AR of 5:1 or greater. Fibers are classified as 0.5 – 5 μm and > 5 μm in length (AHERA, 1987). The ISO 10312 method applies the same minimum length and diameter criteria as AHERA, however, 3:1 or 5:1 AR may be used. From an ISO 10312 analysis, several different airborne asbestos structure concentration values based on a number of fiber size classifications may be obtained (ISO, 1995).

Analytical techniques that count only fibers greater than 5 μm may substantially under-report inhalation exposures. Fiber lengths reported for LA range from less than 1 μm to greater than 20 μm with thicknesses ranging from 0.1 to 1 μm. If PCM counting rules are applied to LA, only one third of the fibers observed would be counted (Weis, 2001). Because the health effects associated with asbestos are not confined to fibers in the regulatory size fraction of greater than 5 μm, it is important to thoroughly characterize the fiber concentration and morphology and not limit this characterization to a counting rule that exists primarily because of an analytical method limitation.

2. **69% of LA fibers<5um**. Hart et al. (2007) reported that 69% of asbestos fibers collected in the Libby area were < 5 μm in length. This is consistent with ambient air sampling trends reported for Libby, using AHERA TEM analysis, of 65% of the

airborne fibers collected at Libby being < 5 μm in length (ATSDR, 2003b). In addition, fiber dimension analysis of bark samples reported by Ward et al. (2006) showed the majority of the asbestos fibers detected were < 5 μm in length.

3. **Small Fibers Are Dangerous**.   Consequently, the current regulatory methods of counting fibers based on fiber length and aspect ratio may not adequately describe the risk of asbestos-related health effects in that the concentration of fibers < 5 μm may contribute to health risks. Fiber size, shape and composition contribute collectively to health risks in ways that are currently being evaluated (ATSDR, 2003b).   The likelihood that Libby amphibole fiber toxicity is confined strictly to fibers in this regulatory size fraction is neither toxicologically sound nor supported by the available health   data from Libby (EPA, 2001).   A study by Suzuki (2005) concluded that "contrary to the Stanton hypothesis, short, thin asbestos fibers appear to contribute to the causation of human malignant mesothelioma. Such fibers were the predominant fiber type detected in lung and mesothelial tissues from human mesothelioma patients. These findings suggest that it is not prudent to take the position that short asbestos fibers convey little risk of disease." Animal and *in vitro* studies also suggest that fibers < 5 μm may also play a role in fibrosis, particularly under conditions of overload. Intense exposures may result in overload, limiting clearance of small fibers (Sullivan, 2007); (ATSDR, 2003b). Data presented by Dodson et al. (2003) argue that asbestos fibers of all  lengths induce pathological responses and that caution should be exerted when an attempt is made to exclude any population of inhaled fibers, based on their length, from being contributors to the potential for development of asbestos-related diseases.

4. **Meeker and Sampling Issues**.   The amphibole minerals within the Rainy Creek Complex (RCC) near Libby, MT, have been  referred to under a variety of names. They were initially classified as tremolite, tremolite/actinolite, or soda-rich tremolite by early geologists (Pardee and Larsen, 1929); (Bassette, 1959); (Boettcher, 1967), with (Larsen, 1942) and (Deer et al., 1963), further  characterizing the amphibole mineral as richterite.  Langer et al. (1991) and Nolan et al. (1991) classified the RCC amphibole as tremolite and richterite, while Wylie and Verkouteren (2000) and Gunter et al. (2003) identified the RCC amphiboles as primarily winchite (once considered a subset of richterite).  Wylie and Verkouteren (2000) further postulated that the amphibole composition may range from winchite to richterite.

An extensive systemic evaluation of the RCC amphibole minerals was conducted by Meeker et al. (2003) which included 30 sample locations from the former mine area. Analytical techniques to characterize the composition, mineralogy, and morphology of both fibrous and non-fibrous components of RCC amphiboles included X-ray diffraction (XRD), electron probe microanalysis (EPMA) using wavelength dispersive spectroscopy (WDS), and scanning electron microscopy combined with energy dispersive X-ray analysis (SEM/EDS), respectively.  Amphiboles were classified based on the Leake et al. (1997) system which is based on site assignments for each cat ion in the structure, including the oxidation state of iron.   Meeker et al. (2003)

approximated the respirable fraction of RCC amphiboles as winchite (84%), richterite (11%) and tremolite (6%), with possible magnesioriebecktite, edenite, and magnesio-arfvedsonite components.

Meeker et al. (2003) further reported that the Vermiculite Mountain amphibole minerals displayed a range of morphologies from prismatic to asbestiform, with fibril diameters ranging from 0.1 to 1 μm.

The discrepancy in the RCC amphibole mineral classification may be due to several factors. These include: (1) amphiboles were viewed as a secondary mineral by early geologists and received little attention (Bandli and Gunter, 2006); (2) there have been modifications in the International Mineralogical Association (IMA) classification systems (Wylie and Verkouteren, 2000); (3) naming of amphibole species is complex because of the variations in chemistry and the substitutions that occur in this mineral group (Gunter et al. 2003); (4) the optical properties of winchite from the RCC are very similar to tremolite (Bandli and Gunter, 2006); and (5) many techniques and methods available for analysis and classification of asbestos are not capable of adequately identifying or distinguishing these minerals according to current IMA guidelines (Meeker et al., 2003).

Environmental data for Libby collected prior to 2007 and analyzed by TEM were limited in their ability to quantify winchite and richterite, which most likely resulted in under-reporting of LA concentrations. In his 2003 paper, Meeker stated "…none of the present regulatory analytical methods (with the possible exception of well-calibrated SEM/EDS analysis using calibrated standards similar to EPMA/WDS) can accurately differentiate the amphiboles present in the asbestiform material from Vermiculite Mountain" (Meeker et al., 2003). These analytical methods were presumably not used during site characterization of the Libby Asbestos Site.

5. **EPA IRIS Toxicological Report**. In December 2014, the EPA released the toxicity assessment for Libby amphibole asbestos, setting forth a reference concentration for LA of 0.00009 fibers per cubic centimeter (fiber/cc). *IRIS Summary*, I.B.1 The reference concentration sets forth what the EPA determines to be an estimate of a daily exposure over a lifetime that is likely to not cause appreciable risk of adverse health effects. *Id.* at I.B. The assessment recognizes the abnormally toxic nature of the Libby amphibole by noting that workers exposed to LA had a 10-fold increase risk of parenchymal disease and up to a 3-fold increase of any other nonmalignant respiratory disease over the general population. *Id.* at I.B.2. Additionally, the reference concentration is considerably lower than OSHA permissible exposure limit of 1 fiber per cubic centimeter for 30 minutes or less per day and 0.1 fibers per cubic centimeter over an eight hour period per day. (29 C.F.R. 1910.1001(c))

The reference concentration and inhalation unit risk from the toxicity assessment are unique in the sense that for the first time the risk for asbestos has been evaluated for a 24 hour period. Typically, regulatory standards have been based on occupational exposure over the course of a work day. Because of the consistent and various exposure pathways in Lincoln County, the EPA necessitated a number that reflected the

unique situation.  The number derived from the EPA for Libby exposure is 1,000 times lower than the OSHA standard for a 8 hour work day, or 333 times lower for a 24 hour day by converting the OSHA standard.  This demonstrates the increased risk of multiple exposure pathways and chronic exposure (EPA, 2014)

6. **OSHA PELs:**   OSHA has established two occupational standards for exposure of workers: an 8-hour time-weighted average (TWA) value of 0.1 f/cc, and a short-term exposure limit (STEL) of 1 f/cc. EPA found a number of personal air samples collected from residential or commercial locations (mainly those associated with active disturbance of vermiculite) exceed one or both of these standards. In relation to these findings, EPA stated:

> "It is important to recognize that occupational exposure standards for asbestos are not generally applicable or protective for residents or workers in non-asbestos environments because occupational standards are intended to protect individuals who a) are fully aware of the hazards of the occupational environment, b) have specific training and access to protective equipment such as respirators and/or protective clothing and, c) participate in medical monitoring (USEPA 1995).   None of these conditions apply to residents or to workers at typical commercial establishments.  Thus, simple compliance with the OSHA standards is not evidence that exposure levels are acceptable in a home or in a non-asbestos workplace.   Indeed, risks to residents or workers occur at exposure levels substantially below the OSHA workplace standards." (EPA 2001a).

The OSHA permissible exposure limits have changed over time, but it has consistently been recognized that injurious exposures can occur at levels below the PEL.  See e.g., NIOSH-OSHA 81-103 Workplace Exposure to Asbestos, Review and Recommendations, 1980: "Excessive cancer risks, however, have been demonstrated at all fiber concentrations studied to date. Evaluation of all available human data provides no evidence for a threshold or for a "safe" level of asbestos exposure.

7. **NIOSH IH guidelines** regarding vermiculite recommend workers consult Occupational Safety and Health Administration (OSHA) asbestos standards for general industry and construction (29 CFR 1910.1001 and 1926.1101) when work will involve vermiculite that is known or presumed to be contaminated with asbestos. If the vermiculite is known or presumed to be contaminated with asbestos, NIOSH recommends the following general industrial hygiene guidelines for limiting asbestos exposure:

- Avoid handling or disturbing loose vermiculite

- Isolate work areas with temporary barriers or enclosures to avoid spreading fibers

- Use wet methods, if feasible, to reduce exposure

125

- Never use compressed air for cleaning

- Avoid dry sweeping, shoveling, or other dry clean-up methods

- Use disposable protective clothing or clothing that is left in the workplace. Do not launder work clothing with family clothing

- Use proper respiratory protection.

- Dispose of waste and debris contaminated with asbestos in leak-tight containers in accordance with OSHA and EPA standards" (DHHS (NIOSH) Publication Number 2003-141, May 2003).

**B. Exposure Mechanisms: Air, Soil, & Vermiculite**

8. **Fiber Travel, General**. Once asbestos fibers enter the environment from either a natural or artificial source, they tend to settle out of the air or water and deposit in soil and sediment (EPA, 1977); (EPA, 1979c). Asbestos fibers can be re-suspended into the air or water following soil and sediment disturbances. The rate at which asbestos particles settle out of the air or water depends on their size (ATSDR, 2001); (EPA,1979). Jaenicke (1979) reported that the residence time for a particle to remain airborne is greatest for particles ranging from 0.1-1 μm in diameter. Fibers in this size range could be transported long distances in air.

The fate and transport of asbestos containing fibers is dependent on the type of host media (soil, water, air, etc.), land use, and site characteristics. Asbestos fibers (both serpentine and amphibole) are indefinitely persistent in the environment. According to the Agency for Toxic Substances and Disease Registry (ATSDR):

"Asbestos fibers are nonvolatile and insoluble, so their natural tendency is to settle out of air and water, and deposit in soil or sediment" (EPA, 1977); (EPA, 1979c). However, some fibers are sufficiently small that they can remain in suspension in both air and water and be transported long distances. For example, fibers with aerodynamic diameters of 0.1–1 μm can be carried thousands of kilometers in air (Jaenicke 1980), and transport of fibers over 75 miles has been reported in the water of Lake Superior" (EPA, 1979c). In addition, "they are resistant to heat, fire, and chemical and biological degradation" (ATSDR, 2001).

The primary transport mechanisms for asbestos and asbestos containing material include:

- Suspension in air and transport via dispersion

- Suspension in water and transport downstream

Asbestos can become suspended in air when asbestos or asbestos containing material is disturbed. Wind, recreational activities, construction, and site work can disturb material outdoors.

Asbestos residence time in the air is determined primarily by particulate thickness;

126

however it is influenced by other factors such as length and static charge. The average thickness of LA particles is 0.4 μm and ranges from approximately 0.1 to 1.0 μm. The suspension of LA in air is measured in "half times" which is the amount of time it will take 50% of LA particles to settle out of the air column. A particle with a thickness of 0.5 μm has a half time of approximately two hours, assuming the source of disturbance has been removed (CDM, 2009).

Larger particles will settle faster; a particle of 1 μm has a half time of about 30 minutes. Smaller LA particles may stay suspended for significantly longer. The typical half time for a 0.15 particle is close to 40 hours (CDM, 2009).

Activity-specific testing found that the half-time of LA suspended by dropping vermiculite on the ground was about 30 minutes. LA suspended from disturbing vermiculite insulation settled within approximately 24 hours (CDM, 2009).Once suspended, LA moves by dispersion through air. LA concentration will be highest near the source and will decrease with increasing distance. In outdoor air, wind speed will determine direction and velocity of LA particle transport. Wind can cause the rapid dispersal of LA from the source of release" (EPA, 2008b).

9. **Fiber Settling Rate.** Asbestos fibers in the air are known to travel long distances from their source or point of origin and the Environmental Protection Agency (EPA) states that,

"During the time that the [asbestos] fiber remains airborne, it is able to move laterally with air currents and contaminate spaces distant from the point of release." Significant levels of contamination have been documented hundreds of meters from a point source of asbestos fibers, and fibers also move across contamination barrier systems with the passage of workers during removal of material.

The theoretical times needed for such [respirable] fibers to settle from a 3 meter (9 ft.) ceiling are 4, 20 and 80 hours in still air. Turbulence will prolong the settling and also cause re- entrainment of fallen fibers" (EPA, 1978b).

10. **Fiber Re-entrainment**.  Because of their shape and small size, asbestos fibers, particularly those of respirable dimensions, remain airborne for hours once they are introduced into the air.  Once they are airborne the asbestos fibers will drift long distances from their source.  Movement and air turbulence causes fibers that have settled out of the air to be reintroduced (re-entrained) into the air and to drift long distances from their source.  In addition, the human traffic on a worksite can also be expected to disburse asbestos throughout the entire work area.  For this reason, asbestos fibers do not respect work areas or job classifications.  It has been repeatedly demonstrated that a source of asbestos emission in the air puts everyone in the general vicinity (bystander exposure) at risk.  Because of the microscopic size of asbestos fibers, and their aerodynamic properties, typical housekeeping activities such as sweeping tend not to remove that asbestos from the plant. Rather, such activities have the effect of stirring up and re- entraining the asbestos that is in the location, ensuring that it is available for inhalation by workers in the vicinity.

11. **EPA (2001) Disturbed Vermiculite Study**. As part of the Phase 2 study, EPA (2001) collected data from personal and stationary air monitors in the immediate vicinity of people actively engaged in disturbing vermiculite insulation. This scenario (referred to as Scenario 3) was intended to assess exposures that might be experienced either by homeowners who engaged in activities in unfinished attic areas, or for contractors who might come into contact with vermiculite during repair or remodeling activities. The results of personal air samples [transmission electron microscopy (phase contrast microscopy –asbestos) TEM (PCME-asb)] showed a mean concentration of 0.309 f/cc with a range of 0.042 – 1.057 f/cc. The results of stationary air samples (TEM (PCME-asb) showed a mean concentration of 0.309 f/cc with a range of 0.023 – 0.789 f/cc.

12. **EPA (2003a) Disturbed Vermiculite Study.** EPA collected data from personal and stationary air monitors in the immediate vicinity of people actively engaged in disturbing vermiculite insulation. This scenario was intended to assess exposures that might be experienced either by homeowners who engaged in activities in unfinished attic areas, or for contractors who might come into contact with vermiculite during repair or remodeling activities. These data demonstrated that active disturbance of vermiculite results in very high concentrations of fibers as measured by both phase-contrast microscopy (PCM) and transmission electron microscopy (TEM) phase-contrast microscopy equivalents (PCME). The highest airborne concentration of 3.3 total asbestos fibers per cubic centimeter (f/cc) by TEM occurred during the simulation with Zonolite Vermiculite. In Phase 2, levels of airborne asbestos fibers were detected during seven simulations conducted in an artificial containment system. Bulk analysis of the Zonolite product indicated that it contained trace amounts of asbestos fibers (PLM: <1% tremolite; TEM: <0.1% tremolite/actinolite). Airborne asbestos fibers were detected in approximately half of the total air samples collected (total from all personal and stationary air samples combined). The maximum airborne concentration of 4.3 total actinolite f/cc by TEM occurred during the first simulation with dry vermiculite (EPA, (2003a).

These findings are consistent with previous studies conducted by W.R. Grace. These "drop tests" demonstrated that fiber concentrations in air resulting from pouring vermiculite insulation onto the floor under controlled conditions can be extremely high even when bulk concentrations in the vermiculite are less than 1% (Grace, 1976).

13. **Soil Disturbance, Greatest Exposure Source.** A variety of factors can influence the extent of airborne exposures associated with asbestos fibers in soil, the most important of which appears to be a disturbance of contaminated soil or material by human activity. Even today, after years of soil remediation in Libby "outdoor activities that disturb soil appear to be the greatest source of Libby amphibole exposure" (McKean, 2011).

Other factors that may affect the suspension of asbestos fibers into the air, and thus airborne asbestos exposures, include the environmental conditions, moisture content of the soil, concentration of asbestos in the soil, the type of the soil, and the

128

characteristics of the asbestos present. Nearly all exposure comes from near-surface soils. These soils generate dust and are often actively disturbed. In most circumstances, contamination is also limited to near surface soils. The EPA Action Plan for Libby established a maximum depth of excavation at 12-18 inches based on the depth that typical residential activities may intrude into the soil (EPA, 2003c)

The airborne dust created during the processing and production of the vermiculite ore was sampled and found to contain approximately 40% to 80% asbestos, well in excess of the percentage of asbestos found in the vermiculite ore, demonstrating the highly friable and easily entrained nature of the LAA fibers (see MCE_121, 10/17/1968 Public Health Service Report; Vermiculite Dust Sampling, 4/13/1962). This phenomenon has also been observed with asbestos containing soils. See, e.g., Addison (1988, 1995) discussed below.

14. **Soil Disturbance/ND Can Release Fibers.** Individuals may be exposed to asbestos in outdoor soil during a variety of different activities that disturb the soil and cause release of fibers from soil into the breathing zone of the person engaged in the soil disturbance activity. When outdoor soil that contains LA is disturbed (e.g., by raking, mowing or digging), fibers are released into the breathing zone of the person who is causing the soil disturbance. The concentration of fibers that are released into the air is highly variable, based on differing types of disturbance activities, but there is a clear trend for levels in air to increase as the levels in soil (as measured by a polarized light microscopy method referred to as PLM-VE) increase. That is, the lowest average levels of LA in air are observed while disturbing soil that is non-detect (ND)(Bin A) by PLM-VE, with increasing average levels for soil that is < 0.2% (Bin B1), between 0.2% and 1% (Bin B2), or > 1% (Bin C) (EPA, 2007a). However, from studies of outdoor soil disturbance, it is evident that soils that are ND can release LA fibers into the air (Addison et al., 1988). As BNSF's contractor EMR points out, there is "evidence to suggest that vermiculite material with an asbestos content as low as 0.1% may generate airborne fiber concentrations ranging between 5 and 10 f/cc." (BNSF_501_0014_0008). See also Millette (2015).

15. **Soil<1%Asb. Poses a Hazard When Disturbed, CO.** According to the Colorado Department of Public Health And Environment, Hazardous Materials and Waste Management Division, several studies using a variety of approaches, including the state of the science, for the release of asbestos fibers from significantly <1% asbestos in soil/debris demonstrated that all types of asbestos fibers can be released into the air or breathing zone during soil disturbing activities resulting in unacceptable risk that is significantly above acceptable cancer risk level of 1 in a million at 0.000004 (4X10$^{-6}$) f/cc (EPA IRIS), and even above the OSHA limit of 0.1 f/cc, in some cases.

16. **EPA (2004b) Spokane LA Soil Disturbance Study.** EPA Region 10 (EPA 2004b) conducted a three phase study at the Spokane vermiculite exfoliation plant to determine if asbestos fibers in the soil at the site could become airborne when the soil was disturbed. Soil samples were taken from several locations within the site boundary and analyzed using polarized light microscopy and X-ray diffraction. Analysis revealed

that most of the asbestos in the soil was similar to the amphibole asbestos that occurs in vermiculite from Libby, Montana.  In phase two of this study, twelve soil specimens were collected from the site and eleven were agitated inside a laboratory enclosure equipped with air monitoring equipment.  Ten of the eleven soil specimens contained asbestos that became airborne when the soil was agitated. Filters used for collection of air samples were analyzed with a transmission electron microscope (TEM) and were found to contain asbestos, with concentrations of asbestos in the air ranging from 0.051 fibers per cubic centimeter (f/cc) to 10.713 f/cc.

During phase three, air samples were collected while performing property maintenance and excavation tasks at two locations on-site. Samples analyzed using TEM showed concentrations of asbestos ranging from 0.010 f/cc to 0.045 f/cc of air. Several asbestos fibers were also detected in filters from stationary air monitors. According to EPA (2004b), this study clearly shows that asbestos in the soil at the former vermiculite exfoliation plant in Spokane can be released into the air when the soil is actively disturbed. Because there is a clear pathway for asbestos to move from contaminated soil to the air, individuals working on the site can be exposed to potentially hazardous levels of airborne asbestos fibers.

17. **Addison (1988, 1995), Soil > .001% Asbestos can generate excess of 0.1f/ml**.  The best information about the levels of asbestos content in soils likely to cause a health risk comes from the Addison et al. (1988) experiments where it was recommended "that soils containing more than 0.001% asbestos are regarded as being capable of generating airborne fibre concentrations in excess of 0.1 f ml-1 (the OSHA workplace standard) and that precautions to protect the workforce by wetting the soil, providing respiratory protection etc., are taken." Addison (1995) stated:

> It would be necessary therefore to take action specifically to control for the asbestos emissions if soils containing higher levels than 0.001% asbestos were to be handled without significant health risks. Asbestos, if present in vermiculite, is likely to behave in a similar fashion; with the asbestos loosely dispersed and readily available for release into the air. Even relatively gentle handling of the vermiculite would abrade the friable asbestos, splitting fiber bundles, and adding to the released fibers. Thus, even though the carcinogens legislation may impose only a 0.1% limit for packaging and labeling, the vermiculite industries would be advised to establish their own target limit of 0.001% for amphibole asbestos. Most current supplies of vermiculite could still meet this standard (Addison, 1995).

18. **Addison (1988), 200X OSHA PEL from Soil at 1% Asbestos**.  Addison et al. (1988) conducted experiments to evaluate the release of dispersed asbestos fibers from soils. Addison et al. (1988) showed that the most important factor controlling airborne fiber concentrations in the experiments with dry loose aggregate mixtures was the bulk asbestos content and that, irrespective of fiber type or soil type, high airborne fiber concentrations over 200 times the current OSHA Permissible Exposure Limit (PEL) for

asbestos can be generated from soil containing just 1% asbestos. Addison also showed that soil with concentrations of 0.1%, or 1/10 the EPA action level, were capable of producing airborne asbestos levels in excess of 8 times the current OSHA PEL for asbestos.

19. **Addison (1988), Reduction in % Asbestos Not Proportionate.** Addison (1988) also reported:

> There was a progressive reduction in airborne fibre concentrations at a given dust concentration with reducing amounts of asbestos in the mixtures, but this reduction was not proportionate to the reduction in asbestos content below 0.1%. With 0.1%, and often 0.01%, of asbestos in soils, the 0.5 f/ml-1 Control Limit for chrysotile and the 0.2 f/ml-1 Control Limit for crocidolite and amosite could be exceeded while respirable dust concentrations were below 5 mg/m-3, the nuisance dust OEL. Similarly, it is apparent that the clearance limit of 0.01 f/ml-1 could be exceeded with any of the 0.01% and 0.001% asbestos mixtures if respirable dust concentrations approached the nuisance dust OEL.

20. **Ward (2006) Bark Study.** In 2005, it was discovered that trees in areas surrounding the vermiculite mine and throughout Libby serve as reservoirs for LA (Ward et.al. 2006), when tree bark samples were collected in support of a proposed firewood harvesting / commercial logging exposure study in the Libby area. Bark samples were collected to simulate a probable amphibole fiber concentration gradient emanating from the mine from forests around the W.R. Grace mine. Bark samples were collected from three separate, heavily forested locations within the Superfund site, within the town of Libby and on the railroad line seven miles west of town, and two miles northeast of the mine on United States Forest Service (USFS) road 4872 in an area that had been recently clear cut. Asbestos concentrations on bark near the mine were greater than one hundred million fibers per square centimeter of tree bark surface area. Asbestos concentrations on bark within the town of Libby showed a quarter of a million fibers per square centimeter, and the tree bark sample collected from a ponderosa pine tree located on the railroad line seven miles west of town (note that the vermiculite mine is east of town) showed 5.8 million fibers of asbestos per square centimeter of tree bark surface area. Tree bark samples collected two miles northeast of the mine on United States Forest Service (USFS) road 4872 showed asbestos concentrations ranging from non-detect to 2 million fibers per square centimeter of tree bark surface area (Ward et.al. 2006).

21. **EPA (2008c) & Ward Bark Study.** From the original samples that were collected near the abandoned W.R. Grace Mine in November 2004 (Ward, 2006), concentrations ranged from 14 million asbestos structures/cm2 bark surface area (s/cm2) to 110 million s/cm2. These original results were confirmed by our team in follow-up bark

sampling programs throughout the mine site, and through a more comprehensive bark sampling program conducted by Region 8 EPA (EPA 2008c).

22. **EPA (2008c) Bark Study Results.** EPA (2008c) collected samples of bark from trees at least 30 years old were collected at a number of stations located on transects that radiate away from the mine, with special emphasis on the predominant downwind direction (northeast).  The EPA bark sampling map is shown in Appendix 1. All tree bark samples were collected from the side of the tree facing toward the mine site, from a height of about 4-5 feet above ground. The tree bark samples were ashed and analyzed for LA by TEM. Results are expressed as LA fibers per $cm^2$ of tree bark. Although there is moderate spatial variability, there is a general tendency for the highest levels (> 2.5 million fibers per $cm^2$) to occur within about 2 to 3 miles of the mined area, with a tendency for  values to diminish as a function of distance from the mine. Elevated values are noted not only in the downwind direction (north-northeast from the mine), but also along nearly all transects. It is suspected that the majority of the LA in tree bark is attributable to historic releases to air during the time the mine was active, although current and on-going releases may also be contributing (EPA 2008c). The EPA program measured significant amphibole contamination in tree bark near the mine (2.5 to 20 million structures/$cm^2$), with contamination extending out miles from the mine in all directions (Ward et al., 2012).

23. **EPA(2008c) Bark Study, Forest Soil and Duff.**  Forest soil and duff samples were collected from approximately equally spaced locations around the perimeter of a circle with a radius of about 5 feet, centered on the same tree where the bark sample was collected. The grab samples were combined into one composite and analyzed for  LA by PLM-VE. LA was detectable in a number of soil samples located relatively close to the mined area, but was not detectable at a distance more than about 2 miles from the mined area. The source of the LA observed at these locations is unknown, but might include a) naturally occurring outcrops of the LA-bearing ore body, b) deposition from historic airborne releases  from the mine and mill, and c) water-based erosion from past and/or present materials at the  mine site (EPA 2008c).

24. **EPA (2011b) Human Receptors in OU3.**  As described above, historic mining, milling, and processing of vermiculite at the Libby mine  site, Operable Unit 3 (OU3), are known to have caused releases of vermiculite and LA to the  environment. A range of different human receptors may be exposed to LA in OU3, including:

- Commercial loggers in the forested area – This receptor population includes adult workers who are employed in commercial logging operations in OU3. Exposures of potential concern for asbestos include inhalation of ambient air, inhalation of airborne emissions of LA from roadways and inhalation of air that contains LA released from soil or duff as well as LA fibers released to air by cutting and stacking timber that has LA in the tree bark. Commercial loggers harvesting wood in OU3 may be exposed as a result of

release of fibers from soil, duff or tree bark into breathing zone air. At present, EPA has not collected any data that are specifically intended to allow an evaluation of risks to commercial loggers. The movement of the vehicle along the road may disturb contaminated soil in or along the roadway, potentially leading to inhalation exposure of the vehicle occupants (EPA 2011b).

- Forest service workers in the forested area – This population includes employees of the USFS who may engage in a range of forest management activities, including maintenance of roads and trails, cutting fire breaks, thinning and trimming trees, measuring trees, etc (EPA 2011b).

- Recreational visitors in the forested area – This receptor population includes older children (assumed to be age 7 or older) and adults who engage in activities such as camping, hiking, dirt bike riding, all-terrain vehicle (ATV) riding, hunting, etc. Exposures of primary concern for asbestos include inhalation of ambient air, inhalation of air in the vicinity of contaminated soil, duff, or roadways/trails disturbed by recreational activity, and inhalation of LA released from contaminated tree bark while gathering wood for a campfire and while burning the wood in a campfire (EPA 2011b).

- Residential wood harvester in the forested area – This receptor population includes adult area residents who engage in sawing, hauling, and stacking wood for personal use. Exposures of potential concern for asbestos in OU3 include inhalation of ambient air, inhalation of airborne emissions of LA from roadways and inhalation of air that contains LA released from soil or duff as well as LA fibers released to air by cutting and hauling timber that has LA in the tree bark (EPA 2011b).

25. **Bark Activity Based Studies Intro.** Following the initial discovery of LA contamination in tree bark (Ward et al., 2006), multiple independent studies that have been conducted in an effort to understand the impact of these findings on the Libby community. These studies include assessing the potential for inhalation exposures to the general public that disturb LA-contaminated trees through residential home heating activities (i.e. firewood harvesting and wood stove use) (Hart et al., 2007; Ward et al., 2009), as well as studies designed to evaluate wild land firefighting and other routine occupational tasks conducted by the United States Department of Agriculture Forest Service (Forest Service) in Libby (Hart et al., 2009; Ward, 2012).

26. **Hart (2007) Firewood Harvesting Study.** Hart et.al (2007) demonstrated that amphibole fibers are released from tree reservoirs during firewood harvesting activities in asbestos-contaminated areas and that the potential for asbestos exposure exists during such activities. The firewood harvesting study consisted of three independent simulation trials conducted on Forest Service property in an area of the Kootenai Forest inside the EPA restricted zone with potential exposures primarily assessed via personal breathing zone (PBZ) sampling and surface wipe sampling of the outer layer of Tyvek™ clothing. The majority of the personal breathing zone (PBZ) samples

collected during the EPA-restricted zone harvest simulations showed concentrations above analytical sensitivities for transmission electron microscopy (TEM) (21 of 24 samples).

The mean time weighted average concentration for fibers <5 μm long was 0.15 s/ml, while the mean concentration for fibers >5 μm long was 0.07 s/ml. Even though the PBZ sample from the chainsaw operator's assistant revealed the highest mean total LA concentration (0.40 ± 0.51 s/ml), overall no significant differences were observed in PBZ concentrations between tasks.

In addition to the airborne exposure potential associated with harvesting amphibole-contaminated trees, there is also a strong potential for clothing contamination and substantial LA concentrations were also revealed on Tyvek clothing wipe samples from each of the investigators. Wipe samples collected from the investigators' chest and thigh revealed asbestos fiber contamination above the AS in 23 of 24 samples. The mean LA concentration (n = 14) was 30,000 s/cm2, with 91% (27,000 s/cm2) composed of fibers <5 μm long.

27. **Hart (2009) USFS Employee Exposure Study.** A United States Department of Agriculture (USDA) Forest Service occupational exposure study was conducted during the summer of 2008 to assess the potential for Forest Service employee exposures while working near the abandoned vermiculite mine, but outside of the EPA restricted zone (Hart et al., 2009). Investigators simulated the following four routine activities: 1) walking through forested areas, 2) conducting tree measurement, 3) constructing a fire line, and 4) performing trail maintenance. In addition to PBZ and Tyvek clothing surface wipe sampling, pre and post vehicle wipes were collected on the rear bumper of the vehicle used to transport investigators and equipment to the research site. Wipe samples were also collected from the chainsaw used in several of the trials post activity.

For individual PBZ samples with LA >5 μm detected, 10 of 24 samples (42%) exceeded the Occupational Safety and Health Administration (OSHA) exposure limit of 0.1 f/ml (assuming an eight hour exposure duration) when analyzed by PCM. These 10 PBZ samples were all collected during the fireline construction simulation activity. When analyzed by TEM (and therefore excluding cellulose fibers from the analyses), 25% of the PBZ samples revealed concentrations greater than the analytical sensitivity (AS). These samples were collected during the fireline construction and tree measurement simulation activities. The mean (n = 4) PBZ sample weighted average concentration for fireline construction activity samples was 0.08 s/ml, while the mean PBZ sample weighted average concentration for tree measurement activity was 0.01 s/ml.

LA was detected on wipe samples collected from all of the activities evaluated. Fifty two percent of post activity wipe samples revealed concentrations greater than the detection limit, with mean concentrations (n = 10) of 941 s/cm2. The most elevated wipe concentrations were associated with the fireline construction activity, with a mean

(n = 4) of 1,456 s/cm2. Similar to the PBZ samples, the tasks that generated wipe sample concentrations greater than the AS for the fireline construction activity were brush clearing, comby tool operating, and Pulaski tool operating. Other activities that generated LA (as detected by the wipes) were tree measurement activities, trail maintenance (brush clearer and chainsaw operator), and hiking activities.

In addition, the wipe samples collected from the chainsaw bar after each trial (n = 3) revealed amphibole contamination ranging from 896 to 11,825 s/cm2, with 12 of 15 fibers <5 µm long. Clothing and equipment contamination may serve as a secondary source of exposure to forest service personnel. Cross contamination of vehicle cabs, vehicle boxes, equipment storage areas, equipment maintenance areas, and offices may occur as a result of clothing and equipment contamination.

The vehicle wipes collected for one of the roads evaluated near the mine revealed concentrations below the AS, while results from another roadway (Jackson Creek) evaluated measured LA concentrations of 17,917 s/cm2.

28. **Ward (2012) USFS Controlled Burn Study.** While the Forest Service occupational exposure assessment provided some guidance into the exposure potential associated with common occupational activities, firefighting or controlled burn activities were not included in this assessment. To address this activity, a small-scale controlled burn was conducted in a (3.7 m X 3.7 m) plot in July 2009 (Ward et al., 2012). The plot location was within the same geographical area where several of the simulated Forest Service tasks were conducted in the occupational assessments described above.

The controlled burn consisted of three activities, including fire line construction, combustion, and mop-up. Sampling was performed independently for each controlled burn activity. In addition to PBZ and Tyvek clothing surface wipe sampling, high volume ambient air sampling was performed during the controlled burn activities. This sampling consisted of four sampling stations positioned 1.2 m from the perimeter of the burn, one station positioned 3.7 m above the burn plot, and one station positioned within the prevailing wind direction. Following the controlled burn, three ash samples were collected from the burn plot.

Nine of 12 (75%) of the PBZ samples revealed concentrations greater than the analytical sensitivity when analyzed by AHERA TEM, with the majority (64%) of structures detected >5µm. Tyvek clothing wipe samples collected from each investigator showed TEM total LA structure concentrations ranging from ND to 2,500 s/cm2, with the majority (62%) of LA <5 µm.

Sixty-two percent of the high volume ambient air samples revealed LA concentrations greater than the analytical sensitivity when analyzed by AHERA TEM, with LA identified in samples collected during all three activities (fireline construction, combustion, and mop-up). The mean high volume TEM air concentrations for LA <5 µm and > 5µm were 0.01 and 0.01 s/ml, respectively. In terms of fiber counts, 70% of the LA fibers identified in high volume air samples were >5 µm long. Bulk ash LA concentrations collected above mineral soil ranged from 8,294,575 to 18,736,220 s/g, with 61% of LA <5 µm.

29. **Disturbance of Contaminated Trees.** Results from the above studies suggest that there is an acute airborne exposure potential to LA associated with disturbing contaminated trees and undergrowth such as brush – both through common public and occupational activities. When analyzed by TEM, 100% of the firewood harvesting samples, 25% of the Forest Service occupational assessment samples, and 75% of the controlled burn samples revealed detectable concentrations of LA. PBZ results showed that the majority of the fibers detected were <5 µm in length, which is consistent with the size fractions seen in our bark sample results measured in the areas surrounding the abandoned vermiculite mine. LA concentrations as measured by PBZ sampling were consistently higher in the firewood harvesting simulation samples compared to samples collected during the Forest Service occupational assessment and controlled burn trials. It is unclear whether the firewood harvesting activity is more likely to contribute to inhalation and clothing contamination or whether the higher concentrations observed were due to elevated concentrations of LA in tree bark. Since two of the Forest Service occupational activities evaluated also employed the use of a chainsaw (fireline construction and trail maintenance), this supports the hypothesis that the higher PBZ and wipe concentrations are most likely associated with elevated tree bark (source) concentrations (Ward et al., 2012).

30. **EPA (2011a) Warning Re: Gathering of Wood in the Libby Valley.** Recent notices by EPA (Victor Ketellapper, 5/5/2011) and the USDA Forest Service [Informed Choices Regarding Libby Amphibole (Asbestos On the Forest)] stated the following:

> **"Gathering Of Wood In The Libby Valley**
>
> To understand the effects of vermiculite mining activity on the surrounding forest area, EPA sampled tree bark and forest ground covering around the Vermiculite Mountain mine. Asbestos fibers were detected in both the tree bark and forestground covering as far as 8 miles away from the mine. Based on these findings, EPA suggests residents only cut and gather firewood from outside of the Libby valley. **Be aware the bark from trees in the Libby valley may contain asbestos fibers."** (EPA 2011a)

136

## XVI.   <u>Appendix 4: Works Cited</u>

Addison, J. Vermiculite*: a review of the mineralogy and health effects of vermiculite exploitation.* Reg. Tox. Pharm. 21: 397-405 (1995).

Addison J., Davies L.S.T., Dwaneson A., Willey R.J. *The release of dispersed asbestos fibres from soils.* Historical Research Report. Research Report TM/88/14 (1988).

Adgate, JL, Cho, JAS, Alexander, BH, Ramachandran, G, Raliegh, KK, Johnson, J, Messing, RB, Williams, AL, Kelly, J, Pratt, GC.  2011 Modeling community asbestos exposure near a vermiculite processing facility:  Impact of human activities and cumulative exposure.  Jour of Exp Sc & Env Epi 21; 529-535.

AIHA, *The Occupational Environment-Its Evaluation, Control, & Management*, 2nd edn., 2003.

Alexander BH, Raleigh KK, Johnson J, Mandel JH, Adgate JL, Ramacandran G, Messing RB, Eshenaur T, Williams A. 2012. Radiographic evidence of nonoccupational asbestos exposure from processing Libby vermiculite in Minneapolis, Minnesota. Env Health Pers 120(1): 44-49.

Amandus HE, Wheeler PE, Jankovic J, Tucker J. 1987. The morbidity and mortality of vermiculite miners and millers exposed to tremolite-actinolite: Part I.  Exposure estimates.  Am J of Ind Med; 11: 1-14.

Amandus HE, Wheeler R. 1987. The morbidity and mortality of vermiculite miners and millers exposed to tremolite-actinolite: Part II. Mortality.  Am J of Ind Med; 1: 15-26.

American Conference of Governmental Industrial Hygienists (ACGIH). Transactions of the Fifth  Annual Meeting of the National Conference of Governmental Industrial Hygienists.
Cincinnati  (1942).

American Conference of Governmental Industrial Hygienists (ACGIH). *Proceedings of the Eighth Annual Meeting of the American Conference of Governmental Industrial Hygienists*. Report of the Sub Committee on Threshold Limits (1946).

American Conference of Governmental Industrial Hygienists (ACGIH, 1963). *Transactions of the 25th Annual Meeting of the American Conference of Governmental Industrial Hygienists*.  Cincinnati, Ohio. (May 6-10, 1963).

American Conference of Governmental Industrial Hygienists (ACGIH) 2001. Asbestos: TLV® Chemical Substances 7th Edition Documentation. Retrieved online June 24, 2013 from: http://www.acgih.org/store/ProductDetail.cfm?id=739.

American Conference of Governmental Industrial Hygienists (ACGIH) Health Consultation. Agency for Toxic Substances and Disease Registry, Division of Health Assessment and Consultation (May 22, 2000).

American Conference of Governmental Industrial Hygienists (ACGIH). *Documentation of the Threshold Limit Values and Biological Exposure Indices*. American Conference of Governmental Industrial Hygienists (2001).

American Conference of Governmental Industrial Hygienists (ACGIH). *American Board of Industrial Hygiene Code of Ethics.* American Board of Industrial Hygiene (May 2007). Retrieved from https://www.aiha.org/about-aiha/governance/Pages/Code-of-Ethics.aspx

American Thoracic Society (ATS) (2003). Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos. 2003. American Journal of Respiratory and Critical Care Medicine. 170 (60) pg. 705. https://doi.org/10.1164/rccm.200310-1436ST

Agency for Toxic Substances and Disease Registry (ATSDR). Disease Registry, Health consultation on export plant and screening plant for Libby Asbestos Site. Atlanta, GA: US Department of Health and Human Services. EPA Facility ID: MT0009083840 **(**May 22, 2000).

Agency for Toxic Substances and Disease Registry (ATSDR). U.S. Department of Health and Human Services, Chemical-Specific Health Consultation: Tremolite Asbestos and Other Related Types of Asbestos. Prepared by Agency for Toxic Substances and Disease Registry Division of Toxicology Atlanta, Georgia 30333 (September 2001).

Agency for Toxic Substances and Disease Registry (ATSDR 2003a). U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, ATSDR, Public Health Assessment, Libby Asbestos Site Libby, Lincoln County, Montana, EPA  Facility ID: MT0009083840 (May 15, 2003).

Agency for Toxic Substances and Disease Registry (ATSDR). U.S. Department of Health and Human Services, ATSDR. Report on the Expert Panel on Health Effects of Asbestosis and Synthetic Vitreous Fibers: The Influence of Fiber Length. Atlanta, GA: Agency for Toxic Substances and Disease Registry (2003). Retrieved from http://www.atsdr.cdc.gov/HAC/asbestospanel/asbestostoc.html

Asbestos Hazard Emergency Response Act (AHERA). Asbestos Hazardous Response Act. Appendix A to Subpart E-Interim transmission electron microscopy

analytical methods.  USEPA, 40 CFR Part 763. Asbestos-containing materials in schools, final rule and notice (1987).

Antao VC, Larson TC, Horton DK. 2012. Libby vermiculite exposure and risk of developing asbestos-related lung and pleural diseases.  Curr Opin Pulm Med. 18: 161-167.

Bandli, B.R. & Gunter, M.E. *A Review of Scientific Literature Examining the Mining History, Geology, Mineralogy, and Amphibole Asbestos Health Effects of the Rainy Creek Igneous Complex, Libby, Montana, USA.*  Literature Review of Libby Mineralogy and Geology (2006).

Barbieri, PG, Mirabelli, D, Somigliana, A, Covene, D, Merler, E 2011.  Asbestos Fiber Burden in the Lungs of Patients with Mesothelioma Who Lived Near Asbestos Cement Factories 2012.  Ann Occup Hyg 56(6): 660-670.

Barrett, G.J. & Donovan, D.F. *Progress in Mine Safety.*  Oliver Iron Mining Company. Mining Congress Journal (1940).

Basset, W.A., *The Origin of the Vermiculite Deposit at Libby, Montana.* American Mineral (1959).  Bjorge, G.N. *Safety Program at Homestake.* Mining Congress Journal (August 1952).

Bianchi C, Bianchi T, Tommasi M. Long latency periods in asbestos-rated mesothelioma of the pleura.  Eur J Oncol. 2007: 12(3):189-195.

Bloomfield, J.J., *Studies of Health Hazards in Industry.* Industrial Hygiene Newsletter (1952).

Boettcher, A.L., *The Rainy Creek Alkaline-Ultramafic Igneous Complex Near Libby, Montana. I:  Ultramafic Rocks and Fenite.* The Journal of Geology. Vol 75, No 5 (September 1967).

Brandt, A.D., Engineering Control of Air Contamination of the Working Environment (1943).

Brandt, A.D., Industrial Health Engineering (1947).

Bristol, L.D.,  *First Aid and Its Relation to Accident Prevents*, Industrial Medicine, Vo. 4, No. 5, 1935.  Pp. 261-262.

139

Brown, V., Discussion. *In The Pneumoconiosis,* edited by A. Vorwald, p. 569. Paul B Haeber, New York (1950).


Carbone M, Ly BH, Dodson RF, et al. Malignant Mesothelioma: Facts, Myths and Hypotheses. Journal of cellular physiology. 2012;227(1):44-58. doi:10.1002/jcp.22724.

Carbone M, Yang H. Targeting Mechanisms of Asbestos and Erionite Carcinogenesis in Mesothelioma. Clinical Cancer Research. 2012;18(3):598-604. doi:10.1158/1078

Carbone, M., S. Kanodia, A. Chao, A. Miller, A. Wali, D. Weissman, A. Adjei, F. Baumann, P. Boffetta, B. Buck, M. de Perrot, A.U. Dogan, S. Gavett, A. Gualtieri, R. Hassan, M. Hesdorffer, F.R. Hirsch, D. Larson, W. Mao, S. Masten, H.I. Pass, J. Peto, E. Pira, I. Steele, A. Tsao, G.A. Woodard, H. Yang, and S. Malik, Consensus Report of the 2015 Weinman International Conference on Mesothelioma. J Thorac Oncol, 2016. 11(8): p. 1246-62.

Case B. 2006. Mesothelioma update for Libby, Montana: Occupational and non-occupational. Lung Cancer 54 (S1) S10.


Centers for Disease Control and Prevention (CDC). NIOSH Pocket Guide to Chemical Hazards. Asbestos (2010). Retrieved from http://www.cdc.gov/niosh/npg/npgd0041.html


Castranova, V. & Vallyathan, V. *Silicosis and coal workers pneumoconiosis.* Environmental Health Perspect. 108 (2000).


CDM Smith (CDM,2009). Former *Export Plant Site Final Remedial Investigation Report, Operable Unit 1, Libby Asbestos Site, Libby, MT* (2009).


Clarke KA, Flynn JJ, Goodman JE, Zu K, Karmaus WJJ, Mohr LC. 2014. Pleural plaques and their effect on lung function in Libby vermiculite miners. Chest. 146: 786-794.

Clarke KA, Flynn JJ, Karmaus WJJ, Mohr LC. 2017. The effects of pleural plaques on longitudinal lung function in vermiculite miners of Libby, Montana. Am J Med Sci. 353(6):533-542.



Colorado Department of Public Health and Environmental, Hazardous Materials and Waste Management Division. Retrieved from http://www.cdphe.state.co.us/hm/asbestos/111021riskppt.pdf


Cook, W.A., *Maximum Allowable Concentrations of Industrial Atmospheric Contaminants.* Industrial Medicine. 14:926-947 (1945).

Cooke, W.E. Fibrosis *of the Lungs Due to the Inhalation of Asbestos Dust.* The British Medical Journal (July 25, 1924).

Dallavalle, J.M. & Jones, R.R. *Basic Principles of Industrial Sanitation*. American Journal of Public Health. Vol 30 (1940).

Deer, W.A. et al. Rock-*forming Minerals. Vol. 4B, Framework Silicates: silica minerals, feldspathoides and the zeolites*. Geological Society (1963).

Dhers, V. *Asbestos and Pulmonary Asbestosis.* Abstracts Section of Journal of Industrial Hygiene. 13: 49 (1931).

Dodson, R.F., Atkinson, A.L. & Levin J.L. *Asbestos fiber length as related to potential pathogenicity: a critical review.* Amer Jour Ind Med. 44: 291-297 (2003).

Dodson RF, Hammar SP. Asbestos Risk Assessment, Epidemiology, and Health Effects. CRC Press, Taylor and Francis Group. 2011. ISBN: 978-1-4398-0968-6.

Doll, R. *Mortality from Lung Cancer in Asbestos Workers*. Brit. J. Indust. Med. 12: 81-86 (1955).

Donaldson, K., Murphy, F. A., *Duffin*, R., and Poland, C. A. (2010). Asbestos, carbon nanotubes and the pleural mesothelium: A review of the hypothesis regarding the role of long fibre retention in the parietal pleura, inflammation and mesothelioma. Part. Fibre Toxicol.

Donnelly, J. *Pulmonary Asbestosis*. American Journal of Public Health. 23: 1275-1281 (1933). Donnelly, J. *Pulmonary Asbestosis: Incidence and Prognosis.* Journal of Industrial Hygiene and Toxicology. 18: 222-228 (1936).

Dressen, W.C. et al. Study *of Asbestosis In The Asbestos Textile Industry.* U.S. Treasury Department Public Health Service. Public Health Bulletin. No 241 (August 1938).

Drinker, P. *Protecting the Worker Against Dust Inhalation*. National Safety News (1933). Drinker, P. & Hatch, T. Industrial Dust, Hygienic Significance, Measurement and Control (1936). Drinker, P. & Hatch, T. Industrial Dust Hygienic Significance, Measurement, and Control. Second Edition (1954).

Drinker, P. & Hatch, T., *Industrial Dust,* McGraw-Hill, 1936

Duncan, K.E. et al. *Effect of Size-Fractionation on the Toxicity of Amosite and Libby Amphibole Asbestos.* Toxicology Sciences (2010).

Dunning KK, Adjei S, Levin L, Rohs A, Hilbert T, Borton E, Kapil V, Rice C, LeMasters GK, Lockey JE.  2012.  Mesothelioma associated with commercial use of vermiculite containing Libby amphibole.  JOEM.  54(11): 1359-1363.

Eaton, F.W., *Kujawa*, R.J. & Kostic, W.R. *Insitu and Environmental Dust Controls for Vermiculite Mining And Expanding Operations.* W.R. Grace Inc (1969).

Ellman, P. *Pulmonary Asbestosis: Its Clinical, Radiological, and Pathological Features, and Associated Risk of Tuberculous Infection.*  The Journal of Industrial Hygiene. Vol XV, No  4 (1933).

Ellman, P. *Pneumoconiosis.* 14 Brit. J. Radiol (1934).

Gardner, L. *Studies On Experimental Pneumonoconiosis. VI. Inhalation of Asbestos Dust: Its Effect Upon Primary Tuberculous Infection.* Journal of Industrial Hygiene. 13: 7-114  (1931).

Gerbils & Ucko. *Asbestosis of the Lung.* Bulletin of Hygiene. 7: 341-342 (1932). Goldfield, J. *Air Handling and Dust Control in John-Manville's New Asbestos Mill.* Mining Engineering (1955).

Gunter, M.E. et al. *Optical, Compositional, Morphological, and X-Ray Data on Eleven Particles of Amphibole from Libby, Montana, U.S.A.* Can Mineral (2003).

Harrington, D. & *Davenport*, S.J. Review of the Literature on Effects of Breathing Dusts with  Special Reference to Silicosis. U.S. Bureau of Mines. Bulletin 400 (1937).

Hart, J.F. et al. *Evaluation of asbestos exposures during firewood harvesting simulations in Libby, Montana – Preliminary Data.*  Ann. Occup. Hyg. Vol 51, No  8 (November 2007).

Hart, J.F. et al. *An evaluation of potential exposure to asbestiform amphiboles near a former vermiculite mine.* Journal Environmental Public Health (2009).

Hatfield, R.L., & Longo, W.E., Summaries of Studies from MAS; Re: Contamination of Clothing  from  Asbestos  Products  and  Secondary  Asbestos  Exposure  from Clothing. Materials Analytical Services (MAS), Inc., Unpublished Study (1999).

142

Helsinki criteria, 2014. International Conference on Monitoring and Surveillance of Asbestos Related Diseases 11-13 February 2014, Finland. Finnish Institute of Occupational Health.

Henley SJ, Larson TC, Wu M, Antao VC, Lewis M, Pinheiro GA, Eheman C. Mesothelioma incidence in 50 states and the District of Columbia, United States, 2003-2008. Int J Occup Environ Health. 2013 Jan-Mar;19(1):1-10. doi: 10.1179/2049396712Y.0000000016. PMID: 23582609; PMCID: PMC4406225.

Higgins, E. et al. *Silicosis Dust in Relation to Pulmonary Disease Among Minder in the Joplin District Missouri.* Department of Interior, Bureau of Mines, Bulletin 132 (1917).

Hoffman, F.L. *Mortality from Respiratory Diseases in Dusty Trades (Inorganic Dusts).* Bulletin of the United States Bureau of Labor Statistics. Industrial Accidents and Hygiene Serious. No 17 (1918).

Huang SXL, Jaurand M-C, Kamp DW, Whysner J, Hei TK. 2011. Role of mutagenicity in asbestos fiber-induced carcinogenicity and other diseases. J. Toxicol. Environ. Health. 14; 179-245.

International Labour Office *(ILO). Model Code of Safety Regulations For Industrial Establishments for The Guidance Of Governments And Industry* (1949).

International Standars Organization (ISO). *Ambient Air - Determination of asbestos fibres – Direct transfer transmission electron microscopy method.* ISO 10312 (April 27, 1995). Retrieved from https://www.iso.org/obp/ui/#iso:std:iso:10312:ed-1:v1:en

Iwatsubo, Y., Pairon, J.C., Boutin, C., Menard, O., Massin, N., Caillaud, D., Orlowski, E., Gatlateau-Salle, F., Bignon, J., Brochard, P. 1998. Pleural Mesothelioma: Dose-Response Relation at Low Levels of Asbestos Exposure in a French Population-based Case-Control Study. American Journal of Epidemiology. 148. No.2.

Jaenicke, R. et al. *n-Alkane studies in the troposphere-1. Gas and particulate concentrations in north Atlantic air.* Atmospheric Environment. Vol 13, Issue 5 (1979).

Jaenicke, R. & Haaf, W. *Results of improved size distribution measurements in the Aitken range of atmospheric aerosols.* Journal of Aerosol Science. Vol 11, Issue 3 (1980).

Johns, W. 1959. *Progress* Report on Geologic Investigations in the Kootenai-Flathead Area, Northwest Montana. Bulletin 12. State of Montana Bureau of Mines and Geology.

Jones, W.E. *Personnel, Safety, and Public Relations.* Climax Molybdenum Co. Mining Congress Journal (1949).

Jones, W.E. & Eisenach, E.J. *Safety, Ventilation, and Industrial Hygiene.* Climax Mining Company. Mining and Metallurgy (1946).
Journal of the American Medical Association (JAMA). Vol 94, No 26 (May 31, 1930). Journal of the American Medical Association (JAMA). Vol 140, No 15, 1219-1220 (1949). Kane, A.B. *Fiber dimensions and mesothelioma: a reappraisal of the Stanton Hypothesis.*
Mechanisms in Fibre Carcinogenesis. NATO ASI Series. 223: 131-141 (1992).

Klassen CD. 2013. Casarett & Doull's Toxicology, the Basic Science of Poisons. 8th Edition. ISBN: 9780071769235.

Konen, T., Johnson, E., Lindgren P., Williams A., *Cancer Incidence and mortality associated with non-occupational and low dose exposure to Libby Vermiculite in Minnesota*, Environmental Research, Volume 175, August 2019, Pages 449-456.

Lacourt, A., Gramond,C., Rolland, P., Ducamp, S. 3,Audignon, S., Astoul, P. Chamming's, S., Gilg Soit Ilg, A.,   Rinaldo, M., Raherison, C., Galateau-Salle, F.,  Imbernon, E., Pairon, J.C., Goldberg, M., Brochard, P.  2014. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma.  Thorax Online First, published on February 7, 2014, as 10.1136/thoraxjnl-2013-203744.

Langer, A.M. et al. *Distinguishing Between Amphibole Asbestos Fibers and Elongate Cleavage Fragments of Their Non-Asbestos Analogues.* Mechanisms in Fibre Carcinogenesis (1991).

Lanza, A.J. *Asbestosis.* JAMA (February 1936).

Lanza, A.J. et al. *Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers.*
U.S. Public Health Report. 50: 1-12 (1935).

Larsen, E.S. *Alkalic rocks of Iron Hill, Gunnison County, Colorado. U.S. Geological Survey Professional Paper 197A.* Washington D.C., U.S. Geological Survey (1942).

Larson TC, Antao VC, Bove FJ. 2010. Vermiculite worker mortality: estimated effects of occupational exposure to Libby amphibole. J Occup Environ Med. 52(5): 555-560.

144

Larson TC, Williamson L, Antao VC. Follow-Up of the Libby, Montana Screening Cohort: A 17-Year Mortality Study. J Occup Environ Med. 2020 Jan;62(1):e1-e6. doi: 10.1097/JOM.0000000000001760. PMID: 31714372; PMCID: PMC8157313.

Leake, B.E. et al. *Nomenclature of Amphiboles: Report of the Subcommittee on Amphiboles of the International Mineralogical Association, Commission on New Minerals and Mineral Names.* The Canadian Mineralogist. Vol 35 (1997).

Leigh J, Davidson P, Hendrie L, Berry D. 2002. Malignant mesothelioma in Australia, 1945–2000. Am J Ind Med 41:188–201.

Lin, R-T, Takahashi, K, Karjalainen, A et al. Ecological association between asbestos related diseases and historical asbestos consumption: an international analysis. Lancet. 2007; 369: 844–849.

Liu G, Cheresh P, Kamp DW. 2013. Molecular Basis of Asbestos-Induced Lung Disease. Annul. Rev Pathol. 8: 161-187.

Lockey JE, Jarabek, A, Carson A, McKay R, Harber P, Khoury P, Morrison J, Wiot J, Spitz H, Brooks S. 1983.  Health issues related to metal and non-metallic mining. Pulmonary Hazards from Vermiculite Exposure.  Boston: Butterworth. 303-315.

Lockey JE, Brooks SM, Jarabek M, Khoury PR, McKay RT, Garson A, Morrison JA, Wiot JF, Spitz HB. 1984. Pulmonary changes after exposure to vermiculite contaminated with fibrous tremolite.  Am Rev Respir Dis. 129(6): 952-958.

Lockey JE, Dunning K, Hilbert TJ (2015a).  HRCT/CT and associated spirometric effects in low Libby amphibole asbestos exposure.  J Occup Environ Med.  57: 6-13.

Lockey JE, Dunning K, Hilbert TJ (2015b).  Response to comment on "HRCT/CT and associated spirometric effects in low Libby amphibole asbestos exposure".  J Occup Environ Med.  57: 6-13.

Lockey, JE, Dunning, K, Hilbert, TJ, Borton, E, Levin, L, Rice, CH, McKay, RT, Shipley, R, Meyer, CA, Perme, C, LeMasters GK (2017) Comment on "pleural plaques and lung function in the Marysville worker cohort: a re-analysis" by Zu et al. (2016), Inhalation Toxicology, 29:2, 43-45, DOI: 10.1080/08958378.2017.1292332

Lynch, K.M. & Smith, W.A. *Asbestosis Bodies in Sputum and Lung.*  Asbestosis. Vol 95, No 9  (1935).

Markowitz (2015) *Asbestos-Related Lung Cancer and Malignant Mesothelioma of the Pleura: Selected Current Issues,* Semin. Respir. Care Med. 36:334-346 DOI: 10.1055/s-0035-1549449.

Mazurek, J.M., Syamlal, G, Wood, J.M., Hendricks, S.A. Weston, A. (2017). Malignant Mesothelioma Mortality – United States, 1999-2015.  Morbidity and Mortality

Weekly Report.  US Department of Health and Human Services/Centers for Disease Control and Prevention.  66 (8). 214-218.

Mazurek JM, Blackley DJ, Weissman DN. Malignant Mesothelioma Mortality in Women — United States, 1999–2020. MMWR Morb Mortal Wkly Rep 2022;71:645–649. DOI: http://dx.doi.org/10.15585/mmwr.mm7119a1external icon

McDonald JC, McDonald AD, Armstrong B, Sebastien P. 1986. Cohort study of mortality of vermiculite miners exposed to tremolite.  Brit J Ind Med. 43: 436-444.

McDonald JC, Harris J, Armstrong B. 2004. Mortality in a cohort of vermiculite miners exposed to fibrous amphibole in Libby, Montana. Occup Environ Med. 2004 61:363-366.

McKean, D. Toxicity and Risk Assessment, U.S. Environmental Protection Agency (EPA), EPA, Region 8 (2011).

Meeker, G.P. et al. *The Composition and Morphology of Amphiboles from the Rainy Creek Complex, Near Libby, Montana.* American Mineralogist. Vol 88 (2003).

Merewether, E.R.A. *The Occurrence Of Pulmonary Fibrosis And Other Pulmonary Affections In Asbestos Workers*. Journal of Industrial Hygiene. Vol 12, No 6 (1930).

Merewether, E.R.A. & Price, C.W. *Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry.* Processes giving Rise to Dust and Methods for its Suppression (1930).

Merewether, E.R.A. *A Memorandum on Asbestosis.* Tuberlce (November 1933).

Miller, A. et al., *Case-fatality study of workers and residents with radiographic asbestos disease in Libby, Montana*, Am. J. Ind. Med., 2021;1-7.

Millette, et al., *Analysis of Vermiculite for Asbestos and Screening for Vermiculite from Libby, Montana*, The Microscope, Vol. 63:2, pp. 59-75 (2015).

*Mineral Dust in Factories*.  Engineering. Vol 129, pp 577-578 (May 2, 1930).

Minimum Requirements for Safety and Industrial Health in Contract Shipyards. Washington, DC, Government Printing Office (1943).

*Modern Change Houses for the Mining Industry.* Mining Congress Journal (November 1954).

146

Mossman BT, Lippmann M, Hesterber TW, Kelsey KT, Barchowsky A, Bonner JC. 2011. Pulmonary endpoints (lung carcinomas and asbestosis0 following inhalation exposure to asbestos.  Toxicol. Environ Health B Crit Rev. 14: 76-121.

Moolgavkar SH, Turm J, Alexander DD, Lau EC, Cushing CA. 2010. Potency factors for risk assessment at Libby, Montana. Risk Analysis. 30(8): 1240-1248.

Naik SL, Lewin M, Young R, Dearwent SM, Lee R.  2017.  Mortality from asbestos-associated disease in Libby, Montana 1979-2011.  Jour Exposure Science and Epi.  27: 207-213.

National Institute for Occupational Safety and Health (NIOSH), *The Industrial Environment-Its Evaluation & Control,* NIOSH, 1973.

National Institute for Occupational Safety and Health (NIOSH).   *Occupational Diseases, A guide to Their Recognition,* NIOSH, 1977.

National Institute for Occupational Safety and Health. Workplace Exposure to Asbestos: Review and Recommendations: NIOSH/OSHA Asbestos Work Group Recommendations. Department of Health and Human Services, 1980: 81-103.

National Institute for Occupational Safety and Health (NIOSH). NIOSH manual of analytical methods, 4th ed. Cincinnati, Ohio: U.S. Department of Health and Human Services, CDC, National Institute for Occupational Safety and Health (1994).

National Institute for Occupational Safety and Health (NIOSH). *Asbestos and Other Fibers by PCM. Method* 7400. NIOSH Manual of Analytical Methods, Fourth Edition. Issue 2 (August 15, 1994).

National Institute for Occupational Safety and Health (NIOSH) Division of Respiratory Disease Studies. 2008. Work-Related Lung Disease Surveillance Report 2007. page 181: Malignant mesothelioma: Counties with highest age-adjusted death rates (per million population), U.S. residents age 15 and over, 2000–2004.  DHHS/ CDC/ NIOSH.

Newhouse, M.L. & Thompson, H.  *Epidemiology of Mesothelial Tumors in the London Area.*  Annals New York Academy of Sciences (1965).

Newhouse, et al*., Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area.*  Br. J. Ind. Med. 22 (4):261-269 (1965).

Nolan, R.P. et al. *Association of Tremolite Habit with Biological Potential: Preliminary Report.* Mechanisms in Fibre Carcinogenisis (1991).

Noonan CW, Pfau JC, Larson TC, Spence MR. 2006. Nestled case-control study of autoimmune disease in an asbestos – exposed population. Envir Health Pers. 114(8): 1243-1247.

Occupational Safety and Health Administration (OSHA), US Department of Health and Human Services (DHHS), National Institute for Occupational Safety and Health (NIOSH) Publication No 77-169, (December 1976).

Occupational Safety and Health Administration (OSHA). *Detailed procedure for asbestos sampling and analysis – Non-Mandatory.* Occupational Safety and Health Standards. (August 10, 1994). Retrieved from https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARD S&p_ id=9997

Offermans, N.S.M., Vermeulen, R., Burdorf, A., Goldbohm, R.A., Kauppinen, T., Kromhout, H., &. van den   Brandt, P.A. 2013. Occupational Asbestos Exposure and Risk of Pleural Mesothelioma, Lung Cancer, and    Laryngeal Cancer in the Prospective Netherlands Cohort Study. Journal of Occupational and Environmental Medicine. Vol 56. No. 1. DOI: 10.1097/JOM.0000000000000060.

Oliver, S.T. *Pulmonary Asbestosis in its Clinical Aspects.* The Journal of Industrial Hygiene (1927).

Orr, H., Noble, W., Whitmarsh D., Smith, D., Rice, L.,, Affidavits in *Orr v. State of Montana*, Cause No. B/DV-2001-423 (2002)

*Orr v. State of Montana*, 2004 MT 354, ¶ 4, 324 Mont. 391, 106 P.3d 100

Palomaki, J. et al. *Long, Needle-like Carbon Nanotubes and Asbestos Activate the NLRP3 Inflammasome through a Similar Mechanism*. American Chemical Society (July 2011).

Pardee, J.J. and Larsen, Deposits of vermiculite and other minerals in the Rainy Creek district near Libby, Montana: U.S. Geol. Surv. Bull. 805-B 13 p (1929). Peipins, L.A. et al. *Radiographic Abnormalities and Exposure to Asbestos-Contaminated Vermiculite in the Community of Libby, Montana, USA.* Environmental Medicine Perspectives. Vol 111, No 14 (November 2003).

G. Peters, et al., *Sourcebook or. Asbestos Diseases,* Garland Press, 1980.

Peipins LA, Lewin M, Campolucci S, Lybarger JA, Miller A, Middleton D, Weis C, Spence M, Black B, Kapil V. 2003. Radiographic abnormalities and exposure to asbestos-contaminated vermiculite in the community of Libby, Montana, USA. Environ Health Perspect; 111(14):1753-1759.

148

Rodelsperger, K., Jockel, K.H., Pohlabein, H., Romer, W., Woitowitz, H.J. 2001. Asbestos and Man-Made Vitreous Fibers as Risk Factors for Diffuse Malignant Mesothelioma: Results From a German Hospital-Based Case-Control Study. American Journal of Industrial Medicine. 39:262-275

Rohs, AM, Lockey JE, Dunning KK, Shukla R, Fan H, Hilbert T, Borton E, Wiot J, Meyer C, Shipley RT, LeMasters GK, Kapil V. 2007. Low-level fiber-induced radiographic changes caused by Libby vermiculite. 177: 630-637.

Rolland, P., Ducamp,S., Gramond, C., Galateau-Salle, F., Pairon, J.C., Astoul, P., Chamming, S., Gilg Soit Ilg, A., Imbernon, E., Goldberg, M., Brochard, P. 2006. Risk of pleural mesothelioma: A French population-based case-control study (1998-2002) Oral Session 1.


Sawyer, R.N. *Asbestos exposure in a Yale building: Analysis and resolution.* Environmental Research. Vol 13, Issue 1 (February 1977).

Sayers, R.R. *Coal Dust.* Mining and Metallurgy (1943).

Scheye, K.G., Facility Audit Draft Report, Zonolite – Libby, Construction Products Division, Industrial Chemical Group (June 1981).

Sebbag G., Sugarbaker PH. Peritoneal mesothelioma proposal for a staging system. Eur J Surg Oncol. 2001; 27(3): 223-224.

Selikoff, I., Churg, J. & Hammond, E.C. *Asbestos Exposure and Neoplasia.* JAMA. Vol 188, No 1 (April 6, 1964).

Shannahan JH, Ghio AJ, Schladweiler MC, McGee JK, Richards JH, Gavett SH, Kodavanti UP. 2011. The role of iron in Libby amphibole-induced acute lung injury and inflammation. Inhal Toxic. 23(6):313-323.

Skammeritz, E., Omland, L.H., Johansen, J.P., Omland, O. 2011. Asbestos Exposure and Survival in Malignant Mesothelioma: A Description of 122 Consecutive Cases at an Occupational Clinic. Journal of Occupational and Environmental Medicine. Vol 2, No. 4.

Sluis-Cremer, G.K., Hnizdo, E. & Du Toit, R.S.J. *Evidence for an Amphibole Asbestos Threshold Exposure for Asbestosis Assessed by Autopsy in South African Asbestos Miners.* British Occupational Hygiene Society (1990).

Spear, T. et al. *The Presence of Asbestos-Contaminated Vermiculite Attic Insulation and/or Other Asbestos Containing Materials in Homes and the Potential for Living Space Contamination.* Advancement of the Science. Vol 75, No 3 (October 2012).

149

Spirtas R, Heineman EF, Bernstein L, et al. Malignant mesothelioma: attributable risk of asbestos exposure. Occup Environ Med 1994;51:804–11. https://doi.org/10.1136/oem.51.12.804

Stanton, M.F. et al. *Relation of Particle Dimension to Carcinogenicity in Amphibole Asbestoses and Other Fibrous Minerals.* JNCI Journal National CancerInstitute. Vol 67, Issue 5 (1981).

State of Montana. *Montana: An Environment Opportunity. The Montana Business Climate Affecting Vermiculite Mining and Processing and Information on the W.R. Grace Mine Near Libby.*

Stayner, L. et al. *An epidemiological study of the role of chrysotile asbestos fibre dimensions in determining respiratory disease risk in exposed workers.* Occupational & Environmental Medicine (2008).

Striegel, B., *No Plant Is Too Small for Employee Health Education.* Industrial Hygiene Newsletter (August 1952).

Sullivan P.A. *Vermiculite, Respiratory Disease, and Asbestos Exposure in Libby, Montana: Update of a Cohort Mortality Study.* Environ Health Perspect. 115:579–585 (2007).

Suzuki, Yasunosuke. *Erratum to Short, thin asbestos fibers contribute to the development of human malignant mesothelioma: Pathological evidence.* Int. J. Environ. Health 208; 439- 444 (2005).

Teleky, L., *History of Factory and Mine Hygiene.* Columbia University Press. New York: Monringside Heights (1948).

Thompson, W.G., *The Occupational Diseases; their Causation, Symptoms, Treatment and Prevention* (1914).

Tolman, W.H. & Kendall, L.B. Safety Methods for Preventing Occupational and Other Accidents and Disease (1913).

United States Environmental Protection Agency (EPA 1977).  Movement of selected metals, asbestos, and cyanide in soil: Applications to waste disposal problems, U.S. Environmental Protection Agency (1977).

United States Environmental Protection Agency (EPA 1978b). Sprayed Asbestos Containing Materials in Buildings, A Guidance Document, U.S. Environmental Protection Agency (March 1978b).

United States Environmental Protection Agency (EPA 1979c).  Water-related environmental fate of 129 priority pollutants. Vol 1. Introduction and technical

background, metals and inorganics, pesticides, and PCBs., U.S. Environmental Protection Agency (1979).

United States Environmental Protection Agency (EPA 2001).   *Action Memorandum Amendment to M. Shapiro from J.W. McGraw: Request for headquarters approval of a ceiling increase beyond $6 million and a modification of the proposed scope of response for the Time-Critical Removal Action at the Libby Asbestos Site.* EPA Region 8, Denver (August 2001).

United States Environmental Protection Agency (EPA 2001b).   Fibrous Amphibole Contamination in Soil and Dust at Multiple Locations in Libby Poses an Imminent and Substantial Endangerment to Public Health, Endangerment Memorandum, Christopher Weiss, Science Support Coordinator (July 9, 2001).

United States Environmental Protection Agency (EPA 2003a).   U.S. Environmental Protection Agency, Final Draft, Pilot Study to Estimate Asbestos Exposure from Vermiculite Attic Insulation, Research Conducted in 2001-2002. Prepared for: Fibers and Organic Branch, National Program Chemical Division, Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency. Prepared by Versar Inc (May 21, 2003).

United States Environmental Protection Agency (EPA 2003b).   Initial Pollution Report, Libby Asbestos, BNSF Cleanup OU6 (September 29,2003).

United States Environmental Protection Agency (EPA 2003c).   U.S. Environmental Protection Agency, Libby Asbestos Site Residential/Commercial Cleanup Action Level and Clearance Criteria, Technical Memorandum Draft Final (December 15, 2003).

United States Environmental Protection Agency (EPA 2004b).   U.S. Environmental Protection Agency. Study of Asbestos Contamination of Former Vermiculite Northwest / W.R. Grace Vermiculite Exfoliation Facility, Jed Januch and Keven McDermott (March 2004).

United States Environmental Protection Agency (EPA 2007a).   U.S. Environmental Protection Agency, Summary Report for Data Collected Under the Supplemental Remedial Investigation Quality Assurance Project Plan (SQAPP) for Libby, Montana (October 23, 2007).

United States Environmental Protection Agency (EPA 2007b).   U.S. Environmental Protection Agency, Technical Memo 9.   Evaluation of Sources of Libby Amphibole in Indoor Dust in Libby, Montana.   Report prepared for USEPA Region 8 by Syracuse Research Corporation (October 2007).

United States Environmental Protection Agency (EPA 2008b).   U.S. Environmental Protection Agency, Problem Formulation for Ecological Risk Assessment at Operable Unit 3 Libby Asbestos Superfund Site (July 2, 2008).

United States Environmental Protection Agency (EPA 2008c).  *Asbestos levels in tree bark,* Project number 0100-008-900 (2008).

United States Environmental Protection Agency (EPA 2009).   Action Memorandum Amendment Request: Approval of a Ceiling Increase for the Time-Critical Removal Action at the Libby Asbestos Site - Libby, Lincoln County, Montana, Carol Rushin, Regional Administrator (June 17, 2009).

United States Environmental Protection Agency (EPA 2011b). Libby Asbestos Superfund Site Operable Unit 3 Initial Screening Level Human Health Risk Assessment for Exposure to Asbestos, Prepared by U.S. Environmental Protection Agency Region 8 Denver, CO (January 23, 2011).

United States Environmental Protection Agency (EPA 2012).   Action Memorandum and Amendment Requesting Approval to Address Amphibole Asbestos Contamination for the Time-Critical Removal Action at the Libby Asbestos Site, Prepared by U.S. Environmental Protection Agency Region 8 Denver, CO (March 14, 2012).

United States Environmental Protection Agency (EPA 2013). Data Summary Report: Nature and Extent of LA Contamination in the Forest, Prepared by CDM Smith for U.S. Environmental Protection Agency Region 8 Denver, CO (August 2013).

United States Environmental Protection Agency (EPA 2013a). Data Summary Report: Wood- burning Stove Ash Removal Activity-Based Sampling Libby Asbestos Superfund Site, Operable Unit 4 Libby, Montana**.** Contract No. EP-W-05-049 (August 2013).

United States Environmental Protection Agency (EPA) 2014. Toxicological Review of Libby Amphibole Asbestos: In Support of Summary Information on the Integrated Risk Information System (IRIS).  EPA 636-R-11-002F.

United States Environmental Protection Agency (EPA) 2015.  Site-Wide Human Health Risk Assessment, Libby Asbestos Superfund Site, Libby, Montana.  Prepared by CDM Smith of the U.S. Environmental Protection Agency. 1562963.

United States Environmental Protection Agency (EPA) 2018.  Superfund Site: Libby Asbestos Site, Libby, MT,  https://cumulis.epa.gov/supercpad/SiteProfiles/index .cfm?fuseaction=second.cleanup&id=0801744.

United States Department of Labor, *Safety and Health Standards For Contractors performing Federal Supply Contracts under the Walshy-Healy Public Contracts Act* (1952).

Vorwald, A.J., Durkan, T.M. & Pratt, P.C. *Experimental Studies of Asbestosis.* AMA Archives of Industrial Hygiene and Occupational Medicine. Vol 3, No 1 (January 1951).

Welch LS. Asbestos exposure causes mesothelioma, but not this asbestos exposure: an amicus brief to the Michigan Supreme Court. Int J Occup Environ Health. 2007 Jul-Sep;13(3):318-27.

W.R. Grace Company. Study to Determine Relationship Between Years of Employment, Age, Smoking Habits and Chest X-Ray Findings, Zonolite/Libby Employees (1969).

W.R. Grace Company. Unpublished data: air sampling record sheets (December 1976, June/July 1982).

Wagner, J.C., Sleggs, C.A. & Marchand, P. *Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province.* British Journal of Industrial Medicine (1960).

Ward, T.J. et al. *Trees as reservoirs for amphibole fibers in Libby, Montana.* Science of the Total Environment (2006).

Ward, T. J. et al. *Fate of Libby amphibole fibers when burning contaminated firewood.* Environmental Science & Technology (2009).

Ward, T.J. et al. *Amphibole Asbestos in Tree Bark-A Review of Findings for This Inhalational Exposure Source in Libby, Montana.* Journal of Occupational and Environmental Hygiene (2012).

Weis, C.P. *Amphibole Mineral Fibers in Source Materials in Residential and Commercial Areas of Libby Poses an Imminent and Substantial Endangerment to Public Health.*
*Memorandum from Christopher P. Weis, US EPA Senior Toxicologist/Science Support Coordinator, Libby Asbestos Site, to Paul Peronard, US EPA On-Scene Coordinator for the Libby Asbestos Site. Denver, CO: US Environmental Protection Agency, Region*
*VIII.* US Environmental Protection Agency, Memorandum (2001).

Whitehouse AC. 2004. Asbestos-related pleural disease due to tremolite associated with progressive loss of lung function: Serial observation in 123 miners, family members, and residents of Libby, Montana. Am J Ind Med 46 (3): 219-225.

Whitehouse AC, Black CB, Heppe MS, Ruckdeschel J, Leven SM. 2008. Environmental Exposure to Libby Asbestos and Mesotheliomas, American Journal of Industrial Medicine, D01 10.1002/ajim.20620.

Wood, E.S., Grace Memo from E.S. Wood to C.E. Brookes and C.N. Graf regarding the tremolite hazard found in Libby Vermiculite, Plaintiffs Exhibit # 183.12 in the W.R. Grace trials (May 24, 1977).

Wyers, H. *Asbestosis.* Postgraduate Medical Journal (December 1949).

Wyle, A.G. & Verkouteren, J.R. *Amphibole Asbestos from Libby, Montana: Aspects of Nomenclature* (2000).

Yang H, Bocchetta M, Kroczynska B, Elmishad AG, Chen Y, Liu Z, Bubici C, Mossman BT, Pass HI, Testa JR, Franzoso G, Carbone M. TNF-alpha inhibits asbestos-induced cytotoxicity via a NFkappaB-dependent pathway, a possible mechanism for asbestos-induced oncogenesis. Proc Natl Acad Sci U S A. 2006; 103(27):10397–10402. [PubMed: 16798876].

Yang H, Rivera Z, Jube S, Nasu M, Bertino P, Goparaju C, et al. Programmed necrosis induced by asbestos in human mesothelial cells causes high-mobility group box 1 protein release and resultant inflammation. Proc Natl Acad Sci U S A. 2010; 107(28):12611–6. PMCID: 2906549. [PubMed:20616036].

Zhaoqiang Jiang, Tianhui Chen, Junqiang Chen, Shibo Ying, Zhibin Gao, Xianglei He, Chao Miao, Min Yu, Lingfang Feng, Hailing Xia, Wei Wu, Riping Chen, Kenji Morinaga, Jianlin Lou and Xing Zhang. 2018. Hand-spinning chrysotile exposure and risk of malignant mesothelioma: A case–control study in Southeastern China. International Journal of Cancer. 142, 514–523. DOI: 10.1002/ijc.31077.

Ke Zu, Ge Tao & Julie E. Goodman (2016) Pleural plaques and lung function in the Marysville worker cohort: a re-analysis, Inhalation Toxicology, 28:11, 514-519, DOI: 10.1080/08958378.2016.1210704.

154