Chad M. Knight
Anthony M. Nicastro
Nadia H. Patrick
KNIGHT NICASTRO MACKAY, LLC
304 W. 10th Street
Kansas City, MO 64105
Email: knight@knightnicastro.com
         nicastro@knightnicastro.com
         npatrick@knightnicastro.com
Telephone: (720) 770-6235
Facsimile: (816) 396-6233
**ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation; and DOES A-Z,<br><br>Defendants. | Case No.:  4:21-cv-00097-BMM<br><br><br>**DEFENDANT BNSF RAILWAY COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT - STRICT LIABILITY** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................3

I.   The Montana Supreme Court's 2020 decision in Barnes was based on improper findings of fact and is not binding on this Court............................................ 3

  a.   BNSF is not collaterally estopped from litigating whether its transportation of vermiculite was abnormally dangerous...........................................................3

    i.   The issues decided by Judge Eddy in Barnes are not identical to the issues presented in this case. ...........................................................4

    ii.  The Barnes case for which the BNSF Ry. Co. decision is based has not reached a final judgment on the merits. ...........................................................6

II.  BNSF's transportation of vermiculite was not an abnormally dangerous activity.......................................................................................... 7

  a.   Any alleged danger of BNSF's transportation of vermiculite was preventable with reasonable care, making strict liability inapplicable. ............11

  b.   Vermiculite was commonly used around the country during BNSF's Libby operations and railcars were commonly used to transport that vermiculite......14

  c.   The fifth factor weighs in favor of BNSF because the Libby railyard was the only practicable location for BNSF to conduct necessary operations to fulfill its duties as a common carrier. .............................................................16

  d.   The sixth factor favors BNSF because vermiculite was, and still is, a useful product in household and commercial industries. .............................................18

III. Even if BNSF's transportation of vermiculite is determined to be an abnormally dangerous activity, BNSF cannot be held strictly liable because at all times it was acting as a common carrier.......................................................... 19

a.   An objective view of the air and soil sampling in and around the Libby railyard shows that Plaintiffs' assertions of a "reservoir of asbestos" is provably incorrect. ...............................................................................................22

IV.   Plaintiffs have no evidence that BNSF engaged in any "other activities" that were not pursuant to its duties as a common carrier.........................................24

a.   The common carrier exception covers all railroad activities carried on in pursuance of a public duty, including railyard activities necessary to provide proper and efficient shipment of materials........................................................25

b.   The common carrier exception covers all railroad activities carried on in pursuance of a public duty, including railyard activities necessary to provide proper and efficient shipment of materials........................................................25

CONCLUSION........................................................................................................26

CERTIFICATE OF COMPLIANCE.......................................................................28

CERTIFICATE OF SERVICE ................................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Alliance General Ins. Co. v. K-Mart Corp.*,
2008 Mont. Dist. LEXIS 140, at *25 .................................................................6

*Amcast Indus. Corp. v. Detrex Corp.*,
779 F. Supp. 1519, 1544 (N.D. Ind. 1991) ..................................9-11, 15-16, 18

*Anderson v. State,*
250 Mont. 18, 817 P.2d 699, 701 (Mont. 1991) ...........................................3, 26

*Baltrusch v. Baltrusch,*
2006 MT 51, ¶¶ 18-23, 331 Mont. 281, 130 P.3d 1267 ......................................6

*Barnes, Braaten, Flores (Cons.) v. BNSF Railway Co., et al.*,
Lincoln County, Cause No. DV-16-111 .................................................1-7, 24-25

*BNSF Ry. Co. v. Asbestos Claims Ct.*,
2020 MT 59, 399 Mont. 180, 459 P.3d 857 ................................................. 25-26

*Chambers v. City of Helena*,
2002 MT 142, ¶ 16, 310 Mont. 241, 49 P.3d 587 ...............................................7

*Christian v. Atl. Richfield Co.,*
2015 MT 255...................................................................................................14

*E S Robbins Corp. v. Eastman Chem. Co.*,
912 Supp. 1476, 1489 (N.D. Ala. 1995) .....................................10-11, 15-16, 18

*Griffin v. Montana Rail Link,*
2000 ML 2438, *8 (D. Mont. 2000) ................................................................26

*Hanford Nuclear Reservation Litig. v. E.I. DuPont de Nemours & Co.,*
534 F.3d 986, 1005-06 (9th Cir. 2008) ....................................................... 19-20

*Ind. H. B. R.R. Co. v. Am. Cyanamid Co.,*
916 F.2d 1174, 1177 (7th Cir. 1990) ........................................................ 8-9, 26

## TABLE OF AUTHORITIES (continued)

*Lamb v. Martin Marietta Energy Sys.,*
    835 F. Supp. 959, 971 (W.D. Ky. July 26, 1993)................................................20

*Scott v. Henrich,*
    283 Mont. 97, 104 (1997) .................................................................................14

*Stevens v. Abbot*,
    220 Mont. 61, 63, 712 P.2d 1347, 1348 (1986) ..................................................6

*Toledo v. Van Waters & Rogers, Inc.*,
    92 F. Supp. 2d 44, 56 (R.I. 2000) .......................................................................9

*Valley View Health Care, Inc. v. Chapman*,
    992 F. Supp. 2d 1016, 1046 (E.D. Cal. 2014) .....................................................4

*Walsh v. Mont. Rail Link,*
    2001 ML 1418, 27 (D. Mont. 2001) .................................................................25

**Statutes**                                            **Page(s)**

Mont. Code Ann. § 69-11-403....................................................................2, 21

49 USCS §11101(a) ..................................................................................2, 21

**Rules**                                                **Page(s)**

29 CFR 1001(j)(1-7) ............................................................................. 11-12

40 CFR Appendix A to Subpart M of Part 61, 1.1 ....................................11

49 CFR §172.102(c)(1)(156) ....................................................................12

**Other**                                              **Page(s)**

Restatement (2d) of Torts §519 ........................................................ 7, 19-21

Restatement (2d) of Torts §520 ....................................... 7, 9-10, 14-15, 19-21

Restatement (2d) of Torts §521 .............................................. 2, 5, 19-21

## INTRODUCTION

Plaintiffs allege that BNSF's shipping of vermiculite through the town of Libby, Montana, and BNSF's ancillary activities related to its shipping of vermiculite caused Joyce Walder and Thomas Wells to develop mesothelioma. In support of these allegations, Plaintiffs make unsupported statements that conflate the actions undertaken by BNSF with those that were taken by W.R. Grace. An example of this is an allegation made in Plaintiffs' Complaint, wherein they state "BNSF's active vermiculite operations began in the 1920s and continued until the last shipment of vermiculite left Libby in 1994." Doc. 1, ¶17. BNSF did not undertake any "vermiculite operations," it merely acted as a common carrier by shipping freight that was tendered to it by W.R. Grace. SUF, ¶ 5. Plaintiffs further argue that BNSF's acceptance and shipping of the vermiculite tendered by W.R. Grace constitutes an abnormally dangerous activity. Doc. 1, ¶ 57. Yet, nothing in the record of this case supports such a finding. Instead, the record shows that BNSF has no reason to believe that the vermiculite being tendered for shipment by W.R. Grace contained asbestos. SUF, ¶ 1. In an attempt to shirk their burden of proving that BNSF's activities caused Joyce Walder and Thomas Wells' mesothelioma, Plaintiffs rely on decisions issued by the Montana Supreme Court and the Asbestos Claims Court in the *Barnes, Braaten, Flores (Cons.) v. BNSF Railway Co., et al.*, Lincoln

County, Cause No. DV-16-111 ("*Barnes*") case.  However, as explained herein, Plaintiffs' reliance on the *Barnes* case is misplaced.

Even if the Court were to consider the Barnes opinions, Plaintiffs have no evidence to support their claims that BNSF's transportation of vermiculite should be considered abnormally dangerous. Furthermore, if the Court finds that BNSF's transportation of vermiculite was abnormally dangerous, BNSF is still exempt from strict liability due to the Restatement (Second) of Torts §521 common carrier exception. Montana and federal law are clear that through BNSF's contracts with W.R. Grace, BNSF was legally obligated to transport the vermiculite concentrate. *See* Mont. Code Ann. §69-11-403 "Acceptance of Freight"; *see also* 49 USCS §11101(a). There can be no dispute that as a common carrier, all activities undertaken pursuant to BNSF's transportation of vermiculite on behalf of W.R. Grace were required by law, and therefore fall under the exception.

Finally, Plaintiffs have no evidence that BNSF engaged in any "other activities" outside of its common carrier duties that could subject it to strict liability. While Plaintiffs' Complaint alleges that BNSF "maintain[ed] a reservoir of asbestos" in its Libby railyard, these characterizations are directly refuted by a complete view of the railyard's air and soil sampling data. Further, any alleged contamination of the Libby railyard, which according to Plaintiffs occurred from vermiculite "spilling" from its railcars while in transit or while being temporarily

2

stored in anticipation of transit, would be the result of BNSF's transportation of vermiculite protected by the common carrier exception. Doc. 001, ¶ 33.

## ARGUMENT

I.  **The Montana Supreme Court's 2020 decision in Barnes was based on improper findings of fact and is not binding on this Court.**

BNSF's Statement of Undisputed Facts ("SUF") rebuts all the material factual findings of the Asbestos Claim's Court's ("ACC") opinion in *Barnes. See* SUF, ¶¶ 1-17; *see also* Judge Amy Eddy's Order on Motions for Summary Judgment from *Barnes, et al. v. BNSF* ("*Eddy Order*"). The record in *Barnes* and in the present case shows that the ACC's opinion was based on factual findings that did not have objective evidentiary basis. Thus, BNSF requests that this Court conduct a *de novo* review of whether BNSF's transportation of vermiculite was abnormally dangerous under the facts of this case and give no deference to the factual findings in either the ACC or Montana Supreme Court's opinions from *Barnes*.

a.  **BNSF is not collaterally estopped from litigating whether its transportation of vermiculite was abnormally dangerous.**

The three elements of collateral estoppel are "(1) the issue has been decided in a prior adjudication and is identical to the one presented; (2) a final judgment on the merits was issued; and (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication." *Anderson v. State*, 250 Mont. 18, 817 P.2d 699, 701 (Mont. 1991).

### i.   The issues decided by Judge Eddy in Barnes are not identical to the issues presented in this case.

"[C]ollateral estoppel depends on whether the issue in both actions is the same, not whether the issue arises in the same context." *Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1046 (E.D. Cal. 2014) (citations omitted). "[O]nly issues actually litigated in the initial action may be precluded from the second proceeding under the collateral estoppel doctrine. . . . An issue is actually litigated '[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *Id.* (citations omitted). "It must appear … that the precise question was raised and determined in the former suit." *Id.* (citations omitted).

In Judge Amy Eddy's Order granting the *Barnes* plaintiffs summary judgment on strict liability, Judge Eddy held that "BNSF is strictly liable to ***these*** [p]laintiffs for engaging in an abnormally dangerous activity vis-à-vis its *operations* in Libby, Montana." Declaration of Nadia H. Patrick, **Exhibit U** at 13 (emphasis added). Judge Eddy did not explicitly state which of BNSF's Libby activities were abnormally dangerous. Thus, by stating that BNSF's *operations* were abnormally dangerous, Judge Eddy's analysis encompasses several distinct activities under one umbrella. In doing so, Judge Eddy conflated every activity that BNSF allegedly engaged in with the activities of W.R. Grace, including activities BNSF was required to perform

as a common carrier, and broadly concluded BNSF was engaged in abnormally dangerous activities.

The Montana Supreme Court then tried to reframe Judge Eddy's analysis as if it applied only to the "handling of asbestos" and the "transportation of vermiculite." *BNSF Ry. Co.*, ¶¶ 31, 36, 39, 49. That is problematic because Judge Eddy's analysis of the six factors was not limited to these distinct activities, yet the Montana Supreme Court adopted Judge Eddy's findings of fact in reaching its conclusion. *See Id.*, ¶¶ 2-4; Declaration of Nadia H. Patrick, **Exhibit U** at 2-5.

On remand after the Montana Supreme Court's 2020 decision, the *Barnes* plaintiffs used the *BNSF Ry. Co.* holdings to apply BNSF's common carrier protections to BNSF's activity of "transportation of vermiculite." Declaration of Nadia H. Patrick, **Exhibit V** at 4. The *Barnes* plaintiffs then alleged that these protections "certainly do[] not apply to BNSF's … harboring of a toxic reservoir of asbestos on their property of its failure to control that asbestos hazard…" *Id.* at 4. This language was not included in the *Barnes* plaintiffs' complaint and was not used by the *Barnes* plaintiffs until after the *BNSF Ry. Co.* decision when the parties were briefing "other activities" on remand. Neither the Montana Supreme Court nor the Asbestos Claims Court has decided the issue of whether BNSF's alleged "harboring" of vermiculite in the Libby railyard was abnormally dangerous or, if so, whether it falls within the common carrier exception under § 521. Thus, the issue in *Barnes* is

not identical, it only arises out of a similar context.  It is, therefore, necessary for this Court to conduct an independent assessment of facts not contemplated by the courts in *Barnes* in arriving in their decisions that BNSF was strictly liable *under the facts of the Barnes case*. Accordingly, the identicality of the issues factor for whether collateral estoppel applies weighs in favor of BNSF.

### ii. The Barnes case for which the BNSF Ry. Co. decision is based has not reached a final judgment on the merits.

Collateral estoppel is inapplicable here for the additional reason that no final judgment has adjudicated these issues. Plaintiffs cite *Baltrusch v. Baltrusch*, 2006 MT 51, ¶¶ 18-23, 331 Mont. 281, 130 P.3d 1267, which states that res judicata in Montana requires that the prior adjudication issue "a final judgment on the merits." *Id.*, ¶ 18.

A ruling on a motion for summary judgment is not a final judgment within the meaning of collateral estoppel. *Alliance General Ins. Co. v. K-Mart Corp.*, 2008 Mont. Dist. LEXIS 140, at *25. In *Alliance General Ins. Co.*, the third-party defendant argued that the defendant was collaterally estopped from relitigating the findings of a prior motion for summary judgment. *Id.* The Court held that the prior ruling on the motion for summary judgment was not a final judgment, which is necessary for collateral estoppel to apply. *Id.* at *26; *See also Stevens v. Abbot*, 220 Mont. 61, 63, 712 P.2d 1347, 1348 (1986) (An order determining liability only, and reserving the issue of damages, is not a final order in a summary judgment).

Here, the Montana Supreme Court's opinion in *Barnes* was not a final judgment and that case is still pending trial. In the prior decisions, the Montana Supreme Court and the ACC did not adjudicate the entirety of the *Barnes* plaintiffs' claims or make any determination of damages. Declaration of Nadia H. Patrick, **Exhibit U** at 13; *See also BNSF Ry. Co.*, ¶ 39. BNSF is still awaiting a trial date in *Barnes* where it can be fully heard on the issue of strict liability and properly appeal any potential unfavorable verdict. Thus, since there has been no final judgment on the merits of *Barnes*, the second collateral estoppel factor weighs entirely in favor of BNSF. Accordingly, BNSF is not barred by collateral estoppel from arguing that its operations in Libby were not abnormally dangerous under the facts presented in this case.

## II.   BNSF's transportation of vermiculite was not an abnormally dangerous activity.

The Montana Supreme Court has "adopted the Restatement (Second) of Torts §§ 519 & 520 (1979) to determine whether an activity is abnormally dangerous." *Chambers v. City of Helena*, 2002 MT 142, ¶ 16, 310 Mont. 241, 49 P.3d 587. Section 520 of the restatement lists the following factors to determine whether an activity is abnormally dangerous:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.

While no one factor is dispositive, other jurisdictions have found that the third factor is particularly instructive to courts seeking to determine whether an activity is abnormally dangerous. *Ind. H. B. R.R. Co. v. Am. Cyanamid Co.,* 916 F.2d 1174, 1177 (7th Cir. 1990). In *Ind. H. B. R.R. Co.*, the Seventh Circuit explained:

> There are, of course, six factors in section 520. They are related to each other in that each is a different facet of a common quest for a proper legal regime to govern accidents that negligence liability cannot adequately control. The interrelations might be more perspicuous if the six factors were reordered. One might for example start with (c), inability to eliminate the risk of accident by the exercise of due care. *The baseline common law regime of tort liability is negligence. When it is a workable regime, because the hazards of an activity can be avoided by being careful . . ., there is no need to switch to strict liability.*

*Id.* (internal citations omitted) (emphasis added). There, the court ultimately *rejected* the plaintiff's theory that the defendant's transportation of acrylonitrile – a flammable, corrosive, and carcinogenic material – was an abnormally dangerous activity, and it did so on the basis that its risk could be ameliorated by the exercise of due care. *Id.* at 1179 ("[Acrylonitrile] is not so corrosive or otherwise destructive that it will eat through or otherwise damage or weaken a tank car's valves although they are maintained with due (which essentially means, average) care. No one suggests, therefore, that the leak in this case was caused by the *inherent* properties of acrylonitrile. It was caused by carelessness[.]") (emphasis original).

When making a determination as to whether an activity is abnormally dangerous, the Court "must look to the activity of the transportation of the materials rather than the materials themselves." *Toledo v. Van Waters & Rogers, Inc.*, 92 F. Supp. 2d 44, 56 (R.I. 2000). In *Toledo*, the Court used the same analysis as *Ind. H. B. R.R. Co.*, and gave special emphasis to the third factor:

> In fact, when analyzing the factors set forth in § 520 of the Restatement of Torts, with respect to the transportation of dangerous chemicals, courts have focused on whether the risk involved could be reduced through the exercise of reasonable care.

*Id.* (citations omitted). The Court granted summary judgment to the defendant, holding that its transportation of nitric and sulfuric acid was not an abnormally dangerous activity. *Id.* The Court reasoned that "transportation of hazardous chemicals along the inter-state highway system is common with companies such as D&S and that function is performed daily across the country." *Id.* The Court further clarified that "[t]transporting chemicals cannot be considered an ultra-hazardous activity because it can be, and has been, performed safely when the parties exercise reasonable care." *Id.*

"The inquiry is not on the hazardous substance's dangerous propensities, but on the defendant's activity with regard to the substance." *Amcast Indus. Corp. v. Detrex Corp.*, 779 F. Supp. 1519, 1544 (N.D. Ind. 1991) (citations omitted) *aff'd in part, rev'd in part*, 2 F.3d 746 (7th Cir.1993) (holding that transportation and

delivery of hazardous substance is not abnormally dangerous activity). In *Amcast*, the plaintiff argued that the common carrier defendant was strictly liable for spilling trichlorethylene ("TCE") when it pumped the chemical from one tank to the other during delivery to the plaintiff's facility. *Id.*, 779 F. Supp. at 1524. The Court granted summary judgment for the defendant on the plaintiff's strict liability claim, holding that while the first and second § 520 factors favored the plaintiff, the third, fourth, fifth, and sixth factors favored the defendant. *Id.*, 779 F. Supp. at 1544. For the third factor, the Court reasoned that "the pumping of dangerous fuel, when properly done, is not so intrinsically dangerous that absolute liability must attach." *Id.* For the fourth factor, the Could held that "although TCE is not a common household fuel, it is an industrial solvent, and pumping it from one tank to another is not unusual." *Id.* The fifth factor also favored the defendant because the location in which the spilling occurred was dependent on where the defendant was required to deliver the TCE as part of its duties as a common carrier. *Id.* Last, the sixth factor weighed towards the defendant because TCE was found "to be a very useful solvent" and was used for many years. *Id.*

When asserting strict liability, the plaintiff has the burden of producing evidence that the chemical product cannot be transported and off-loaded safely. *E S Robbins Corp. v. Eastman Chem. Co.*, 912 Supp. 1476, 1489 (N.D. Ala. 1995). In *E S Robbins Corp.*, the Court granted summary judgment to the defendant holding that

"the handling and off-loading of [a] chemical product is not an abnormally dangerous activity." *Id.*, 912 Supp. at 1491. The Court held that the third, fourth, fifth, and sixth factors all weighed in favor of the defendant. For the third factor, the Court reasoned that the alleged spills of the chemical "were preventable with reasonable care." *Id.*, 912 F. Supp. at 1490. For the fourth factor, the Court found that the chemical was commonly used in products manufactured around the country, making it not uncommon. *Id.* For the same reasons as *Amcast Indus. Corp.*, the Court also found that the fifth and sixth factors weighed in favor of the defendant. *Id.*, 912 F. Supp. at 1490-91.

> ### a. Any alleged danger of BNSF's transportation of vermiculite was preventable with reasonable care, making strict liability inapplicable.

BNSF maintains that it was, at all relevant times, unaware that the vermiculite concentrate being tendered for shipment by W.R. Grace contained asbestos. SUF, ¶ 1. Nevertheless, here, BNSF is alleged to have transported vermiculite concentrate that contained asbestos. Here, the vermiculite BNSF transported contained on average 0.5% asbestos. SUF, ¶ 8. This material is not hazardous. In fact, it does not even meet the current federal definition of an asbestos containing material. *40 CFR Appendix A to Subpart M of Part 61, 1.1* ("Asbestos-containing material (ACM) is material containing more than one percent asbestos …"); 29 CFR 1910.1001(b)(" Asbestos-containing material (ACM) means any material containing more than 1%

asbestos."). OSHA regulations would not require any labeling or special handling of this vermiculite material due to its low asbestos content. 29 CFR 1001(j)(1-7). Subsection (j)(6) of this regulation provides that "labels and safety data sheets required by paragraph (j) of this section do not apply where … Asbestos is present in product concentrations less than 1.0%." Similarly, the Department of Transportation has concluded that asbestos bound in a mineral such as vermiculite does not pose an unreasonable risk of health hazards and has excluded this material from the special handling regulations applied to hazardous chemicals and materials. *See 49 C.F.R. §172.102(c)(1)(156) and BNSF's Motion for Summary Judgment-Preemption*. Plaintiffs in this case seek to have this Court conclude that transporting vermiculite from the mine is abnormally dangerous when in virtually every area of health and safety regulation, the federal government has concluded that it is not.

Assuming arguendo that the vermiculite transported by BNSF was abnormally dangerous, such a finding would still not support application of strict liability. When determining strict liability under § 520, the Court looks to whether the _activity_ of transporting the substance was abnormally dangerous, not to whether the substance itself was abnormally dangerous. Plaintiffs have not presented any evidence in this case that precautions could not have been taken while transporting the vermiculite to that ameliorate the risk of spillage and dust creation.

To the contrary, any alleged airborne or soil contamination resulting from moving the vermiculite railcars could have been ameliorated with due care. Plaintiffs assert that there was "dust blowing off and loose vermiculite spilling from the tops of the loaded vermiculite railroad cars." Doc.1, ¶ 40. Plaintiffs also allege that BNSF's transportation of vermiculite caused "visible clouds of dust to be produced while returning loaded cars … to its downtown Libby railyard." Doc.1, ¶ 20. While BNSF disputes that either assertion is true, the alleged vermiculite dust "blowing off" railcars would be preventable by using covered and sealed hopper cars to prevent alleged product release and cleaning the tops of the cars prior to departure, SUF, ¶ 1, **Exhibit A**; Doc. 1, ¶¶ 11, 26, 33, 40, 49-50. Furthermore, any dust present on the top of the cars *would be the result of W.R. Graces activity of loading the vermiculite into the hopper cars*, which it is well-established throughout Libby asbestos cases that BNSF took no part in. SUF, ¶ 10.

The record also shows that precautions and alternative methods were available to BNSF for its railyard activities that were necessary to perform its common carrier duty to transport the vermiculite. Plaintiffs' expert Dr. Julie Hart asserts that "BNSF performed dry sweeping of the [rail] yard and its tracks throughout applicable periods of operation." SUF, ¶ 11.  According to Dr. Hart, BNSF's alleged "dry sweeping" violated 29 C.F.R. 1910.93(a), which requires that "[a]ll cleanup of asbestos dust and blowing shall be performed by vacuum cleaners." SUF, ¶ 11. Thus,

any danger created by the dry sweeping could be reduced or eliminated by using vacuums. In other words, any risk of asbestos exposure resulting from necessary maintenance of BNSF's railyard could be ameliorated using reasonable care. Thus, the third § 520 factor favors BNSF.

Whether BNSF took reasonable precautions in this case would be a question of fact for the jury to determine in relation to Plaintiffs' negligence claims, not strict liability.[1] *See Scott v. Henrich,* 283 Mont. 97, 104 (1997) ("The traditional standard of negligence, as defined under Montana law, is 'conduct of a reasonable and prudent person under the circumstances.'") (internal citation omitted); *see also Christian v. Atl. Richfield Co.,* 2015 MT 255, ¶ 49 ("[S]trict liability for the conduct of an abnormally dangerous activity . . . means that the defendant is liable for harm resulting from the activity, *even if the defendant acted with reasonable care."*) (emphasis added).

### b. Vermiculite was commonly used around the country during BNSF's Libby operations and railcars were commonly used to transport that vermiculite.

Libby vermiculite was commonly used around the country for various commercial products between the early 1920s until 1990. While vermiculite's main use was attic insulation, it was also sold at hardware and gardening stores as a soil

---

[1] BNSF does not concede that all issues raised in Plaintiffs' Complaint should be submitted to the jury to decide.

conditioner. SUF, ¶ 9. In *E S Robbins Corp.*, the Court found that the fourth factor weighed in favor of the common carrier because the chemical at issue was commonly used in manufacturing products. 912 F. Supp. at 1490. Here, vermiculite was commonly used in various industrial and commercial applications throughout the country during BNSF's entire tenure of shipping W.R. Grace's vermiculite.

Libby vermiculite was also shipped throughout the U.S. to more than 200 domestic processing and receiving facilities. SUF, ¶ 9. In *Amcast Indus. Corp.*, the Court held that the fourth factor favored of the common carrier because although the dangerous chemical was "not a common household fuel … pumping it from one tank to another is not unusual." 779 F. Supp. at 1544. While in operation, the Libby mine produced 80 percent of the world's supply of vermiculite. SUF, ¶ 9. This vermiculite was shipped to the 200 processing and receiving facilities almost exclusively by rail car. Thus, during the relevant period, Plaintiffs cannot argue that transporting the vermiculite via rail car was unusual. In fact, BNSF's activity of shipping the vermiculite via rail was the norm, not the exception. The same is true with respect to products containing asbestos for much of the relevant time period. During the time period at issue in the case, products containing asbestos were widely used, and the asbestos properties of these materials were considered desirable and safe.

Accordingly, the fourth factor from Restatement (Second) of Torts § 520 favors BNSF.

    **c.    The fifth factor weighs in favor of BNSF because the Libby railyard was the only practicable location for BNSF to conduct necessary operations to fulfill its duties as a common carrier.**

BNSF's duties as a common carrier required it to conduct its operations in and around Libby, Montana, because that was the location of the Zonolite and later W.R. Grace vermiculite mine. In *Amcast Indus. Corp.* and *E S Robbins Corp.*, the Courts found that the fifth factor favored the common carrier because the location in which the alleged injuries occurred was determined by the common carrier's client, and not the common carrier. Here, BNSF did not determine the location of vermiculite mountain and the resulting mining operations that occurred there. BNSF simply picked up loaded railcars at the closest point where its rail already extended to. BNSF then brought these railcars to its closest railyard, which happened to be located in Libby, where it conducted necessary common carrier operations such as switching and classifying railcars for shipment to over 200 clients.

Plaintiffs' have asserted without evidence that the vermiculite loaded railcars "could have been connected to out-bound trains at the BNSF owned siding … 5 miles outside of town at its vermiculite loading facility or at any other more suitable location." Doc. 60, at 21. This position is detached from reality. BNSF was statutorily required to move significant quantities of vermiculite to over 200 of W.R. Grace's clients around the country. This required use of classification tracks within in the Libby railyard as seen by the 1977 photograph of the Libby railyard below:



Plaintiffs also do not consider that the one siding by the river loading facility was the track being used by W.R. Grace to load the vermiculite into railcars. SUF, ¶ 5, 10. That meant that when BNSF employees arrived to pick up the loaded railcars, W.R. Grace had to cease loading while BNSF employees switched and connected the cars to bring to the Libby railyard. SUF, ¶ 10. It is inconceivable to imagine that BNSF could have switched, organized, and built multiple trains using only one small siding. Even if this were possible, which it was not, BNSF employees would have to switch and build the trains while W.R. Grace employees were using the siding to load railcars with vermiculite. Per W.R. Grace's policy of not loading vermiculite while BNSF employees were just picking up loaded cars, this would have constantly

interrupted loading operations, reducing efficiency at the river loading facility to zero. Additionally, with only one siding, BNSF would have to do all the switching on the mainline track, further interrupting railroad travel and unnecessarily exposing its employees to oncoming train traffic.

> **d.    The sixth factor favors BNSF because vermiculite was, and still is, a useful product in household and commercial industries.**

The holdings in *Amcast Indus. Corp.* and *E S Robbins Corp.* are instructive in showing that just because harm results from a chemical, it can still be outweighed by its benefits simply because the transported material was "useful" to the party it allegedly harmed. 779 F. Supp. at 1544; 912 F. Supp. at 1490. For the reasons described in support of the fourth factor in Section I(b), BNSF's transportation of vermiculite provided a significant economic benefit to the town of Libby and the plethora of Libby residents that worked for W.R. Grace and during the mining operations. While harm did result from W.R. Grace's mining operations, that harm is attributable to *W.R. Grace's activities* of mining, milling, expanding, bagging, and loading vermiculite. The vermiculite concentrate that BNSF shipped in its closed and sealed hopper cars contained an average of 0.5% asbestos, which is still considered today to not be an asbestos containing material. SUF, ¶ 8.

Additionally, in hindsight it is easy to say that the resulting economic benefit of the vermiculite operations was minimal compared to the resulting harm. The record shows that neither BNSF nor Libby residents had any knowledge that W.R.

Grace's refined vermiculite contained asbestos. SUF, ¶ 3. Thus, up until 1990 when W.R. Grace was shut down, the economic benefits resulting from BNSF shipping the concentrated vermiculite far exceeded any harm conceivable at the time. Accordingly, four of the six § 520 factors favor BNSF and a conclusion that BNSF's transportation of vermiculite was not an abnormally dangerous activity.

Since at least four of the six § 520 factors favor BNSF, BNSF's transportation of vermiculite cannot be considered an abnormally dangerous activity as a matter of law.

## III.   Even if BNSF's transportation of vermiculite is determined to be an abnormally dangerous activity, BNSF cannot be held strictly liable because at all times it was acting as a common carrier.

While Plaintiffs' Complaint alleges that BNSF created an abnormally dangerous condition and engaged in abnormally dangerous activities under § 519 and § 520, it omits any explanation of why BNSF's activity of transporting vermiculite is not covered by § 521. Section 521 explicitly provides that the rules of strict liability for abnormally dangerous activities do not apply to common carriers:

> The rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee *or as a common carrier.*

(*emphasis added).* The Ninth Circuit Court of Appeals explained in *Hanford Nuclear Reservation Litig. v. E.I. DuPont de Nemours & Co.,* 534 F.3d 986, 1005-06 (9th Cir. 2008) (*"Hanford Nuclear Reservation Litig."*) that the comments to § 519

indicate the common carrier exception is part and parcel of strict liability. Comment "a" to § 519 states that "[t]he general rule stated in this Section is subject to exceptions and qualifications, too numerous to be included within a single section. It should therefore be read together with §§ 520 to 524A, by which it is limited." (RESTATEMENT, § 519, comment "a"). Comment "d" further limits the scope of strict liability and states that persons are accountable only for abnormally dangerous activities they undertake "for [their] own purposes." (*Id.,* § 519, comment "d"). A key corollary to this point is that strict liability does not apply to activities carried on in pursuit of a public duty the actor was legally obligated to perform. *See* § 521; *Hanford Nuclear Reservation Litig.,* 534 F.3d at 1005-1006.

As stated by Plaintiffs, BNSF is a corporation engaged in interstate commerce. Doc. 1, ¶ 3. As a commercial railroad, BNSF is a common carrier of freight. SUF ¶ 5. BNSF was hired by W.R. Grace to transport its vermiculite. Just as commercial airlines are required to provide transport to any customer that purchases a ticket, railroad common carriers are mandated by federal law to deliver any freight it is contracted to transport. BNSF is a common carrier, and as such, is exempt from strict liability for alleged abnormally dangerous activities. *See, Lamb v. Martin Marietta Energy Sys.,* 835 F. Supp. 959, 971 (W.D. Ky. July 26, 1993)(declining to recognize a cause of action for strict liability because the alleged abnormally dangerous activity – plutonium mining – was carried on in pursuance of a public necessity and that,

pursuant to § 521, abnormally hazardous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier.").

BNSF was legally obligated to transport the vermiculite tendered to it by W.R. Grace under both federal and Montana law. Mont. Code Ann. § 69-11-403 "Acceptance of Freight," sets out Montana's requirements for common carriers and provides as follows:

> A common carrier **shall,** if able to do so, accept and carry whatever is offered to the carrier, at a reasonable time and place, of a kind that the carrier undertakes or is accustomed to carry.

(*emphasis added*). Similarly, 49 USCS § 11101 establishes federal requirements for the services a railroad carrier is obligated to perform and provides that a rail carrier providing transportation or service **shall** provide the transportation or service on reasonable request. 49 USCS §11101(a)(*emphasis added*).

There can be no dispute that as a common carrier, BNSF was required by law to briefly store and transport vermiculite on behalf of W.R. Grace. Therefore, based upon the RESTATEMENT §§ 519 and 520, and pursuant to the exception provided by § 521, BNSF is entitled to judgment as a matter of law.

a.   **An objective view of the air and soil sampling in and around the Libby railyard shows that Plaintiffs' assertions of a "reservoir of asbestos" is provably incorrect.**

Plaintiffs' conclusory allegations regarding the state of the Libby railyard being a "reservoir of asbestos" are refuted by the evidence. In 2001, 71 personal air samples were collected on railroad personnel performing soil disturbance activities within BNSF's railyard. 62 of those samples returned no detected asbestos. The remaining 9 samples returned negligible results, with 0.092 f/cc being the highest detection. SUF, ¶ 13. This highest detection is orders of magnitude below the OSHA limit deemed permissible for 8 hours of daily exposure over a working lifetime. Exactly zero personal air samples exceeded the OSHA permissible limit. *Id*.

During that same period, an additional 119 "area" samples were tested, 100 of which returns results of no detectable asbestos or less than 1%, again below the OSHA permissible limit. SUF ¶ 14. Within the 19 samples that were not below 1%, we find the single result of 14 f/cc repeatedly championed by Plaintiff. *Id*. In truth, that sample, along with the majority of these 19 samples, were determined to be faulty by the engineering contractors performing the tests and were accordingly designated "overloaded." *Id*. Furthermore, the single 14 f/cc sample was taken during a "brooming operation" which, as reflected in the below photograph, creates significant dust, in particular at the base of the apron. *Id*. In 2016, Don Cleveland, BNSF Chief Industrial Hygienist, testified that this 14 f/cc sample was generated by

placing the testing equipment directly next to the base of the apron of the brooming machine (called a ballast regulator) to try to generate a high reading. *Id*.

During the 2004 response action, personal air sampling was conducted in July and September on approximately 25% of the work force. Ten out of 12 personal air samples had detectable fibers with concentrations ranging from 0.003 f/cc to 0.036 f/cc (orders of magnitude below the present OSHA permissible exposure limit). The remaining two samples were beneath the limit of detection. SUF ¶ 15.

During the 2005 response action, personal air samples were again collected and analyzed. Five of the seven personal air samples had detectable fibers with concentrations ranging from 0.005 to 0.049 s/cc (again orders of magnitude below the present OSHA permissible exposure limit). SUF ¶ 16. Two samples were beneath the limit of detection. 18 of 30 additional personal samples collected on workers during the response actions had no detected asbestos, while the remaining 12 samples had fiber concentrations ranging from 0.003 to 0.036 s/cc. cc (again orders of magnitude below the present OSHA permissible exposure limit). *Id*. In total, 222 of 232 stationary air samples collected during the 2004 and 2005 response actions returned no detected asbestos, while the remaining 10 samples had concentrations ranging from 0.0021 s/cc to 0.0120 s/cc. SUF ¶ 17.

Plaintiffs cannot present any objective showing of the total evidence surrounding the Libby railyard that would support their characterizations of its alleged asbestos content.

## IV. Plaintiffs have no evidence that BNSF engaged in any "other activities" that were not pursuant to its duties as a common carrier.

After unsuccessfully arguing in *Barnes* against the adoption of the common carrier exception to strict liability, Plaintiffs' counsel now attempts, through a new set of plaintiffs, to re-cast the same allegations regarding BNSF's transportation of vermiculite in an attempt to sidestep the Montana Supreme Court's ruling. Plaintiffs' Complaint and prior briefing describes several re-characterizations of their original allegations they believe BNSF engaged in, such as:

1. "[H]arboring, and failure to control, a veritable open-air repository for asbestos waste." (Doc. 060, at 2, 15, 24) *see also* (Doc. 001, ¶ 20, 25, 59).
2. "[H]arboring of a toxic asbestos dump." (Doc. 060, at 21).
3. "[H]arboring and failure to control a reservoir of asbestos waste." (Doc. 060, at 25).

Tellingly, Plaintiffs never cite to any factual evidence when claiming that BNSF engaged in any of these alleged "other activities." Plaintiffs' failures to cite to competent evidence is easily explained–***no*** evidence exists that supports Plaintiffs' assertions that BNSF designated or treated the Libby railyard as an asbestos "dump" or "reservoir." Plaintiffs use of these assertions is simply a recharacterization of their original allegations that: asbestos leaked from rail cars onto the ground within the railyard; trains passed through the yard repeatedly through the day kicking up dust;

and that this dust in the air could affect nearby community members. These are the same allegations asserted in support of McGarvey's claim in *Barnes* that BNSF's transportation of vermiculite was an abnormally dangerous activity. These are also the same allegations expressly discussed by the Montana Supreme Court when it evaluated the Restatement factors as applied to BNSF's transportation of vermiculite.

> **a.    The common carrier exception covers all railroad activities carried on in pursuance of a public duty, including railyard activities necessary to provide proper and efficient shipment of materials.**

The Montana Supreme Court held that the common carrier exception applies to all activities "carried on *in pursuance of* a public duty." *Id.* at ¶ 46 (emphasis added). The court in *Walsh v. Mont. Rail Link,* 2001 ML 1418, 27 (D. Mont. 2001), an opinion cited favorably by the Montana Supreme Court in *BNSF Ry. Co. v. Asbestos Claims Court*, likewise holds, "The common carrier exception to strict liability [applies to] *activities involving the transportation* of" materials–meaning than any railyard activities would necessarily be included within the common carrier exception.

> **b.    The common carrier exception covers all railroad activities carried on in pursuance of a public duty, including railyard activities necessary to provide proper and efficient shipment of materials.**

It is BNSF's position that the operation of its Libby railyard for the purposes of receiving, switching, classifying, and delivering railcars carrying vermiculite was

necessary and inseparable from its public duty as a common carrier. There can be no dispute that at all times these activities were an integral part of its transportation activities. A "railroad network is a hub-and-spoke system. And the hubs are in metropolitan areas." *Ind. H. B. R.R. Co.,* 916 F.2d at 1180.

In *Griffin v. Montana Rail Link,* 2000 ML 2438, *8 (D. Mont. 2000), a decision also cited favorably in *BNSF Ry. Co. v. Asbestos Claims Court*, the court applied the exception to "transporting and storing" hazardous materials. The court found that applying the exception in this manner was consistent with the policy of meeting the public need for nation-wide transportation of such materials. *Id.* at *11. Similarly, Judge McCarter in *Anderson v. BNSF Railway Co.,* 2010 Mont. Dist. LEXIS 73, *4 (2010), held that BNSF's activities of storing diesel fuel on its properties, "which is an integral part of its operation as a common carrier, is protected from strict liability."

## **CONCLUSION**

BNSF respectfully requests that this Court grant summary judgment in its favor as to Plaintiffs' Count II strict liability claim.

//

//

26

DATED this 27th day of March, 2023.

KNIGHT NICASTRO MACKAY, LLC

By: /s/ Chad M. Knight
    Chad M. Knight
    Anthony M. Nicastro
    Nadia H. Patrick
    *Attorneys for Defendant*
    *BNSF Railway Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with L.R. 7.1(d)(2), and that the number of words in the brief, excluding caption, certificates of compliance and service, table of contents and authorities, and exhibit index, is less than 6,500 words.

KNIGHT NICASTRO MACKAY, LLC

By: /s/ Chad M. Knight
    Chad M. Knight
    *Attorneys for Defendant*
    *BNSF Railway Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of March, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Roger Sullivan
Jinnifer Jeresek Mariman
Ethan Welder
McGARVEY LAW
345 First Avenue East
Kalispell, MT 59901
rsullivan@mcgarveylaw.com
jmariman@mcgarveylaw.com
ewelder@mcgarveylaw.com

Alexandra Bailey Abston (PHV)
Rachel Lanier (PHV)
Sam Taylor, II (PHV)
LANIER LAW FIRM, P.C.
10940 W. Sam Houston Parkway N.
Suite 100
Houston, TX 77064
Alex.abston@lanierlawfirm.com
Rachel.lanier@lanierlawfirm.com
Sam.taylor@lanierlawfirm.com
*Attorneys for Plaintiffs*

                    KNIGHT NICASTRO MACKAY, LLC

                    By: /s/ Chad M. Knight
                         Chad M. Knight
                         *Attorneys for Defendant*
                         *BNSF Railway Company*