Roger Sullivan
Jinnifer Jeresek Mariman
Ethan Welder
John Lacey
McGarvey Law
345 First Avenue East
Kalispell, MT  59901
(406) 752-5566
rsullivan@mcgarveylaw.com
jmariman@mcgarveylaw.com
ewelder@mcgarveylaw.com
jlacey@mcgarveylaw.com

Mark Lanier
Sam Taylor II
Rachel Lanier
Alex Abston
LANIER LAW FIRM, PC
10940 W. Sam Houston Pkwy N., Ste. 100
Houston, TX 77064
mark.lanier@lanierlawfirm.com
sam.taylor@lanierlawfirm.com
rachel.lanier@lanierlawfirm.com
alex.abston@lanierlawfirm.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased,<br><br>Plaintiffs,<br>vs.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | CV-21-97-GF-BMM<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT RE: LIMITED SCOPE OF THE COMMON CARRIER DEFENSE TO BNSF'S ABNORMALLY DANGEROUS ACTIVITY** |

1

## INTRODUCTION

Plaintiffs' *Motion* is narrow, following the wisdom of the Montana Supreme Court ("MTSC") in consolidating 540 asbestos cases into the Asbestos Claims Court ("ACC") to resolve "common issues" in "lead cases." The ACC selected a "lead case" against Defendant BNSF Railway Co. ("BNSF), which culminated in the unanimous MTSC opinion holding "BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable." *BNSF Ry. Co. v. Asbestos Claims Court* ("*BNSF*"), 2020 MT 59, ¶39, 459 P.3d 857. Plaintiffs ask the Court to apply that holding and determine whether the common carrier exception applies to BNSF's strict liability for harboring of and failing to control an open-air repository for asbestos waste on its downtown Libby property.

BNSF's *Response* seeks to re-litigate that fully adjudicated issue—an attempt the policy of the ACC and Montana issue preclusion law does not support. Rather, the focus here is whether the common carrier exception applies to BNSF's activities other than "transportation of vermiculite." Because these activities "were not undertaken pursuant to its statutory duty" as a common carrier, the Court should find BNSF is strictly liable for Plaintiffs' damages to the extent they result from the toxic asbestos condition in BNSF's downtown Libby railyard. *Id.*, ¶49.[1]

---

[1] All emphasis herein is added.

## BACKGROUND

In 2017, the MTSC created the ACC to address:

> the extraordinary complexity and cost of these cases, and the enormous detrimental impact on the resources of Montana district courts if required to litigate these cases on an individual basis.

Second Affidavit of Jinnifer Mariman, Ex.15, p.1.[2]

In 2018, Judge Eddy implemented the MTSC's directive with "procedures that will facilitate the expeditious, economical and just resolution of these cases." Ex.16, p.1. Judge Eddy ordered selection of "Lead/Test cases" "to encompass a variety of types of Plaintiffs, types of exposures, types of diagnosis, <u>legal issues</u>, and Defendants." Ex.17, p.2. The ACC selected *Barnes et al. v. BNSF*, Cause No. DV-16-111, ("*Barnes*") as the lead case against BNSF. Ex.18, p.2.

In *Barnes*, the ACC considered the parties' competing motions for summary judgment on the issue of strict liability, held oral argument, and issued its *Order* holding BNSF strictly liable "for engaging in an abnormally dangerous activity vis-à-vis its operations in Libby, Montana." Ex.12, p.13. BNSF petitioned for a Writ of Supervisory Control.[3]

---

[2] Hereafter, "Ex." refer to Exhibits 1-29 to the First and Second Affidavits of Jinnifer Mariman.
[3] BNSF's Petition states "Judge Eddy even encouraged the parties file such petitions, stating, 'I would rather get the Supreme Court's opinion <u>so we're not trying all these cases under what might be my misapprehension of the law</u>.'" Ex.24, p.3 citing Ex.19, p.64.

In 2020, the MTSC, after considering 133 Plaintiff exhibits and 161 BNSF exhibits, briefing, and hearing, unanimously "conclude[d] <u>BNSF's handling of asbestos</u> under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519." *BNSF*, ¶39.

The MTSC's 2021 *Order* dissolving the ACC noted the resolution of key liability issues:

> <u>Since 2017, Judge Eddy has been working diligently to resolve those common pretrial issues that most impacted the Asbestos Claims Court docket on a case-wide basis, including resolution of significant issues of liability</u> ...

Ex.20.

Nevertheless, BNSF seeks to relitigate the very arguments and evidence leading to the MTSC's decision. While BNSF disparages that decision as "incorrect," it is Montana law.

## ARGUMENT

**I.   ISSUE PRECLUSION PREVENTS RE-LITIGATION OF BNSF'S STRICT LIABILITY FOR "HANDLING OF ASBESTOS" PREMISED ON THE TOXIC DOWNTOWN LIBBY RAILYARD.**

In this diversity action, the Court applies Montana's substantive law regarding issue preclusion. *Moe v. System Transport,* CV 09-157-M-DWM-JCL, 2010 WL 4534947, at *3 (D. Mont. 9/27/10). The purpose of the doctrine is to promote a "definite end to litigation," to "conserv[e] judicial resources and encourag[e]

4

reliance on adjudication by preventing inconsistent judgments." *Baltrusch v. Baltrusch*, 2006 MT 51, ¶15, 130 P.3d 1267 (citations omitted).

Collateral estoppel is not merely a principle for discretionary application; rather, its binding preclusive effect is as conclusive as an adjudication of a missed statute of limitations. *McDaniel v. State*, 2009 MT 159, ¶46, 208 P.3d 817. When a party has had a full and fair opportunity to litigate an issue "determined in a prior suit," that party is barred from relitigating that issue. *Baltrusch,* ¶18 (noting the burden of proof is on the party attempting to defeat application of the doctrine).

*Baltrusch* provides a *four-part* test to determine if the doctrine applies: (1) the identical issue was previously decided; (2) final judgment on the merits was issued; (3) the party against whom preclusion is asserted is the same or in privity with that party; and (4) the party against whom preclusion is asserted was afforded a full and fair opportunity to litigate any issues which may be barred. *Baltrusch*, ¶15.

### a. The issue litigated in *Barnes* and decided by the MTSC is the identical issue here.

To determine if an issue is identical, the court "compares pleadings, evidence, and circumstances surrounding the two actions." *Brishka v. Dep't of Transp.*, 2021 MT 129, ¶12, 487 P.3d 771. The identity standard is met when "issues are so intertwined that to decide the issue before it" the court would have to rehear the "precise issue previously decided." *Id*.  A litigant cannot avoid collateral estoppel simply by reframing the same issues or raising new arguments if those new theories

5

or factual assertions "could have been raised" in the prior adjudication—the determination is conclusive. *Baltrusch*, ¶25 (internal quotations omitted).

Here, the pleadings, evidence, and framing of the issue is identical in every material respect. The complaints in *Barnes* and this case are identical, except, in conformance with the MTSC's *BNSF* decision, Plaintiffs removed "transport of vermiculite" allegations from their strict liability claim. *Cf.* Doc.1 (*Wells* Complaint) with Ex.21 (*Barnes* Third Amended Complaint).

Moreover, a review of the parties' arguments before the ACC and MTSC confirm the focus of those arguments was the toxic condition at BNSF's downtown Libby railyard, which was the basis of Plaintiff's claim and the MTSC's decision:

> Justice Sandefur: "their claim is based upon airborne dispersal of dust out of this railyard, correct … I don't understand how you can say there's a genuine issue of material fact that there was unsafe levels of asbestos in that railyard." …
> Justice Shea: "it's decades of buildup of asbestos and essentially a failure to remediate that over the course of those decades. And if the allegation is the presence of that in the yard as opposed to the transportation … is there a distinction between the maintaining of an unreasonably dangerous condition there, with kind of like the pond in *Covey* that because of the buildup in the yard as opposed to it blowing off the cars and people inhaling it that from the transportation of it?

Ex.22 (MTSC Oral Argument, 1:07:05-1:11:15, https://vimeo.com/369950108).

The toxicity of the railyard was the very basis for the MTSC's finding of strict liability—identical to Plaintiffs' strict liability claims here:

6

- "Because it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination, and exposure to asbestos creates a great risk of harm to individuals …" *BNSF*, ¶25.

- "It is beyond dispute that extensive asbestos existed, at high levels, on BNSF's properties." *Id.* ¶23.

- In applying the fifth factor: "[i]ndeed, it is especially relevant that BNSF's railyard was located in downtown Libby and its tracks ran through the town, where Plaintiffs, as citizens of Libby, are claiming they were injured by exposure to asbestos while conducting their daily activities." *Id.* ¶34.

BNSF advances the same arguments and evidence already considered and rejected by Montana's highest court, but the law of issue preclusion is clear—if arguments "could have been raised" in the prior adjudication, then BNSF is precluded from relitigating them here. *Baltrusch*, ¶25.

### b. **A final judgment in the prior adjudication is not required because the MTSC's opinion was "adequately deliberated and firm."**

The requirement for a final judgment was modified in *Baltrusch* (2006). The Montana Federal District Court has noted, under the "relaxed standard" for issue preclusion, a final judgment is <u>not</u> necessary to give preclusive effect if "the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered, and should refuse preclusion if the decision was avowedly tentative." *Moe*, 2010 WL 4534947, at *3 (quoting

7

*McDaniel*, ¶39); *see also Baltrusch,* ¶22 (four factors considered for preclusive effect from a case with no final judgment).

In *Barnes*, the identical issue was briefed and argued.  Judge Eddy's Order followed. BNSF appealed the case to the MTSC, which considered more briefing, oral argument, and hundreds of exhibits. Thereafter, the MTSC unanimously held BNSF strictly liable for its "handling of asbestos." The MTSC's *Opinion* was thoroughly and deliberately final, not "avowedly tentative."

The clear policy undergirding the creation of the ACC supports finality. To deny preclusive effect of the MTSC's *Opinion* "would lead to an absurd result," giving BNSF an incentive to drag out every issue "as long as possible, with the hope of delaying the preclusive effects of an earlier ruling" until an inconsistent judgment is obtained, the very concern issue preclusion arose to address. *Baltrusch*, ¶21.

**c.  The MTSC carefully considered the same relevant documentary record and arguments in reaching its decision giving BNSF a full and fair opportunity to litigate this issue.**

Despite the ACC's and MTSC's consideration of the voluminous record regarding the toxicity of BNSF's Libby railyard and its unanimous holding that no reasonable factual dispute exists on that issue, Section II of BNSF's brief asks this Court to rehash those same factual issues.  All four of BNSF's alleged factual disputes attempt to reverse the fully adjudicated fact "that BNSF's properties in Libby contained extensive asbestos contamination." *BNSF*, ¶25. BNSF argues the ACC's and MTSC's reliance on certain documents, including BNSF's own asbestos

8

sampling reports and official U.S.E.P.A. site documents, led the MTSC to issue an "incorrect opinion."[4]

Tellingly, every document BNSF references in Section II was within the documentary record before both the ACC and MTSC. Determinative here, <u>identical arguments based on the same documentary evidence</u> were front and center in the briefing <u>and</u> oral argument before <u>both</u> the ACC and the MTSC. *See, e.g.*:

1. <u>Air sampling at the Libby railyard demonstrated results "up to 7-14 f/cc"</u>: *BNSF*, ¶¶22-25 discussing BNSF's identical arguments on this issue; Ex.22 (MTSC Oral Argument), 32:00-40:08, 1:06:34-1:11:50; Ex.23 (ACC Oral Argument Transcript), pp.152-157; Ex.24 (BNSF's Petition for Writ), pp.14-15; Ex.25 (Plaintiff's Response to Writ), pp.6-7, 16-18; Ex.26 (BNSF's Reply in Support of Writ), pp.6-8; Ex.27 (BNSF's Opening Brief on Writ), pp.38-39; Ex.28 (Plaintiff's Answer Brief on Writ), pp.7-8, 25-27; Ex.29 (BNSF's Reply Brief on Writ, pp.11-13).

2. <u>Air sampling performed in 1975 "near the downtown BNSF Railyard" revealed outdoor air concentrations of up to 1.5 f/cc</u>: Ex.23, pp.158-160; Ex.25, p.18; Ex.26, p. 13; Ex.28, pp. 7, 27; Ex.29, p.10-11.

---

[4] While "BNSF categorically denies the correctness" of the MTSC's decision, BNSF did not seek any petition for re-hearing. *See* Mont.R.App.P. Rule 20 (allowing rehearing if "it overlooked some fact material to the decision").

9

3. <u>Soil testing revealed the BNSF railyard had "high levels" of asbestos contamination ranging from 2-5%</u>: *BNSF*, ¶ 22-25, discussing identical arguments on this issue; Ex.22, 9:00-13:22, 32:00-40:08, 1:06:34-1:11:50; Ex.23, pp.143-146; Ex.24, pp.14-15; Ex.25, pp.6-7, 16-18; Ex.26, pp.6-8; Ex.27, pp.38-39; Ex.28, pp.7-8, 25-27; Ex.29, p.10-13.

4. <u>Visible vermiculite does not equate to the presence of asbestos</u>: Ex.22, 1:07:00-1:11:50; Ex.23, pp. 164-166; Ex.26, pp.6-7; Ex.28, p.7.

Following the extensive briefing, oral argument, and its review of this record containing the documentary evidence and arguments presented here again by BNSF, the MTSC held:

> Because <u>it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination</u>, and exposure to asbestos creates a great risk of harm to individuals, the Asbestos Court did not err in concluding this factor weighs in favor of finding BNSF strictly liable.

*BNSF,* ¶25. The ACC and MTSC both found BNSF's <u>interpretation</u> of the <u>undisputed record</u> unpersuasive: "[t]hus, although BNSF cherry picks the record to cite to isolated favorable test results, it is beyond dispute that extensive asbestos existed, at high levels, on BNSF's properties." *BNSF*, ¶23.[5] While BNSF disparages

---

[5] While not pertinent to the scope of the common carrier exception, BNSF's interpretation of the undisputed documentary record lacks merit: BNSF cannot dispute (a) BNSF's railyard air sampling, performed <u>more than a decade after vermiculite shipment ceased</u>, demonstrated 53 samples containing asbestos levels up to 14 f/cc, (b) these reports were relied upon by BNSF and USEPA without any question of validity, and (c) immediately thereafter BNSF mandated railyard

the MTSC decision, it is clear BNSF had a "full and fair opportunity" to litigate its interpretation of these four facts with the MTSC. The law of issue preclusion is clear—these arguments were raised and "could have been raised" in the prior adjudication, so BNSF is precluded from relitigating them here. *Baltrusch*, ¶ 25.

## II. THE COMMON CARRIER EXCEPTION DOES NOT APPLY TO BNSF'S HARBORING OF AND FAILURE TO CONTROL AN OPEN-AIR REPOSITORY FOR ASBESTOS WASTE ON ITS PROPERTY IN DOWNTOWN LIBBY.

The narrow scope of this Court's inquiry is whether the common carrier exception protects BNSF from strict liability for the abnormally dangerous condition it created and maintained. Namely, this Court must decide, as a matter of law, whether BNSF was legally required to harbor and fail to control the toxic asbestos on its property in the downtown Libby railyard for several decades. Under no reasonable interpretation of both the duties imposed on a common carrier and the

---

employees use respirators, coveralls, and decontamination procedures. *See, e.g.*, Declaration of Nadia Patrick, Ex.R. It is undisputed that subsurface railyard soil samples taken during BNSF's initial cleanup effort in 2003 ranged from 1-3% asbestos and all composite samples were 2% asbestos (e.g, BNSF SDF, ¶¶25,33). There is no indication that in the 20 years since publication, BNSF ever questioned USEPA's report of "asbestos levels in soil from 2-5%." Tellingly, BNSF concedes USEPA performed its own railyard soil sampling in 1999 before all sampling referenced here by BNSF (e.g., BNSF SDF, ¶31).

11

analysis of the MTSC's adoption of Restatement § 521 should BNSF be immune from strict liability for its "handling of asbestos."

In *BNSF*, relying on this Court's reasoning in *Murphy-Fauth v. BNSF*, 2018 U.S. Dist. LEXIS 126180, the MTSC described the scope of the common carrier exception: (a) the exception applies <u>only</u> to activites "undertaken pursuant to its <u>statutory duty</u>," "<u>only</u> to the extent that a defendant was <u>legally required</u> to perform the ultrahazardous activity," and (b) "the exception does <u>not</u> apply when an entity engages in abnormally dangerous activity <u>for 'its own purposes</u>.'" *Id.*, ¶49 (quoting *Murphy-Fauth*, 2018 U.S. Dist. LEXIS 126180 at *6).

BNSF relies on unappealed Montana district court decisions, including *Walsh v. Mont. Rail Link*, 2001 Mont. Dist. LEXIS 3033, *22 and *Griffin v. Mont. Rail Link*, 2000 Mont. Dist. LEXIS 1331, **5-6, both of which involved <u>train derailments during transport</u> releasing toxic chlorine gas. These cases exemplify the purpose and proper application of the § 521 exception to strict liability. Less tethered to a statutory duty the "defendant was <u>legally required</u> to perform," is *Anderson v. BNSF Ry. Co.*, 2010 Mont. Dist. LEXIS 73, *4, where the district court ruled, in a single paragraph of analysis, the storage of diesel fuel was an imposed transportation obligation on BNSF as a common carrier and therefore an "integral part of its operation." In contrast, BNSF's harboring of asbestos-contaminated soil in its railyard was neither integral to nor during its transportation duties.

12

While neither the MTSC nor Restatement § 521 provide specific factors for defining the scope of the common carrier exception, case law demonstrates for the exception to apply, there must be (a) a nexus between the activity "integral" to its operations and the statutorily imposed public duty, and (b) a temporal link between that statutorily mandated activity and the injurious exposure. Here, easily distinguishable from *Anderson* and the diesel needed to operate the railroad's locomotives, BNSF was <u>not</u> legally required nor was it an "integral part" of transporting vermiculite to harbor and maintain an open-air asbestos repository in downtown Libby. Further, Plaintiffs' exposures were to high levels of asbestos for a period of years, and which persisted <u>long after the last vermiculite was transported, further demonstrating both the lack of nexus to BNSF's integral operations and the lack of a temporal link between transportation and exposure.</u>

Simply stated, BNSF argues the exception should swallow the rule: because it had to transport vermiculite, and "everything necessary for that purpose," (quoting § 69-11-107, MCA) it was therefore "legally required" to harbor an open-air asbestos repository in the middle of downtown Libby. The MTSC already put that argument to rest—the "narrow" exception for common carriers is limited only to the "<u>transportation of vermiculite</u>." *BNSF*, ¶49. BNSF's position improperly expands the narrow common carrier exception—both temporally and in consideration of a nexus to activities integral to vermiculite transportation—to the point BNSF may

13

<u>never</u> be found strictly liable simply because at some point in its operations it was required to transport vermiculite.

BNSF's interpretation also contradicts the second limitation on the common carrier exception—when an entity engages in an activity "for its own purposes." This Court should reject BNSF's contention that BNSF did not act intentionally by failing to prevent the highly toxic asbestos contaminating the railyard allegedly causing injury to the Libby community so it did not act for its own purpose. Not only does Restatement § 519 specifically state intent is irrelevant for this analysis (*see* cmt. d "The liability stated in this Section is not based upon any intent of the defendant to do harm to the plaintiff . . ."), but the purpose of the abnormally dangerous activity need not be for financial gain. *See* cmt. d to Restatement § 520 ("The rule here stated is equally applicable when there is no pecuniary benefit to the actor.").

Nevertheless, BNSF <u>did</u> financially gain from operating its railyard in downtown Libby, and by failing to take precautions to prevent contamination and injurious exposures from the open-air asbestos repository it maintained. BNSF's failure is particularly egregious because it is undisputed (a) "there were large amounts of asbestos present in [BNSF's] railyard" and "asbestos soil levels of 2-5%" in the railyard (*BNSF*, ¶23) and (b) BNSF had "actual knowledge of the consequences of asbestos dust exposure, stemming both from concentration of exposure and duration, and . . . that asbestos dust exposure could cause latent

disease." *BNSF*, ¶26 (quoting ACC's decision). BNSF's conduct again falls outside the narrow common carrier exception which does not apply when the abnormally dangerous activity was "for its own purposes."

## CONCLUSION

Plaintiffs respectfully request the Court uphold the MTSC ruling that BNSF is strictly liable for its "handling of asbestos" at its downtown Libby railyard; and grant partial summary judgment to Plaintiffs holding as a matter of law the common carrier exception does not apply to BNSF's act of harboring an abnormally dangerous condition at its downtown Libby railyard.

Respectfully submitted this 29th day of March, 2023.

                                                        McGARVEY LAW

                                                        /s/ Jinnifer Mariman
                                                       JINNIFER MARIMAN
                                                       *Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this *Brief* complies with the requirements of Local Rule 7.1(d)(2). The lines in this document are double-spaced, except for footnotes and quoted and indented material, and the document is proportionally spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 3,182 words (less than 3,250 words), excluding caption, certificates of services and compliance, and table of contents and authorities.

DATED this 29th day of March, 2023.

                                              McGARVEY LAW

                                              /s/ Jinnifer Mariman
                                              JINNIFER MARIMAN
                                              *Attorney for Plaintiffs*