# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased,<br><br>    Plaintiffs.<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation, ROBINSON INSULATION COMPANY, a Montana Corporation for profit, GROGAN ROBINSON LUMBER COMPANY, a Montana Corporation for profit, et al.,<br><br>    Defendants. | **CV-21-97-GF-BMM**<br><br><br><br>**ORDER** |

## INTRODUCTION

Plaintiffs Jackson Wells, as personal representative for the estate of Thomas Wells ("Wells"), and Judith Hemphill, as personal representative for the estate of and Joyce Walder ("Walder") (collectively "Plaintiffs"), have sued Burlington Northern Santa Fe Railway Company ("BNSF"), Robinson Insulation Company, and Grogan Robinson Lumber Company for negligence, strict liability, wrongful death, and punitive damages. (Doc. 1.) This suit arises from Wells's and Walder's

1

deaths from asbestos exposure-caused mesothelioma. (Doc. 15 at 2.) Plaintiffs allege that Wells and Walder were exposed to airborne amphibole asbestos dust at the BNSF railyard in Libby. (*Id.*) Plaintiffs allege that these exposures caused Wells and Walder to develop mesotheliomas and eventually die from them. (*Id.*)

The Court previously dismissed Plaintiffs' claims against Robinson Insulation and Grogan Robinson Lumber. (Doc. 42.) BNSF remains the sole Defendant in this case. Plaintiffs have filed two Motions for Summary Judgment seeking to prevent BNSF from assigning fault to any other nonparty to the litigation and that the presence of asbestos dust and waste at the BNSF Libby railyard constituted an abnormally dangerous activity subject to strict liability. (Doc. 53); (Doc. 57.) BNSF also has filed two Motions for Summary Judgment in which it argues that strict liability does not apply to its activities in the Libby railyard and that federal law preempts Plaintiffs' claims. (Doc. 83); (Doc. 79). The parties also have filed a variety of procedural and evidentiary motions. (Doc. 100); (Doc. 126); (Doc. 91); (Doc. 94); (Doc. 97); (Doc. 103); (Doc. 109); (Doc. 113); (Doc. 116); (Doc. 120); (Doc. 131); (Doc. 138); (Doc. 146); (Doc. 149); (Doc. 106); (Doc. 123); (Doc. 141); (Doc. 144.) The Court held a hearing on the parties' motions on June 16, 2023. (Doc. 207.) The Court now will address the parties' Motions for Summary Judgment regarding affirmative defenses, preemption, and BNSF's Motion to Stay. (Doc. 53); (Doc. 83); (Doc. 126). The Court will address by separate Orders the remaining motions.

## BACKGROUND

Vermiculite ore containing high concentrations of amphibole asbestos was intensively mined, processed, and shipped from Libby between 1923 and 1994. (Doc. 15 at 4.) Vermiculite mining and transport operations resulted in the accumulation of significant asbestos contamination in and around Libby, including airborne asbestos contamination. (*Id.*) BNSF's railyard in downtown Libby served as the hub of the railroad company's vermiculite business. Plaintiffs allege BNSF transported crushed vermiculite ore, loaded into open rail cars from the vermiculite mine and along BNSF's "Libby Logger" line, to BNSF's railyard in downtown Libby. (Doc. 1 at 7-11.) Plaintiffs claim that BNSF transported from 193 million to four billion pounds of asbestos between 1925 and 1981, moving up to 105,000 pounds of asbestos per day into downtown Libby in the late 1960s and 1970s, and up to 126,000 pounds of asbestos per day through the 1980s. (Doc. 15 at 6.) Plaintiffs base these amounts of asbestos on the range of asbestos content of the processed vermiculite that BNSF handled. Plaintiffs claim that the transport of such volumes of asbestos-ridden vermiculite resulted in significant accumulations of asbestos-contaminated dust in the railyard and throughout Libby.

Plaintiffs allege that BNSF's activities caused Wells's and Walder's exposures to extraordinary high levels of asbestos in or near Libby. (*See* Doc. 1.) Plaintiffs allege that their exposure resulted, in significant part, from BNSF's

negligent operation of its Libby loading facility, its Libby railyard, and its transportation of asbestos-contaminated vermiculite between its loading facility and railyard. (*Id.* at 10-13.) Plaintiffs allege that a layer of asbestos-contaminated dust regularly coated the loading facility and the loaded rail cars. (*Id.*) Plaintiffs allege that BNSF's train cars released visible clouds of contaminated dust as they traveled from BNSF's loading facility to BNSF's railyard in Libby. (Doc. 1 at 4-5.) Plaintiffs claim that BNSF failed to contain this dust or otherwise prevent it from blowing through Libby's downtown and surrounding neighborhoods, thus exposing Libby residents, rather than just railyard employees, to its harms. Plaintiffs allege that certain of BNSF's activities in the Libby vermiculite industry extended beyond its role as a common carrier that simply transported required goods. Plaintiffs also claim that BNSF knew of the dangers of asbestos exposure by at least the 1940s but failed to control the risk of asbestos dust pollution that regularly accumulated at BNSF's railyard. (Doc. 15 at 9.)

Plaintiffs base their historic estimates of asbestos concentrations in part on the presence of significant volumes of asbestos-contaminated waste even after the Libby cleanup efforts began in earnest in 2001: "The Environmental Protection Agency has stated that the sources of asbestos contamination are, at least in part, from properties, railroad tracks, and rights of way owned, leased, and maintained by BNSF, [including the railyard]." (*Id.* at 7.) Plaintiffs claim that Wells's dust

exposures allegedly occurred while he lived adjacent to the railyard and Walder's exposures occurred when she lived in downtown Libby and regularly walked along BNSF's tracks and through its railyard. (Doc. 54 at 8.)

## LEGAL STANDARD

The Court will grant summary judgment when the moving party demonstrates both an absence of material fact issues and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The summary judgment inquiry requires examining the evidence in the light most favorable to the nonmovant. Once the movant has met this initial burden, however, the party opposing the motion "may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.*

The Court possesses broad discretion to manage its own docket. This broad discretion includes the inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). The Court, in deciding a motion to stay, considers the "possible damage" the stay may cause, "the hardship

or inequity" that a party may suffer if the case goes forward, and whether a stay would simplify or complicate the issues, proof, and questions of law of the case. *Lockyer v. Mirant Corp*, 398 F.3d 1098, 1110 (9th Cir. 2005).

## DISCUSSION

### I.   Plaintiffs' Motion for Summary Judgment regarding nonparty affirmative defenses (Doc. 53) and BNSF's Motion for a Stay (Doc. 126)

Plaintiffs ask the Court to prohibit BNSF from asserting affirmative defenses related to the alleged liability of certain entities that are not, or no longer remain, parties to this case. (Doc. 56.) Plaintiffs first contend that BNSF may not maintain any nonparty defenses as to entities it failed to join in this case. (*Id.* at 7.) Plaintiffs specifically identify W.R. Grace as an improper third party. (*Id.* at 8.) Plaintiffs also argue that Mont. Code Ann. § 27-1-703, "the mechanism for allocation of responsibility where a plaintiff is injured by the acts or omissions of multiple tortfeasors," requires BNSF to satisfy certain steps to shift or allocate any liability onto other parties. (*Id.* at 6-7) (quoting *Metro Aviation, Inc. v. United States*, 305 P.3d 832 (Mont. 2013)). Plaintiffs argue that BNSF has failed to comply with Mont. Code Ann. § 27-1-703 as it relates to settled parties in this case: Robinson Insulation, Grogan Robinson Lumber, and the State of Montana. (*Id.* at 6-7.) Plaintiffs also contend that BNSF has disclosed no experts who can opine as to the negligence of these settled parties and, because of the expired expert disclosure deadlines, lacks

the means to introduce evidence regarding the settled parties' liability at trial. (*Id.* at 8.)

The Court first will address W.R. Grace as a nonparty. BNSF seeks to assert, ultimately to a jury, an affirmative defense that W.R. Grace caused Plaintiffs' alleged injuries. (Doc. 67 at 5.) BNSF failed to join W.R. Grace in this action. Plaintiffs have not settled with W.R. Grace. (Doc. 87 at 5.) BNSF also seeks to stay the current case until Plaintiffs' claims against W.R. Grace settle. (Doc. 126.)

W.R. Grace conducted extensive vermiculite mining and processing activities in Libby. W.R. Grace, as with many major asbestos-related businesses across the country, filed for bankruptcy protection in the face of a significant volume of asbestos-related lawsuits initiated against it. *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013).

The long latency period of asbestos-related injuries and the need for a mechanism to protect unknown future asbestos claimants spurred the Bankruptcy Court for the District of Delaware to approve the W.R. Grace Personal Injury Settlement Trust ("W.R. Grace Trust") as part of W.R. Grace's plan of reorganization. *See id.* This trust survived W.R. Grace's discharge and became the entity into which all asbestos-related liabilities were to channel. Upon confirmation

of the plan of reorganization, the bankruptcy proceeding enjoined all future asbestos claimants from proceeding with individual lawsuits against W.R. Grace. Claimants instead must assert their claims with the W.R. Grace Trust. *Id.*

The W.R. Grace Trust formed pursuant to 11 U.S.C. § 524(g) of the Bankruptcy Code, a statute enacted to provide "supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability." *Id.* at 91. Section 524(g) of Title 11 of the U.S. Code explicitly authorizes the creation of such asbestos trusts. It directs that asbestos bankruptcy trusts be funded by stock in the reorganized company, insurance proceeds, and other company assets, and those funds then pay claims submitted by present and future claimants. *See* 11 USC § 524(g)(2)(B)(I).

The channeling of all asbestos-related liabilities of a debtor such as W.R. Grace into its formed trust proves essential to § 524's imposition of injunctions barring lawsuits in trial courts. *See* 11 USC § 524(g)(2)(B). "In order to receive the benefits of the trust and channeling injunction, the debtor and any covered third parties must satisfy the explicit requirements of § 524(g)." *In re W.R. Grace & Co.*, 475 B.R. at 91. The Bankruptcy Court approves these procedures specific to each trust. A Trust Agreement formally establishes the trust, and Trust Distribution Procedures "describe the process by which claims will be collected, reviewed, and paid." Francis E. McGovern, *The Evolution of Asbestos Bankruptcy Trust*

8

*Distribution Plans*, 62 NYU Ann. Surv. Am. L. 163, 1-3 (2006). The W.R. Grace Trust Distribution Procedures establish several asbestos-related "Disease Levels . . . defined by specific medical and compensation criteria derived from medical research and applicable tort system considerations." *In re W.R. Grace & Co.*, 475 B.R. at 122. Claimants to the W.R. Grace Trust must meet the criteria for a specific Disease Level before they may obtain settlement offers. *Id.*

### A.    BNSF's Motion for a Stay (Doc. 126)

BNSF, as an initial matter, asks the Court to defer its ruling on any affirmative defense as to W.R. Grace because it lacks the documents necessary to determine whether Plaintiffs have "come to a meeting of the minds as to their controversy" with W.R. Grace. (Doc. 67 at 7.) BNSF also asks, in a separate Motion, that the Court stay this case until Plaintiffs' pending claims against the W.R. Grace Trust resolve. (Doc. 126.) BNSF argues that it cannot satisfy itself that W.R. Grace remains an unsettled party absent documents it has subpoenaed from the W.R. Grace Trust. (Doc. 67 at 6-7.)

BNSF also argues that "[i]f Mont. Code Ann. § 27-1-703 is held to be valid and enforceable in this case, a continuance of the trial is necessary until Plaintiffs resolve their claims against the Grace Trust so the jury can fairly apportion fault to W.R. Grace." (Doc. 127 at 5.) The Montana Supreme Court already has addressed a similar issue in *BNSF Ry. Co. v. Eddy*, 459 P.3d 857, 876 (Mont. 2020). The

Montana Supreme Court explained that "[W.R.] Grace and [other plaintiffs suing BNSF for similar asbestos exposures] have not settled. Although a fund has been established to provide for those injured by Grace's activities . . . none of the Plaintiffs have yet received a settlement from that fund. . . . There is no evidence in the record to indicate there has been a meeting of the minds between [W.R.] Grace and the Plaintiffs. [The record does not reveal] evidence that the Plaintiffs have reached any agreement with [W.R.] Grace regarding how much they might be entitled to, the nature and duration of their illnesses, or the form of settlement they are entitled to." *Id.* Implicit in the Montana Supreme Court's determination that W.R. Grace did not represent a "settled party" under Mont. Code Ann. § 27-1-703 was the understanding that the asbestos claims court, the trial court in that instance, would continue adjudication of the cases before it upon remand. Nothing in the Montana Supreme Court's unequivocal determination that W.R. Grace represented an unsettled party suggested that due process would require the W.R. Grace Trust administrative process to take precedence over adjudication of the cases before the trial court.

The Court will not require such a result here. The Montana Supreme Court has determined previous versions of Mont. Code Ann. § 27-1-703(4) to be unconstitutional only when they "violated the federal and state substantive due process rights of *plaintiffs* and *previously settled or released third-party tortfeasors.*" *Stowe v. Big Sky Vacation*, 454 P.3d 655, 666 n.22 (Mont. 2019)

(emphasis in original). As discussed further below, BNSF here represents neither. BNSF points to no caselaw that supports finding any hardship or inequity would flow should adjudication of a case before a district court fail to yield to a claim proceeding akin to the W.R. Grace Trust proceedings. As further discussed below, Plaintiffs, rather than BNSF likely would face damage should the Court indefinitely stay this case pending the potential of a decades' long resolution of Plaintiffs' W.R. Grace Trust claims.

BNSF points to a motion to stay granted in another asbestos-related case now pending before a Montana state district court. BNSF argues that the plaintiffs' filing of the motion to stay in *Bree v. BNSF* should preclude Plaintiffs from arguing against a stay here. (Doc. 178 at 5.) BNSF contends that "[other plaintiffs] through identical counsel are making a completely different argument regarding the application of [Mont. Code Ann. § 27-1-703]" and, by extension, the propriety of staying proceedings to allow resolution of claims against all alleged tortfeasors. (*Id.* at 5-6.) BNSF ignores, however, that Mont. Code Ann. § 27-1-703's relevance here involves its application to nonparties.

Maryland Casualty Company was the party before the Montana state district court in *Bree v. BNSF*. The plaintiff in *Bree* had named Maryland Casualty Company as a defendant at the outset of his suit. (Doc. 179-1.) The plaintiff in *Bree* asked to pause the litigation when Maryland Casualty Company sought resolution of the

11

question whether its own bankruptcy proceedings would render it immune from claims like the one filed by the plaintiff. (Doc. 179-2 at 5.)

Maryland Casualty Company, unlike W.R. Grace, had not yet reached any final determination of its obligations or potential liability to suits from Libby residents. Maryland Casualty Company, unlike W.R. Grace, actively disputed and had yet to resolve whether claims of the type presented by the plaintiff in *Bree* could proceed against it in any fashion, whether in a district court or otherwise. The *Bree* case implicated the plaintiff's substantive rights to resolution of its legal claims against a defendant whom the plaintiff had chosen to assert his cause of action. These facts distinguish *Bree* from the case before the Court and the issue of W.R. Grace's role in this litigation.

The Court further remains unpersuaded by BNSF's arguments that Plaintiffs, in fact, have settled with the W.R. Grace Trust or deliberately seek to delay resolution of their W.R. Grace Trust claims to unfairly influence the outcome of this case. (Doc. 178 at 8-10.) BNSF points to evidence of deficiency notices Plaintiffs received from the W.R. Grace Trust regarding the processing of Plaintiffs' claims. BNSF suggests that these deficiency notices indicate that the W.R. Grace Trust will not proceed with resolution of the claims until Plaintiffs correct the deficiencies. (Doc. 209 at 47-48.) BNSF argues that Plaintiffs' conduct has led to the W.R. Grace Trust claims' remaining unresolved. (Doc. 209); (Doc. 178.)

Counsel for Plaintiffs have sworn and represented the contrary. Plaintiffs suggest that they have no guarantees of any payment from the W.R. Grace Trust and that the W.R. Grace Trust yet may deny their claims. (*See* Doc. 209 at 65-67); (Doc. 54.) Counsel for Plaintiffs also have clarified that they have received no deficiency notices from the W.R. Grace Trust involving their mesothelioma claims which parallel the claims at issue here. (Doc. 209 at 63-64.) Nothing in the record before the Court refutes these representations. BNSF has pointed to no evidence to show that Plaintiffs have satisfied all criteria for the W.R. Grace Trust's Distribution Procedures. *See In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013).

Counsel for Plaintiffs have described their pursuit of settlements with the W.R. Grace Trust and "their responsibility to [their] clients to pursue these claims as [they] can." (Doc. 209 at 66.) The record before the Court does not show that Plaintiffs or their counsel deliberately have delayed their W.R. Grace Trust claims. The record before the Court also does not reveal any evidence to refute Plaintiffs' counsel's representation that claims with the W.R. Grace Trust often take many years, at times more than twenty, to resolve. As further discussed below, fairness does not require this litigation to remain secondary to the resolution of Plaintiffs'

W.R. Grace Trust claims. The Court will deny BNSF's Motion to Stay for these reasons.

## B. Plaintiffs' Motion for Summary Judgment regarding BNSF's affirmative defenses

Mont. Code Ann. § 27-1-703 provides in relevant part that, "[i]n an action based on negligence, a defendant may assert as a defense that the damages of the claimant were caused in full or in part by a person with whom the claimant has settled or whom the claimant has released from liability." Mont. Code Ann. § 27-1-703(6)(a). The statute also allows defendants to join "any other person whose negligence may have contributed as a proximate cause to the [plaintiff's alleged] injury." Mont. Code Ann. § 27-1-703(4).

The statute limits, however, the entities against whom a defendant may raise a comparison of fault defense: "[e]xcept for persons who have settled with or have been released by the claimant, comparison of fault with any of the following persons is prohibited: (i) a person who is immune from liability to the claimant; (ii) a person who is not subject to the jurisdiction of the court; or (iii) any other person who could have been, but was not, named as a third party." Mont. Code Ann. § 27-1-703(6)(c).

Finally, the statute provides that, "[i]f for any reason all or part of the contribution from a party liable for contribution cannot be obtained, each of the other parties shall contribute a proportional part of the unpaid portion of the noncontributing party's share and may obtain judgment in a pending or subsequent

action for contribution from the noncontributing party." Mont Code Ann. § 27-1-703(5).

W.R. Grace, in Plaintiffs' view, represents a "person both 'immune from liability to [Plaintiff]' and 'not subject to the jurisdiction of th[is] Court' following resolution of its federal bankruptcy proceedings." (Doc. 56 at 8) (quoting Mont. Code Ann. § 27-1-703(6)(c)). BNSF first contends that W.R. Grace does not represent any of the prohibited parties listed in Mont. Code Ann. § 27-1-703(6)(c). (Doc. 67 at 12-13.) BNSF then counters that any application of the limitations in § 27-1-703(6)(c) as to W.R. Grace would violate BNSF's substantive due process rights. BNSF then asserts that Mont. Code Ann. § 27-1-703(4) grants it an affirmative right to ask the fact finder to determine whether W.R. Grace's actions constituted a proximate cause of Plaintiffs' alleged injuries. (*Id.*) BNSF claims that W.R. Grace's federal bankruptcy and reorganization prohibit BNSF from exercising its rights under Montana law. BNSF in effect argues that, unless it is allowed to ask the fact finder to apportion some fault to W.R. Grace, it will have been deprived of a guaranteed right. (*Id.* at 15-17.) BNSF's arguments prove unpersuasive.

The Court agrees that W.R. Grace, in this context, does not represent a party immune from Plaintiffs. The W.R. Grace Trust remains accessible to Plaintiffs, and, indeed, even though they have not yet settled claims with the Trust, Plaintiffs may yet recover from the Trust. The Court also agrees that W.R. Grace does not represent

an entity beyond the jurisdiction of the Court. The Court nevertheless determines that BNSF may not assert a nonparty defense as to W.R. Grace in this case.

The Montana Supreme Court first interpreted the version of Mont. Code Ann. § 27-1-703 enacted in 1977 to permit the right of contribution only among defendants against whom the plaintiff has recovered judgment and only in cases in which the plaintiff did not prove negligent. *Consol. Freightways Corp. v. Osier,* 605 P.2d 1076 (Mont. 1979). The Montana legislature amended the statute in 1981 to expand the right of contribution to cases where no comparative negligence existed and to allow a defendant to join unnamed joint tortfeasors. The Montana Supreme Court interpreted these amendments in *State ex rel. Deere & Co. v. Dist. Ct.*, 730 P.2d 396 (Mont. 1986). The Montana Supreme Court determined that the amended statute did not permit contribution from a defendant with whom a plaintiff had already settled. *Id.* at 402.

The Montana legislature again amended the statute in 1987, and, in 1994, the Montana Supreme Court addressed the statute's requirement that the fact finder apportion negligence among plaintiffs and all alleged tortfeasors, including settled parties, people immune from liability, and nonparties. *Newville v. State*, 883 P.2d 793, 802 (Mont. 1994). The Montana Supreme Court concluded that this provision denied substantive due process to plaintiffs. *Id.* The Montana Supreme Court determined that the statute lacked any safeguards to ensure that the fact finder's

apportionment of liability accurately reflected the various parties' comparative fault: "[Mont. Code Ann. § 27-1-703 (1987)] unreasonably mandates an allocation of percentages of negligence to nonparties . . .. It imposes a burden upon plaintiffs to anticipate defendants' attempts to apportion blame." *Id.*

The Montana legislature, in response, again amended the statute in 1995. The 1995 amendments "revived the nonparty defense . . . found unconstitutional in *Newville,* but provided several procedural requirements which had not been present in the 1987 version of the statute." *Plumb v. Fourth Judicial Dist. Court*, 927 P.2d 1011, 1021 (Mont. 1996*)*. The Montana Supreme Court again struck down a portion of the statute after determining that it violated unnamed third parties' rights. The Montana Supreme Court reasoned that allowing "apportionment of liability to parties who are not named in the lawsuit and who do not have an opportunity to appear and defend themselves . . .  is not rationally related to the legitimate government objective of fairly apportioning liability among parties based on the degree to which their negligence contributes to another person's injuries."  *Id.*

The Montana legislature's most recent amendments came in response to *Plumb*. Mont. Code Ann. § 27-1-703. The Montana Supreme Court has not disturbed the statute since the 1997 amendments. The current statute, as described above, allows defendants to seek to join "any person whose negligence may have contributed as a proximate cause to the [plaintiff's alleged] injury." Mont. Code

Ann. § 27-1-703(4). The statute now includes a defense against settled nonparties and establishes certain procedural requirements for asserting a settled party defense. The statute prohibits, however, comparison of fault with nonparties immune from liability, those not subject to the Court's jurisdiction, and those that could have been joined as parties but were not. Mont. Code Ann. § 27-1-703(6)(c). Accordingly, nonparties with whom a plaintiff has settled and nonparties whom a plaintiff has released from liability now appear to represent the only proper objects of a nonparty defense.

BNSF complains of this limitation: "the federal bankruptcy code and W.R. Grace's joint plan of reorganization preclude BNSF from exercising its right to join W.R. Grace as an additional party. . . . BNSF is thus left incapable of exercising its right . . . even though [Mont. Code Ann. § 27-1-703 itself does not prohibit apportioning fault to W.R. Grace." (Doc. 67 at 14-15.) BNSF, in effect, seeks permission to argue what the Montana Supreme Court twice has determined unconstitutional: the assignment of fault to a non-settled, nonparty. *Plumb v. Fourth Judicial Dist. Court*, 927 P.2d 1011, 1021 (Mont. 1996); *Newville v. State*, 883 P.2d 793, 802 (Mont. 1994).

The Montana Supreme Court has offered the following conclusions relevant to this issue in its decisions prompting amendments to Mont. Code Ann § 27-1-703: 1) "[t]he allocation of percentages of liability to non-parties violates substantive due

process as to the plaintiffs," *Newville*, 883 P.2d at 803; 2) constitutional constraints do not permit assignment of liability to "persons released from liability by the claimant, persons immune from liability to the claimant, and any other persons who have a defense against the claimant," *Id.*; 3) "a jury's apportionment of liability to someone who is not a party to the lawsuit, has not appeared, and has not been represented, will not be an accurate reflection of the true degree of that person's fault," *Plumb*, 927 P.2d at 1019; and 4) "the nonparty defense provided for by the 1995 amendments to [Mont. Code Ann.] § 27-1-703 . . . (1987), is not rationally related to that legitimate governmental objective, but is more likely to accomplish the opposite result." *Id.* at 1021. The Montana Supreme Court has reiterated that "Montana law . . . prohibits a defendant from attempting to apportion fault to the conduct of a non[]party. Assignment of liability to a non-party without affording that party the opportunity to defend against liability, risks an unreliable and disproportionate assignment of liability, and places the burden of defending the non[]party on the plaintiff." *Truman v. Mont. Eleventh Judicial Dist. Court*, 68 P.3d 654, 660 (Mont. 2003). The Court declines to invalidate a statutory scheme to allow BNSF to seek fault attribution in a manner contrary to the direction of the Montana Supreme Court.

The Montana Supreme Court previously rejected BNSF's argument that Mont. Code Ann § 27-1-703(4) "requires without exception a single-case

determination and apportionment of all sources of negligence alleged by any party to have been a cause of the injury and damages claimed by a plaintiff to have resulted from the negligence of the named defendant[]." *Stowe v. Big Sky Vacation*, 454 P.3d 655, 666 (Mont. 2019). The Montana Supreme Court has explained that Mont. Code Ann. § 27-1-703(4) "does not necessarily require joinder of all unsettled/unreleased responsible parties in every case." *Stowe v. Big Sky Vacation*, 454 P.3d 655, 666 (Mont. 2019). The Court declines to invalidate Mont. Code Ann. § 27-1-703 for BNSF's benefit in this case.

Moreover, the safety valve that BNSF seeks already exists. The Montana Supreme Court has explained that "[a] named defendant may separately seek contribution from another alleged tortfeasor (with whom the plaintiff has not settled or released) if '*for any* reason . . . contribution cannot be obtained' from that individual in the primary negligence action." *Stowe v. Big Sky Vacation*, 454 P.3d 655, 666 (Mont. 2019) (emphasis in original). "Nothing in the clear and unambiguous language of [Mont. Code Ann. § 27-1-703(4)-(5)] evinces any effect or intent to preclude [bankruptcy and reorganization] as a legal reason . . . why contribution cannot be obtained from W.R. Grace [as a] joint tortfeasor who would otherwise be subject to third-party joinder and contribution pursuant to [Mont. Code Ann. § 27-1-703(4)]." The ultimate success or failure or BNSF's attempts separately to seek contribution from W.R. Grace remain outside the scope of Plaintiffs' Motion

for Summary Judgment on this issue. Plaintiffs simply have asked that BNSF limit itself to the nonparty defenses permitted by Montana law. Plaintiffs' right to seek full compensation in the instant case "simply does not depend on whether [W.R. Grace] is joined as a third-party defendant to [BNSF]." *Stowe v. Big Sky Vacation*, 454 P.3d 655, 667 (Mont. 2019).

The Court notes in conclusion that the W.R. Grace Trust offers an avenue for the potential relief that BNSF seeks. BNSF implies that it will remain deprived of any relief against its alleged joint tortfeasor absent its ability to assert an empty chair defense against W.R. Grace in this case. (Doc. 126); (Doc. 67.) The W.R. Grace Trust appears to provide for the relief that BNSF may seek should Plaintiffs prevail on their claims: "The current structure of the [W.R. Grace Trust Plan] accounts for both direct and indirect claims against Grace. . .. Indirect claims against Grace are those claims that are derivative of Grace's liability, such as common-law indemnity and contribution claims, brought by co-defendants of Grace in the tort system." *In re W.R. Grace & Co.*, 475 B.R. 34, 128 (D. Del. 2012) *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013). The court that affirmed W.R. Grace's reorganization plan further explained that "BNSF is an indirect claimant of Grace because it seeks indemnification and contribution from Grace for personal injury

lawsuits it previously defended or will defend related to the Grace Asbestos that it transported by railroad from the Libby mine site," and that the W.R. Grace Trust "has established procedures to handle the payment" of indirect claims, including requiring indirect claimants such as BNSF first to prove that "it paid all, or a significant portion, of a liability that Grace owed to a direct claimant." *In re W.R. Grace & Co.*, 475 B.R. 34, 128 (D. Del. 2012). The indirect claimant then may pursue an indemnity and/or contribution claim against the trust: "[a]t this point, the indirect claimant assumes the same position as a direct claimant and is entitled to recover from the trust the same amount that a direct claimant could have recovered had it brought a direct claim against the trust itself." *In re W.R. Grace & Co.*, 475 B.R. 34, 128 (D. Del. 2012). This process appears to provide BNSF with an alternative right to seek contribution and positions it similarly to the nonparty discussed in *Stowe v. Big Sky Vacation*, 454 P.3d 655, 666 (Mont. 2019), whom the defendant could not join in the action due to the existence of an arbitration agreement with the defendant. The Court will grant Plaintiffs' Motion as to W.R. Grace for these reasons.

The Court now will address BNSF's affirmative defenses as to the settled parties the State of Montana and the Robinson defendants. Mont. Code Ann. § 27-1-703(6) allows defendants to assert certain nonparty defenses against parties with whom a plaintiff has settled or released. Mont. Code Ann. § 27-1-703(6)(a). The

statute places the burden of proof for the nonparty's negligence upon the defendant pleading the defense and establishes procedural requirements to provide notice and an opportunity to intervene and defend to the nonparty whose negligence the defendant asserts as a defense. *See* Mont. Code Ann. § 27-1-703 (6)(e)-(g). The statute requires defendants seeking to assert that a plaintiff's damages were caused by a settled party to prove the following: 1) "the negligence of the person whom the claimant has released or with whom the claimant has settled"; 2) "any standard of care applicable to the person whom the claimant released or with whom the claimant settled"; and 3) "that the negligence of the person whom the claimant has released or with whom the claimant has settled was a contributing cause under the law applicable to the matter." Mont. Code Ann. § 27-1-703(6)(e).

Plaintiffs seek to prevent BNSF from asserting nonparty defenses as to the Robinson defendants and the State of Montana. (Doc. 56 at 11.) Plaintiffs first argue that BNSF remains strictly liable to Plaintiffs for their injuries. Plaintiffs point out that Mont. Code Ann. § 27-1-703 does not apply to strict liability claims. (*Id.* at 15) (citing *Hulstine v. Lennox Indust., Inc.*, 237 P.3d 1277 (Mont. 2010)). The Court will address by separate Order the parties' independent motions regarding strict liability. The Court will address Plaintiffs' arguments as to their negligence claims for the purposes of Plaintiffs' Motion for Summary Judgment regarding BNSF's nonparty affirmative defenses. (Doc. 53).

Plaintiffs have argued that BNSF cannot prove the Mont. Code Ann. § 27-1-703(6)(e) elements without expert testimony and that BNSF has failed to disclose any experts as to each element. (Doc. 56 at 11-14.) BNSF contends that it may rely on Plaintiffs' Complaint, which includes allegations regarding the Robinson defendants' negligence, and Plaintiffs' previous litigation involving the State of Montana, which includes allegations regarding the State of Montana's negligence. (Doc. 67 at 19-20); (*See, e.g.*, Doc. 69 at 165-67.) BNSF argues that Plaintiffs' pleadings represent judicial admissions that "conclusively establish the standards of care and causation elements." (Doc. 67 at 20.) BNSF cite several paragraphs in Plaintiffs' Complaint as examples supporting this position.

These cited paragraphs contain the following allegations: 1) that "Plaintiffs' decedents were exposed to [the Robinson defendants'] unreasonably dangerous asbestos contaminated products, which [the Robinson defendants] wrongfully placed in the stream of commerce for use and consumption by the general public"; 2) the Robinson defendants "knew that extended exposure to asbestos was unreasonably dangerous and hazardous to an individual's health [but] concealed and failed to disclose such knowledge to their employees, the public, and the Plaintiffs' decedents"; 3) the Robinson defendants "owed the Plaintiffs' decedents a duty to act with reasonable care concerning their business operations"; 4) the Robinson defendants "breached their duty of care by negligently, carelessly, and recklessly

24

generating, handling, storing, releasing, disposing of, and failing to control and contain unreasonably dangerous and hazardous asbestos created by and/or resulting from their for-profit business operations"; and 5) "[a]s a direct and proximate result of Plaintiffs' decedents' exposure to asbestos-laced vermiculite generated and released by Robinson Insulation's and Grogan Robinson's business activities, Plaintiffs' decedents incurred a level of asbestos exposure that was more than insubstantial in its contribution to their development of asbestos related mesothelioma and resultant death." (Doc. 1 ¶¶ 64-71.) The complaints from other litigation involving the State of Montana in Montana state district courts contain similar allegations related to the State of Montana. (*See* Doc. 69.)

These paragraphs state only legal conclusions, however, that the Court does not consider judicial admissions. "Parties are only bound by factual allegations in a complaint, and not legal conclusions." *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 134 F. Supp. 3d 1199, 1205 (N.D. Cal. 2015). Other circuits have reached a similar conclusion: "[t]o constitute a judicial admission, the statement must be one of fact—a legal conclusion does not suffice"; judicial admissions "must be statements of fact that require evidentiary proof, not statements of legal theories"; and "[j]udicial admissions of fact must be deliberate and clear, while legal conclusions are rarely considered to be binding judicial admissions." *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020); *see also In re Teleglobe*

*Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir. 2007); *Com. Money Ctr., Inc., v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)  The Court agrees that, "[w]hile a judicial admission in a pleading has the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact, to constitute a judicial admission in a pleading, the party against whom the admission is sought must have admitted *a fact*." *Elliott v. Solis*, 2019 WL 2150949, at *6 (E.D. Cal. May 16, 2019) (emphasis in original) (citation omitted); *see also Pierson v. Ford Motor Co.*, 2008 WL 7074289, at *2 (N.D. Cal. Oct. 3, 2008).

The Court sets aside for the moment the fact that Plaintiffs do not represent the parties against whom admissions would be sought as it relates to BNSF's negligence theories as to the Robinson defendants or the State of Montana. The Court determines that Plaintiffs' legal conclusions relating the Robinson defendants' and the State of Montana's negligence and causation do not represent "facts" to be considered as competent evidence that could prove the required elements of BNSF's settled nonparty affirmative defenses. BNSF must provide other competent evidence to carry its burden under Mont. Code Ann. § 27-1-703(6)(e).

BNSF next argues that expert testimony does not prove necessary for it to carry the burden of proof for its settled party defenses. (Doc. 67 at 18-21.) The Court previously has explained that Mont. Code Ann. § 27-1-703(6)(e) essentially places the same burdens plaintiffs bear as to defendants upon defendants as to settled

nonparties. A plaintiff "must prove four essential elements: duty, breach, causation, and damages" to establish negligence under Montana law. *Fisher v. Swift Transp. Co.,* 181 P.3d 601, 606 (Mont. 2008). BNSF must present similar proof as to the Robinson defendants and/or the State of Montana to establish their negligence. *See* Mont. Code Ann. § 27-1-703(6)(e).

Expert witness testimony remains required to establish duty, breach, and causation in a negligence case when those issues are "sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence." *Dubiel v. Montana Department of Transportation,* 272 P.3d 66, 70 (Mont. 2012). Expert opinion testimony may prove necessary where the issues of causation remain "beyond the common experience and understanding" of lay jurors. *Tin Cup County Water and/or Sewer District,* 200 P.3d 60, 69 (Mont. 2008). The Court may grant summary judgment where a party fails to present the expert testimony necessary to prove the elements of its claim. *Dubiel,* 272 P.3d at 70.

Plaintiffs have alleged that their decedents developed asbestos-related disease due to exposures to open-air asbestos repositories at BNSF's Libby railyard. (Doc. 1); (Doc. 15.) BNSF must prove the negligence of either the Robinson defendants and/or the State of Montana, including any applicable standard of care, as part of its settled party defenses. Mont. Code Ann. § 27-1-703(6)(e).  Carrying its burden likely

will require BNSF to show that Plaintiffs' decedents negligently were exposed to asbestos due to the Robinson defendants and/or the State of Montana. BNSF must do more than show Plaintiffs' decedents suffered injuries from some exposure attributable to Robinson and/or the State of Montana to establish the elements of negligence. BNSF also must prove that the Robinson defendants and/or the State of Montana affirmatively breached a duty owed to Plaintiffs' decedents.

The mere existence of asbestos alone and Plaintiffs' decedents' documented mesotheliomas and deaths, in other words, remain insufficient to establish the liability of the Robinson defendants or the State of Montana. *See Krieg v. Massey*, 781 P.2d 277, 278-79 (Mont. 1989); *Fisher v. Swift Transp. Co.,* 181 P.3d 601, 606 (Mont. 2008). BNSF rather must prove by a preponderance of the evidence that all elements of a negligence claim exist to prevail on its settled party affirmative defenses. *See* Mont. Code Ann. § 27-1-703(6)(e); *see, e.g.*, *E.F. Matelich Const. Co. v. Goodfellow Bros.*, 702 P.2d 967, 969 (Mont. 1985). To carry this burden, BNSF must show not only that asbestos was present, but also likely that the Robinson defendants and/or the State of Montana knew, or should have known, at the relevant times, that the concentration and volume of asbestos posed a specific risk of causing Plaintiffs' decedents' alleged injuries. *See, e.g.*, *Md. Cas. Co. v. Asbestos Claims Court*, 460 P.3d 882 (Mont. 2020); *Orr v. State*, 106 P.3d 100, 109 (Mont. 2004). A negligence claim, for example, requires demonstrating that "the alleged tortfeasor

28

owed a legal duty of care to the claimant(s) under the particular circumstances of that case, as a threshold matter of law." *Id.* at 894. The existence of a common law duty, in turn, requires showing that "the harm at issue is of a type reasonably foreseeable under the circumstances and, if so, imposition of such duty and liability comports with public policy under those circumstances." *Id.* Establishing the necessary foreseeability of harm stemming from industrial operations such as the Robinson defendants and the scope of their duty regarding asbestos, or likely any hazardous substance, remains beyond the common knowledge of laypeople. BNSF also likely must prove that a reasonably prudent manufacturer or industrial operation would have taken greater precautions than did the settled parties. *See, e.g.*, *Jack v. DCo, LLC*, 2019 U.S. Dist. LEXIS 89886, at *15-19 (W.D. Wash. May 28, 2019); *Jack v. Borg-Warner Morse Tec, LLC*, 2018 U.S. Dist. LEXIS 158123, at *32 (W.D. Wash. Sep. 17, 2018).

It remains true that the jury may be able to provide the applicable standard of care from its collective knowledge and common experience in a typical negligence case. *Cf. Tin Cup County Water and/or Sewer District*, 200 P.3d 60, 69 (Mont. 2008); *Dayberry v. City of E. Helena*, 80 P.3d 1218 (Mont. 2003). If the subject lies outside the common experience of the factfinder, however, the jury may not reach a particular conclusion absent the aid of expert testimony. *Dubiel v. Montana Department of Transportation,* 272 P.3d 66, 70 (Mont. 2012). The duty of care owed

to Plaintiffs' decedents, and whether Robinson and/or the State of Montana breached that standard of care, stand beyond the experience of the ordinary juror and require expert testimony.

An ordinary juror will not be able to determine, without expert testimony, whether the Robinson defendants manufactured unsafe asbestos-contaminated products and wrongfully placed them into the stream of commerce, and whether the Robinson defendants' business activities, and/or the State of Montana's supervision of them, implicated knowledge and concealment of the dangers of asbestos exposures. "The issue of whether [the Robinson defendants' operations] produced hazardous or toxic dust that migrated . . . and caused medical injury to [Plaintiffs' decedents] involves technical matters outside the scope of ordinary experience requiring expert testimony in order to establish the link between [the Robinson defendants'] conduct and the injuries that conduct allegedly caused." *Goebel v. Arps Red-E-Mix, Inc.*, 2019 LEXIS 132, at *19-20 (Neb. Ct. App. May 14, 2019). The industrial hygiene issues likely involved in the Robinson defendants' operations and the State of Montana's monitoring, such as air quality testing, ventilation, any manufacturer's warnings and safety standards, and proper safety training similarly would fall beyond the experience of the ordinary jurors. *See, e.g.*, *id.* The Court also notes that historic knowledge of the potential harms associated with asbestos, the industries where such harms existed, the specific nature of the

exposure that could lead to disease development, the means to mitigate these harms, as well as the ultimate issue of causation all remain beyond the experience of a lay juror. *Cf. Carpenter v. 3M Co.*, 2022 U.S. Dist. LEXIS 226395, at *49 (C.D. Cal. Dec. 13, 2022).

BNSF would need to introduce expert testimony to establish the Robinson defendants' and/or the State of Montana's negligence. Plaintiffs assert that BNSF has not disclosed any experts as to the Robinson defendants or the State of Montana. (Doc. 87 at 11.) BNSF appears to concede this point. (Doc. 67 at 20.) BNSF also does not argue that any required expert testimony would fall within the scope of the experts it, or Plaintiffs have disclosed. This failure proves fatal to BNSF's settled party defenses as to the Robinson defendants and the State of Montana. The Court will grant Plaintiffs' Motion for Summary Judgment as to settled parties Robinson Insulation Company, Grogan Robinson Lumber Company, and the State of Montana.

Plaintiffs also argue that BNSF insufficiently pleaded its superseding intervening cause defense. (Doc. 56 at 18-19.) "The key to determining the sufficiency of pleading an affirmative defense is whether it gives the plaintiff fair notice of the defense." *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979) (citing *Conley v. Gibson*, 355 U.S. 41, 78 (1957)); *Simmons v. Navajo*, 609 F.3d 1011, 1023 (9th Cir. 2010). Fair notice generally requires a statement of the

nature of the defense, but it does not require a detailed statement of facts. *Conley*, 355 U.S. at 78.

BNSF's Nineteenth Affirmative Defense states "Plaintiffs' claims may be the result of a superseding intervening cause." (Doc. 41 ¶ 19.) BNSF's response to Plaintiffs' Interrogatory regarding this defense states as follows: "Defendant objects to this contention Interrogatory as it seeks to require the Defendant to the provide the equivalent of a narrative account of its case including every fact, detail or supporting document. Defendant also objects based on the fact that discovery has just started and Plaintiffs have yet to produce any witnesses within their control for depositions. Subject to and without waiving these objections, as stated by the Courts this affirmative defense is one that challenges causation and applies after Plaintiffs prove proximate causation. Plaintiffs have yet to do so. Additionally, Plaintiffs allegations regarding settled parties or other parties as discussed above would be responsive to evidence supporting this defense." (Doc. 54-4 at 4.) These answers identify third parties as potential proximate causes of superseding acts. They fail to identify, however, what wrongful conduct may have contributed to Plaintiffs' decedents' injuries. These statements fail to allege sufficiently the grounds upon which BNSF's superseding intervening cause rest to give fair notice of the defense to Plaintiffs. The Court will grant Plaintiffs' Motion for Summary Judgment as to superseding intervening causes for these reasons.

## II.   BNSF's Motion for Summary Judgment regarding federal preemption (Doc. 79)

BNSF argues that federal law preempts Plaintiffs' state law-based causes of action. (Doc. 79.) BNSF specifically contends that the Hazardous Materials Transportation Act ("HMTA") and the Federal Railroad Safety Act ("FRSA") preempt Plaintiffs' negligence and strict liability claims. (Doc. 80 at 2.) BNSF argues that the following HMTA preemption clause preempts Plaintiffs' claims:

> A law, regulation, order, or other requirement of a State . . . about any of the following subjects, that is not substantively the same as a provision of this chapter, a regulation prescribed under this chapter, or hazardous materials transportation security regulation . . . is preempted:
>
> (A) the designation, description, and classification of hazardous material.
>
> (B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.
>
> (C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents.
>
> (D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material and other written hazardous materials transportation incident reporting involving State or local emergency responders in the initial response to the incident.
>
> (E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

49 U.S.C. § 5125(b).

The HTMA defines "hazardous material" as a "substance or material the Secretary designates under section 5103(a) of this title." 49 U.S.C. § 5102(2). The regulation regarding asbestos specifically excludes asbestos "that is immersed or fixed in a natural or artificial binder material, such as . . . mineral ore." 49 C.F.R. 172.102(c)(1)(156) (2016). BNSF argues that this exclusion means the vermiculite ore at issue here should remain free of any regulation, including liability for its transportation. (Doc. 80 at 7-9.)

BNSF also argues that the following FRSA preemption clause bars Plaintiffs' claims:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary…prescribes a regulation or issues an order covering the subject matter of the State requirement. A state may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation or order[:]
>     (A) is necessary to eliminate or reduce an essential local safety or security hazard;
>     (B) is not incompatible with a law, regulation, or order of the United States Government; and
>     (C) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106(a)(1).

BNSF suggests that the duties Plaintiffs seek to impose upon it "are aimed at the exact same safety concerns addressed by FR[S]A regulation" and are therefore

substantially subsumed by the federal regulations. (Doc. 80 at 13.) BNSF also contends that "Plaintiffs' allegations that BNSF is negligent in failing to prevent dust from escaping its railcars are preempted by FRSA regulations concerning train speed" and that FRA regulations require inspection of freight cars at each location where they are placed in a train, and "any claim by Plaintiffs that vermiculite escaped its cars . . . are preempted." (*Id.* at 13-14) (citing 49 C.F.R § 215.13; 49 C.F.R. § 213.9)).

A presumption against preemption exists: "both the United States Supreme Court and [the Montana Supreme] Court have consistently held that preemption is not favored." *Reidelbach v. Burlington N. & Santa Fe Ry. Co.*, 60 P.3d 418, 423 (Mont. 2002) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "Federal preemption is an affirmative defense upon which defendant bears the burden of proof." *Fifth Third Bank v. CSX Corp.*, 306 F.Supp.2d 841, 849 (N.D. Ind. 2004). A defendant must show "evidence of a clear and manifest intent of Congress to preempt state law" to overcome the presumption against preemption. *Reidelbach*, 60 P.3d at 423 (Mont. 2002) (citing *Favel v. Am. Renovation & Construction Co.*, 59 P.3d 412, 423 (Mont. 2002)). A federal law still impliedly may preempt a state law, in the absence of a clear and manifest congressional purpose, under certain circumstances. "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively . . . or

when state law is in actual conflict with federal law." *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 899 (2000) (citing *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

Plaintiffs contend that collateral estoppel prohibits BNSF from pursuing its preemption arguments given their similarities to arguments raised in other asbestos-related cases before the Court and the Montana Supreme Court. (Doc. 160 at 5-7.) The Court declines to decide BNSF's motion on this estoppel question. The Court nevertheless reiterates the conclusion it has reached on this argument in at least three other cases. *See Deason v. BNSF Ry. Co.*, 2018 WL 3601236, at *3-7 (D. Mont. July 27, 2018); *Underwood v. BNSF Ry. Co.*, 2018 WL 3601238, at *3-7 (D. Mont. July 27, 2018); *Murphy-Fauth v. BNSF Ry. Co.*, 2018 WL 3601235, at *3-7 (D. Mont. July 27, 2018).

The plaintiff in *Murphy-Fauth v. BNSF* resided in Libby from 1963 to 1969 and alleged that she was exposed to asbestos dust from BNSF's Libby railyard. *Murphy-Fauth v. BNSF Ry. Co.*, No. 4:17-cv-0079-BMM-JTJ (D. Mont.) (Doc. 6.) The plaintiff in *Underwood v. BNSF* resided in Libby from 1954 to 1959 and alleged that he was exposed to asbestos dust from BNSF's Libby railyard and other properties. *Underwood v. BNSF Ry. Co*, No. 4:17-cv-0083-BMM-JTJ (D. Mont.) (Doc. 6.) The plaintiff in *Deason v. BNSF* resided in Libby from 1937 to 1952 and alleged that he was exposed to asbestos dust from BNSF's Libby railyard and other

properties. *Deason v. BNSF Ry. Co.*, No. 4:17-cv-0076-BMM-JTJ (D. Mont.) (Doc. 12.)

BNSF argued in *Deason* in support of its Motion to Dismiss and against the plaintiff's Motion for Summary Judgment regarding preemption that the HMTA and FRSA preempted the plaintiff's negligence and strict liability claims. *Deason v. BNSF Ry. Co.*, No. 4:17-cv-0076-BMM-JTJ (D. Mont.) (Doc. 5-1); (Doc. 38.) Regarding the HMTA, BNSF argued that Congress clearly intended that transportation of asbestos remain free from regulation because the United States Department of Transportation specifically exempted mineral-bound asbestos from its regulatory control under the HMTA. *Id.* (Doc. 5-1.) Regarding the FRSA, BNSF argued that "because the [Department of Transportation] has explicitly determined that special measures–handling, loading, transporting, warning, etc.–are not warranted [for mineral-bound asbestos], Plaintiff's state law claims with respect to such measures are preempted." *Id.* (Doc. 5-1 at 16). BNSF also argued that any alleged failure "to prevent dust from escaping its railcars [is] preempted by the extensive regulations concerning train speed." *Id.* (Doc. 5-1 at 16-17).

In *Murphy-Fauth*, BNSF argued in support of its Motion to Dismiss and against the plaintiff's Motion for Summary Judgment regarding preemption that the HMTA and FRSA preempted the plaintiff's negligence and strict liability claims. *Murphy-Fauth*, No. 4:17-cv-0079-BMM-JTJ (Doc. 3-1); (Doc. 30.) Regarding the

HMTA, BNSF again argued that Congress clearly intended that transportation of such asbestos remain free from regulation because the Department of Transportation specifically exempted mineral-bound asbestos from its regulatory control under the HMTA. With respect to the FRSA, BNSF argued that "because the [Department of Transportation] has explicitly determined that special measures–handling, loading, transporting, warning, etc.–are not warranted [for mineral-bound asbestos], Plaintiff's state law claims with respect to such measures are preempted." *Id.* (Doc. 3- 1 at 16). BNSF also argued that any alleged failure "to prevent dust from escaping its railcars [is] preempted by the extensive regulations concerning train speed." *Id.* (Doc. 3-1 at 16-17).

In *Underwood*, BNSF argued in support of its Motion to Dismiss and against the plaintiff's Motion for Summary Judgment regarding preemption that the HMTA and FRSA preempted the plaintiff's negligence and strict liability claims. *Underwood v. BNSF Ry. Co*, No. 4:17-cv-0083-BMM-JTJ (D. Mont.) (Doc. 3-1); (Doc. 24.) Regarding the HMTA, BNSF argued for a third time that Congress clearly intended that transportation of such asbestos remain free from regulation because the United States Department of Transportation specifically exempted mineral-bound asbestos from its regulatory control under the HMTA. Regarding the FRSA, BNSF again argued that "because the [Department of Transportation] has explicitly determined that special measures–handling, loading, transporting, warning, etc.–are

not warranted [for mineral-bound asbestos], Plaintiff's state law claims with respect to such measures are preempted." *Id.* (Doc. 3-1 at 16). BNSF also argued that any alleged failure "to prevent dust from escaping its railcars [is] preempted by the extensive regulations concerning train speed." *Id.* (Doc. 3-1 at 16-17).

BNSF now makes nearly identical arguments for a fourth time in as many cases. (Doc. 80); (Doc. 188.) BNSF points, for example, to the same preemption clause of the HMTA to argue that the Department of Transportation's decision not to regulate mineral-bound asbestos reflects a determination that no regulation, and no liability, should touch this form of asbestos: "Libby vermiculite was specifically considered by the DOT and was not classified as a 'hazardous material.' Plaintiffs appear to believe that the DOT's determination in 49 C.F.R. § 172.102(c)(1)(156) was unwise and, so they are simply attempting to make an end-run around it via the application of a state tort duty." (Doc. 80 at 8-9.) BNSF also points to the same preemption clause of the FRSA to argue that the statute preempts all "state regulations aimed at the same safety concerns addressed by FRA regulations." (*Id.* at 13) (quoting *Burlington N. R.R. Co. v. Montana*, 880 F. 2d 1104, 1105-06 (9th Cir. 1989)). BNSF again has argued that "[a]s the [Department of Transportation] has expressly considered and rejected the notion that special measures are necessary for handling, loading, and transporting mineral ores containing asbestos, state law cannot mandate such action by a rail carrier, as that would be contrary to the FRA's

decision on whether mineral ores containing asbestos are 'hazardous materials.'"
(*Id.*)

The Court reiterates the previous analyses adopted from Magistrate Judge John Johnston's Findings and Recommendations in each preceding case. Regarding the HMTA, "since asbestos immersed in mineral ore–like the vermiculite in this case–is not a hazardous material, then the Hazardous Materials Transportation Act has no regulatory effect." *Murphy-Fauth v. BNSF Ry. Co.*, No. 4:17-cv-0079-BMM-JTJ (D. Mont.) (Doc. 66.) *Underwood v. BNSF Ry. Co*, No. 4:17-cv-0083-BMM-JTJ (D. Mont.) (Doc. 61.) *Deason v. BNSF Ry. Co.*, No. 4:17-cv-0076-BMM-JTJ (D. Mont.) (Doc. 72.) "[N]o conflict with any state law regarding vermiculite and the HMTA exists as a result. . . . state law claims regarding immersed asbestos [remain] compatible with subsection[s (a) and (b) of § 5125]. Based on this language, the Court finds that the HMTA does not expressly or impliedly preempt state law with respect to [plaintiffs'] state law claims." *Id.*

Regarding the FRSA, the Court again agrees that "Montana state laws are not inconsistent with the FRSA regulations and are therefore not preempted by the FRSA." *Id.* "A state law regarding negligence," furthermore "cannot be 'incompatible' with the FRSA when the FRSA explicitly excludes address mineral-bound asbestos." *Id.* (citing 49 U.S.C. § 20106(a)(2)(B)). The Court again concludes

that "BNSF has not shown any specific FRSA regulation which substantially subsumes or covers [plaintiffs'] specific claims of BNSF's negligent activities." *Id.*

Finally, the Montana Supreme Court now has reached a similar conclusion regarding BNSF's preemption claims. The Montana Supreme Court has rejected the argument BNSF here makes, that "Plaintiffs' allegations that BNSF is negligent in failing to prevent dust from escaping its railcars are preempted by extensive FR[S]A regulations concerning train speed." (Doc. 80 at 14) (citing 49 U.S.C. § 213.9)). The Montana Supreme Court has explained that "BNSF has not established that Plaintiffs' claims are based on the contention BNSF's trains were travelling in excess of the maximum speed permitted by the regulation for the type of track it used in Libby. . . . [because] Plaintiffs' claims are not substantially about train speed, the cited regulations can only be said at most to "touch upon" or "relate to" Plaintiffs' broader claims, and have no preemptive effect upon this action." *BNSF Ry. Co. v. Eddy*, 459 P.3d 857, 866 (Mont. 2020).

The Montana Supreme Court also disagreed with "BNSF's preemption argument that the [Department] of Transportation's exclusion of mineral ore asbestos within the HMTA constitutes an authoritative federal determination that the transportation of mineral-bound asbestos is to be unregulated." *Id.* at 867. The Montana Supreme Court determined that nothing in the Department of Transportation's regulations and comments indicates that it took "the further step of

deciding, as a matter of policy, that the States and political subdivisions should not regulate the handling and transport of vermiculite ore. Most importantly, the language does not indicate that a jury's finding that BNSF mishandled vermiculite ore would be in conflict with federal law." *Id.* BNSF has offered no new reasoning that compels the Court to reach a different result. The Court will deny BNSF's Motion for Summary Judgment regarding preemption for these reasons.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that:

1) BNSF's Motion to Stay Trial (Doc. 126) is **DENIED**.

2) Plaintiffs' Motion for Summary Judgment regarding BNSF's Non-Party Affirmative Defenses (Doc. 53) is **GRANTED**.

3) BNSF's Motion for Summary Judgment regarding Preemption (Doc. 79) is **DENIED**.

DATED this 9th day of August, 2023.

Brian Morris, Chief District Judge
United States District Court