## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased, | **CV-21-97-GF-BMM** |
| Plaintiffs, | **ORDER** |
| v. | |
| BNSF RAILWAY COMPANY, a Delaware corporation, ROBINSON INSULATION COMPANY, a Montana Corporation for profit, GROGAN ROBINSON LUMBER COMPANY, a Montana corporation for profit, et al., | |
| Defendants. | |

## INTRODUCTION

Jackson Wells, as personal representative for the Estate of Thomas E. Wells, and Judith Hemphill, as personal representative for the estate of Joyce H. Walder (collectively "Plaintiffs") filed a motion for summary judgment on February 2, 2023, concerning the limited scope of the common carrier defense to Burlington Northern Santa Fe Railway Company's ("BNSF") abnormally dangerous activity. (Doc. 57.)

BNSF opposes this motion. (Doc. 70.) BNSF filed a motion for partial summary judgment on March 27, 2023. (Doc. 83.) Plaintiffs oppose this motion. (Doc. 170.)

The Court previously dismissed Plaintiffs' claims against Robinson Insulation and Grogan Robinson Lumber. (Doc. 42.) BNSF is the only defendant remaining. (*See id.*) The Court granted Plaintiffs' motion for summary judgment regarding BNSF's nonparty affirmative defenses. (Doc. 210.) The Court denied BNSF's motion for summary judgment regarding federal preemption. (*Id.*) Numerous evidentiary motions remain outstanding. (*See* Doc. 91); (Doc. 94); (Doc. 97); (Doc. 103); (Doc. 109); (Doc. 113); (Doc. 116); (Doc. 120); (Doc. 131); (Doc. 138); (Doc. 146); (Doc. 149.) The Court will address Plaintiffs' motion for summary judgment concerning the limited scope of the common carrier defense to BNSF's abnormally dangerous activity. (*See* Doc. 57.) The Court also will address BNSF's motion for partial summary judgment. (*See* Doc. 83.) The Court will address the remaining motions by separate orders.

## FACTUAL AND LEGAL BACKGROUND

Vermiculite ore containing high concentrations of amphibole asbestos was intensively mined, processed, and shipped from Libby, Montana between 1923 and 1994. (Doc. 15 at 4.) Vermiculite mining and transport operations resulted in the accumulation of significant asbestos contamination in and around Libby, including airborne asbestos contamination. (*Id.*) BNSF's railyard in downtown Libby served

2

as the hub of the railroad company's vermiculite business. Plaintiffs allege BNSF transported crushed vermiculite ore, loaded into open rail cars from the vermiculite mine and along BNSF's "Libby Logger" line, to BNSF's railyard in downtown Libby. (Doc. 1 at 7-11.) Plaintiffs claim that BNSF transported between 193 million and four billion pounds of asbestos between 1925 and 1981, moving up to 105,000 pounds of asbestos per day into downtown Libby in the late 1960s and 1970s, and up to 126,000 pounds of asbestos per day through the 1980s. (Doc. 15 at 6.)

Plaintiffs allege that BNSF's activities caused Wells and Walder to be exposed to extraordinarily high levels of asbestos in or near Libby. (*See* Doc. 1.) Plaintiffs allege that their exposure resulted, in significant part, from BNSF's negligent operation of its Libby loading facility, its Libby railyard, and its transportation of asbestos-contaminated vermiculite between its loading facility and railyard. (*Id.* at 10-13.) Plaintiffs allege that a layer of asbestos-contaminated dust regularly coated the loading facility and the loaded rail cars. (*Id.*) Plaintiffs allege that BNSF's train cars released visible clouds of contaminated dust as they traveled from BNSF's loading facility to the Libby railyard. (Doc. 1 at 4-5.)

Plaintiffs claim that BNSF exposed Libby residents by failing to contain the dust or otherwise prevent it from blowing through Libby's downtown and surrounding neighborhoods. Plaintiffs allege that some of BNSF's activities in the Libby vermiculite industry extended beyond its role as a common carrier that simply

transported required goods. Plaintiffs also claim that BNSF knew of the dangers of asbestos exposure by at least the 1940s, but failed to control the risk of the asbestos dust that regularly accumulated at the Libby railyard. (Doc. 15 at 9.)

Plaintiffs claim that Wells's asbestos exposures allegedly occurred while he lived adjacent to the Libby railyard. (Doc. 54 at 8.) Plaintiffs allege that Walder's exposures occurred when she lived in downtown Libby and regularly walked along BNSF's tracks and through the Libby railyard. (*Id.*)

## LEGAL STANDARD

Summary judgment proves appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine material fact dispute requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The movant bears the initial burden of establishing the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The summary judgment inquiry requires examining the evidence in the light most favorable to the nonmovant. Once the

movant has met this initial burden, however, the party opposing the motion "may not rest upon the mere allegations or denials of [their] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.*

## DISCUSSION

## I.   Plaintiffs' motion for summary judgment concerning the limited scope of the common carrier defense to BNSF's abnormally dangerous activity.

Plaintiffs' motion for summary judgment concerning the limited scope of the common carrier defense to BNSF's abnormally dangerous activity and BNSF's motion for partial summary judgment are largely duplicative. (*See* Doc. 57); (Doc. 70); (Doc. 83); (Doc. 89); (Doc. 170); (Doc. 189.) The Court will discuss the motions together. The Court first will discuss whether collateral estoppel requires that the Court rule, as a matter of law, that BNSF's activities concerning asbestos handling in Libby were abnormally dangerous. The Court then will address the applicability of the Restatement (Second) of Torts § 521's common carrier exception to BNSF's activities in Libby.

### a.   Whether collateral estoppel requires that the Court hold, as a matter of law, that BNSF's handling of asbestos in Libby, Montana was abnormally dangerous.

Plaintiffs ask that the Court rule, as a matter of law, that BNSF's handling of asbestos at the Libby railyard resulted in an abnormally dangerous condition for which BNSF stands strictly liable. (Doc. 60 at 28.); (Doc. 170 at 13.) Plaintiffs allege

that the doctrine of collateral estoppel, or issue preclusion, prevents BNSF from challenging whether its handling of asbestos constituted an abnormally dangerous activity. (Doc. 89 at 3-4.); (Doc. 170 at 4.)

State law determines whether a prior state court judgment should be entitled to collateral estoppel. *See Dodd v. Hood River County*, 136 F.3d 1219, 1225 (9th Cir. 1998). Collateral estoppel "bars the reopening of an issue that has been litigated and resolved in a prior suit." *Victory Ins. Co. v. Downing*, 532 P.3d 850, 855 (Mont. 2023).  Collateral estoppel requires that four elements be substantiated: 1) the issue decided in the prior adjudication must be identical to the issue raised in the action in question; 2) there must be a final judgment on the merits in the prior adjudication; 3) the party against whom preclusion is now asserted must be a party or in privity with a party to the prior adjudication; and 4) the party against whom preclusion is now asserted must have been afforded a full and fair opportunity to litigate the issue which may be barred. *McDaniel v. State*, 208 P.3d 817, 825 (Mont. 2009). The Court will consider separately each collateral estoppel element.

### i.   Issue identity

The Court compares the pleadings, evidence, and circumstances surrounding the two actions to determine whether the issue decided in a prior adjudication is identical to the issue raised in the present case. *Id.* at 826 (citations omitted). "[T]he bar that arises from collateral estoppel extends to all questions essential to the

judgment and actively determined by the prior valid judgment." *Id.* (citing *Baltrusch v. Baltrusch*, 130 P.3d 1267, 1276 (Mont. 2006)). Collateral estoppel prevents relitigation of "determinative facts which were actually or necessarily decided in a prior action." *Id.* The "identity of the issues is the most critical element . . . the fact that each action arises from the same transaction does not mean that each involve the same issues." *Stanley L. & Carolyn M. Watkins Tr. v. Lacosta*, 92 P.3d 620, 626 (Mont. 2004).

BNSF argues that the Montana Supreme Court's decision in *BNSF Ry. Co. v. Eddy*, 459 P.3d 857 (Mont. 2020), addressed different issues. (Doc. 70 at 4); (Doc. 84 at 4-5.) BNSF claims that the Asbestos Court did not explicitly state that BNSF's activities in Libby, Montana were abnormally dangerous. (Doc. 70 at 4-5.); (Doc. 84 at 4.) BNSF asserts that neither the Asbestos Court, nor the Montana Supreme Court, determined whether BNSF's alleged harboring of asbestos in the Libby railyard constituted an abnormally dangerous activity. (Doc. 70. at 6); (Doc. 84 at 5-6.) BNSF attempts to distinguish *Eddy* on the grounds that this case addresses whether BNSF engaged in an "abnormally dangerous activity when it allegedly 'harbored' an 'open-air repository for asbestos' in the Libby railyard." (Doc. 189 at 4) (citations omitted.)

*Eddy* addressed legal issues identical to the issues raised in this case. *Eddy* addressed whether the Asbestos Court erred in concluding that BNSF's handling of asbestos constituted an abnormally dangerous activity. 459 P.3d at 868. The

Asbestos Court determined that BNSF had engaged in an abnormally dangerous activity. (*See* Doc. 58-12 at 12.) The Asbestos Court analyzed the six factors set out in Restatement (Second) of Torts § 520: 1) existence of a high degree of risk of some harm to the person, land or chattels of others; 2) likelihood that the harm resulting from it will be caused; 3) inability to eliminate the risk by the exercise of care; 4) extent to which the activity is not a matter of common usage; 5) inappropriateness of the activity to the place where it is carried out; and 6) extent to which its value to the community is outweighed by its dangerous attributes. (*See id*. at 9.)

The Asbestos Court concluded that the existence of a high degree of risk, the likelihood that the harm that results will be great, the extent to which the activity is not a matter of common usage, the inappropriateness of the activity to the place where it was carried out, and the extent to which its value to the community is outweighed by its dangerous attributes all weighed in favor of finding that BNSF's activities in Libby were abnormally dangerous. (*Id.* at 12-13.) The Asbestos Court ruled that BNSF stands strictly liable "to these Plaintiffs for engaging in an abnormally dangerous activity vis-à-vis its operations in Libby, Montana." (*Id.* at 13.) The Montana Supreme Court affirmed the Asbestos Court's reasoning: "we conclude BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519." *Eddy*, 459 P.3d at 873.

8

Plaintiffs similarly raise the issue of whether BNSF's handling of asbestos in the Libby railyard constitutes an abnormally dangerous activity for purposes of strict liability. BNSF contends that this issue differs from the issue in *Eddy*. BNSF notes, however, that the Montana Supreme Court concluded that BNSF was entitled to the common carrier exception to strict liability, pursuant to § 521, for its transportation of vermiculite. BNSF's argument places the cart before the horse. The Montana Supreme Court first determined in *Eddy* that BNSF's handling of asbestos constituted an abnormally dangerous activity for which BNSF is strictly liable. 459 P.3d at 873. The Montana Supreme Court determined that BNSF could be entitled to § 521's common carrier exception for its *transportation* of vermiculite only after having determined that BNSF's *handling* of asbestos constituted an abnormally dangerous activity. *Id.* at 874 (emphasis added).

BNSF's attempt to distinguish the Asbestos Court's holding falls short. (*See* Doc. 58-12.) The Libby railyard operated between 1923 and 1994, a fact common to the multitude of asbestos exposure cases originating in Libby, Montana. BNSF's operation of the Libby railyard as an open-air vermiculite loading and storage facility allegedly caused the asbestos exposure. (*See* Doc. 1 at 10-13.) Admittedly, the alleged asbestos exposure may have occurred in a variety of forms and through a variety of activities. This difference fails to change the fact that BNSF's asbestos handling and storage practices in and around the Libby railyard played a significant

role in the alleged asbestos exposure. The nexus between BNSF and the harm caused, the continued presence of asbestos contaminated vermiculate at the Libby railyard, and the resulting asbestos exposure, remains the same in *Eddy* and here.

BNSF additionally seeks to distinguish the claims at issue from *Eddy* because "the current Plaintiffs allege from the outset of the lawsuit in their Complaint that BNSF 'harbored an abnormally dangerous condition at its downtown Libby railyard by maintaining a reservoir of asbestos contaminated material . . . and failing to take measures to prevent toxic dust from collecting upon and escaping from its property.'" (Doc. 67 at 6.) BNSF contends the Plaintiffs allege an issue not contemplated in *Eddy* and seek to cabin too narrowly the facts presented in *Eddy*. (*Id.*) BNSF's argument misstates the Montana Supreme Court's ruling.

The Montana Supreme Court determined that "BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519." *Eddy*, 459 P.3d at 873. The handling of asbestos in *Eddy* included "the transport of asbestos-containing vermiculite, the spillage of asbestos containing material along BNSF's tracks and in its railyard, and the continued disruption of the built-up spilled asbestos by BNSF's trains and workers." *Id.* at 864. *Eddy* encompasses the facts here based on the direct nexus between the spillage of asbestos contaminated material by BNSF and the accumulation of such spilled material into "reservoirs" of asbestos

10

contaminated material at the Libby railyard. (*See* Doc. 1 at 14.) The material in *Eddy*, the asbestos contaminated material, remains the same material alleged to be present here, and it arrived at the Libby railyard in the same manner. The facts differ only in the following ways: 1) the state of the asbestos laden vermiculite; 2) whether the vermiculite was being spilled onto the ground at the Libby railyard; and 3) whether the vermiculite had been spilled and was present and accumulated on the ground at and around the Libby railyard. These facts present a difference without distinction.

The pleadings in *Eddy* raised identical issues. Plaintiffs Barnes, Braaten, and Flores, as representatives of the consolidated litigation before the Asbestos Court, alleged asbestos exposure stemming from the Libby railyard. (Doc. 90-7.) Plaintiff Barnes alleged exposure when riding his bike through piles of vermiculite in the downtown Libby railyard. (*Id.* at 3.) Barnes also alleged exposure when walking along the railroad tracks at the Libby railyard while bird hunting. (*Id.*) Plaintiff Braaten alleged exposure when playing along the railroad tracks in and around the downtown Libby railyard. (*Id.* at 4.) Plaintiff Flores alleged exposure from activities around the Libby railyard, including working at the Libby Care Center, attending baseball games, and using recreational facilities in the area surrounding the Libby railyard. (*Id.* at 5.)

Plaintiffs similarly allege asbestos exposure as a consequence of being in close proximity to the Libby railyard. (Doc. 1 at 3.) Plaintiff Wells alleges that

exposure occurred when he lived approximately one-quarter mile from the railroad (*See* Doc. 59 at 4.) Plaintiff Wells alleges that further exposure occurred during the summer of 1978 when he lived in a trailer home abutting the Libby railyard. (*See id.*) Plaintiff Walder alleges that exposure occurred when, as a child, she would walk on the railroad tracks to get from her home to the ball field near the Libby railyard. (*See id*. at 9.) Plaintiff Walder further alleges that exposure occurred when she spent time near the Libby railyard while running track in middle and high school and frequenting the municipal baseball fields to watch her brothers play baseball and to recreate. (*See id.* at 7.) Plaintiffs further allege that dust containing asbestos would drift through the Libby community and would be blown through Libby during periods of high winds. (*Id.* at 6.) The Libby railyard, and repeated close proximity thereto, presents a common issue raised in the pleadings in *Eddy* and the pleadings here.

### ii. Final judgment

The Court will "look to see if [an issue] was actually litigated and adjudged as shown on the face of the judgment." *McDaniel*, 208 P.3d at 825 (citations omitted). "It is widely recognized that the finality requirement is less stringent for issue preclusion that for claim preclusion." *Baltrusch*, 130 P.3d at 1274 (citation omitted). In deciding whether to give preclusive effect to issues resolved in a judgment or order not yet entered as final, courts consider four factors: "1) whether

the prior decision was adequately deliberated and firm and not avowedly tentative; 2) whether the parties were fully heard; 3) whether the court supported its decision with a reasoned opinion; and 4) whether the court's prior decision was subject to appeal or was in fact reviewed on appeal." *Id.* (citing Restatement (Second) of Judgments, § 12).

The Asbestos Court's determination that BNSF had engaged in an abnormally dangerous activity in Libby, Montana, was adequately deliberated and not avowedly tentative. The 24-page ruling contains extensive factual background and procedural history discussion. (*See* Doc. 58-12.) The Asbestos Court considered the plaintiff's claims in the third amended complaint and BNSF's answer in which it raised 15 affirmative defenses. (*Id.* at 2.) The Asbestos Court individually analyzed the §520 factors. (*See id.*) The Asbestos Court's well-reasoned order considered the arguments advanced by both parties and relevant facts underlying those arguments. (*See id.*)

The parties were heard fully on the issue of whether BNSF's activities were abnormally dangerous. The Asbestos Court conducted two hearings, one on December 11, 2018, and a second on January 7, 2019. (*See* Doc. 90-5); (Doc. 90-9.) The Montana Supreme Court reviewed the issue of whether BNSF's handling of asbestos constituted an abnormally dangerous activity in *Eddy*. 459 P.3d. The Montana Supreme Court affirmed the Asbestos Court's ruling and determined that

"BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519." *Id.* at 873.

### iii.  Party or party in privity

The application of issue preclusion to a party that was not a party to the prior proceeding conflicts with the "deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (internal citations and quotations omitted). BNSF was a party in *Eddy*. 459 P.3d. This element of collateral estoppel has been met.

### iv.  Full and fair opportunity to adjudicate the claim

The burden rests on the party attempting to defeat the application of collateral estoppel to establish the absence of a full and fair opportunity to litigate. *Baltrusch*, 130 P.3d at 1274. BNSF fails to offer evidence that it was denied a full and fair opportunity to litigate the issue of whether its handling of asbestos was abnormally dangerous in *Eddy* and the underlying Asbestos Court case. *See* 459 P.3d. This element of collateral estoppel has been met.

Plaintiffs have met their burden in demonstrating that the issue of BNSF's handling of asbestos is identical to the issue raised in *Eddy*. 459 P.3d at 873. Plaintiffs have also met their burden in demonstrating that *Eddy* is to be given preclusive effect. Plaintiffs have further met their burden in demonstrating that

BNSF was a party in *Eddy*. BNSF failed to meet its burden in demonstrating that it did not have a full and fair opportunity to litigate the issue of whether its handling of asbestos in Libby was abnormally dangerous. BNSF is collaterally estopped from arguing that is handling of asbestos in Libby was not abnormally dangerous.

### b.  Whether BNSF is limited in its use of § 521 to support its common carrier defense to strict liability.

Federal courts exercising diversity and alienage jurisdiction must apply the substantive law of the state in which they are located. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Montana Supreme Court adopted Restatement (Second) of Torts, § 521, which provides, "the rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier." *Eddy*, 459 P.3d at 873. The Montana Supreme Court determined that § 521 does not provide complete immunity, but rather serves as a shield against strict liability while still allowing plaintiffs to allege and pursue general negligence claims against defendants. *Id.* at 874 (citations omitted). The common carrier exception applies if "(1) the activity is carried on in pursuance of a public duty and (2) that public duty is imposed on the actor as a common carrier." *Id.* at 874.

The Montana Supreme Court recognized in *Eddy* that BNSF serves as a common carrier of vermiculite, and, as such, § 521's common carrier exception applies. *Id.* The Montana Supreme Court noted, however, that § 521 does not apply

to "other activities" in which BNSF engages not pursuant to its statutory duties. *Id.* at 875. The Montana Supreme Court cited to *Murphy-Fauth v. BNSF Ry. Co.*, Case No. CV-17-79-GF-BMM-JTJ, 2018 WL 3601235, at \*2 (D. Mont. July 27, 2018), in noting that the common carrier exception "does not apply when an entity engages in abnormally dangerous activity for 'its own purposes.'" *Eddy*, 459 P.3d at 875.

The Asbestos Court has not yet determined which of BNSF's activities in Libby, if any, fall into the category of "other activities" outside § 521. Relatively few cases address the application of § 521 to similar factual circumstances. BNSF cites to *Anderson v. BNSF Railway Co.*, 2010 Mont. Dist. LEXIS 73, as a point of comparison. The Montana state district court in *Anderson* denied summary judgment to the plaintiffs on their claim that strict liability applied to injuries arising from BNSF's storage of diesel fuel on its property. *Id.* at \*9. The Montana court concluded that BNSF's storage of diesel fuel on its property "is an integral part of its operation as a common carrier, [and] is protected from strict liability." *Id.*

Diesel fuel inherently implicates BNSF's duties as a common carrier, as diesel fuel powers the locomotives that BNSF uses in its role as a carrier. *Id.* at \*4. The storage of asbestos contaminated materials, in contrast, does not appear inherently connected and essential to BNSF's role as a common carrier. The alleged presence of "reservoirs" of asbestos and asbestos contaminated materials at the Libby railyard appears to stand a step removed from BNSF's role as a carrier of vermiculite.

16

Nothing appears to have directly required BNSF to store asbestos and asbestos contaminated materials at the Libby railyard to fulfill its role as a carrier of vermiculite.

BNSF cites to *Griffin v. Montana Rail Link*, 2000 ML 2438, *8 (D. Mont. 2000), as an example of § 521 being applied to the "transportation and storage" of hazardous materials. (Doc. 84 at 26.) *Griffin* addressed the leak of chlorine gas due to a train derailment. *Id.* at * 12. The hazardous material exposure occurred while Montana Rail Link directly operated as a common carrier. *Id.* The alleged presence of asbestos contaminated materials at the Libby railyard, in contrast, did not result directly from BNSF operating as a common carrier. The record remains unclear as to the scope of BNSF's storage of the materials at the Libby railyard and what circumstances dictated BNSF's storage of the materials. The Court anticipates resolution of those factual disputes through further development of the record.

The Court notes that federal law provides, in pertinent part, that "[a] rail carrier providing transportation or service . . . shall provide the transportation or service on reasonable request." 49 U.S.C. § 11101. As defined in federal law, "transportation" includes "services related to [the movement of passengers or property or both by rail], including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property." 49 U.S.C § 10102(9)(b). Montana law provides, in relevant part, that "[a]

common carrier shall, if able to do so, accept and carry whatever is offered to the carrier, at a reasonable time and price, of a kind that the carrier undertakes or is accustomed to carry." Mont. Code Ann. § 69-11-403 (Repealed April 19, 2023.)

BNSF contends that the common carrier exception "reach[es] into leasing, construction, oversight, management, and operations of facilities at the industry location that intersects with the railroad transportation line where the goods are collected for transportation." (Doc. 70 at 16.)  BNSF asserts that the Libby railyard was necessary and inseparable from its public duty as a common carrier. (*Id.* at 17); (Doc. 84 at 20.) BNSF's proposed approach would render §§ 519-520 redundant. No room would remain to impose strict liability for an abnormally dangerous activity if a common carrier were involved in any way if § 521 were read to encompass all aspects of a carrier's operations, including leasing, construction, management, and facility operations. Strong policy arguments admittedly caution against the imposition of strict liability in the context of common carriers.

The Court recognizes that common carriers are tasked with transportation upon reasonable request. *See 49* U.S.C. § 11101; *Griffin*, 2000 ML 2438 at *11 ("[T]here is a clear public need to provide nation-wide transportation for commonly used materials regardless of the characteristics of such materials.") ("[T]he common carrier exception to strict liability for activities involving the transportation of hazardous materials is intended to resolve the public policy conflict based on sound

public policy that outweighs public policy reasons for imposing strict liability."); *Eddy*, 459 P.3d at 873 ("[I]t would be unjust to subject a common carrier to strict liability for any danger done by a material the carrier is required to transport by the law."); see also *Walsh v. Mont. Rail Link*, 2001 Mont. Dist. LEXIS 3033.

The Montana Supreme Court intended for § 521's common carrier exception to be construed narrowly. *See Eddy*, 459 P.3d at 875. The Montana Supreme Court noted that "any other activity BNSF engaged in that was not undertaken pursuant to its statutory duty, but alleged to have caused injuries to Plaintiffs, is not protected from strict liability." *Id.* The application of § 521 to BNSF's transportation of vermiculite must balance the need to protect individuals and communities from dangerous activities against the public policy to provide and protect the transportation of materials throughout the country as mandated by law. The logic of *Chavez v. S. Pac. Transp. Co.*, 413 F. Supp. 1203 (E.D. Cal., May 12, 1976), proves persuasive.

In *Chavez*, eighteen boxcars loaded with bombs being hauled under a contract with the Department of the Navy exploded in Southern Pacific Transportation Company's Antelope Yard in Roseville, California. *Id.* at 1203. The California District Court applied strict liability because "[t]he victims of [abnormally dangerous] activity are defenseless. Due to the very nature of the activity, the losses suffered as a result of such activity are likely to be substantial—an 'overwhelming

misfortune to the person injured.'" *Id.* at 1209. BNSF similarly stands in the better position have prevented, avoided, or mitigated the injury caused by the alleged presence of asbestos-contaminated materials at the Libby railyard. The Court balances the essential transport of materials via common carrier against the need to provide redress for those in the worst position to avoid the risk of abnormally dangerous activity. This balance leads the Court to determine that § 521 applies to BNSF's transport of vermiculite, but does not apply to activities undertaken by BNSF outside its statutory duties as a common carrier. *Eddy*, 459 P.3d at 875.

Plaintiffs claim BNSF harbored a toxic asbestos dump in the Libby railyard and was not required to do so to fulfill its role as a carrier of vermiculite. (Doc. 60 at 21.) Plaintiffs further allege that BNSF failed to control the asbestos hazard for decades. (Doc. 170 at 8.). BNSF disputes Plaintiffs' characterization of the Libby railyard as a toxic "open-air repository for asbestos." (Doc. 189 at 3) (citations omitted). BNSF cites to scientific sampling studies done at and around the Libby railyard which it claims demonstrates that a "reservoir of asbestos" did not exist. (Doc. 84 at 22-24.) A genuine dispute exists as to BNSF's practices at the Libby railyard and the presence of asbestos and asbestos contaminated materials therein. A genuine dispute also exists as to the scope of BNSF's activities that fall within the auspice of BNSF's transport of vermiculite. The Court endeavors to develop the

factual record to determine which of BNSF's activities fall outside its duties as a common carrier transporting vermiculite.

BNSF additionally claims that it cannot be held strictly liable for the alleged accumulation, maintenance, or collection of asbestos at the Libby railyard when such accumulation, maintenance, or collection was not deliberate or intentional. (Doc. 84 at 21-22.) BNSF asserts that, even assuming Plaintiffs' allegations are true, Plaintiffs accuse BNSF of "inactivity" rather than "other activity" not covered by § 521. (Doc. 189 at 13.) Plaintiffs point to Restatement (Second) § 519, which provides that, "[t]he liability stated in this Section is not based on any intent of the defendant to do harm to the plaintiff." (Doc. 89 at 14.)

BNSF's contention fails. Strict liability under § 519 "arises out of the abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity. It is founded upon a policy of the law that imposes upon anyone who for his own purposes creates an abnormal risk of harm to his neighbors, the responsibility of relieving against that harm when it does in fact occur." Restatement (Second) of Torts § 519, *comment* d. The Montana Supreme Court determined in *Eddy* that BNSF's handling of asbestos constitutes an abnormally dangerous activity for which BNSF stands strictly liable under § 519. 459 P.3d at 873. The Montana Supreme Court's ruling in *Eddy* collaterally estopps BNSF from arguing against the application of strict liability for its handling of asbestos in and around the Libby

21

railyard. Development of the record will eventually determine which statutory duties, if any, required BNSF to store and handle asbestos at the Libby railyard and would be subject to § 521's immunity from strict liability pursuant to the common carrier defense.

## II.     BNSF's motion for partial summary judgment.

BNSF's motion for partial summary judgment raises the same issues and relies on the same or substantially similar facts as BNSF's response to Plaintiffs' motion for summary judgment concerning the limited scope of the common carrier defense to BNSF's abnormally dangerous activity. (*See, e.g.*, Doc. 60); (Doc. 70); (Doc. 83); (Doc. 89); (Doc. 170); (Doc. 189.) BNSF's alleged facts and arguments fail to meet the standard of showing that no genuine dispute of material facts exists concerning Plaintiffs' strict liability claim. Those arguments also fail to show that BNSF is entitled to judgment as a matter of law concerning Plaintiffs' strict liability claim. *See* Fed. R. Civ. P. 56(a). BNSF fails to meet its burden as the moving party for its motion for partial summary judgment.

## ORDER

Accordingly, **IT IS ORDERED:**

1. Plaintiffs' motion for summary judgment concerning whether BNSF's handling of asbestos in Libby, Montana constituted an abnormally dangerous activity (Doc. 57) is **GRANTED IN PART.** The Montana Supreme Court's

decision in *Eddy* collaterally estopps BNSF from arguing that its handling of asbestos in Libby did not constitute an abnormally dangerous activity. Plaintiffs' motion for summary judgment concerning the scope of the common carrier defense to BNSF's abnormally dangerous activity (Doc. 57) is **DENIED IN PART**. Further development of the record will determine what portion or portions of BNSF's handling of asbestos, if any, falls within BNSF's statutory duty to transport vermiculite and is subject to § 521's common carrier doctrine.

2. BNSF's Motion for Partial Summary Judgment is **DENIED**.

DATED this 16th day of October, 2023.

Brian Morris, Chief District Judge
United States District Court