Chad M. Knight
Anthony M. Nicastro
Cole R. Anderson
KNIGHT NICASTRO MACKAY, LLC
304 W. 10th Street
Kansas City, MO 64105
Email: knight@knightnicastro.com
        nicastro@knightnicastro.com
        anderson@knightnicastro.com
Telephone: (720) 770-6235
Facsimile: (816) 396-6233
**ATTORNEYS FOR DEFENDANT**
**BNSF RAILWAY COMPANY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation; and DOES A-Z,<br><br>Defendants. | Case No.:  4:21-cv-00097-BMM<br><br>**DEFENDANT BNSF RAILWAY COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR A DIRECTED VERDICT REGARDING PLAINTIFFS' STRICT LIABILITY CLAIM** |

COMES NOW, Defendant BNSF Railway Company ("BNSF"), by and

through its counsel of record, Knight Nicastro MacKay, LLC, and hereby submits

1

this Brief in Support of its Motion for a Directed Verdict regarding Plaintiffs' Strict Liability Claim as follows:

## **INTRODUCTION**

This Court's October 16, 2023 Order held that BNSF was collaterally estopped from re-litigating the Montana Supreme Court's decision in *Barnes* that its transportation of vermiculite was an abnormally dangerous activity. However, the Order also held that a genuine dispute of fact existed as to whether BNSF engaged in any "other activity" outside of the facts considered in the *Barnes* decision:

> A genuine dispute exists as to BNSF's practices at the Libby railyard and the presence of asbestos and asbestos contaminated materials therein. A genuine dispute also exists as to the scope of BNSF's activities that fall within the auspice of BNSF's transport of vermiculite. The Court endeavors to develop the factual record to determine which of BNSF's activities fall outside its duties as a common carrier transporting vermiculite.

At the final pretrial conference, the Court reiterated Plaintiffs' obligation to present evidence that BNSF engaged in "other activities" before it made any ruling on strict liability:

> I want to hear evidence about the activities that BNSF ha[s] engaged in, what you think is relevant, for the -- what might fall under the common carrier exception and what would be subject to strict liability as determined by the Montana Supreme Court. Their opinion wasn't entirely clear. It talks about the activities around the rail yard, but I want to try to fine tune that a little bit more.

**Exhibit A** - Trial Trans. Vol. I, Apr. 8, 2024, at 21:19-22:1. After hearing opening

statements, the Court expressed that it had "serious questions about the validity of

[Plaintiffs'] strict liability claims":

> We are now at trial. It's now time to put up – or shut up. Based upon what I
> heard yesterday -- and, again – I haven't heard evidence yet. But my
> understanding was initially the material was mined at the mine site,
> transported through the railyard, stored at the railyard, and then loaded on
> railcars. **That seems to be erroneous.**
>
> Yesterday, what I saw in the opening statement, which is not evidence, was
> that materials were mined at the mine site, trucked down to the processing
> facility, concentrated, loaded on railcars outside of town. Those cars are then
> taken on the rail -- to the railyard, where they're hooked on east and westbound
> trains whenever they are available. And they are sealed at the site as well.
>
> **So I'm not sure what activities you're talking about that -- undertaken
> for BNSF's own purposes that resulted in -- or caused injuries to the
> plaintiffs in this case.** So I'll wait to hear evidence before I make a ruling on
> that. **But I have serious questions about the viability of your strict liability
> claims.**

**Exhibit B** - Trial Trans. Vol. III, Apr. 9, 2024, at 321:14-322:7. Plaintiffs have

rested their case without submitting substantial evidence that BNSF engaged in any

activities that fall outside the common carrier exception. Their claim for strict

liability is therefore not submissible and should be dismissed.

### DIRECTED VERDICT STANDARD

In diversity cases, courts apply federal procedural law in determining the

standard for a directed verdict and whether the plaintiff has put forward sufficient

substantial evidence to make a submissible claim to the jury. *Trujillo v. State Farm*

*Mut. Auto. Ins. Co.*, 2992 U.S. App. LEXIS 18440, at *4-5 (9th Cir. 1992); *See Motus v. Pfizer Inc.*, 358 F.3d 659, 660 (9th Cir. 2004) (citation omitted) ("[In] a diversity case, federal law alone governs whether evidence is sufficient to raise a question for the trier-of-fact."). "The standards for granting a motion for judgment notwithstanding the verdict are the same as those governing the granting of a directed verdict." *Harper House, Inc. v. Thomas Nelson, Inc.*, 1987 U.S. Dist. LEXIS 14132, at *2 (C.D. Cal. 1987). "A trial court is justified in directing a verdict when there is no substantial evidence to support recovery by the party against whom the verdict is being directed, or where the evidence is all against him, or so overwhelming as to leave no doubt what the fact is." *Willman v. Alver*, 252 F.2d 895, 898 (9th Cir. 1958); *see also Galardo v. AMP, Inc.*, 1982 U.S. Dist. LEXIS 9288, at *4-5 (N.D. Cal. 1982) ("Upon the motion of a defendant, the District Court shall issue a directed verdict if there exists no substantial evidence to support the plaintiff's claim."). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Harper House, Inc.*, at *2. "The Court is not free in such situation to weight the evidence or to pass on the credibility of the witnesses." *Harper House, Inc.*, at *3.

**I.     Assuming that BNSF is bound to the *Barnes* decision that its transportation of vermiculite was abnormally dangerous, Plaintiffs' have failed to produce substantial evidence that BNSF engaged in any "other activity" outside the common carrier exception to strict liability.**

The common carrier exception applies if "(1) the activity is carried on in pursuance of a public duty and (2) that public duty is imposed on the actor as a common carrier." (Doc. 222, p. 15). On the second day of trial, the Court held on the record that the common carrier exception "covers the activities imposed on the carrier as a result of the transportation of vermiculite, and that [its] required to transport by law." **Exhibit B**, at 321:4-6.

In *Barnes*, the Montana Supreme Court analyzed whether BNSF's activities in Libby were abnormally dangerous under the six factors from Restatement (Second) of Torts § 520. The Court's analysis incorporated the following alleged activities and circumstances when determining whether BNSF engaged in any abnormally dangerous activity: "Libby vermiculite activities;" "**large amounts of asbestos present in its railyard and around its tracks**;" "BNSF…br[inging] asbestos into Libby;" "'visible biotite' on all of BNSF's tracks;" "transporting asbestos;" "transporting vermiculite;" "BNSF br[inging] a dangerous material on its property that escaped onto the property of others;" and "handling of asbestos." *BNSF Ry. Co.*, 2020 MT 59, ¶¶ 22-24, 31, 32, 34-36 (emphasis added). It is therefore undisputed that the Montana Supreme Court incorporated the alleged facts regarding

the presence of asbestos in the Libby railyard into its analysis as to whether BNSF's transportation of vermiculite was abnormally dangerous. *See Id.*, ¶ 39 (emphasis added) (holding that "**under the facts presented here**," BNSF's handling of asbestos constitutes an abnormally dangerous activity.) After this analysis, the Montana Supreme Court concluded that "BNSF is entitled to the common carrier exception for strict liability imposed as a result of its transportation of vermiculite." *Id.*, ¶ 47. It should be noted that the Court did not hold that any of the above-listed activities fell outside of BNSF's transportation of vermiculite. In other words, the Court did not make any determinations about what "other activities" outside of its analysis would not be covered by the common carrier exception. *Id.*, ¶ 49.

This Court's October 16, 2023 Order held that the *Barnes* Court's strict liability analysis included "'the transport of asbestos-containing vermiculite, the spillage of asbestos containing material along BNSF's tracks and in its railyard, and the continued disruption of the built-up spilled asbestos by BNSF's trains and workers.'" **Exhibit C** - Wells Order, Oct. 16, 2023, p. 10 (quoting *BNSF Ry. Co.*, 2020 MT 59, ¶ 5). The Order then holds that collateral estoppel applies because the "spillage of asbestos" contemplated in *Barnes* represents the same alleged facts as Plaintiffs' current allegation of harboring an asbestos "reservoir":

> *Eddy* encompasses the facts here based on the direct nexus between the spillage of asbestos contaminated material by BNSF and the accumulation of such spilled material into "reservoirs" of asbestos contaminated material at the Libby railyard.

*Id.*, p. 10-11.

There can be no doubt that the Montana Supreme Court incorporated the railyard's alleged contamination into its abnormally dangerous and common carrier analyses. *See BNSF Ry. Co.*, ¶ 23 ("…there were large amounts of asbestos present in its railyard and around its tracks."); *see also Id.*, ¶ 25 ("…BNSF's properties in Libby contained extensive asbestos contamination."). These factual findings of asbestos contamination in the railyard were explicitly analyzed and found to "weigh[] in favor of finding BNSF strictly liable." *Id.*, ¶ 25.  The Court then held that BNSF's handling of asbestos **under the facts presented here** constitutes an abnormally dangerous activity **for which BNSF is strictly liable** under Restatement (Second) of Torts, § 519." *Id.*, ¶ 39 (emphasis added). Nevertheless, the Montana Supreme Court held that "BNSF is entitled to the common carrier exception **for strict liability imposed** as a result of its transportation of vermiculite…" *Id.*, ¶ 47. It follows that if the *Barnes* Court did consider any "other activities" that would fall outside of the scope of the common carrier exception, the condition of the Libby railyard would not be one of them. *Id.*, ¶ 49 ("What those 'other activities' may be is not an issue now before this Court…").

It is unsurprising that there is little caselaw discussing whether a railroad's operations in railyards are covered by the common carrier exception seeing that in most cases involving strict liability, the occurrence of the alleged abnormally

dangerous activity is rarely in dispute. However, certain authority exists that is instructive as to what specific operations conducted within a railyard are done in pursuance of a railroad's public duty as a common carrier. *See Nichols v. Pabtex, Inc.*, 151 F. Supp. 2d 772, 778 (E.D. Tex. 2001) (holding that the switching of railcars would constitute rail service); *Kieronski v. Wyandotte T. R., Co.*, 806 F.2d 107, 110-11 (6th Cir. 1986) (holding that "switching and moving cars" destined for another location was part of a railroads operations); *see also Crescent Coal Co. v. L. & N. R. R. Co.*, 143 Ky. 73, 76, 135 S.W. 768, 769 (Ky. App. 1911):

> A common carrier, such as the appellee company was, may undoubtedly have what may be called yard facilities, including switches, spurs and side tracks for its convenience in the handling, storing and distribution of its cars and freight…
>
> …
>
> It is essential in the operation of railroads that they should have at terminals and other places where the business requires it, yards and facilities that they may use in the conduct of their business, in such a way as not to be inconvenienced by the necessity of receiving and unloading goods for shippers.

*See Glenn v. CSX Transp., Inc.*, 2014 U.S. Dist. LEXIS 159224, at *19 (D. Md. 2014) (emphasis added) (holding that "there is no legal authority that would support a finding that the ***operation of a railroad*** is an 'abnormally dangerous activity.'")

Plaintiffs do not dispute that as a common carrier, BNSF was required by law to transport W.R. Grace's vermiculite. W.R. Grace contracted with BNSF to transport significant quantities of its vermiculite to over 200 of its clients around the

country. The magnitude of BNSF's contractual obligations with W.R. Grace and other shippers in the region necessitated BNSF's use of the Libby railyard for the purposes of receiving, switching, classifying, and delivering railcars carrying vermiculite. The foregoing establishes that Plaintiffs' sole claim is that BNSF harbored an asbestos "reservoir" by allowing its railyard to become contaminated with asbestos through the alleged spillage during railyard activities necessary for it to execute its duties as a common carrier. Plaintiffs' have not produced evidence that BNSF engaged in ***any*** "other activity" in its Libby railyard that was outside of its role as a common carrier or could be considered abnormally dangerous. BNSF is therefore entitled to common carrier protections for any alleged contamination that occurred while BNSF was conducting unavoidable railyard activities that are standard for the operation of an efficient railroad.

### a. BNSF did not "store" vermiculite or asbestos in its Libby railyard, and Plaintiffs' have not presented any evidence that it did so.

This Court's October 16, 2023 Order carved out an exception for the alleged activity of "storage of asbestos" that it held would be exempt from common carrier protections. **Exhibit C**, p. 16-17 ("Nothing appears to have directly required BNSF to store asbestos and asbestos contaminated materials at the Libby railyard to fulfill its role as a carrier of vermiculite."). *Id.*, p. 16-17.

To be clear, BNSF did not "store" asbestos or vermiculite on its property, and Plaintiffs have not presented any evidence of this claim throughout their entire case

in chief. Any vermiculite product that traversed BNSF's Libby Railyard was product tendered to BNSF from the customer under a bill of lading governed by Federal transportation law. The railcars were then weighed and at times switched throughout the railyard and then added to trains for transportation to a final destination. BNSF was never in the business of storing vermiculite, and Plaintiffs have not presented any evidence that BNSF removed W.R. Grace's product from the original railcars it was loaded into or kept the loaded railcars in the railyard for any time longer than necessary to switch the cars and build the respective outbound train. Plaintiffs are required to prove through actual evidence that BNSF engaged in the activity of storing vermiculite or asbestos before any strict liability can be imposed.

BNSF believes that to the extent Plaintiffs are claiming that BNSF "stored" vermiculite or asbestos, they are referring to the alleged continued presence of asbestos in the railyards soil up until its remediation in the early 2000s. This is evidenced by the fact that Plaintiffs have not alleged in this matter or produced evidence at trial that BNSF had any sort of facilities, containers, or general area in its railyard in which it "stored" vermiculite instead of transporting it to W.R. Grace's clients. Beyond not being supported by the extensive record in this case, any such allegation would be contrary to a logical understanding of BNSF's duties as a carrier of freight – that being to transport the shipper's product to the location specified in the bill of lading.

10

**b. Plaintiffs' witnesses have not produced any evidence at trial that BNSF "stored asbestos" or participated in any "other activity" not covered by the common carrier exception.**

Plaintiffs' experts Dr. Julie Hart and Dr. Barry Castleman both conceded that industry standards and regulations governing the conduct and operations of common carriers of freight are outside of their areas of expertise. **Exhibit D** - Trial Trans. Vol. IV, Apr. 10, 2024, at 545:15-18; **Exhibit E** – Trial Trans. Vol. V, Apr. 11, 2024, at 824:2-10. Dr. Julie Hart did not provide any testimony or documentary evidence that BNSF "stored" vermiculite or asbestos at the Libby railyard or engaged in any "other activity" at the Libby railyard other than transporting vermiculite. However, she did testify to BNSF allegedly engaging in the exploration of "economic development opportunities" related to vermiculite mines. To the extent that Plaintiffs claim that this constitutes an "other activity," that claim fails because there is no interpretation of Restatement (Second) of Torts § 520 in which exploring economic opportunities could be considered an abnormally dangerous activity. In fact, Dr. Hart testified on re-direct that there was nothing improper about funding a geology study under a cooperative agreement with the Bureau of Mines. **Exhibit D**, at 691:12-24.

Plaintiffs' counsel also elicited testimony from Dr. Hart that John Swings "tour" of the W.R. Grace mine constitutes a "duty beyond a common rail carrier." *Id.*, at 668:5-13. Mr. Swing's alleged "tours" of the mine are not related to Plaintiffs'

original claims that BNSF "harbored" asbestos in its Libby railyard. More importantly, any tour of the mine that John Swing, or any other BNSF employee did cannot fall outside the common carrier exception because it is not an abnormally dangerous activity in the first place. Finally, Dr. Hart had an opportunity to substantiate Plaintiffs' claims of "storage" when she explained BNSF's process of bringing railcars from the River Loading Facility and preparing them for transport to their final destination:

> There's a particular group of railroad workers called the log job, and so as the vermiculite's being loaded -- or the train is pushed with the engine at the back -- or was pushed back into Libby, then it's brought to the railyard. **At the railyard, several decisions are made in terms of how many cars -- they're uncoupled, they're weighed, and then decisions in terms of which train to hook them up to.** They might sit in the railyard for substantial time.

*Id.*, at 714:17-24 (emphasis added); Dr. Hart correctly testifies that BNSF used its Libby railyard to weigh, switch, and classify its railcars in order to build trains for transport to their final destination. However, her claim that these cars "*might* sit in the railyard for a substantial time" is not substantial evidence of an "other activity" because this claim is not supported by any exhibit or other documentary evidence from which a reasonable person might conclude that this activity occurred. It also fails to show an "other activity" because a covered and sealed hopper car containing vermiculite concentrate sitting in BNSF's railyard for the required time to be coupled to the outgoing train is not abnormally dangerous. A railcars presence in the railyard is exactly what operations fall within BNSF's duties as a common carrier, and Dr.

Hart's testimony does not establish that BNSF "stored" or allowed vermiculite or asbestos to be "harbored" in BNSF's railyard for BNSF's "own purposes." Dr. Hart did not contribute any substantial evidence to Plaintiffs' strict liability claim, and her testimony should not be given any weight is assessing whether Plaintiffs' have submitted sufficient evidence upon which the Court could properly find BNSF to be strictly liable.

Similarly, Dr. Julian Marshall testified that BNSF's Libby railyard had "classification tracks" that were used to switch and sort railcars filled with vermiculite concentrate so that they could be coupled with a different train for transport to their final destination. **Exhibit F**: Trial Trans. Vol. VI, Apr. 12, 2024, at 1226:4-18; *see also* at 1262:9-13 (Dr. Marshall acknowledges that "switching is the kind of stuff you do in a railyard."). Dr. Marshall added that the railyard was used for weighing the railcars loaded with vermiculite. *Id*., at 1226:19-1227:3. Dr. Marshall also agreed that although sometimes a railcar loaded with vermiculite might sit in the railyard for a day or two, "ultimately[] it would get put on a train to then exit out of the yard. *Id.,* at 1227:4-11. Throughout his testimony, Dr. Marshall failed to offer any evidence that the railyards alleged contamination resulted from anything other than vermiculite "spilling" off railcars from BNSF's transportation of vermiculite. *Id.*, at 1212:4-21.

Plaintiffs have also failed to provide any substantial evidence that BNSF's railcars leaked vermiculite into the railyard, which was another crucial aspect of Plaintiffs' claim that BNSF's railyard was maintained as a "reservoir of asbestos." *See* **Exhibit D**, at 551:1-5 (Dr. Hart testifies that it was W.R. Grace's employees' responsibility to put seals on the hatches of the railcars prior to the railcars ever arriving in the Libby railyard). As their sole documentary evidence for claiming that BNSF's railcars leaked, Plaintiffs admitted several exhibits of "Presentation of Loss and Damage Claims." **Exhibit B**, at 382:7-391:9. However, Dr. Hart conceded that these alleged losses could have occurred at any point between Libby and final destinations as far away as South Carolina. **Exhibit D**, at 616:4-617:1. The loss forms also showed that as many as five different railroads transported the railcars between Libby and their final destinations, and Dr. Hart conceded that she did not do any investigation to see what railroad was transporting the railcar when the loss occurred. *Id.* She also did not conduct any investigation to see how the shipment was lost. *Id.,* at 617:6-13. The only other alleged evidence Dr. Hart presented on the issue of leaking railcars was hearsay statements from unidentified "railroad workers," which is insufficient to make a submissible claim that BNSF harbored an asbestos "reservoir" in the Libby railyard because hearsay statements an expert relies on are not evidence. **Exhibit B**, at 392:2-22; *See United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997) (holding that inadmissible evidence necessary to

illustrate or explain an expert's opinion should be accompanied by a limiting instruction because it is not substantive evidence).

After the Court heard the testimony of Dr. Hart, Dr. Castleman, and Dr. Marshall, it reiterated that it has "doubts" and "serious questions" about Plaintiffs' claim that the common carrier exception would not apply to "the railroad's work from what [it] has heard so far." **Exhibit F**, at 1329:7-12; 1331:16-19.

## II.  Plaintiffs' strict liability claims for alleged asbestos emissions resulting from BNSF's operations in its Libby railyard are preempted by the ICCTA.

Plaintiffs allege that BNSF should be held strictly liable for emissions caused by vermiculite spilled from rail cars in transit, which they then allege was entrained in the air by passing trains. Plaintiffs' specific allegations are:

The Libby Railyard was at the heart of BNSF activities in Lincoln County.

(Doc. 001, at ¶ 21)

During the vermiculite loading, movement into Libby, switching, and storage operations, asbestos contaminated vermiculite was spilled, dumped, and otherwise released onto BNSF property in Lincoln County and thereafter disturbed and distributed by BNSF's consistent and constant industrial activities and other soil disturbances resulting in the entrainment of asbestos fibers into the air and onto property in Lincoln County.

*Id.* at ¶ 49.

Plaintiffs' decedents resided or remained in proximity to the real property of BNSF and were thereby exposed to asbestos dust from BNSF's property and operations.

*Id.* at ¶ 44.

15

Defendant BNSF failed to control asbestos contaminated vermiculite present during the operation of their business in Lincoln County thereby creating an abnormally dangerous condition.

*Id.* at ¶ 56.

These claims implicate BNSF's operation of its railyard, maintenance of its facilities, and general railroad operations and are, therefore, preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). *See, e.g.*, *CSX Transp., Inc. v. City of Sebree, Ky.*, 924 F.3d 276 (6th Cir. 2019).

By enacting the ICCTA in 1995, Congress granted the federal STB exclusive jurisdiction over:

(1) **transportation by rail carriers**, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, **operation**, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or **facilities**, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b)(emphasis added). Congress determined that the "remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Tipton v. CSX Transp., Inc.*, No. 3:15-CV-311-TAV-CCS, 2016 WL 11501426, at * 6 (E.D. Tenn. July 7, 2016) (citing 49 U.S.C. § 10501(b)).

The ICCTA defines "railroad" expansively to include "track, terminal, terminal facility, and a freight depot, **yard**, **and ground**, used or necessary for transportation." 49 U.S.C. § 10102(6)(emphasis added). "Transportation" is defined by the ICCTA to include "a locomotive, car, vehicle, vessel, . . . or equipment of any

kind related to the movement of passengers or property, or both, by rail," and "services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, **storage, handling, and interchange** of passengers and property." 49 U.S.C. § 10102(9). Railyards and operations within railyards are expressly included in ICCTA's definition of covered facilities and within the definition of "transportation" and are "related to the movement of … property" by rail. 49 U.S.C. § 10501(b).

Heeding Congress's direction, courts have applied the ICCTA expansively to preempt state law tort claims that have the effect of regulating how a railroad should run its railroad, including how a railroad manages and maintains its railyards and facilities. The Ninth Circuit in *City of Auburn v. U.S.*, 154 F.3d 1025, 1030 (9th Cir. 1998), cited to the ICCTA statutes as placing exclusive jurisdiction over the "operation" of railroad facilities with the Surface Transportation Board, and holding those regulations "*preempt* the remedies provided under Federal or State Law." (Emphasis in original). In fact, the Ninth Circuit recognized ***"It is difficult to image a broader statement of Congress's intent to preempt state regulatory authority over railroad operations."*** *Id.* (quoting *CSX Transp. Inc. v. Georgia Public Service Comm'n,* 944 F.Supp 1573 (N.D. Ga. 1996)). Likewise, the United States District Court for Montana held "the most natural reading of [ICCTA] is that federal remedies are the only remedies available as to the regulation of rail transportation." *BNSF v.*

*Anderson*, 959 F.Supp. 1288, 1295 (D. Mont. 1997). *See also, City of Sebree, Ky.*, 924 F.3d at 283 (the ICCTA preempted municipal ordinance that had effect of unreasonably interfering with rail operations that required use of method that reduced train safety and required railroad to obtain permit from city council prior to commencing any maintenance or construction project); *CSX Transp., Inc. v. City of Plymouth*, 92 F.Supp.2d 643 (E.D. Mich. 2000), *judgment aff'd on other grounds*, 283 F.3d 812 (6th Cir. 2002) (state statute limiting the amount of time a train could block a grade crossing was preempted by the ICCTA because it had the effect of requiring the railroad to undergo substantial capital improvements to upgrade its class of track, relocate its yards, or upgrade speed).

ICCTA preemption extends to efforts to regulate airborne emissions from rail facilities. In *Ass'n of Am. R.R. v. South Coast Air Quality Mgmt. Dist.*, 2007 U.S. Dist. LEXIS 65685 (C.D. Cal. 2007), multiple railroads challenged a state agency's attempt to regulate airborne emissions arising from rail operations and impose reporting requirements on railyard operators in southern California. The Court held the proposed rules would improperly regulate railroad operations, which is the exclusive jurisdiction of the STB. *Id.*, at *20. The Court noted that it did "not arrive at its decision lightly, and recognizes that there is a serious problem with air quality in the Basin which needs to be addressed." *Id.*, at *25. Nevertheless, ICCTA

preempted any state regulation of emission arising from railroad operations. *Id.*, at *24.

The courts and Congress's statutory language make plain that ICCTA prohibits state law tort claims from being used to "manage or govern" how a railroad designs, configures, operates, or maintains its railroad and facilities, including track and railyards. *E.g.*, *Maynard v. CSX Transp., Inc.*, 360 F.Supp.2d 836, 841-42 (E.D. Ky. 2004) (finding plaintiffs' negligence and nuisance claims for allowing drainage to escape from railroad sidetracks onto adjacent properties were "expressly preempted by the ICCTA."); *Jones Creek Investors, LLC v. Columbia Cnty., Ga.*, 98 F.Supp.3d 1279, 1294 (S.D. Ga. 2015) ("[a]ny state tort claims against [the railroad company] for damages resulting from this construction to its infrastructure effectively govern [the railroad company's] ability to keep its rail lines in safe, working order"); *A & W Props., Inc. v. Kansas City S. Ry. Co.*, 200 S.W.3d 342, 343-44 (Tex. App. 2006) (plaintiff's claim alleging that railroad's failure to enlarge a culvert led to threat of flooding of plaintiff's property was preempted by the ICCTA).

Courts have specifically found that claims alleging damages arising from emissions from railyards or similar facilities are preempted. In *Tipton v. CSX Transp., Inc.*, 2016 U.S. Dist. LEXIS 195179, *10 (E.D. Tenn. 2016), multiple plaintiffs sued CSX for claims of exposure that resulted from a rail car carrying toxic

chemicals that derailed from CSX tracks and caught on fire. The plaintiffs alleged that the spilled chemicals affected their ground water and smoke from the fire reached their homes. *Id.* The Court acknowledged establish precedent that "the ICCTA 'preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation …" *Id.* at *22. The plaintiffs alleged that CSX failed to properly design, operate, inspect, maintain, and repair its tracks. *Id.* The court granted CSX's motion to dismiss, holding,

> [T]his allegation "may reasonably be said to have the effect of managing or governing rail transportation," as rail transportation is defined in the ICCTA., and that it goes beyond the state's police powers. [citation omitted]. Furthermore, imposing this duty on CSX could unreasonably interfere with its rail operations*, as it pertains to CSX's design, operation, inspection, maintenance, and repair of its tracks and trains, which go to the core of CSX's railroad operations*. Consequently, the Court finds that this duty is preempted as applied in this case.

*Id.* at *27-28 (emphasis added).

Similarly, the court in *Suchon v. Wis. Cent., Ltd.*, 2005 U.S. Dist. LEXIS 4343, at *11 (W.D. Wis. Feb. 23, 2005), granted the defendant railroad's motion for partial summary judgment brought pursuant to the ICCTA. The plaintiff filed a common law nuisance action against the railroad for vibrations and diesel fumes allegedly emanating from the defendant's railyard. *Id.* at *1. The court dismissed the claim, holding:

> Allowing plaintiff to obtain a monetary or injunctive remedy by application of the state's nuisance law to defendant's actions is not significantly different from allowing the state to impose restrictions on defendant through laws and regulations. In either case, the effect would be the same. Defendant would be restricted in its use of its property, in derogation of the ICC Termination Act.

> … Defendant's motion for partial summary judgment will be granted as to plaintiff's claim of nuisance.

*Id.* at *10. *See also Rushing v. KCS*, 194 F.Supp.2d 493 (S.D. Miss. 2001) (ICCTA preempts claim filed by property owner alleging damage due to noise and vibration emanating from the defendant's railyard – "Congress remove[d] the ability of states to frustrate its policy of deregulating and reviving the railroad industry."); *Guckenberg v. Wisc. Cent. Ltd.*, 178 F.Supp. 2d 954, 958 (E.D. Wisc. 2001) (Nuisance claim aimed at noise and fume emissions from railyard are preempted. – "Indeed, 'state regulation' can be as effectively asserted through an award of damages as through some form of preventive relief.").

Plaintiffs' claim in this case seeks to accomplish just what ICCTA forbids. It attempts to regulate BNSF's construction, design, operation, inspection, and maintenance of its Libby railyard through imposition of a monetary award. This claim is preempted by the ICCTA and should be dismissed.

## CONCLUSION

For the aforementioned reasons, BNSF respectfully requests that the Court grant its Motion for a directed verdict on Plaintiffs' strict liability claims.

//

//

Dated this 15th day of April, 2024.

KNIGHT NICASTRO MACKAY, LLC

By: /s/ Anthony M. Nicastro
    Chad M. Knight
    Anthony M. Nicastro
    Cole R. Anderson
    *Attorneys for Defendant*
    *BNSF Railway Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with L.R. 7.1(d)(2), and that the number of words in the brief, excluding caption, certificates of compliance and service, table of contents and authorities, and exhibit index, is less than 6,500 words.

KNIGHT NICASTRO MACKAY, LLC

By: <u>/s/ Anthony M. Nicastro</u>
    Anthony M. Nicastro
    *Attorneys for Defendant*
    *BNSF Railway Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of April, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Roger Sullivan
Jinnifer Jeresek Mariman
Ethan Welder
John F. Lacey
McGARVEY LAW
345 First Avenue East
Kalispell, MT 59901
rsullivan@mcgarveylaw.com
jmariman@mcgarveylaw.com
ewelder@mcgarveylaw.com
jlacey@mcgarveylaw.com

Alexandra Bailey Abston *(PHV)*
Rachel Lanier *(PHV)*
Sam Taylor, II *(PHV)*
Lanier Law Firm, P.C.
10940 W. Sam Houston Pkwy N., Ste. 100
Houston, TX 77064
Alex.abston@lanierlawfirm.com
Rachel.lanier@lanierlawfirm.com
Sam.taylor@lanierlawfirm.com
*Attorneys for Plaintiffs*

KNIGHT NICASTRO MACKAY, LLC

By: /s/ Anthony M. Nicastro
    Anthony M. Nicastro
    *Attorneys for Defendant*