## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased,<br><br>                         Plaintiffs,<br><br>     v.<br><br>BNSF RAILWAY COMPANY,<br><br>                         Defendant. | **CV-21-97-GF-BMM**<br><br>**ORDER** |

## INTRODUCTION

Plaintiffs Jackson Wells, as Personal Representative for the Estate of Thomas E. Wells, deceased, and Judith Hemphill, as Personal Representative for the Estate of Joyce H. Walder, deceased, (collectively "Plaintiffs") filed a motion to enter judgment on May 16, 2024. (Doc. 406.) Defendant Burlington Northern Santa Fe Railway Company ("BNSF") opposes Plaintiffs' motion. (Doc. 414.)

BNSF filed a motion for judgment notwithstanding the verdict as to Plaintiffs' strict liability claims on May 20, 2024. (Doc. 408.) Plaintiffs oppose BNSF's motion. (Doc. 419.) The Court conducted a motion hearing on June 26, 2024. (Doc.

425.) The Court will consider BNSF's motion for judgment notwithstanding the verdict. (Doc. 408.) The Court examines Plaintiffs' motion to enter judgment (Doc. 406), Plaintiffs' application of costs (Doc. 404), BNSF's objection to Plaintiffs' application of costs (Doc. 405), and BNSF's motion to strike response (Doc. 413) in a future order.

## FACTUAL AND LEGAL BACKGROUND

The facts remain well-known to the Court and to the parties and will not be repeated in full here. This action concerns BNSF's handling and transport of vermiculite containing asbestos in Libby, Montana. The Court conducted a jury trial in this matter from April 8, 2024, to April 22, 2024. The jury determined that BNSF's handling of vermiculite containing asbestos outside its duties as a common carrier served as a substantial factor in bringing about the injuries to Plaintiffs Wells and Walder. (Doc. 390); (Doc. 392.) The jury determined, however, that BNSF did not act negligently with respect to Plaintiffs Wells and Walder. The jury declined also to find that BNSF had acted maliciously with respect to Plaintiffs Wells and Walder. The jury awarded Plaintiffs Wells and Walder $4,000,000 each in compensatory damages, for a total of $8,000,000.

## LEGAL STANDARD

Fed R. Civ. P. 50(b) permits a party to file a renewed motion for judgment as a matter of law and include an alternative or joint request for a new trial under Fed.

2

R. Civ. P. 59. "To move for judgement as a matter of law after a verdict, the movant must have moved for judgment as a matter of law pre-verdict." *Andrews v. Dejoy*, No. CV-20-11-GF-BMM, 2022 WL 109939, at \*1 (D. Mont. Jan. 5, 2022), aff'd sub nom. *Andrews v. Brennan*, No. 22-35081, 2023 WL 4637114 (9th Cir. July 20, 2023). The grounds for the renewed motion for a judgment as a matter of law are "limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). A party may not "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Id.* (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

Judgment as a matter of law is "proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370, 1372 (9th Cir. 1977). "The verdict will be upheld if it is supported by substantial evidence, 'even if it is also possible to draw a contrary conclusion.'" *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) (quoting *Pavao*, 307 F.3d at 918)). The standard that a party must meet to overturn a jury's verdict proves very high. *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002). The Court may not substitute its "view of the evidence for that of the jury" and the Court may not "make credibility

determinations." *Id.* (internal quotations omitted). "[T]he court must draw all reasonable evidentiary inferences in favor of the non-moving party." *Id.*; *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).

## DISCUSSION

### I.     BNSF's motion to alter judgment.

BNSF asserts four grounds in its motion to alter the judgement: 1) Plaintiffs' strict liability claim is preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), the Hazardous Materials Transportation Act ("HMTA"), and the Federal Railroad Safety Act ("FRSA"); 2) the Court erred in applying collateral estoppel to determine that BNSF's handling of asbestos in Libby, Montana amounted to an abnormally dangerous activity; 3) the common carrier exception bars Plaintiffs' strict liability claims; and 4) Plaintiffs failed to present sufficient evidence to support their strict liability claims. (Doc. 409 at 13-31.) The Court will discuss separately each of these grounds.

### 1. Federal Preemption

#### A. ICCTA

BNSF asserts that the ICCTA preempts Plaintiffs' strict liability claims. (Doc. 409 at 13.) The Court disagrees. The Court denied previously BNSF's motion for a directed verdict concerning Plaintiffs' strict liability claims, writing in pertinent part:

Plaintiffs have offered evidence sufficient to survive a motion for judgment

as a matter of law that Defendant carried on the abnormally dangerous activity of maintaining a railyard or other BNSF property in such a manner that accumulated asbestos could spread as airborne particulates into the nearby community. *Compare Eddy* at 873 ("BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519"). Plaintiffs have presented evidence that non-party W.R. Grace loaded BNSF cars and provided asbestos-containing vermiculite that BNSF subsequently moved onto, around, and through BNSF property. Plaintiffs have proffered evidence that vermiculite-containing BNSF railcars transited and stopped at BNSF properties in Libby in various states of disorder and disrepair, such that vermiculite particulates left the exteriors and interiors of railcars to alight on BNSF property.

Plaintiffs have presented evidence that once the asbestos-containing material landed on BNSF property, BNSF failed to adequately clean or quarantine the material, instead allowing it to disperse in the air in and around the premises. Nothing under BNSF's duty as a common carrier prevented Defendant from periodically cleaning the railyard, or from improving its facilities to capture vermiculite dust for safe disposal. Defendant carried on an "abnormally dangerous activity," that is, maintaining uncontained asbestos-containing material [with access to] open air on its property, caused Plaintiffs harm—asbestos-exposure-related disease—of the type that made the activity abnormally dangerous.

(Doc. 373 at 4-5.) The Court additionally viewed as persuasive the district court's determination in *In re E. Palestine Train Derailment*, No. 4:23CV0242, 2024 U.S. Dist. LEXIS 43837, at *49-50 (N.D. Ohio Mar. 13, 2024), that strict liability was not prohibited where "[Norfolk Southern] voluntarily undertook activities for their own purpose; namely, to release and burn vinyl chloride in order to get the derailed cars out of the way to start their trains running through East Palestine [Ohio] again to earn revenue." (citations omitted.)

The ICCTA provides the Surface Transportation Board ("STB") exclusive jurisdiction over the: (1) "transportation by rail carriers, and the remedies provided in this part with respect to . . . services, and facilities of such carriers"; and (2) "construction, acquisition, [and] operation . . . of facilities." 49 U.S.C. § 10501(b). The ICCTA expressly preempts state law remedies that relate to the "regulation of rail transportation":

> Except as otherwise provided in this part, the remedies provided under this part with respect to *regulation of rail transportation* are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added). The ICCTA defines "transportation" to encompass physical instrumentalities that are "related to the movement of passengers or property," such as a "yard, property, facility, instrumentality, or equipment" as well as "services related to that movement, including . . . storage, handling, and interchange of passengers or property[.]" 49 U.S.C. § 10102(9).

The Ninth Circuit has determined that the "ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.,* 622 F.3d 1094, 1097 (9th Cir. 2010). "Where a tort claim would interfere with 'rail transportation' or 'operation' of railroad tracks or facilities, the regulation or claim is expressly preempted." *Benson v. Union Pacific R. Co.*, 2008 WL 2946331, at *3 (E.D. Cal. 2008) (quoting *City of Auburn v. United States*, 154 F.3d 1025, 1031 (9th

Cir. 1998)). The ICCTA also preempts state common law duties that impact how a railroad operates their lines. *Staley v. BNSF Ry. Co.*, No. CV 14-136-BLG-SPW, 2015 WL 860802, at \*6 (D. Mont. Feb. 27, 2015) (quoting *Friberg v. Kansas City S. Ry Co.*, 267 F.3d at 439, 444 (5th Cir. 2001.)) "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *City of Auburn*, 154 F.3d at 1030 (citation omitted).

The ICCTA does not, however, "preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce." *BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018) (citation omitted). The ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation. What matters is the degree to which the challenged regulation burdens rail transportation[.]" *Id.* at 760–61 (quoting *Am. Railroads*, 622 F.3d at 1097-98). The Eleventh Circuit in *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001), recognized that "Congress narrowly tailored the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation, . . . while permitting the continued

application of laws having a more remote or incidental effect on rail transportation." (alterations in original).

Though not binding, the Court views the Fifth Circuit's determination in *Guild v. Kansas City Southern Ry. Co.*, 541 Fed. Appx. 362 (5th Cir. 2013), as persuasive. The Fifth Circuit in *Guild* determined that the plaintiffs' negligence claim stemming from Kansas City Southern Railway Company ("KCSRC") alleged damaging of the plaintiffs' spur track by parking rail cars with excessive weight was not expressly or implicitly preempted by the ICCTA. *Id.* at 367-68. The Fifth Circuit wrote in pertinent part: "[r]ather, the effects of state negligence law on rail operations are merely incidental." *Id.* at 367 The Fifth Circuit further noted that plaintiffs' negligence claim, as pleaded, would not "have the effect of *unreasonably* burdening or interfering with KCSRC's operations." *Id.* at 368 (emphasis original) (citation omitted.)

The Court views as similarly persuasive the Tenth Circuit's determination in *Emerson v. Kansas City Southern Ry. Co.*, 503 F.3d 1126 (10th Cir. 2007). *Emerson* considered whether the ICCTA preempted plaintiff's state law tort claims arising from KCSRC's discarding of used rails and railroad ties, in addition to KCSRC failing to maintain the condition of a drainage ditch, thereby resulting in flooding on the plaintiff's property. *Id.* at 1128. The Tenth Circuit determined that the ICCTA did not expressly preempt the plaintiffs' state law claims. *Id.* at 1132. The Tenth

Circuit wrote in pertinent part, "[w]e do not think that the plain language of [the ICCTA] can be read to include the conduct the landowners complaining of here – discarding old railroad ties into a wastewater drainage ditch adjacent to the track and otherwise failing to maintain the ditch. . . . Rather, [these acts] are possibly tortious acts committed by a landowner who happened to be a railroad company." *Id.* at 1129-30.

The Tenth Circuit further concluded that "a factual assessment must be made as to whether requiring [KCSRC] to remedy the injury claimed by the Landowners would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at 1133. The Court recognizes that the Tenth Circuit remanded *Emerson* back to the Eastern District of Oklahoma, and, following a jury trial, judgment was entered for the railroad defendant. *See Revocable Tr. of Davis v. Kansas City S. Ry. Co.*, No. CIV-05-331-KEW, 2009 WL 3150409, at *1 (E.D. Okla. Sept. 30, 2009).

The Court determines that the ICCTA does not bar Plaintiffs' strict liability claims. Plaintiffs' strict liability claims concern the presence and accumulation of asbestos and asbestos-contaminated vermiculite at the Libby Railyard. Plaintiffs' strict liability claims, that alleged that BNSF engaged in an abnormally dangerous activity through its handling of asbestos in Libby, Montana, represent a law of general applicability that does not unreasonably interfere with interstate commerce.

*See BNSF Ry. Co.*, 904 F.3d at 760. Strict liability for carrying out an abnormally dangerous activity remains a state law claim, as noted by the Montana Supreme Court in *BNSF Ry. Co. v. Eddy*, 459 P.3d 857 (Mont. 2020).

The Court recognizes that the definition of "transportation" for purposes of the ICCTA remains broad. *See* 49 U.S.C. § 10102(9). The Court determines, however, that the accumulation and presence of asbestos and asbestos-contaminated vermiculite in the Libby Railyard does not amount to a physical instrumentality related to the movement of passengers or property. *See id.* The Court recognizes that the Libby Railyard itself may indeed be a physical instrumentality related to the movement of passengers or property, and, therefore, the Libby Railyard itself likely falls within the purview of the ICCTA. The Court determines, however, that the accumulation of presence of asbestos-contaminated vermiculite proves separable from the remainder of the Libby Railyard because the asbestos-contaminated vermiculite is not itself property, equipment, or an instrumentality related to the movement of passengers or property. *Cf. id.* The Court further acknowledges the transient nature of asbestos-contaminated vermiculite, which maintains the ability to enter the air and travel a considerable distance when disturbed from the ground. The remainder of the Libby Railyard, including the tracks, ballast, buildings, and equipment, do not maintain the ability to be freely and easily dispersed from the Libby Railyard and into the Libby, Montana community. The asbestos and asbestos-

10

contaminated vermiculite do not serve as a permanent or semi-permanent fixture of the Libby Railyard.

The asbestos and asbestos-contaminated vermiculite prove comparable to the drainage ditch at issue in *Emerson*, 503 F.3d at 1132. The Tenth Circuit determined that "discarding old railroad ties into a wastewater drainage ditch adjacent to the track and otherwise failing to maintain the ditch" does not amount to "transportation" within the meaning of the ICCTA. *Id.* The asbestos and asbestos-contaminated vermiculite here and wastewater and discarded railroad ties in *Emerson*, 503 F.3d at 1132, pose danger to persons and property existing outside the direct physical instrumentalities related to the movement of passengers and property.

The Court similarly determines that the ICCTA's exclusive jurisdiction over the construction, acquisition, and operation of facilities does not expressly preempt Plaintiffs' strict liability claims. The ICCTA provides in pertinent part the following: "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C.A. § 10501(b). Plaintiffs' strict liability claims admittedly involve the Libby Railyard, which likely would be classified as a railroad facility within the meaning of the ICCTA, but such claims do not amount to a remedy concerning the regulation of rail transportation. *See Florida East Coast Ry Co.*, 266 F.3d at 1331 ("Congress narrowly tailored the ICCTA pre-

emption provision to displace only "regulation," i.e., those state laws that may reasonably be said to have the effect of "manag[ing]" or "govern[ing]" rail transportation, Black's Law Dictionary 1286 (6th ed.1990), while permitting the continued application of laws having a more remote or incidental effect on rail transportation.")

Plaintiffs' strict liability claims concern the presence and accumulation of asbestos and asbestos-contaminated vermiculite in the Libby Railyard. Such claims do not seek to govern the operation of the Libby Railyard or the use of the Libby Railyard for rail transportation. The district court in *Suchon v. Wis. Cent., Ltd.*, No. 04-C-0379-C, 2005 U.S. Dist. LEXIS 4343, at *10 (W.D. Wis. Feb. 23, 2005), as a contrary example, determined that the ICCTA expressly preempted the plaintiff's state law nuisance claim where the railroad defendant would be "restricted in the use of its property" because the plaintiff's nuisance claim would not be "significantly different from allowing the state to impose restrictions on defendant through laws and regulations."

The Ninth Circuit determined in *City of Auburn*, 154 F.3d at 1031, that the imposition of environmental permitting regulations on a railroad company by the plaintiff municipality was preempted by the ICCTA because such regulations amount to "'economic regulation' if the [railroad] carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." Plaintiffs'

strict liability claims, by contrast, do not seek to impose zoning requirements or regulate the land or environmental use of the Libby Railyard. Plaintiffs' strict liability claims instead seek to remedy the hazard posed by BNSF's abnormally dangerous activity of handling asbestos and asbestos-contaminated vermiculate in Libby, Montana, including at the Libby Railyard. This remedy's effect on rail transportation, including the operation of facilities, appears negligible. The Court declines to interpret the ICCTA's preemptive effect so broadly as to encompass any potentially tortious conduct by a landowner who happens to be a railroad company, even if such conduct may have occurred on or around a facility within the meaning of the ICCTA. *See Emerson*, 503 F.3d at 1129-30. The Court concludes that the ICCTA does not expressly preempt Plaintiffs' strict liability claims.

The Court further determines that the ICCTA does not implicitly preempt Plaintiffs' strict liability claims. Plaintiffs' strict liability claims, stemming from the presence of vermiculite-contaminated asbestos in the Libby Railyard, do not have the effect of unreasonably burdening or interfering with BNSF's railroading operations. The presence of, or lack thereof, asbestos and asbestos-contaminated vermiculite in the Libby Railyard does not impact, interfere with, or otherwise effect BNSF's ability to conduct railroad operations from the Libby Railyard. The Libby Railyard does not require asbestos-contaminated vermiculite to operate. Asbestos

does not serve as an essential component of the goods being hauled by BNSF to or from the Libby Railyard.

The asbestos and asbestos-contaminated vermiculite instead represent an incidental byproduct related to BNSF's transportation of vermiculite from Libby, Montana. To hold BNSF strictly liable for injuries caused by the presence and buildup of asbestos-contaminated vermiculite amounts to a tortious act committed by a landowner who happens to be a railroad company. *See Emerson*, 503 F.3d at 1129-30. To hold a landowner strictly liable for an abnormally dangerous activity conducted on their property remains a law of general applicability. The Court fails to see how such a claim for relief unreasonably will interfere with interstate commerce. *See BNSF Ry. Co*, 904 F.3d at 760. To permit Plaintiffs' strict liability claims in this instance will not have the effect of managing or governing rail transportation, but instead will provide a claim for relief for tortious acts committed by a landowner who happens to be a railroad. *See id.* at 760-61.

The Court need not consider Plaintiffs' argument that collateral estoppel bars BNSF's ICCTA preemption argument. The Court recognizes, however, that BNSF failed to raise ICCTA preemption at any time during the pre-trial proceedings. (*See* Doc. 80 at 2) ("Plaintiffs' negligence and strict liability tort claims under Montana common law are preempted, as a matter of law, by the Hazardous Materials Transportation Act and the Federal Railroad Safety Act."); (Doc. 188 at 6-12). BNSF

14

first raised ICCTA preemption during the course of trial in its motion for a directed verdict concerning Plaintiffs' strict liability claims on April 15, 2024. (*See* Doc. 359 at 15) ("Plaintiffs' strict liability claims for alleged asbestos emissions resulting from BNSF's operations in its Libby railyard are preempted by the ICCTA.")

## B. HMTA AND FRSA

BNSF asserts that the HMTA and FRSA similarly preempt Plaintiffs' strict liability claims. (Doc. 409 at 13.) BNSF failed to raise preemption stemming from the HMTA and FRSA in its pre-verdict motion for judgment as a matter of law. (*See* Doc. 359 at 15-21.) A party is limited to the grounds raised in a pre-verdict Fed. R. Civ. P. 50(a) motion when renewing its motion for a judgment as a matter of law. *Go Daddy Software*, 581 F.3d at 961. "This requirement exists in part because it gives the non-moving party an opportunity to correct any alleged deficiencies in evidence at a time when the non-moving party is still in a position to correct the problem." *Siqueiros v. Gen. Motors LLC*, 676 F. Supp. 3d 776, 801 (N.D. Cal. 2023) (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)). The Ninth Circuit strictly construes the requirement to initially raise grounds in a pre-verdict Fed. R. Civ. P. 50 motion. *See Freund*, 347 F.3d at 761; *see also Idaho Golf Partners*, *Inc. v. TimberStone Mgmt., LLC.*, No. 1:14-CV-00233-BLW, 2017 WL 3531481, at *3 (D. Idaho Aug. 17, 2017). The Court declines to consider BNSF's HMTA and FRSA arguments that were not raised in BNSF's pre-verdict motion.

15

The Court additionally recognizes that the Court considered HMTA and FRSA preemption in an earlier pre-trial motion filed by BNSF. (*See* Doc. 210 at 33.) The Court wrote in pertinent part: "[r]egarding the HMTA, 'since asbestos immersed in mineral ore–like the vermiculite in this case–is not a hazardous material, then the Hazardous Materials Transportation Act has no regulatory effect.'" (*Id.* at 40.) (citing *Murphy-Fauth v. BNSF Ry. Co.*, No. 4:17-cv-0079-BMMJTJ (D. Mont.) (Doc. 66.); *Underwood v. BNSF Ry. Co*, No. 4:17-cv-0083-BMMJTJ (D. Mont.) (Doc. 61.); *Deason v. BNSF Ry. Co.*, No. 4:17-cv-0076-BMM-JTJ. (D. Mont.) (Doc. 72.)) The Court determined that "the HMTA does not expressly or impliedly preempt state law with respect to [plaintiffs'] state law claims." (*Id.*) The Court determined additionally that "[r]egarding the FRSA, the Court again agrees that 'Montana state laws are not inconsistent with the FRSA regulations and are therefore not preempted by the FRSA.'" (*Id.* at 41.)

### 2. Collateral Estoppel

BNSF contends that it is entitled to a new trial pursuant to Fed. R. Civ. P. 59 because the Court erred in holding that collateral estoppel from *Eddy*, 459 P.3d, applies to BNSF's "handling of asbestos." (Doc. 409 at 19.) Fed. R. Civ. P. 59(a) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . .."

BNSF's contention proves unavailing. The Court determined previously that BNSF's handling of asbestos in Libby, Montana constituted an abnormally dangerous activity as a matter of law. (Doc. 222 at 5-15.) BNSF's argument appears to be an attempt to relitigate the Court's prior determination. BNSF fails to present evidence to warrant such relitigation, and the Court declines to disturb its prior determination. The Court properly deemed BNSF to be collaterally estopped from arguing that its "handling of asbestos" in Libby, Montana does not constitute an abnormally dangerous activity  for the following reasons: 1) the issue presented in this action and in *Eddy*, 459 P.3d at 873, prove to be the same; 2) the Asbestos Court's order, and the Montana Supreme Court's opinion, prove to be final judgments on the merits; 3) BNSF is the same party in both this action and in *Eddy*, 459 P.3d; and 4) BNSF was provided with a full and fair opportunity to adjudicate whether its handling of asbestos in Libby, Montana constituted an abnormally dangerous activity for purposes of strict liability. (Doc. 222 at 5-15.)

### 3.  Common carrier exception

BNSF asserts that the Plaintiffs' strict liability claims are barred by the common carrier exception to common law strict liability as described in the Restatement (Second) of Torts § 521. (Doc. 409 at 24-25.) The Court ruled previously as follows:

> Plaintiffs have presented evidence that once the asbestos-containing material landed on BNSF property, BNSF failed to adequately clean or quarantine the

17

material, instead allowing it to disperse in the air in and around the premises. Nothing under BNSF's duty as a common carrier prevented Defendant from periodically cleaning the railyard, or from improving its facilities to capture vermiculite dust for safe disposal. Defendant carried on an "abnormally dangerous activity," that is, maintaining uncontained asbestos-containing material open air on its property, caused Plaintiffs harm—asbestos-exposure-related disease—of the type that made the activity abnormally dangerous.

(Doc. 372 at 4-5.) The Court declines to disturb its prior conclusion, or the jury's verdict, based on BNSF's argument concerning the common carrier exception. *See First Nat'l Mortg. Co.*, 631 F.3d at 1067 (a jury's verdict "will be upheld if it supported by substantial evidence, even if it is also possible to draw a contrary conclusion.") (citation omitted.)

### 4. Sufficiency of evidence

BNSF lastly asserts that Plaintiffs presented insufficient evidence in support of their strict liability claims. (Doc. 409 at 25-33.) BNSF specifically claims the following: 1) inaction cannot predicate strict liability *vis a vie* an abnormally dangerous activity; 2) BNSF's activities were carried on in pursuance of a public duty, and are, therefore, exempt from strict liability; and 3) the Libby Railyard was an integral part of BNSF's railroading operations and fall within the common carrier exception. (*Id.*) BNSF's arguments fail to disturb the jury's determination that BNSF stands strictly liable for injuries caused to the Plaintiffs.

### A. Inactivity

With regard to inactivity, BNSF asserts that Plaintiffs' strict liability claims are based on inactivity, namely, the alleged failure to clean and remove asbestos from the Libby Railyard. (Doc. 409 at 25.) The Court recognizes that BNSF failed to raise this argument in its written motion for a judgment as a matter of law regarding Plaintiffs' strict liability claims. (*See* Doc. 358.); (Doc. 359.) The grounds for the renewed motion for a judgment as a matter of law are "limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C.*, 581 F.3d at 961. The Court declines to consider BNSF's inactivity argument.

Even if the Court were to reach the merits of BNSF's inactivity argument, BNSF's assertion proves unsupported. It is true, admittedly, that counsel for BNSF briefly referenced the argument that inactivity may not be the basis for a strict liability claim during the course of trial. (*See* Doc. 422-1 at 3) ("Similarly, an inaction in a railyard, if that's really what their theory is here, is not and cannot be an abnormally dangerous activity.") BNSF's inactivity argument, while referenced after the close of Plaintiffs' case in chief, was not made as an independent basis for granting BNSF's pre-verdict judgment as a matter of law motion concerning Plaintiffs' strict liability claims. BNSF referenced such argument when rebutting Plaintiffs' counsel's description of the basis for Plaintiffs' strict liability claim. The Court, in denying BNSF's pre-verdict judgment as a matter of law motion, wrote in pertinent part: "Defendant [BNSF] carried on an "abnormally dangerous activity,"

that is, maintaining uncontained asbestos-containing material open air on its property, caused Plaintiffs harm—asbestos-exposure-related disease—of the type that made the activity abnormally dangerous." (Doc. 373 at 5.)

BNSF's attempt to classify the maintenance of asbestos and asbestos-contaminated vermiculite in the Libby Railyard as inactivity proves unpersuasive. The asbestos and asbestos-contaminated vermiculite arrived at the Libby Railyard via BNSF's railroading operation at the Libby, Montana vermiculite mine. This condition did not naturally exist or occur without impetus or activity from BNSF. BNSF transported asbestos and asbestos-contaminated vermiculite from the Libby, Montana vermiculite mine to and through the Libby Railyard. Asbestos and asbestos-contaminated vermiculite entered the Libby Railyard via BNSF's transport and remained in the Libby Railyard subject to being disturbed and scattered into the air, blowing into the Libby, Montana town and community. The Court disagrees that BNSF's activities in maintaining the Libby Railyard in such a condition amount to inactivity and denies BNSF's motion on inactivity grounds.

### B. Common carrier exception

BNSF contends additionally that the common carrier exception applies to Plaintiffs' strict liability claims because its operation of the Libby Railyard proves "necessary and inseparable from its public duty as a common carrier." (Doc. 409 at 30.) The Court declines to adopt such an expansive interpretation. The Court

previously recognized that "[t]he Montana Supreme Court adopted Restatement (Second) of Torts, § 521, which provides, 'the rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier.' *Eddy*, 459 P.3d at 873." (Doc. 222 at 15.) The Court further noted, however, that the Montana Supreme Court in *Eddy*, 459 P.3d at 875, determined that "§ 521 does not apply to 'other activities' in which BNSF engages not pursuant to its statutory duties." (*Id.* at 15-16.)

The Court's previous order in this action discussed the common carrier exception in substantial detail: "[t]he alleged presence of "reservoirs" of asbestos and asbestos contaminated materials at the Libby railyard appears to stand a step removed from BNSF's role as a carrier of vermiculite." (*Id.* at 16-17.) The Court further wrote:

> BNSF contends that the common carrier exception "reach[es] into leasing, construction, oversight, management, and operations of facilities at the industry location that intersects with the railroad transportation line where the goods are collected for transportation." (Doc. 70 at 16.) BNSF asserts that the Libby railyard was necessary and inseparable from its public duty as a common carrier. (*Id.* at 17); (Doc. 84 at 20.) BNSF's proposed approach would render §§ 519-520 redundant. No room would remain to impose strict liability for an abnormally dangerous activity if a common carrier were involved in any way if § 521 were read to encompass all aspects of a carrier's operations, including leasing, construction, management, and facility operations.

(*Id.* at 18.)

21

Plaintiffs presented evidence at trial that the Libby Railyard contained a dangerous concentration of asbestos and asbestos-contaminated vermiculite that maintained the ability to escape from the Libby Railyard and travel into the Libby, Montana community. Plaintiffs further presented evidence that the Plaintiffs' deaths were caused by mesothelioma, and that the Plaintiffs' lungs contained Libby amphibole asbestos fibers, an asbestos fiber unique to Libby, Montana. The jury, after hearing evidence of the Plaintiffs' deaths, the presence of asbestos and asbestos-contaminated vermiculite, and the condition of the Libby Railyard, determined that BNSF stands strictly liable for Plaintiffs' injuries. The jury's conclusion proves reasonable, and the Court declines to disturb the jury's conclusions. *See Pavao*, 307 F.3d at 918; *see also Kay*, 548 F.2d at 1372.

BNSF's common carrier argument, similar to its argument presented in pre-trial proceedings, likely would result in the common carrier exception rendering redundant strict liability stemming from an abnormally dangerous activity when the defendant serves as a common carrier. (*See* Doc. 222 at 18.) The Court remains mindful that the Montana Supreme Court, in adopting the common carrier exception, likely intended the common carrier exception to be construed narrowly. *See Eddy*, 459 P.3d at 875 ("[t]hus, BNSF's activities other than transportation of vermiculite are not protected by the common carrier exception.") The Court declines to disturb the jury's verdict based on this rationale.

## II.    BNSF's motion for a new trial.

BSNF argues finally that it is entitled to a new trial because the Court erred in determining that collateral estoppel prevented BNSF from arguing that its handling of asbestos in Libby, Montana did not amount to an abnormally dangerous activity. (Doc. 409 at 19-21.) Fed. R. Civ. P. 59(a)(1)(A) permits a court to "grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." The Court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc., 481 F.3d 724, 729* (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

The Ninth Circuit has determined that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Id.* (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). In considering a motion for a new trial, the Court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district

court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

The Court determines that BNSF was properly collaterally estopped from arguing that its handling of asbestos in Libby, Montana did not amount to an abnormally dangerous activity, based on the analysis presented above. The Court determination forecloses BNSF's argument for a new trial based on alleged misapplication of collateral estoppel. The Court finds no evidence or argument supports the granting of a new trial, and denies BNSF's motion.

## ORDER

Accordingly, **IT IS ORDERED:**

1. BNSF's motion for judgment notwithstanding the verdict as to Plaintiffs' strict liability claims (Doc. 408) is **DENIED**.

   DATED this 11th day of July 2024.

_____
Brian Morris, Chief District Judge
United States District Court